1 Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrellcantrall.com
2 Janet J. Hur, State Bar No. 330358
E-Mail: jhur@hurrellcantrall.com
3 Jerad J. Miller, State Bar No. 334001
E-Mail: jjmiller@hurrellcantrall.com
4 HURRELL CANTRALL LLP
800 West 6th Street, Suite 700
5 Los Angeles, California 90017
Telephone: (213) 426-2000
6 Facsimile: (213) 426-2020

7 Attorneys for Defendants, COUNTY OF LOS ANGELES, MARISOL BARAJAS and HECTOR VAZQUEZ

8

9

10 **UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12

13 JENNIE QUAN, individually and as successor in interest to BENJAMIN CHIN, deceased,

14            Plaintiff,

15     v.

16 COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR

17 VAZQUEZ; and DOES 3-10, inclusive,

18        Defendants.

Case No. 2:24-cv-04805-MCS(KSx)

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR PARTIAL SUMMARY JUDGMENT**

[Filed Concurrently With: 1) Defendants' Separate Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment, or Partial Summary Judgment; 2) Declarations of Marisol Barajas, Hector Vazquez, Kyle Toves, Ed Flosi, and Jerad J. Miller; 3) [Proposed] Order; 4) [Proposed] Judgment

[Assigned to Hon. Mark C. Scarsi, Courtroom "7C"]

23     TO THE HONORABLE COURT, PARTIES AND THEIR ATTORNEYS OF

24 RECORD:

25     PLEASE TAKE NOTICE that on November 3, 2025 at 9:00 a.m., or as soon

26 thereafter as the matter may be heard, in "7C" of the above-entitled Court, Defendants

27 COUNTY OF LOS ANGELES, MARISOL BARAJAS AND HECTOR VAZQUEZ

28 (collectively, "Defendants") will and hereby do move this Court for summary

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

1  judgment on the Complaint for Damages filed by Plaintiff JENNIE QUAN in favor

2  of the Defendants and against Plaintiff.

3      This Motion is brought pursuant to Rule 56 of the Federal Rules of Civil

4  Procedure on the grounds that MARISOL BARAJAS and HECTOR VAZQUEZ are

5  entitled to qualified immunity, and the Defendants are therefore entitled to judgment

6  as a matter of law on all causes of action.

7      This Motion will be based upon this Notice, the attached Memorandum of

8  Points and Authorities, the Separate Statement of Uncontroverted Material Facts, the

9  Compendium of Documentary Evidence, and the Declarations of Jerad J. Miller,

10  Deputy Kyle Toves, MARISOL BARAJAS and HECTOR VAZQUEZ, filed and

11  served concurrently herewith, the Court's records and file herein, and upon all further

12  oral and documentary evidence as may be presented at the time of the hearing on this

13  Motion.

14  DATED:  September 29, 2025        HURRELL CANTRALL LLP

17                        By:    /s/ Jerad J. Miller
                                 _____
18                               THOMAS C. HURRELL
                                 JANET J. HUR
19                               JERAD J. MILLER
                                 Attorneys for Defendants, COUNTY OF
20                               LOS ANGELES, MARISOL BARAJAS
                                 and HECTOR VAZQUEZ

*HURRELL CANTRALL LLP*
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

# **TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF ARGUMENT ................................................................. 1

II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS................... 3

    A.    Use of Force By Deputy Barajas ............................................... 3

    B.    Use of Force by Detective Vazquez............................................ 4

III.    SUMMARY JUDGMENT STANDARD ................................................. 8

IV.    THE DEFENDANT DEPUTIES ARE ENTITLED TO QUALIFIED IMMUNITY UNDER FEDERAL LAW ............................................... 8

    A.    No Clearly Established Rights were Violated by the Defendant Deputies' Use of Force ....................................................... 10

    B.    The Defendant Deputies Preserved the Decedent's Rights by Promptly Rendering Medical Care ................................... 14

V.    THE DEFENDANT COUNTY OF LOS ANGELES IS NOT LIABLE UNDER MONELL................................................................... 16

    A.    Plaintiff Cannot Demonstrate the Threshold Underlying Violation of the 4th Amendment to Support a Monell Theory.......................... 16

    B.    Even if Plaintiff can Demonstrate a Viable 4th Amendment Claim, Plaintiff has no Evidence to Support any Monell Theory ................... 17

VI.    PLAINTIFF'S STATE LAW CLAIMS ARE BARRED BY QUALIFIED IMMUNITY ..................................................................... 18

    A.    Negligence & Battery Claims ............................................... 19

    B.    Bane Act (Cal. Civil Code § 52.1) ......................................... 20

VII.    CONCLUSION ............................................................................. 22

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

i

## TABLE OF AUTHORITIES

**Page**

## CASES

*Board of County Comm'rs v. Brown,* 520 U.S. 397, 403 (1997)................................17

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993) ..............................9

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970)......................................18

*Allstate Ins. Co. v. Madan*, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995) ...................8

*Blankenhorn v. City of Orange,* 485 F.3d 463,471 (9th Cir. 2007) ..........................9

*Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526-28 (2009)...................................19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)..................................................8

*Chaudhrey v. City of Los Angeles*, 751 F.3d 1096, 1105-06 (9th Cir. 2014)...........20

*City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983.) ......................................................................14

*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1272 (1998) ...............19, 20

*Fisher v. City of San Jose*, 558 F.3d 1069, 1081 (9th Cir. 2009)..............................11

*Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995).................................17

*George v. Morris*, 736 F.3d 829, 837 (9th Cir. 2013) ..............................................10

*Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986) ................................10

*Gomez v. City of Fremont*, 730 F.Supp.2d 1056, 1068 (N.D. Cal. 2010)................20

*Graham v. Connor*, 490 U.S. 386, 396-397, 109 S.Ct. 1865 (1989) .................10, 11

*Gravelet-Blondin v. Shelton* 728 F.3d 1086, 1090 (9th Cir. 2013) ..........................10

*Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 628-29 (2013) ....................................19

*Hinton v. City of Elwood* (10th Cir. 1993) 997 F.2d .................................................16

*Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1168 (N.D. Cal. 2009)...............20

*Lal v. Cal.*, 746 F.3d 1112, 1116 (9th Cir. 2014) ......................................................9

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166 (1993) .......................................................................................18

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

*Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir.1986.)......................14

*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334 ..............................19

*Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) ...........................................11

*Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012)..........................10

*Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012).......................................9

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)..........................................................9

*Monell v. NewYork City Dept. of Social Services,* 436 U.S. 658, 690-691 (1978) ................................................................................................................17, 18

*Mueller v. Auker*, 700 F.3d 1180, 1194 (9th Cir. 2012)............................................18

*Pallottino v. City of Rio Rancho* (10th Cir. 1994) 31 F.3d 1023, fn. ........................16

*Pearson v. Callahan*, 555 U.S. 223, 231, (2009) .......................................................9

*Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir.1992) ..................................................9

*Person v. Callahan*, 555 U.S. 223 (2009) ................................................................11

*Plumeau v. School Dist. #40 County of Yamhill,* 130 F.3d 432, 438 (9th Cir. 1997).................................................................................................................17

*Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018).......................21

*Reichle v. Howards*, 566 U.S. 658 (2012) ..................................................................9

*Reynolds v. County of San Diego* (S.D.Cal.1994) 858 F.Supp. 1064, 1073 .............11

*Rivera v. Rhode Island* (1st Cir. 2005) 402 F.3d..................................................16

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) ...............................................................9

*Saucier v. Katz*, 533 U.S. 194, 205 (2001) ...........................................................9, 11

*Schulz v. Long* (8th Cir. 1995) 44 F.3d...................................................................16

*State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)..............................................................................8

*Tennessee v. Garner*, 471 U.S. 1 (1985) .................................................................10

*United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993) ..........................................21

## **OTHER AUTHORITIES**

42 U.S.C. § 1983..........................................................................................1, 2, 8, 10

*Cal. Civ. C*ode § 52.1(a)-(b) ................................................................20

Cal. Civil Code § 52.1 .................................................................1, 2

*Cal. Gov. Code* §835 ......................................................................2

*Cal. Gov't Code* § 820.................................................................19

Cal.Rptr.3d 684, 305 P.3d 252 ...................................................19

California Penal Code § 148(a)(1)..................................................7

*Fed. R. Civ. P.* 56(a) ....................................................................8

Federal Rules of Civil Procedure Rule 56 .....................................8

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    SUMMARY OF ARGUMENT

This matter arises from Los Angeles County Sheriff's Department Deputy MARISOL BARAJAS' ("Deputy Barajas") and Detective HECTOR VAZQUEZ'S ("Deputy Vazquez") (collectively, "Defendant Deputies") shooting of Benajamin Chin ("Decedent") in self-defense on June 19, 2023. Plaintiff JENNIE QUAN, the mother of the Decedent and his successor-in-interest, brings this lawsuit against the COUNTY OF LOS ANGELES ("County"), Deputy Barajas and Detective Vazquez (collectively, "Defendants.") The lawsuit alleges the following claims: 1) Unreasonable Search and Seizure – Excessive Force (42 U.S.C. § 1983) (Deputy Barajas, Detective Vazquez, and DOE DEPUTIES); 2) Unreasonable Search and Seizure – Denial of Medical Care (42 U.S.C. § 1983) (Deputy Barajas, Detective Vazquez, and DOE DEPUTIES); 3) Municipal Liability – Ratification (42 U.S.C. § 1983) (County and DOES 6 – 10); 4) Municipal Liability – Failure to Train (42 U.S.C. § 1983) County and DOES 6 – 10); 5) Municipal Liability – Unconstitutional Custom or Policy (42 U.S.C. § 1983) (County and DOES 6 – 10); 6) Battery (Wrongful Death) (County, Deputy Barajas, Detective Vazquez, and DOE DEPUTIES); 7) Negligence (Wrongful Death) (all Defendants); 8) Violation of Cal. Civil Code § 52.1 (Bane Act) (all Defendants).

On this date, Los Angeles County Sheriff's Department deputies, including Defendants Deputy Marisol Barajas and Detective Vazquez, responded to a call involving a suspect (the Decedent) wearing bullet-proof vest and carrying an AR-15 around Diamond Bar Boulevard and Crooked Creek Drive. Prior to deputies arriving at the scene, Deputy Barajas and Detective Vazquez received dispatch reports that Plaintiff fired his assault rifle in the air multiple times, and that there was a stabbing victim. Deputies arrived on the scene and positioned themselves and their vehicles in front of the Decedent on Diamond Bar Boulevard, and behind the Decedent on Crooked Creek Drive as he traveled northbound on Diamond Bar Boulevard. After

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

1

1  ignoring numerous commands to drop his rifle and dangerously proceeding forward

2  toward deputy and civilian vehicles with at least one hand on his rifle, Deputy Barajas

3  and Detective Vazquez fired several shots at the Decedent.  The Decedent collapsed

4  after being struck by multiple rounds. Medical aid was immediately rendered to the

5  Decedent by the deputies on-site. Paramedics arrived less than five minutes after the

6  final shot to render aid to the Decedent.  The Decedent was transported to Pomona

7  Valley Hospital, where he was pronounced dead later that night.

8      Plaintiff alleges that Deputy Barajas' and Detective Vazquez's use of force

9  during the incident was excessive and violative of the Decedent's constitutional

10  rights. Plaintiff, as an individual and successor-in-interest, now brings federal claims

11  for Unreasonable Search and Seizure – Excessive Force and Unreasonable Search and

12  Seizure – Denial of Medical Care (42 U.S.C. § 1983), and state law claims for Battery

13  (Wrongful Death),  Negligence (Wrongful Death) and Violation of Cal. Civil Code §

14  52.1 (Bane Act) against Deputy Barajas and Detective Vazquez. Moreover, Plaintiff

15  brings claims for Municipal Liability – Ratification (42 U.S.C. § 1983), Municipal

16  Liability – Failure to Train (42 U.S.C. § 1983), Municipal Liability – Unconstitutional

17  Custom or Policy (42 U.S.C. § 1983), Battery, Negligence and Violation of Cal. Civil

18  Code § 52.1 (Bane Act) against the County.

19      The Defendant Deputies preserved the Decedent's constitutional rights by

20  using reasonable force throughout the incident and by providing immediate medical

21  care once the Decedent no longer posed a threat to deputies and nearby civilians.

22  Qualified immunity thus shields the Defendant Deputies from liability and negates

23  Plaintiff's state law causes of action because reasonable force was used.  Additionally,

24  Plaintiff has produced no evidence to support her theories of Municipal Liability

25  against the County. As a result, all Defendants are entitled to summary judgment as

26  to all causes of action brought against them.

27

28

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### A.    Use of Force By Deputy Barajas

Deputy Barajas was a deputy for the Los Angeles County Sheriff's Department on the day of the incident.  (Separate Statement of Uncontroverted Material Fact ("SSUMF") No. 1.)  On June 19, 2023, she responded with lights and sirens (Code-3) to a call regarding a man armed with an AR-15 style rifle walking around the Diamond Bar Boulevard area. (SSUMF No. 4.)  She traveled southbound on Diamond Bar Boulevard, and the Decedent appeared on the same street walking northbound. (SSUMF No. 5.)  The Decedent was estimated to be approximately 15 - 20 feet from Deputy Barajas' vehicle when she turned on Diamond Bar Boulevard.  (SSUMF No. 6.)  Next to Deputy Barajas was a civilian in a Tesla, who was in the direct path of the Decedent heading northbound. (SSUMF No. 29.) Behind Deputy Barajas were additional deputies, preventing her from moving her vehicle to create more distance between herself and the Decedent.  (SSUMF No. 8.)

The Decedent continued to move northbound towards deputies and civilians with his AR-15 slung around his shoulder to his right-side.  (SSUMF No. 7.)  Believing that the Decedent was an imminent dangerous threat to civilians, deputies and herself, due to the radio calls received and her observations of the Decedent, Deputy Barajas exited her vehicle and drew her firearm. (SSUMF No. 9.)  She used the driver-side door as cover and stated over her radio that she was detaining the suspect. (SSUMF No. 10.)  Deputy Barajas then ordered the Decedent to drop his weapon approximately seven (7) times. (SSUMF No. 11.)  The Decedent ignored Deputy Barajas' commands and continued moving northbound, progressing to within approximately 7 – 10 feet of Deputy Barajas and the civilian in the Tesla.  (SSUMF No. 12.)

Deputy Barajas then fired her first shot from her service handgun at the Decedent, which appeared to have no effect on the Decedent.  (SSUMF No. 14.) Deputy Barajas determined that less-lethal ammunition was not an option because the

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1  Decedent posed an immediate lethal threat due to his proximity to the civilian, and

2  his bullet-proof vest would have rendered less-lethal ammunition ineffective.

3  (SSUMF No. 13.)

4       After her first shot, Deputy Barajas reassessed the situation and determined the

5  Decedent was still an imminent lethal threat because he continued to advance with his

6  rifle. (SSUMF No. 15.) Moreover, the Decedent's bullet-proof vest prevented Deputy

7  Barajas from determining whether her first shot struck and injured the Decedent.

8  (SSUMF No. 16.) Deputy Barajas then commanded the Decedent to drop his rifle an

9  eighth (8) time as he continued his approach. (SSUMF No. 17.) She then ordered the

10  Decedent to drop his weapon a ninth (9) time and begins ordering him to drop it a

11  tenth (10) time, but her order is interrupted by Detective Vazquez's first shot.

12  (SSUMF No. 18.)

13       The Decedent remained standing and capable of firing his rifle slung around

14  his shoulder, indicating to Deputy Barajas that he still remained a dangerous lethal

15  threat to civilians and deputies. (SSUMF No. 19.) While the Decedent continued

16  approaching, Deputy Barajas fired two additional shots at the Decedent. (SSUMF

17  No. 20.) Deputy Barajas recalled firing three-to-four (3-4) shots total at the Decedent,

18  but body-worn camera of the incident details that she fired three shots. (SSUMF No.

19  21.) The Decedent still remained standing with his rifle. (SSUMF No. 22.) Detective

20  Vazquez then fires the final shot, after which the Decedent is finally immobilized and

21  drops to the ground with his rifle. (SSUMF No. 23.)

22       **B.    Use of Force by Detective Vazquez**

23       Detective Vazquez was on-duty in Diamond Bar, CA, when he received a

24  dispatch call concerning an Asian male with an assault rifle firing rounds in the air,

25  possibly with a bullet-proof vest, near the intersection of Crooked Creek Drive and

26  Rising Star Drive. (SSUMF Nos. 2-3.) Dispatch requested that deputies in the area

27  respond Code-3. (SSUMF No. 4.) The suspect was later determined to be the

28  Decedent. (SSUMF No. 4.) As Detective Vazquez proceeded to the incident location,

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

1  dispatch continued to broadcast that the Walnut Sheriff's Station had received

2  multiple calls regarding the same suspect, and that he had fired shots from his rifle.

3  (SSUMF No. 29.)

4      Due to the reports that the suspect was carrying an assault rifle, Detective

5  Vazquez grabbed his shotgun and loaded it with slug ammunition. (SSUMF No. 31.)

6  While looking for the suspect, Detective Vazquez observed an elderly Asian female

7  with blood on her hands. (SSUMF No. 32.) She approached the deputies and asked

8  us them not to harm the suspect. (SSUMF No. 33.) This was later determined to be

9  Plaintiff Jennie Quan. (SSUMF No. 32.) Although Detective Vazquez did not know

10  that the elderly Asian female was the Decedent's mother at the time of the initial

11  interaction, he believed she was acquainted with the Decedent because she asked the

12  deputies not to harm him. (SSUMF No. 34.) The Decedent's willingness to attack

13  and bloody someone he knew heightened Detective Vazquez's fears that the Decedent

14  was a threat and would be willing to use deadly force against him, other deputies or

15  civilians. (SSUMF No. 35.)

16      Deputy Carlos De La Torre then informed Detective Vazquez that the Decedent

17  was approaching Diamond Bar Boulevard. (SSUMF No. 36.) Detective Vazquez

18  observed the Decedent approximately 150-200 feet ahead of him wearing a bullet-

19  proof vest and what appeared to be an AR-15 rifle with an optical lens for improved

20  accuracy. (SSUMF No. 37.) Detective Vazquez reasonably believed that the

21  Decedent would be capable of accurately striking him, other deputies or civilians from

22  approximately 150 – 200 feet away with an AR-15 equipped with an optical lens.

23  (SSUMF No. 38.) Moreover, Detective Vazquez understood Diamond Bar Boulevard

24  to constitute a heavily trafficked roadway where significant civilian presence is likely.

25  (SSUMF No. 44.) Positioned behind the Decedent, Detective Vazquez began

26  approaching the Decedent with his shotgun. (SSUMF No. 39.) He yelled repeated

27  commands for the Decedent to drop his weapon, which the Decedent ignored while

28  continuing his pursuit on Diamond Boulevard with his AR-15 in the low-ready

5

1  position.  (SSUMF Nos. 40-41.)

2  To prevent against the threat that the Decedent could turn around and shoot at

3  the deputies positioned where Detective Vazquez was located, Deputy Vazquez asked

4  Detective Christopher Bronowicki to use his vehicle as cover as the deputies

5  approached the Decedent.  (SSUMF No. 42.)  Detective Vazquez urgently pursued

6  the Decedent towards Diamond Bar Boulevard with fears that the Decedent could

7  open-fire on deputies and civilians at any point. (SSUMF No. 43.)  The Decedent's

8  bullet-proof vest, AR-15 and stabbing of the Plaintiff signaled to Detective Vazquez

9  that the Decedent was ready for a violent conflict. (SSUMF No. 44.)  Detective

10 Vazquez began running on foot from Crooked Creek Drive to northbound Diamond

11 Bar Boulevard behind the Decedent. (SSUMF No. 45.)  His continued commands for

12 the Decedent to drop his rifle were ignored.  (SSUMF No. 45.)

13 As Detective Vazquez turned the corner of Crooked Creek Drive and

14 approached Diamond Bar Boulevard, he observed civilian and deputy vehicles

15 directly in front of the Decedent's path. (SSUMF No. 46.)  There was the risk of

16 crossfire from his position due to the civilian and deputy vehicles directly in front of

17 the Decedent, so he repositioned himself towards the Decedent's left-flank without

18 any cover.  (SSUMF No. 47.)  As he was flanking the Decedent, he heard one shot

19 from an unknown source. (SSUMF No. 48.)  He observed that the Decedent had been

20 impacted because he momentarily stopped, but the Decedent then continued forward.

21 (SSUMF No. 49.)  Detective Vazquez then observed the Decedent's elbow raise as if

22 to reach for his rifle, position the barrel forward, and begin firing.  (SSUMF No. 50.)

23 The Decedent was approximately 10-15 feet from the civilian and deputy vehicles in

24 front of him at this point.  (SSUMF No. 51.)

25 Fearing that the Decedent was going to shoot at deputies and civilians,

26 Detective Vazquez fired one round from his shotgun at the Decedent.  (SSUMF No.

27 52.)  The round struck the Decedent's bullet-proof vest and appeared to have no effect

28 on the Decedent.  (SSUMF No. 53.)  Without cover and believing that the Decedent

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

6

1 would turn towards Detective Vazquez to shoot him, Detective Vazquez fired a
2 second shotgun round at the Decedent.  (SSUMF No. 54.)  The Decedent fell to the
3 ground immediately after Detective Vazquez fired his second shot, with his AR-15
4 still within his wingspan. (SSUMF Nos. 55-56.)  After preparing a plan to safely and
5 securely approach the Decedent, the deputies cautiously approached the Decedent,
6 handcuffed him and began rendering aid while the fire department staged. (SSUMF
7 No. 57-58.)

8      Based on the facts above, Deputy Barajas and Detective Vazquez are entitled
9 to summary judgment and protected from liability under qualified immunity because
10 the Decedent's clearly established rights were not violated by the Defendant Deputies.
11 (SSUMF Nos. 24; 59.)

12      According to police practices expert Ed Flosi, LASD deputies had a legitimate
13 law enforcement purpose and reasonable suspicion to contact and detain the
14 Decedent.  (SSUMF No. 68.)  The deputies' actions were consistent with current law
15 enforcement training and practices the appropriate level of force was used. (SSUMF
16 No. 69.) Further, Ed Flosi opines that LASD deputies had a legitimate law
17 enforcement purpose and probable cause to arrest decedent.  (SSUMF No. 70.) A
18 reasonable officer could have an honest and strong belief that Decedent's actions were
19 in violation of California Penal Code § 148(a)(1). (SSUMF No. 71.) The deadly force
20 response by Defendants Barajas and Vasquez was appropriate and reasonable to
21 prevent a perceived imminent and credible threat of serious bodily injury or death.
22 (SSUMF No. 72.) The actions of decedent created a life-threatening situation and
23 forced the deputies to react quickly and decisively. (SSUMF No. 73.) Mr. Flosi
24 concludes that taking into consideration the facts and circumstances observed and
25 perceived by Deputy Vasquez and Deputy Barajas prior to and at the time of the
26 deadly force responses, that deadly force responses by the deputies were appropriate
27 and reasonable to prevent a perceived credible threat of injury created by the
28 Decedent's actions and behaviors. (SSUMF No. 74.) Further, the deadly force

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

responses by Deputy Vasquez and Deputy Barajas were appropriate and consistent with current law enforcement training standards in consideration of the "totality of circumstances" presented to them at the moments non-deadly force was used. (SSUMF No. 75.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment motions are governed by Federal Rules of Civil Procedure Rule 56.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). Rule 56 also allows a court to grant partial summary judgment. *See Fed. R. Civ. P.* 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); *see also Allstate Ins. Co. v. Madan*, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. *See Fed. R. Civ. P.* 56(a); *State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  Once the moving party has demonstrated that summary judgment is proper, the burden then shifts to the nonmovant to show that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To make such a showing, the nonmovant must go beyond the pleadings to designate specific facts showing there is a genuine triable issue of fact. *Id*. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence [presented] on which the jury could reasonably find for the [non-moving party]." *Id*., at 252.

## IV.    THE DEFENDANT DEPUTIES ARE ENTITLED TO QUALIFIED IMMUNITY UNDER FEDERAL LAW

Plaintiff alleges that the Defendant Deputies violated the Decedent's constitutional rights through 1) Unreasonable Search and Seizure – Excessive Force (42 U.S.C. § 1983); and 2) Unreasonable Search and Seizure – Denial of Medical

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

Care (42 U.S.C. § 1983).  The Defendant Deputies are shielded from liability under qualified immunity because no clearly established constitutional right was violated by the Defendant Deputies.

Officials sued in their individual capacities may assert that they are entitled to qualified immunity. *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir.1992) Qualified immunity shields an officer from civil liability where the officer acts reasonably but makes a mistake of law or fact. *Lal v. Cal.*, 746 F.3d 1112, 1116 (9th Cir. 2014). A law enforcement officer is entitled to qualified immunity unless *every* reasonable officer in his position would have acted differently. *Reichle v. Howards*, 566 U.S. 658 (2012); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993). In *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012), the Supreme Court reiterated that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." (Internal quotation marks and citations omitted). "[E]ven if the violated right was clearly established, the [Supreme] Court [has] recognized that it may be difficult for a police officer fully to appreciate how the legal constraints apply to the specific situation he or she faces. Under such a circumstance, '[i]f the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense.' " *Blankenhorn v. City of Orange,* 485 F.3d 463,471 (9th Cir. 2007) (quoting *Saucier,* 533 U.S. at 205) (alteration in original). Further, because "qualified immunity is 'an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial.' " *Pearson v. Callahan*, 555 U.S. 223, 231, (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

For qualified immunity to apply, the Court must determine (1) whether the facts show a violation of the plaintiff's constitutional rights; and (2) whether that right was "clearly established" by law at the time of the incident.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (*overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 236

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

9

1    (2009).  Courts are "permitted to exercise their sound discretion in deciding which of

2    the two prongs of the qualified immunity analysis should be addressed first in light of

3    the circumstances in the particular case at hand." *Id*. at 236.

4          **A.**    **No Clearly Established Rights were Violated by the Defendant**

5                **Deputies' Use of Force**

6          The Defendant Deputies' use of force in response to the Decedent's violent

7    actions during the incident was objectively reasonable.  (SSUMF Nos. 24; 59.)  To

8    sustain a claim under 42 U.S.C. § 1983 against a defendant, the plaintiff must prove

9    that: (1) defendant was acting under color of state law, and (2) deprived plaintiff of

10    rights secured by the Constitution or federal statutes.  *Gibson v. United States*, 781

11    F.2d 1334, 1338 (9th Cir. 1986).  The Fourth Amendment protects "against excessive

12    force in the course of an arrest."  *Gravelet-Blondin v. Shelton* 728 F.3d 1086, 1090

13    (9th Cir. 2013), cert. denied, 2014 WL 684092 (2014).  Evaluation of "excessive

14    force" requires examining "the objective reasonableness of a particular use of force

15    to determine whether it was indeed excessive."  *Id*.  All claims of excessive force are

16    analyzed under the objective reasonableness standard of the Fourth Amendment as

17    enunciated in *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471

18    U.S. 1 (1985).  Factors *Graham* sets for evaluating reasonableness include: "(1) the

19    severity of the crime at issue, (2) whether the suspect posed an immediate threat to

20    the safety of the officers or others, and (3) whether the suspect actively resisted arrest

21    or attempted to escape."  *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir.

22    2012).  *Garner* considered similar factors, including the immediacy of the threat,

23    necessity of force to safeguard officers or public, and whether officers issued a

24    warning, assuming it was practicable.  *George v. Morris*, 736 F.3d 829, 837 (9th Cir.

25    2013).  "[A]n officer may reasonably use deadly force when he or she confronts an

26    armed suspect in close proximity whose actions indicate an intent to attack. In these

27    circumstances, the Courts cannot ask an officer to hold fire in order to ascertain

28    whether the suspect will, in fact, injure or murder the officer. The high numbers of

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

10

1  officer mortalities in recent years illustrate the unreasonableness of such a

2  notion." (*Reynolds v. County of San Diego* (S.D.Cal.1994) 858 F.Supp. 1064, 1073.)

3       Despite these factors, "there are no per se rules in the Fourth Amendment

4  excessive force context[,]" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en

5  banc), cert. denied, 132 S.Ct. 2682 (2012), and the court must balance "the nature and

6  quality of the intrusion on the individual's Fourth Amendment interests against the

7  countervailing government interests at stake." *Graham*, 490 U.S. at 397 (internal

8  quotation marks and citations omitted).  Further, reasonableness is evaluated from the

9  perspective of a reasonable officer on the scene without the benefit of hindsight.

10 *Graham*, 490 U.S. at 396; *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001),

11 overruled on other grounds by *Person v. Callahan*, 555 U.S. 223 (2009).

12 Consideration must be given to "the fact that police officers are often forced to make

13 split-second judgments – in circumstances that are tense, uncertain, and rapidly

14 evolving …" *Graham*, 490 U.S. at 396-97; *Fisher v. City of San Jose*, 558 F.3d 1069,

15 1081 (9th Cir. 2009) (en banc) (same).  "Thus, under *Graham,* we must avoid

16 substituting our personal notions of proper police procedure for the instantaneous

17 decision of the officer at the scene. We must never allow the theoretical, sanitized

18 world of our imagination to replace the dangerous and complex world that policemen

19 face every day." *Gonzalez* at 813.

20      The Defendant Deputies are entitled to qualified immunity because the

21 Decedent's rights were not so clearly established in a way that would have put every

22 reasonable officer on notice that their conduct during the shooting violated those

23 rights. As discussed in *Graham*, "objectively reasonable" use of force requires

24 examining the facts and circumstances of the circumstances confronting the deputies.

25 *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. Courts look at (1) the severity of the crime

26 at issue, (2) whether the suspect posed an immediate threat to the safety of the officers

27 or others, and (3) whether the suspect actively resisted arrest or attempted to escape

28 when evaluating whether a deputy's actions were reasonable. *Id*. at 396.  Weighing

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

11

1   the totality of circumstances leads to the inescapable conclusion that the Defendant

2   Deputies' use of force was reasonable and necessary to protect themselves and nearby

3   citizens from the threat of imminent death or substantial bodily harm.  (SSUMF Nos.

4   24; 59.)

5       Each use of force by the Defendant Deputies was objectively reasonable given

6   the facts known to the Defendant Deputies prior to the encounter and the

7   ineffectiveness of warnings and lethal munitions during the shooting.  (SSUMF Nos.

8   12-14; 17-23; 40; 45.)  The potential crime at issue – murder – and the Decedent's

9   possession of an AR-15 and use of a bullet-proof vest posed a significant and deadly

10  threat to deputies and civilians in the vicinity.  (SSUMF Nos. 4; 26-27.)  All uses of

11  force ceased once the Decedent was no longer a dangerous threat.  (SSUMF Nos. 25;

12  60.)  Qualified immunity is thus applicable to the Defendant Deputies.

13      Deputy Barajas' use of force was reasonable at all times during the encounter

14  with the Decedent.  (SSUMF No. 24.)  Before responding to Diamond Bar Boulevard,

15  Deputy Barajas received dispatch calls describing the Decedent as wearing a bullet-

16  proof vest and AR-15, which she confirmed through observation when she arrived to

17  the scene. (SSUMF Nos. 4; 26-27.)  The vest and rifle established that the Decedent

18  anticipated a lethal conflict with deputies. (SSUMF No. 27.)  Moreover, she received

19  a dispatch call that there was a stabbing victim prior to her arrival.  (SSUMF Nos. 27.)

20  In the direct path of the Decedent on Diamond Bar Boulevard were deputies and

21  civilians in vehicles.  (SSUMF Nos. 28.)  Deputy Barajas then issued seven (7)

22  warnings to the Decedent to drop his rifle, which he ignored while continuing his

23  advancement.  (SSUMF No. 12.)  It was only after the Decedent demonstrated a clear

24  intent to ignore deputy commands and came within dangerous proximity of a civilian

25  in his Tesla that Deputy Barajas discharged her firearm. (SSUMF Nos. 7-9; 12-14.)

26  The Decedent's bullet-proof vest prevented the lethal munitions from halting the

27  Decedent's approach, requiring Deputy Barajas to continue discharging her weapon

28  until the Decedent fell to the ground and dropped his rifle after Detective Vazquez's

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1  second, and final, shot. (SSUMF Nos. 13-23.) Once the Decedent began falling and

2  no longer possessed a dangerous threat to deputies or civilians, Deputy Barajas

3  refrained from discharging her firearm further. (SSUMF No. 25.)

4       Moreover, Deputy Vazquez's use of force was reasonable based on the totality

5  of circumstances. (SSUMF No. 59.) After receiving a dispatch call concerning a man

6  wearing a bullet-proof vest and firing his rifle around the Diamond Bar area, Detective

7  Vazquez arrived to the scene and immediately observed the Plaintiff's hand covered

8  in blood – placing him on notice that the Decedent was willing to commit violence

9  against someone he knew. (SSUMF Nos. 4; 32-35.) Detective Vazquez then

10  proceeded to Diamond Bar Boulevard, where he observed the Decedent

11  approximately 15 – 20 feet ahead approaching deputies and civilians with his rifle in

12  the tactical low-ready position. (SSUMF Nos. 36-41 ) Due to the risk of cross-fire

13  from the Deputies positioned in front of the Decedent, Detective Vazquez was forced

14  to flank the Decedent without cover. (SSUMF No. 47.) Observing that the Decedent

15  was ignoring warnings from deputies and rapidly approaching civilian vehicles,

16  Detective Vazquez discharged his shotgun one (1) time. (SSUMF Nos. 45-52.)

17  Having little effect on the Decedent due to his bullet-proof vest, Detective Vazquez

18  discharged his shotgun a second and final time. (SSUMF Nos. 52-54.) The second

19  shot struck the Decedent, after which the Decedent fell to the ground. No additional

20  shots were fired after the Decedent fell to the ground. (SSUMF Nos. 55.)

21       Officers are trained that for an investigative stop of detention to be valid, there

22  must be reasonable suspicion that: (1) criminal activity may be afoot and (2) the

23  person about to be detained is connected with that possible criminal activity. (SSUMF

24  No. 76.) Under the totality of the circumstances, a reasonable officer could conclude

25  that the subject described in the call for service was involved or preparing to become

26  involved in criminal activity hence LASD deputies had a legitimate law enforcement

27  purpose and reasonable suspicion to contact and detain Decedent. (SSUMF. No. 77.)

28  Further, The deputies' actions were consistent with current law enforcement training

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

1 and practices. (SSUMF. No. 78.)

2       Accordingly, the Defendant Deputies are entitled to qualified immunity

3 for this cause of action because their use of force did not violate any clearly

4 established right of the Decedent.

5       **B.    The Defendant Deputies Preserved the Decedent's Rights by**

6            **Promptly Rendering Medical Care**

7       The Defendant Deputies preserved the Decedent's constitutional rights by

8 promptly rendering him medical care after the shooting.  The Due Process Clause of

9 the Fourth Amendment requires the responsible government or governmental agency

10 to provide medical care to persons…who have been injured while being apprehended

11 by the police.  *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.

12 Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983.)  Due process requires that police officers

13 seek the necessary medical attention for a detainee when he or she has been injured

14 while being apprehended by either promptly summoning the necessary medical help

15 or by taking the injured detainee to a hospital." *Maddox v. City of Los Angeles*, 792

16 F.2d 1408, 1415 (9th Cir.1986.)  "A police officer who promptly summons the

17 necessary medical assistance has acted reasonably for purposes of the Fourth

18 Amendment." *Id*. at 1415.

19       Here, the final shot is discharged at approximately 11:45:15.  (SSUMF No. 60.)

20 When the Decedent fell to the ground, his rifle remained within his wingspan.

21 (SSUMF No. 57.)  The deputies were unable to determine the extent of the Decedent's

22 injuries due to his bullet-proof vest, preventing the deputies from assessing that the

23 Decedent was no longer a threat.   (SSUMF No. 16.)   Prior to approaching the

24 Decedent and rendering aid, the responding deputies had to ensure that the Decedent

25 would not pose a threat of harm. (SSUMF No. 57.) From approximately 11:45:15 to

26 11:47:07, the deputies developed a plan to safely and securely approach the Decedent

27 to render aid and prevent against the risk that he could retake possession of his rifle

28 and harm deputies.  (SSUMF No. 57.) At approximately 11:47:17 – 11:47:39, the

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

deputies approached the Decedent with a shield and guns drawn, and placed the Decedent in handcuffs. (SSUMF No. 62.) From approximately 11:47:41 – 11:48:30, the Decedent's bullet-proof vest is un-Velcroed, his  person is searched, and the deputies release him from his handcuffs. (SSUMF No. 63.) Deputies then remove his vest and begin cleaning the blood from his body. (SSUMF No. 64.)  At approximately 11:49:40, paramedics from the fire department begin assisting with the Decedent's aid. (SSUMF No. 65.) At approximately 11:57:40, the Decedent is wheeled away on a gurney and taken to be placed in an ambulance. (SSUMF No. 66.)

The Defendant Deputies fulfilled their duty of summoning prompt medical care as soon as reasonably possible. (SSUMF Nos. 60-67.)  Once it was reasonably safe to approach the Decedent, deputies began rendering aid less than three minutes after the final shot was discharged.  (SSUMF Nos. 65.)  Moreover, the fire department arrived and began assisting with the Decedent's aid approximately four minutes and thirty seconds after the final shot was discharged. (SSUMF No. 65.)  Paramedics placed him on a gurney and began transporting him to an ambulance less than thirteen minutes after the final shot. (SSUMF No. 66.)  It is clear that the Defendant Deputies rendered aid in a reasonable and swift manner once the Decedent was determined to no longer be a threat.  (SSUMF No. 67.)

Police practices expert Ed Flosi concluded that there is no independent and objective evidence to support a claim that the Defendant Deputies denied the Decedent medical care. (SSUMF No.79.)   A review of the material and video evidence reveals that the last shot was fired at approximately 11:45:15. (SSUMF No. 80.) The approach to the Decedent began at approximately 11:47:07. (SSUMF No. 81.) LASD deputies make contact with the Decedent to render aid at approximately 11:47:17. (SSUMF No. 82.) The Decedent was handcuffed at approximately 11:47:40. (SSUMF No. 83.) A deputy confirmed that the fire department personnel was responding at 11:47.58.  (SSUMF No. 84.) LASD deputies start rendering medical aid at approximately 11:48:16. (SSUMF No. 85.) The fire department

15

1    personnel are on scene at approximately 11:48.42. (SSUMF No. 86.)  After being

2    shot, the Decedent fell next to the rifle that he was wielding. (SSUMF No. 87.) There

3    was a legitimate tactical need to get a shield and contact team formed with non-deadly

4    and deadly force options prior to moving to whether the Decedent fell. (SSUMF No.

5    88.) It is also noted that there was information that the Decedent had stabbed another

6    person and the edged weapon was unaccounted for. (SSUMF No. 89.) It is

7    demonstrably false that LASD deputies denied the Decedent of medical care (SSUMF

8    No. 90.)

9        Accordingly, the Defendant Deputies are entitled to qualified immunity for this

10   cause of action.

11   **V.    THE DEFENDANT COUNTY OF LOS ANGELES IS NOT LIABLE**

12         **UNDER MONELL**

13   **A.    Plaintiff Cannot Demonstrate the Threshold Underlying Violation**

14         **of the 4th Amendment to Support a Monell Theory**

15       If a plaintiff did not suffer an underlying constitutional deprivation by a deputy

16   or officer of a government entity, the plaintiff's *Monell* claim automatically fails.  9th

17   Cir. Mod. Instruct. 9.8.  In *Los Angeles v. Heller,* 475 U.S. at 799, the Supreme Court

18   held that if a person has suffered no constitutional injury at the hands of the individual

19   police officer, the fact that departmental regulations might have authorized the

20   unconstitutional conduct is "quite beside the point."  (See also *Pallottino v. City of*

21   *Rio Rancho,* 31 F.3d 1023, fn. 1 (10th Cir. 1994) (plaintiff claimed the City had a

22   policy or custom of displaying deliberate indifference, but since there was no

23   underlying violation by its officers, the City could not be liable); *Hinton v. City of*

24   *Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *Schulz v. Long*, 44 F.3d 643, 650 (8th

25   Cir. 1995) (where plaintiff alleged the municipality failed to have in place a custom

26   or policy of training officers, the municipality could not be liable if there was no

27   underlying constitutional violation by the officer); and *Rivera v. Rhode Island*, 402

28   F.3d 27, 39 (1st Cir. 2005) (as Plaintiff failed to establish a constitutional violation,

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1    the *City of Canton* failure to train claim likewise failed).

2        As briefed above, there is no basis upon which Plaintiff can show any 4th

3    Amendment violation by the deputies. (SSUMF Nos. 24; 59.)   Without a viable

4    underlying 4th Amendment claim, there can be no municipal liability. Further, police

5    practices expert, Ed Flosi, concludes the deadly force responses by the deputies were

6    appropriate and reasonable to prevent a perceived credible threat of injury created by

7    Decedent's actions and behaviors. (SSUMF No. 91.) The deadly force responses by

8    Vasquez and Barajas were appropriate and consistent with current law enforcement

9    training standards in consideration of the "totality of circumstances" presented to them

10   at the moments non-deadly force was used. (SSUMF No. 92.) Therefore, Plaintiff's

11   third, fourth, and fifth causes of action fail.

12       **B.    Even if Plaintiff can Demonstrate a Viable 4th Amendment Claim,**

13           **Plaintiff has no Evidence to Support any Monell Theory**

14       Plaintiff cannot show that the County or Deputies are liable for this incident

15   per any *Monell* theory. Local governments are "persons" subject to liability under 42

16   U.S.C. § 1983 where official policy or custom causes a constitutional tort. *Monell v.*

17   *NewYork City Dept. of Social Services,* 436 U.S. 658, 690 (1978). However, a city or

18   county may not be held vicariously liable for the unconstitutional acts of its employees

19   under the theory of *respondeat superior. Board of County Comm'rs v. Brown,* 520

20   U.S. 397, 403 (1997); *Monell,* 436 U.S. at 691; *Fuller v. City of Oakland,* 47 F.3d

21   1522, 1534 (9th Cir. 1995). To impose municipal liability under § 1983, a plaintiff

22   must show: (1) that the plaintiff possessed a constitutional right of which he or she

23   was deprived; (2) that the municipality had a policy; (3) that this policy amounts to a

24   deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is

25   the moving force behind the constitutional violation. *Plumeau v. School Dist. #40*

26   *County of Yamhill,* 130 F.3d 432, 438 (9th Cir. 1997). If plaintiffs cannot point to a

27   specific policy that was the moving force, which they cannot, they must show that the

28   practices at the WCPD are "persistent and widespread...permanent and well-

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1  settled." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970). Absent competent

2  evidence demonstrating that the City of W.C. and Chief Bryden had a policy, practice,

3  or custom that *caused* the alleged 4th Amendment constitutional violation, the City

4  of W.C. and Chief Bryden cannot be liable for monetary damages in a §

5  1983 suit. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination*

6  *Unit,* 507 U.S. 163, 166 (1993) ("a municipality ... cannot be held liable [under §

7  1983] unless a municipal policy or custom caused the constitutional injury").

8  plaintiffs cannot provide any evidence of an "express policy of the entity" or a practice

9  of the WCPD which is "so permanent and well-settled as to constitute a 'custom or

10 usage' with the force of law." *Monell,* 436 U.S. at 691. Neither are plaintiffs able to

11 provide any evidence that shows that what the Officers did in response to Banta's

12 deadly threat was improper. These claims clearly fail. Plaintiffs cannot establish the

13 County was deliberately indifferent to the known or obvious consequences of its

14 failure to train its officers, which generally requires a Plaintiff to prove prior incidents.

15 *Mueller v. Auker*, 700 F.3d 1180, 1194 (9th Cir. 2012).

16      Here, Plaintiff cannot present any evidence of prior incidents of  during trial or

17 any evidence that the County had a policy, practice, or custom that *caused* the alleged

18 4th Amendment constitutional violation. (SSUMF Nos. 24; 59.)  Thus, Plaintiff failed

19 to establish deliberate indifference as a matter of law, and the County is entitled to

20 judgment. Further, police practices expert Ed Flosi concludes that there is no objective

21 independent evidence in the record that LASD failed to adequately train the involved

22 deputies or that LASD maintains unconstitutional customs, practices, and/or policies.

23 (SSUMF No. 93.)

24 **VI.  <u>PLAINTIFF'S STATE LAW CLAIMS ARE BARRED BY QUALIFIED</u>**

25      **<u>IMMUNITY</u>**

26      The Defendant Deputies cannot be found liable for Plaintiff's state law claims

27 if qualified immunity is granted. The determination that an officer acted reasonably

28 and is entitled to qualified immunity bars state law claims. See *Martinez v. County of*

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

1  *Los Angeles* (1996) 47 Cal.App.4th 334; *Edson v. City of Anaheim* (1998) 63
2  Cal.App.4th 1269. Here, Plaintiff's claims for Negligence, Battery, and the Bane Act
3  are barred because the Defendant Deputies' reasonable use of force requires the
4  application of qualified immunity.

5      **A.    Negligence & Battery Claims**

6      The Defendants are shielded from Plaintiff's state law claims for Negligence
7  and Battery because the Defendant Deputies' of force during the incident was
8  reasonable. "Except when otherwise provided by law, public employees in California
9  are statutorily liable to the same extent as private persons for injuries caused by their
10 acts or omissions, subject to the same defenses available to private persons." *Hayes*
11 *v. Cty. of San Diego*, 57 Cal.4th 622, 628-29 (2013) (citing *Cal. Gov't Code* § 820).
12 "[T]o prove facts sufficient to support a finding of negligence, a plaintiff must show
13 that defendant had a duty to use due care, that he breached that duty, and that the
14 breach was the proximate or legal cause of the resulting injury." *Id*. at 629, 160
15 Cal.Rptr.3d 684.  The California Supreme Court "has long recognized that peace
16 officers have a duty to act reasonably when using deadly force." *Id*. "Law enforcement
17 personnel's tactical conduct and decisions preceding the use of deadly force are
18 relevant considerations under California law in determining whether the use of deadly
19 force gives rise to negligence liability." *Id*. at 639, 160 Cal.Rptr.3d 684, 305 P.3d 252.
20 "Such liability can arise, for example, if the tactical conduct and decisions show, as
21 part of the totality of the circumstances, that the use of deadly force was
22 unreasonable." *Id*.

23      To prevail on a claim for Battery by a peace officer, a plaintiff must prove (1)
24 the officer intentionally touched the plaintiff; (2) the officer used unreasonable force
25 to arrest, prevent the escape of, or overcome the resistance of the plaintiff; (3) the
26 plaintiff did not consent to the use of that force; (4) the plaintiff was harmed; and (5)
27 the officer's use of unreasonable force was a substantial factor in causing the
28 plaintiff's harm. *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526-28 (2009); *Edson*

Hurrell Cantrall LLP
800 West 6th Street, Suite 700
Los Angeles, CA 90017-2710
Telephone (213) 426-2000

19

*v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998). "A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Id*. at p. 527.

Here, a finding that the Defendant Deputies acted reasonably during the encounter will shield the Defendants from Plaintiff's state law claims because reasonable conduct negates both causes of action. If the Defendant Deputies' conduct was reasonable, then there is no resulting breach of the Defendant Deputies' standard of care. Similarly, Plaintiff's cause of action for Battery will fail because Battery requires unreasonable force. The analysis of Plaintiff's federal claim for Unreasonable Search and Seizure – Excessive Force clearly demonstrates that the Defendant Deputies' use of force was reasonable at all times, and no violation of the Decedent's clearly established rights occurred. (SSUMF Nos. 24; 59.) Accordingly, the Court should grant summary judgment for the Defendants for Negligence and Battery.

### B.    Bane Act (Cal. Civil Code § 52.1)

The Bane Act, California Civil Code § 52.1, authorizes a claim for relief against any "person or persons, whether or not acting under color of law, [who] interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state[.]" *Cal. Civ. Code* § 52.1(a)-(b). "The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim." *Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1168 (N.D. Cal. 2009); *Gomez v. City of Fremont*, 730 F.Supp.2d 1056, 1068 (N.D. Cal. 2010). "[A] successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1." *Chaudhrey v. City of Los Angeles*, 751 F.3d 1096, 1105-06 (9th Cir. 2014). "[T]he 'reasonableness' inquiry in an excessive force case is ... whether the officers' actions are 'objectively reasonable' in light of

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1  the facts and circumstances confronting them, without regard to their underlying

2  intent or motivation." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir.

3  2018). "A mere intention to use force that the jury ultimately finds unreasonable—

4  that is, general criminal intent—is insufficient." *United States v. Reese*, 2 F.3d 870,

5  885 (9th Cir. 1993). Rather, the jury must find that the defendants "intended not only

6  the force, but its unreasonableness, its character as 'more than necessary under the

7  circumstances.' " *Id*. But it is not necessary for the defendants to have been "thinking

8  in constitutional or legal terms at the time of the incidents, because a reckless

9  disregard for a person's constitutional rights is evidence of a specific intent to deprive

10  that person of those rights." *Reese* at 1045.

11       The Defendants are entitled to judgment as a matter of law on Plaintiff's Bane

12  Act claim because, as outlined above, the Defendant Deputies' conduct during the

13  encounter was reasonable. (SSUMF Nos. 24; 59.) Plaintiff cannot establish that the

14  Defendant Deputies violated the Decedent's constitutional rights since reasonable

15  force was used, and a claim under the Bane Act cannot succeed without such a

16  showing. As a result, the proper remedy is to grant the Defendant Deputies' motion

17  for summary judgment on the Bane Act.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    **VII.    <u>CONCLUSION</u>**

2        Based on the foregoing, the Court should grant the Defendants' motion for

3    summary judgment as to all causes of action.

4    DATED:  September 29, 2025        HURRELL CANTRALL LLP

5

6

7                                By:    */s/ Jerad J. Miller*

8                                       THOMAS C. HURRELL
                                       JANET J. HUR
9                                       JERAD J. MILLER
                                       Attorneys for Defendants, COUNTY OF
10                                      LOS ANGELES, MARISOL BARAJAS
                                       and HECTOR VAZQUEZ
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HURRELL CANTRALL LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000