# DECLARATION OF EDWARD FLOSI

I, Edward T. Flosi, declare as follows:

1. I am not a party in the above-entitled action.

2. I have personal knowledge of the facts set forth herein, and if called upon as a witness to testify thereto, I could competently and truthfully do so.

3. I make this declaration in support of Defendants' Motion for Summary Judgment, or in the alternative partial summary judgment.

4. I am a career law enforcement professional with over 27 years of fulltime experience in law enforcement. I have a Bachelor of Science in Criminal Justice Administration with a major in Law Enforcement from San Jose State University and a Master of Science (with Honors) in Emergency Services Administration. I've earned an Associates in Science (Business/Accounting) from De Anza College in Cupertino, CA in December 1982.

5. I was a Reserve Officer with the San Jose Police from September 1983 through December 1984. I was a San Jose Police Officer from December 1984 through September 2001. I was a Sergeant with the San Jose Police from September 2001 through December 2011. As a Sergeant, I was the Training Unit Supervisor from March 2009 through December 2011. I was a Reserve Deputy Sheriff with the San Benito County Sheriff's Office from December 2014 through March 2016.

6. I obtained my Basic Certificate from the California Commission on Peace Officers Standards and Training in December 1985, my Intermediate Certificate in January 1988, my Advanced Certificate in December 1990 and my Supervisory Certificate in September 2004. In September 2009 I obtained a Clear Designated Subjects Adult Education Teaching Credential for Law Enforcement Occupations from the California Commission on Teacher Credentialing.

7. From September 2001 through 2014, I was a Law Enforcement Instructor at South Bay Regional Public Safety Training Consortium. I was a Law Enforcement Trainer/Consultant from April 2010 through February 2012 at

Martinelli and Associates. I was an Adjunct Instructor in the Administration of Justice Department at West Valley College, Saratoga, CA from April 2010 through April 2018. I was a Consultant of Training and Customer Development from September 2012 through December 2012 at ShotSpotter, Inc. I was the Director of Training at ShotSpotter, Inc. from January 2013 through July 2019. From February 2012 through the present I have been the Principal Instructor/CEO at PROELIA Defense and Arrest Tactics. I have been the President of Justitia Consulting from July 2018 through the present. I have also been an adjunct professor at Fullerton College in the Administration of Justice Department from August 2019 to present.

8. I provided instruction for law enforcement personnel on a variety of topics, including Raid Planning and Entry, Hostage/Barricade Situations, Arrest Control and Defensive Tactics, Use of Force-Cognitive, Use of Force-Constitutional Based Training (Non-Continuum), Use of Force Documentation, Ethics in the Criminal Justice System and PC 832 California POST Academy-Entire Course. From 1988 through 2004, I was a Guest Lecturer at De Anza College. My teaching experiences includes, but is not limited to: From 1992-1993, I was on the San Jose Police Department Team Training. In 1999, I was a contracted instructor for M.L. Eslinger & Assoc. From 2000-2001 I was a Lead instructor in the Force Operations Simulator Program in the San Jose Police Department Training Unit. I taught Emergency Vehicle Operations from 2000 through 2009. From 2001 through 2009, I taught Use of Force Documentation and Alternative Car Stop Tactics in the San Jose Police Department Training Program. From 2004-2005, I taught Use of Force (cognitive) at the South Bay Regional Public Safety Training Consortium, and also from 2005 through 2011 in the San Jose Police Academy. I taught Force Documentation in the San Jose Police Supervisor Course from 2005 through 2007. I also taught Defensive Tactics at the San Jose Police Academy from 2005-2008 and 2010-2012. From 2007-2019 I taught Excited Delirium Response/Persons in Crisis at the Sa Jose Police CIT Academy. From 2010 through

2018, I taught at West Valley College. From 2017 through the present, I was a Law Enforcement Training Instructor/Consultant in the Division of Criminal Justice Services in New York State.

     9.     I reviewed the following materials in preparing my opinions:

         a.     The Los Angeles Sheriff's Department's Policies and Procedures.

         b.     Plaintiff's Complaint for Damages; Plaintiff's document production 00002-00085.

         c.     Los Angeles County Sheriff's Department Homicide Bureau Report 023-04539-2927-013; Los Angeles County Sheriff's Department Supplemental Reports; Los Angeles County Sheriff's Department Use of Force Policy.

         d.     Audio interviews and transcribed interviews of seven sheriff deputies.

         e.     Eight separate body worn camera footage of the incident.

         f.     California POST Basic Academy Workbook Learning Domain 3 - Principled Policing in the Community; California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest; California POST Basic Academy Workbook Learning Domain 16 – Search and Seizure; California POST Basic Academy Workbook Learning Domain 20 - Use of Force/De-escalation; California POST Basic Academy Workbook Learning Domain 21 - Patrol Techniques; California POST Basic Academy Workbook Learning Domain 23 – Crimes in progress; California POST Basic Academy Workbook Learning Domain 33 - Arrest and Control; California POST Basic Academy Workbook Learning Domain 34 – First Aid, CPR, and AED; California POST Basic Academy Workbook Learning Domain 35 – Firearms/Chemical Agents; California POST Basic Academy Workbook Learning Domain 37 – People with Disabilities; California POST Basic Academy Workbook Learning Domain 39 – Crimes Against the Justice System;

California POST Basic Academy Workbook Learning Domain 40 – Weapons Violations; California Peace Officer's Legal Sourcebook.

10. A short synopsis of the incident is as follows:

a. On June 19, 2023, the Los Angeles County Sheriff's Department ("LASD") received a call for service to respond to 2962 Crooked Creek Drive, Diamond Bar regarding a man with gun call. The call was updated that the male (later identified as Benjamin Chin) was walking on Crooked Creek Drive toward Diamond Bar Boulevard with an assault rifle. The call stated the male was wearing body armor and had fired multiple rounds from his firearm.

b. Officers responded with lights and sirens (Code-3) to a call regarding a man armed with an AR-15 style rifle walking around the Diamond Bar Boulevard area.

c. When officers arrived at the scene, there was a civilian in a Tesla, who was in the direct path of the Decedent heading northbound. Behind Deputy Barajas were additional deputies, preventing her from moving her vehicle to create more distance between herself and the Decedent.

d. The Decedent continued to move northbound towards deputies and civilians with his hands on his AR-15. Believing that the Decedent was an imminent dangerous threat to civilians, deputies and herself, Deputy Barajas exited her vehicle and drew her firearm. She used the driver-side door as cover and stated over her radio that she was detaining the suspect. Deputy Barajas then ordered the Decedent to drop his weapon approximately seven (7) times. The Decedent ignored Deputy Barajas' commands and continued moving northbound, progressing to within approximately 7 – 10 feet of Deputy Barajas and the civilian in the Tesla.

e. Deputy Barajas then fired her first shot from her service handgun at the Decedent, which appeared to have no effect on the Decedent. Less-lethal ammunition was not an option because the Decedent posed an immediate lethal

-4-

threat due to his proximity to the civilian, and his bullet-proof vest would have rendered less-lethal ammunition ineffective.

   f. After her first shot, Deputy Barajas reassessed the situation and determined the Decedent was still an imminent lethal threat because he continued to advance with his rifle. Moreover, the Decedent's bullet-proof vest prevented Deputy Barajas from determining whether her first shot struck and injured the Decedent. Deputy Barajas then commanded the Decedent to drop his rifle an eighth (8) time as he continued his approach. She then ordered the Decedent to drop his weapon a ninth (9) time and began ordering him to drop it a tenth (10) time, but her order was interrupted by Detective Vazquez's first shot.

   g. The Decedent remained standing and capable of firing his rifle slung around his shoulder, indicating to Deputy Barajas that he still remained a dangerous lethal threat to civilians and deputies. While the Decedent continued approaching, Deputy Barajas fired two additional shots at the Decedent. The Decedent still remained standing with his rifle. Detective Vazquez then fired the final shot, after which the Decedent is finally immobilized and drops to the ground with his rifle.

   h. The Defendant Deputies fulfilled their duty of summoning prompt medical care as soon as reasonably possible. Once it was reasonably safe to approach the Decedent, deputies began rendering aid less than three minutes after the final shot was discharged. Moreover, the fire department arrived and began assisting with the Decedent's aid approximately four minutes and thirty seconds after the final shot was discharged. Paramedics placed him on a gurney and began transporting him to an ambulance less than thirteen minutes after the final shot. It is clear that the Defendant Deputies rendered aid in a reasonable and swift manner once the Decedent was determined to no longer be a threat.

  11. **Opinion #1: The LASD deputies had a legitimate law enforcement purpose and reasonable suspicion – based on current law enforcement training**

**– to contact and detain Decedent. The deputies' actions were consistent with current law enforcement training and practices.**

12. In this incident, a reasonable officer could conclude that the subject described in the call for service was involved or preparing to become involved in criminal activity (e.g. unlawful/negligent discharge of a firearm, assault with a deadly weapon.) Therefore, LASD deputies had a legitimate law enforcement purpose and reasonable suspicion to contact and detain Decedent. The deputies' actions were consistent with current law enforcement training and practices.

13. **Opinion #2: The LASD deputies had a legitimate law enforcement purpose and probable cause – based on current law enforcement training – to arrest Decedent. The deputies' actions were consistent with current law enforcement training and practices.**

14. In this incident, Decedent was verbally and visually contacted by uniformed deputies that were driving a marked LASD vehicle on Crooked Creek and prior to walking onto Diamond Bar Blvd. The deputies gave commands to Decedent to drop the gun in order to de-escalate the situation. Decedent failed to comply with the commands and continued to walk away from the deputies efforts to detain Decedent.

15. **Opinion #3: The LASD deputies' pre-force tactics were consistent with current law enforcement training and practices considering the totality of facts and circumstances known/perceived by them at the time.**

16. There was a need to act quickly if LASD deputies were going to be able to contain Decedent based on Decedent's actions and behaviors. There was not enough time to stage and have a tactical huddle if they wanted to be able to detain Decedent.

17. Allowing too much distance between Decedent and LASD deputies would have given Decedent an opportunity to flee which would have thwarted the

ability to further investigate the incident. Indeed, officers are trained to optimize distance depending on the facts and circumstances at the time.

18. De-escalation is a goal. There is no one correct way to the end goal of de-escalation. There are no known phrases or techniques that force a subject to de-escalate their actions and behaviors. It is known that for de-escalation tactics to be effective, both parties must be willing and able to participate in the process.

19. In this incident, the situation was primarily being driven by the actions and behaviors of Decedent and LASD deputies were reacting to such actions and behaviors. LASD deputies' attempts to control and de-escalate the situation were not successful as Decedent appeared unwilling to participate in the de-escalation process and maintained his resistant and eventually aggressive posture.

20. There is no evidence in the record to show that another type of de-escalation tactic would have caused a change in Decedent's behavior or willingness to participate in the de-escalation process or would have eventually complied with the officers' verbal directions.

21. **<u>Opinion #4: The deadly force responses by Detective Vasquez and Deputy Barajas were appropriate and reasonable to prevent a perceived imminent and credible threat of serious bodily injury or death. The deadly force responses were appropriate and consistent with the current law enforcement training standards in consideration of the "totality of circumstances" presented to Detective Vasquez and Deputy Barajas at the moments force was used.</u>**

22. Police officers are trained that they are permitted to use reasonable force to effect an arrest, prevent the escape or to overcome the resistance of a suspect.

23. Police officers are trained that they may use deadly force under certain circumstances.

24. Peace officers are only justified in using deadly force upon another person if and only if the officer reasonably believes, based on the totality of the circumstances that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person.

25. Decedent displayed no indications of surrender or compliance with the commands of the deputies to drop the rifle.

26. A reasonable officer could conclude that there would be no legitimate reason for Decedent to continue walking forward towards others when holding the grip of the rifle near the trigger guard other than to get closer to available targets and/or compromise the cover of Deputy Barajas.

27. Decedent created the life-threatening situation and forced deputies to react quickly and decisively.

28. Deadly force responses by the deputies were appropriate and reasonable to prevent a perceive credible threat of injury created by Decedent's actions and behaviors.

29. The deadly force responses by Detective Vasquez and Deputy Barajas were appropriate and consistent with current law enforcement training standards in consideration of the totality of the circumstances presented to them at the moments non-deadly force was used.

30. **Opinion # 5: There is no independent and objective evidence to support a claim that the LASD deputies denied Decedent of medical care.**

31. Video evidence reveals that LASD deputies promptly provided medical care to Decedent.

32. Video footage shows: the last shot was at approximately 11:45:15. The approach to Decedent began at approximately 11:47:07. Contact with Decedent was at approximately 11:47:07. Decedent was handcuffed at approximately 11:47:40. A deputy confirmed that the fire department personnel was responding at 11:47.58. The Decedent was unhandcuffed and deputies began to render medical aid at

approximately 11:48.16. The fire department personnel were on scene at approximately 11:48.42.

33. Video footage show that after being shot, Decedent fell next to the rifle. There would be a legitimate tactical need to get a shield and contact team formed with non-deadly and deadly force options prior to moving to where Decedent fell. It is also noted that there was information that Decedent had stabbed another person and the edged weapon was currently unaccounted for.

34. **Opinion # 6: There is no objective and independent evidence in the record that the LASD failed to adequately train the involved deputies.**

35. Each officer involved in this incident completed a POST Basic Academy. In this academy, the officers receive statewide approved standardized training on several learning domains and are tested to determine competence.

36. There is no objective and independent evidence in the record that the LASD failed to adequately train the involved deputies.

37. **Opinion # 7: There is no objective and independent evidence that the LASD maintains unconstitutional customs, practices, and/or policies.**

38. I reviewed LASD Use of Force Policy Section 3-10/000.000 – 3-10/140.00.

39. There is no objective and independent evidence that the LASD maintains unconstitutional customs, practices, and/or policies.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 29, 2025, at Fullerton, California.

_____
Edward T. Flosi

-9-