# EXHIBIT 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4

5  JENNIE QUAN, individually and as
   successor in interest to BENJAMIN
6  CHIN, deceased,

7          Plaintiffs,

8  vs.                    Case No.  No. 2:24-cv-04805-MCS-KS

9  COUNTY OF LOS ANGELES;
   MARISOL BARAJAS; HECTOR
10 VASQUEZ; and DOES 3-10, inclusive,

11          Defendants.
   _____/
12

13

14       STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15     REMOTE VIDEO DEPOSITION OF HECTOR VASQUEZ

16          THURSDAY, SEPTEMBER 25, 2025

17

18

19

20

21

22 Reported Stenographically by:

23 KIMBERLY D'URSO, CSR 11372, RPR

24 Job No.  20243

25

```
 1              THE WITNESS:  Yeah.
 2              MR. GALIPO:  Tom and I know right away, but we
 3    often don't want to share it.
 4    BY MR. GALIPO:
 5         Q.   In this incident, you fired some shots; is that
 6    correct?
 7         A.   Yes.
 8         Q.   And what type of weapon did you fire the shots
 9    from?
10         A.   From a shotgun.
11         Q.   And do you know what type of shotgun it was?
12         A.   County-issued patrol shotgun.
13         Q.   Do you know what type of ammunition it
14    generally carries?
15         A.   We carry two types of ammunition on it.
16         Q.   And what are those?
17         A.   One is double-lock buck shot.  And the other
18    one is slugs.
19         Q.   What's the difference, as you understand it?
20         A.   The double-lock buck shot is -- consists of
21    several smaller pellets, I believe it's nine; whereas a
22    slug is one piece, I believe it's one ounce, of lead.
23         Q.   And what type of ammunition did you put in the
24    shotgun, if you recall?
25         A.   At what point?
```

Jennie Quan v. County of Los Angeles, et al.                    Page: 15

Focus Litigation Solutions

Hector Vasquez

```
 1          Q.   Well, did you fire all the same type of
 2     ammunition, or did it change?
 3          A.   I fired the same type.
 4          Q.   What type was that?
 5          A.   The slugs.
 6          Q.   And how many slugs did you fire, approximately?
 7          A.   Two.
 8          Q.   Was there any time gap between the two shots?
 9          A.   I would say not very much, almost one
10     immediately after the other.
11          Q.   Okay.  How far would you estimate you were from
12     the person you shot when you fired?
13          A.   Just a rough estimate, maybe 30, 40 feet.
14          Q.   What surface were you on when you fired,
15     meaning, street, sidewalk, whatever -- whatever applies?
16          A.   I was on the sidewalk.
17          Q.   And what sidewalk were you on?
18          A.   I'm thinking about it because that street
19     curves.  So I guess it would be the west sidewalk,
20     maybe.
21          Q.   Do you know what street or streets are located
22     there?
23          A.   Yeah.  It was on Diamond Bar Boulevard.
24          Q.   Do you know what the closest cross street was
25     to where you were positioned?
```

Hector Vasquez

1  Q.    And do you know which direction that street

2  runs?

3  A.    North and south at that location.  Like I said,

4  it curves, so it changes a lot.

5  Q.    Which -- the person was walking just before you

6  fired; is that correct?

7  A.    Correct.

8  Q.    Which direction was the person walking?

9  A.    It was northbound.

10  Q.    And when you fired your first shot, what part

11  of the person was exposed to you?  Or where were you

12  aiming?  I'm sure you were shooting center mass?

13  A.    Yes.

14  Q.    What was center mass, from your perspective?

15  A.    The left side of his torso.

16  Q.    Was the individual's left side closer to you

17  than the right side?

18  A.    Yes.

19  Q.    Were you able to see the person's back when you

20  were firing?

21  A.    Slightly.

22  Q.    And how about the second shot; was it generally

23  the same area or did it change?

24  A.    It changed somewhat.

25  Q.    Can you explain that, please?

Jennie Quan v. County of Los Angeles, et al.                    Page: 18

Focus Litigation Solutions

Hector Vasquez

1  A.    Yes.  After the first shot, he began to rotate

2  his body in my direction, so his -- the front of him

3  became more of a center mass for me.

4  Q.    At the time of your first shot -- let me just

5  break this down, if I can.  At the time of your first

6  shot, was the individual more or less facing northbound?

7  A.    Yes.

8  Q.    And which compass direction were you firing

9  when you fired your first shot?

10  A.    It would have been in an eastwardly direction.

11  Q.    Was it due east or slightly northeast, if you

12  know?

13  A.    Probably slightly northeast.

14  Q.    And when you fired your second shot, are you

15  saying the person turned towards you between your first

16  shot and your second shot?

17  A.    Correct.

18  Q.    And which way was the front -- which way was

19  the front of the body of the individual facing when you

20  fired your second shot?

21  A.    It would make it west, in a westerly direction

22  towards me.

23  Q.    And so for your second shot, center mass would

24  have been what?

25  A.    The front of his body.

Hector Vasquez

```
1        Q.   Okay.  So do I have it correct that the first
2   shot would have been like his -- more his left side or
3   back left side; and the second shot would be the front
4   of the body?
5        A.   Front, left side of the body.
6        Q.   So your recollection is he turned toward you in
7   between the first shot and the second shot?
8        A.   Correct.
9        Q.   And so for the second shot he was more or less
10  facing you?
11       A.   Correct.
12       Q.   And if I have my directions correct, for the
13  first shot he would have been facing north; the second
14  shot, he would have been facing west?
15       A.   Correct.
16       Q.   Had You heard any shots before you fired your
17  first shot?
18       A.   I heard what I believed to be one shot.
19       Q.   And could you tell where that shot was coming
20  from?
21       A.   I could not.
22       Q.   Did you think he fired that shot?
23       A.   I wasn't sure.
24       Q.   Could you tell if the shot was from a handgun
25  or something else?
```

Hector Vasquez

 1        A.    I couldn't distinguish, just based on the

 2    sound.

 3        Q.    Did you have an impression or belief at the

 4    time as to whether another deputy had fired?

 5        A.    I wasn't sure.

 6        Q.    Did you believe that he had fired the shot?

 7             MR. HURRELL:  Objection.  It's asked and

 8    answered.

 9             But go had ahead.

10             THE WITNESS:  I wasn't sure.

11    BY MR. GALIPO:

12        Q.    Did you ever see him firing any shots at any

13    time?

14        A.    No.

15        Q.    Did you give any verbal warning that you were

16    going to fire?

17        A.    Not that I was going to fire, no.

18        Q.    Did you hear any other deputy give any verbal

19    warning that shots were going to be fired?

20        A.    I don't recall hearing anything.

21        Q.    When you heard the first shot, could you see

22    the individual?

23        A.    Yes.

24        Q.    How far was the individual from you when you

25    heard the first shot?

1    A.    The same distance; I would say, 30 to 40 feet.

2    Q.    And if I'm understanding you correctly, you're

3    saying if you -- well, strike that.

4         When I say "the first shot," are you

5    understanding the first shot you heard, as opposed to

6    the first shot you took?

7    A.    Yes, first shot I heard.

8    Q.    Okay.  So am I understanding you correctly that

9    you were looking at him from 30 to 40 feet away, you

10   heard a shot, and you didn't know whether he shot the

11   shot or someone else?

12   A.    Correct.

13   Q.    Could you tell if it appeared that the first

14   shot you heard impacted him?

15   A.    I did notice him flinch somewhat, but I wasn't

16   sure what that was.

17   Q.    Okay.  Can you describe a little bit what you

18   observed, with respect to how he flinched?

19   A.    Sure.  As he's walking in a northerly

20   direction, his flinch movement was -- how would you call

21   it?  Like he bent forward slightly and came back up.

22   Q.    Okay.

23   A.    Yeah.

24   Q.    So in your mind, did you think he possibly had

25   been struck, but you weren't sure?

1      A.    Correct.

2      Q.    And then how much time, approximately, passed

3   between that first shot you heard and your first shot?

4      A.    Not very much time.

5      Q.    Do you have an estimate?

6      A.    I would say almost immediate, as I saw him --

7   that's when I saw him reach for -- reach for his

8   firearm, basically.

9      Q.    You saw him reach for the firearm after you

10  heard the first shot?

11     A.    That's when I noticed it, from my angle.

12     Q.    Okay.  And so are you saying that you fired

13  within a second or so from hearing the first shot?

14     A.    I would think so, yes.

15     Q.    And then your second shot you're saying was

16  almost consecutive or immediate after your first shot?

17     A.    Correct; right as he started to rotate towards

18  me with the gun in hand.

19     Q.    How long were you observing him before you

20  heard the first shot?

21     A.    I couldn't tell you exactly, but it all

22  happened super fast.

23     Q.    I certainly don't expect exact.  I know you

24  weren't looking at your clock or anything.  But since

25  you were there, and I wasn't, I'm trying to get some

1    range.  I don't know if you were looking at him for 30

2    seconds, 60 seconds, 5 to 10 seconds, whatever it might

3    apply.

4         A.   Are you asking from when I first saw him; or at

5    what point?

6         Q.   Yeah, exactly.  From when you first saw him to

7    when you fired your first shot, how much time would you

8    estimate passed in between those two points?

9         A.   From when I first saw him to the time I fired

10   my first shot, it had to be maybe a minute or so.

11        Q.   And where was he when you first saw him?

12        A.   He was on Crooked Creek, on the sidewalk.

13        Q.   And was he stationary or walking?

14        A.   When I first saw him, he was stationary, facing

15   -- facing the houses on the street, basically.

16        Q.   And how far was he from you when you first saw

17   him?

18        A.   It was like half a block distance.

19        Q.   And I take it, given that you're young, at

20   least from my perspective, your eyesight is pretty good,

21   as far as you know?

22        A.   I think so.

23        Q.   When you saw him from about a half a block

24   away, initially, could you see that he had what appeared

25   to be a rifle slung over his right side?

1     A.   Yes; and also wearing a bullet proof vest.

2     Q.   And you could see that from half a block away?

3     A.   Yes.

4     Q.   Did you think, based on your training, it would

5 be appropriate to shoot him when you first saw him

6 standing there?

7     A.   No.

8     Q.   And why not at that point?

9     A.   Well, I didn't see any people around him for

10 him to pose a threat to them.  And also, the backdrop

11 behind him was very busy, so I couldn't take a shot from

12 there, even if I wanted to or had to.

13     Q.   Okay.  And then did you see him moving at some

14 point from that initial stopped position?

15     A.   Yes.

16     Q.   And which direction did you see him moving?

17     A.   He began walking towards Diamond Bar Boulevard.

18     Q.   And would that be northbound?

19     A.   That would be eastbound.

20     Q.   Oh, eastbound?

21     A.   I believe so.  Those streets curve a lot in

22 that area, so they change direction.

23     Q.   Okay.  So do I have it correct that you

24 initially saw him, and he was more or less stationary or

25 stopped?

1          A.    Correct.

2          Q.    And then at some point he started walking?

3          A.    Correct.

4          Q.    And when he started walking, he was going

5    toward Diamond Bar Boulevard?

6          A.    Correct.

7          Q.    And you think, initially, from where he was,

8    that would be in an eastbound direction?

9          A.    I believe so, yes.

10          Q.    And how far did you observe him walking

11    eastbound before he changed direction?

12          A.    He made it all the way onto Diamond Bar

13    Boulevard.  And when he reached Diamond Bar Boulevard,

14    he went onto the street and then made a turn to proceed

15    northbound.

16          Q.    And do you have any estimate as to how far he

17    had to walk eastbound before he got to Diamond Bar

18    Boulevard?

19          A.    About half a block.

20          Q.    And during that time frame, could you see the

21    rifle still slung over his right side?

22          A.    Yes.

23          Q.    And you could still see the bullet proof vest?

24          A.    Yes.

25          Q.    Did you say anything to him during that time

1    frame?

2          A.    Yes, several times.

3          Q.    What did you say?

4          A.    I was asking him to stop and drop the gun.

5          Q.    Okay.  Did you think, based on your training,

6    it would have been appropriate to shoot him as he was

7    walking eastbound, before getting to -- I'm drawing a

8    blank on the name -- Diamond Bar Boulevard?  I'm sorry.

9          A.    No.

10         Q.    And so then he got to Diamond Bar Boulevard,

11   correct, and he started walking northbound?

12         A.    Correct.

13         Q.    And how far did he walk northbound on Diamond

14   Bar Boulevard?

15         A.    Very minimal amount, maybe 20, 30 feet.

16         Q.    When he first started walking northbound on

17   Diamond Bar Boulevard, before you heard the shot, did

18   you think it was appropriate to shoot him?

19         A.    I didn't hear the shot until I was on Diamond

20   Bar Boulevard myself.

21         Q.    But I think you told me you could see him at

22   the time of the shot; is that correct?

23         A.    Yes.  That's when I was on Diamond Bar

24   Boulevard already.

25         Q.    Okay.  And how long -- did he go out of your

1  view for some period of time?

2       A.   For a split second, yes.

3       Q.   And how long did he come back in your view

4  before you heard the first shot?

5       A.   Can you kind of clear that up for me a little

6  bit?

7       Q.   Sure.  It's my understanding, when you heard

8  the first shot, you could see him; is that correct?

9       A.   Correct.

10      Q.   And he was walking northbound on Diamond Bar

11 Boulevard?

12      A.   Correct.

13      Q.   Do you have an estimate as to how far he walked

14 northbound on Diamond Bar Boulevard before you heard the

15 first shot?

16      A.   About 20, 25 feet.

17      Q.   And for how long were you watching him walking

18 northbound on Diamond Bar Boulevard before you heard the

19 first shot?

20      A.   Probably less than a second.

21      Q.   Did you think, based on your training, you

22 could simply shoot him for walking away?

23      A.   I didn't shoot him for walking away.

24      Q.   Okay.  I'm not saying you did.  I'm just

25 wondering, based on your training, in this scenario, did

1    you think you could shoot him merely for walking away?

2              MR. HURRELL:  Dale, one second.  Looks like --

3    we lost -- we lost you.

4              MR. GALIPO:  What happened?

5              MR. HURRELL:  Looks like we lost the

6    connection.

7              MR. GALIPO:  I can hear you.

8              THE CERTIFIED STENOGRAPHER:  I can hear you.

9              MR. HURRELL:  There we go back.

10             THE WITNESS:  Sorry.  Can you repeat?

11   BY MR. GALIPO:

12        Q.   Okay.  Sure.  I'm not saying you shot him for

13   just walking away.  I'm just wondering, based on your

14   training, given the scenario, did you think you could

15   shoot him just for walking way?

16        A.   Given the scenario, no.

17        Q.   And why not, based on your training, given the

18   scenario, you could not shoot him for just walking way?

19        A.   Because he hadn't committed any, I guess,

20   multiple casualty incidents or shootings at the time.

21   What was said to us was he was firing rounds.  And I

22   know he had assaulted someone, but I don't know to what

23   extent.

24        Q.   Okay.

25        A.   So I didn't think it was enough.

1          Q.    Okay.  So, in your mind, based on your training

2      it wasn't enough just to shoot him for walking way?

3      There had to be more?  Is that fair?

4          A.    Yes.

5          Q.    And I think you have some training with respect

6      to scenarios you can use deadly force.  One is, if there

7      is, you know, an imminent or immediate threat of death

8      or serious bodily injury, is that one of the scenarios?

9          A.    Correct.

10         Q.    And the other scenario is, you know, if the

11     circumstances warrant it, someone who's a fleeing

12     felon --

13         A.    Yes.

14         Q.    -- under very specific circumstances?  Are you

15     familiar with that concept?

16         A.    Correct.  That's what I was referring to, yes.

17         Q.    Okay.  So if I'm understanding you correctly,

18     based on your training and understanding, you couldn't

19     shoot him as a fleeing felon, but you could shoot him if

20     there was an immediate or imminent threat of death or

21     serious bodily injury?

22         A.    Correct.

23         Q.    You indicated that after the first shot you saw

24     him "flinch," or words to that effect.  Do you recall

25     that?

1        A.    Yes.

2        Q.    After you fired your first shot, did you have

3    an impression as to whether your first shot struck him?

4        A.    Yes.

5        Q.    What was your impression?

6        A.    I'm pretty sure it struck.

7        Q.    And what did you see that made you believe your

8    first shot struck him?

9        A.    The bullet proof vest that he was wearing kind

10   of, I guess when the round impacted it, kind of exploded

11   some.  And that's pretty much when he began to turn

12   towards me.

13       Q.    Okay.  And I think you told me earlier you were

14   firing slugs?

15       A.    Correct.

16       Q.    Could you tell what part of his vest, whether

17   it was top part, middle part, lower part that you

18   struck?

19       A.    If I had to guess --

20             MR. HURRELL:  Don't guess.

21             MR. GALIPO:  You can estimate, but we don't

22   want you to guess.

23             THE WITNESS:  Okay.  I know it was in the left

24   side, approximately, towards the middle left, rear area.

25   BY MR. GALIPO:

1        Q.    Okay.  And you saw something that made you

2     believe you struck him in that area?

3        A.    Correct.

4        Q.    And it sounds like at the time you fired your

5     first shot, his upper body was facing northbound; does

6     that sound correct?

7        A.    Yes.

8        Q.    And you were firing, I guess it would be mostly

9     eastbound, but maybe slightly northeast?

10        A.    Correct.

11        Q.    And then if I'm understanding your testimony,

12     his body moved after you struck him with the first --

13     your first round.  Am I understanding that correctly?

14        A.    Yes.  He began to rotate to face me at that

15     time.

16        Q.    Okay.  When you fired your first round, was --

17     just prior to firing your first round, was his body more

18     or less upright?

19        A.    Yes.

20        Q.    And do you have an estimate as to his height

21     and weight?

22        A.    I don't recall.

23        Q.    He appeared to be Asian to you; or could you

24     tell?

25        A.    He appeared to be Asian.

1    Q.   And how much of the barrel could you see?  Do

2    you have any estimate?

3    A.   I couldn't estimate the amount.

4    Q.   And where was the barrel directed just prior to

5    firing your first shot?

6    A.   It was pointing northbound towards -- on

7    Diamond Bar Boulevard, basically.

8    Q.   So -- I don't know if you took geometry at some

9    point -- and I don't want to confuse you here -- but

10   have you heard the term "low ready"?

11   A.   Yes.

12   Q.   So I'm just trying to figure out, was it

13   pointed in a low ready towards the ground or somewhere

14   else?

15   A.   I think originally it was in the low ready, and

16   then it started to come up.

17   Q.   Started to come up after you fired your first

18   shot, or before?

19   A.   When I observed it, it was when I fired my

20   first shot.

21   Q.   You think it started to come up at the time you

22   fired your first shot?

23   A.   It might have come up before that, but from my

24   angle, I saw it when I fired my first shot, basically.

25   Q.   Okay.  And then where was it positioned when

1    you fired your second shot?

2         A.    It was continuing to come up, but he was

3    rotating with the -- with the gun grip in his hand,

4    towards me.

5         Q.    Could you see his hand when you fired the

6    second shot?

7         A.    I don't know if I saw it when I fired it, but

8    it did come into view pretty much immediately after.

9         Q.    When you fired your first shot or second shot,

10    could you see the trigger area of the rifle?

11         A.    I don't recall.

12         Q.    Did you ever see his left hand touch the rifle

13    at any time?

14         A.    I believe that when he began to rotate towards

15    me, his left hand went towards the rifle.

16         Q.    Did you ever see the left hand make contact

17    with the rifle?

18         A.    I don't remember.

19         Q.    From your viewpoint, did you ever actually see

20    his right hand on the trigger?

21         A.    I saw his hand in the position of gripping the

22    pistol grip.  I couldn't see the trigger.

23         Q.    Could you see his hand, though?  I thought you

24    told me you couldn't actually see his hand, you could

25    just see the elbow and the upper part of his arm?

1    A.    Correct.  And I said the position of what it

2    would look like to grip it.

3    Q.    Okay.  But just so I'm clear, you couldn't

4    actually, from your viewpoint, see his hand on the

5    trigger; is that fair?

6    A.    Correct.

7    Q.    How did he fall to the ground, if you recall?

8    A.    As he began rotating towards me, after the

9    second -- after I took my second shot, his rotation

10    continued, and his -- his rotation along with the rifle

11    as well.  And as he continued to lift the rifle up, he

12    basically managed to get the rifle up and over his head.

13    The sling flew off of it, and he fell kind of in a side

14    -- like to his side, slightly, forward slightly, to his

15    left, as the rifle basically -- he launched it above his

16    head.  And it fell just in front of his head, pretty

17    much.

18    Q.    Okay.  Did -- I know you said he was facing

19    westbound, I believe, when you fired your second shot;

20    is that correct?

21    A.    Correct.

22    Q.    So did he fall with his head to the west?

23    A.    His head would have been to the south, and the

24    front of his body was now to the west.  So he managed to

25    rotate all the way around, pretty much.  And his -- the

1    front of his body, as he laid on his left side, the

2    front of his body was facing west and his head was --

3    basically, the top of his head was pointing south.

4        Q.    And did he end up in a chest down position or

5    some other position?

6        A.    Another position.

7        Q.    What position did he end up in?

8        A.    I would say on his left side, so on top of his

9    left arm.

10        Q.    So he's kind of laying on his left side?

11        A.    Yes.

12        Q.    Was -- was his right hand gripping or touching

13    the rifle, if you recall, when he was on the ground?

14        A.    No. Like I said, he -- he -- during his motion

15    towards me, he continued to raise the rifle, and it came

16    up off of his head -- off his neck.  The sling came off.

17    And then as he fell -- I don't know if he threw it or he

18    just -- the rifle and it fell a little bit south of his

19    head.

20        Q.    Did you approach him at some point after the

21    shooting?

22        A.    Yes.

23        Q.    And do you know how much time passed from the

24    shooting to you approaching him?

25        A.    A few seconds, I think.

1    Q.    And when you approached him was he moving at

2    all?

3    A.    Yes.

4    Q.    What did you see, in regard to him moving when

5    you approached him?

6    A.    It was slight movement in his body.  I don't

7    know how to describe -- no major movement.  Maybe some

8    rocking, a little bit.

9    Q.    So he appeared, at least to you, to still be

10    alive when you approached him?

11    A.    Yes.

12    Q.    And did you ever hear him say anything at any

13    time?

14    A.    No.

15    Q.    Could you tell, when you approached him,

16    whether he had been struck or not?

17    A.    Once we got close enough, I did see blood on

18    the floor.

19    Q.    Was it your impression that your second shot

20    struck him as well?

21    A.    I believe so.

22    Q.    What did you see that led you to believe your

23    second shot struck him?

24    A.    Nothing -- there was no -- nothing on the vest.

25    It was just, I guess, more of a trust in my firing

1    abilities.  I think I hit him.

2         Q.   Okay.  Also, it sounds like he very soon after

3    the second shot went to the ground.  Does that sound

4    right?

5         A.   Yes.

6         Q.   So did that also play a part in your impression

7    that you had struck him?

8         A.   Yes.

9         Q.   Did you hear any other shots?  I know you heard

10   one shot before you fired.  Did you hear any other shots

11   during your shooting sequence or immediately after?

12        A.   No.

13        Q.   Now, just backing up a little bit -- and you've

14   already touched on this, I think.  You had some

15   information that some shots had maybe been fired in the

16   air, or something like that?

17        A.   Yes.

18        Q.   And you had some information that someone may

19   have been stabbed, but you didn't have any specifics as

20   to who, or the severity; is that correct?

21        A.   I got to see the person who got stabbed, but I

22   don't know who she was.

23        Q.   And it was hard for you to tell the severity;

24   is that fair?

25        A.   Yes.

Hector Vasquez

```
 1          Q.   You actually had a conversation with this
 2     person?
 3          A.   I wouldn't call it a conversation, but we did
 4     exchange words, yes.
 5          Q.   What do you recall the person saying to you?
 6          A.   "Don't hurt him."  "Don't shoot him."
 7     Something to that effect.
 8          Q.   Okay.  And how many times do you recall this
 9     person saying that?
10          A.   She said it a few times.  I don't know how
11     many.
12          Q.   Did the person seem emotional to you?
13          A.   She did.
14          Q.   And was this person like a Hispanic -- strike
15     that -- an Asian female?
16          A.   Yes.
17          Q.   Did you think that this possibly could be
18     someone who knows him?
19          A.   That was the assumption I made, it was a friend
20     or family member.
21          Q.   Okay.  You thought maybe it's a family member;
22     it could be a mother or aunt or friend?  You just
23     weren't sure at the time?
24          A.   Correct.
25          Q.   Did you see a little bit of blood on this
```

1    person's hands?

2         A.    A lot of blood on her hands.

3         Q.    Okay.  You didn't know where the source of the

4    blood was?

5         A.    No.

6         Q.    You didn't know if the cut was to her hand or

7    somewhere else?

8         A.    No.

9         Q.    Did you ask her if she needed medical

10   attention?

11        A.    No.

12        Q.    Did you call medical attention for her?

13        A.    No.

14        Q.    When she told you, "Don't hurt him," or "Don't

15   shoot him," or words to that effect, could you see him

16   at that point?

17        A.    It was somewhere around that time that I saw

18   him.

19        Q.    And at some point did you decide to get the

20   shotgun?

21        A.    Yes.

22        Q.    And did you have to load the shotgun?

23        A.    I had to rearrange the way the ammo was loaded

24   in it, yes.

25        Q.    Can you explain how you did that, please?

1          A.    Sure.  Normally, we carry our shotguns with the

2    double-lock butt rounds loaded in it.  And we carry

3    slugs on the rifle -- or the shotgun saddle.  So when I

4    got the shotgun, after seeing where he was, and the

5    distance he was at, and the fact that he was wearing a

6    bullet proof vest, I knew that the double lock butt was

7    going to be ineffective from that distance, or even if

8    we were closer.  So I racked out the double-locked butt

9    rounds and inserted rifle slugs.

10         Q.    At some point you, I think, asked another

11   deputy to drive closer to him in the patrol vehicle?

12         A.    Yes.

13         Q.    And you were a passenger in the vehicle at that

14   time?

15         A.    Yes.

16         Q.    At the time just before you fired, when you

17   were standing on the sidewalk, did you have any cover at

18   that point?

19         A.    When I fired?

20         Q.    Yes.

21         A.    When I fired, I did not have any cover.

22         Q.    Do you, in your mind, think that was at least a

23   factor in you firing, because you didn't have any cover?

24         A.    No.

25         Q.    How about the second shot?  Do you think that

1    was a factor, in your mind at all, in firing, that you

2    didn't have any cover?

3        A.    I knew that I was very exposed.  And I don't

4    think -- I think it was part of it, maybe, but not --

5    the fact that he was rotating with gun in hand towards

6    me was why I fired at him.

7        Q.    I understand it's not the only reason.  I'm

8    just wondering if you think that was part of the reason,

9    not having cover for that second shot?

10       A.    Yes.  I think I was severely out-gunned, and I

11   was afraid his rifle would pierce my vest, without any

12   cover in front of me.

13       Q.    Okay.  And then I'm just going to ask a few

14   more questions, and we can take our first break.

15            But if, hypothetically -- this is my

16   hypothetical.  If he had just been walking northbound

17   and not turned towards you, not grabbed the rifle, not

18   raised the rifle, but the rifle had just continued to be

19   slung, you know, around his neck, pointed down -- are

20   you with me in my hypothetical?

21       A.    Yes.

22       Q.    If that had happened, and he never raised it,

23   grabbed it or turned towards anyone, would you agree

24   that, based on your training, it would be inappropriate

25   to shoot him?

1        A.    I think that if he made no movements towards

2    grabbing the rifle and was just walking, yes, we would

3    let it play out and try to deescalate the situation

4    further.

5        Q.    Okay.

6            MR. GALIPO:    All right.    Is this a good time,

7    Kimberly, and Tom and Jerad, and Hector, to take a

8    ten-minute break?

9            (Unanimous yesses.)

10            MR. GALIPO:    Okay.    Thank you.    I'll be back in

11    ten minutes.    We'll go off video, please.

12            THE VIDEOGRAPHER:    Okay.    We're off the record

13    at 9:59 a.m.

14            (Break taken.)

15            THE VIDEOGRAPHER:    We're back on the record at

16    10:12 a.m.

17    BY MR. GALIPO:

18        Q.    Okay.    Deputy, are you ready -- or Detective, I

19    should say.    Are you ready to continue?

20        A.    Yes.    Thank you.

21        Q.    You're welcome.

22            You mentioned if he had, you know, not grabbed

23    the rifle or not picked it up, or turned and kept

24    walking, you would have -- there would have been other

25    potential tactics you would have used.    Do you recall us

1      A.    Yes.

2      Q.    Is that one of the reasons you wanted another

3  deputy to assist, by bringing up a car, with you, to

4  have potential cover?

5      A.    Yes.

6      Q.    You have training with respect to the concept

7  of de-escalation?

8      A.    Yes.

9      Q.    You have training with respect to less lethal

10  options, if the situation permits?

11      A.    Yes.

12      Q.    And you have training on the concept of

13  containment and perimeter?  In other words, you can get

14  other officers to help, if you need it?

15      A.    Yes.

16      Q.    What was your understanding as to how many

17  officers were on scene, that you were aware of, prior to

18  you firing your shots?

19      A.    I know that when I initially arrived on scene,

20  I arrived with one other person.  And then I know that

21  the person who I called for to bring his car was an

22  additional person.  And when we arrived at Diamond Bar

23  Boulevard, I saw a patrol vehicle, but I didn't see who

24  was occupying that patrol vehicle.

25      Q.    Were you aware of the names of some of the

Hector Vasquez

1  Q.   Now, you also had training with respect to the

2  use of deadly force; correct?

3  A.   Yes.

4  Q.   And we talked about it a little bit prior, but

5  were you generally trained in deadly force is the

6  highest level of force an officer can use?

7  A.   Yes.

8  Q.   And were you trained that shooting someone

9  center mass is likely to cause great bodily injury or

10  death?

11  A.   Yes.

12  Q.   And absent that fleeing felon scenario that we

13  talked about doesn't apply to this case, were you

14  trained that to use deadly force, there has to be an

15  immediate or imminent threat of serious bodily injury?

16  A.   Correct.

17  Q.   Are you trained that you should give a verbal

18  warning before using deadly force, when feasible?

19  A.   When feasible, if you can do so safely.

20  Q.   And are you trained, generally, that deadly

21  force should only be used when there are no other

22  reasonable options?

23  A.   Yes.

24  Q.   Are you trained that, in terms of using deadly

25  force, you need, to the best of your ability, to assess

```
 1    before shooting, and even in between shots?

 2         A.    Correct.

 3         Q.    And are you trained that you are responsible to

 4    justify each of your shots in using deadly force?

 5         A.    Correct.

 6         Q.    Are you trained that you should consider your

 7    backdrop or background?

 8         A.    Correct.

 9         Q.    What was your backdrop when you were firing

10    your two shots?

11         A.    There was a hill, like a berm area, that was my

12    backdrop.

13         Q.    Okay.  It sounds like you did not want to fire

14    with the street at your backdrop, the main street; is

15    that fair?

16         A.    Yes.

17         Q.    And have you had training that -- in terms of

18    the immediate threat of death or serious bodily injury,

19    have you had training that there has to be the ability,

20    opportunity, and apparent intent to immediately cause

21    death or serious bodily injury?

22         A.    Yes.

23         Q.    And obviously, you would have had that training

24    before the day of this shooting incident; is that

25    correct?
```

1          A.    Yes.

2          Q.    Do you -- when you arrived on scene, were you

3     driving your patrol car?

4          A.    Yes.

5          Q.    Was anyone else in your patrol car with you?

6          A.    No.

7          Q.    I think you mentioned that you arrived at about

8     the same time as Deputy De la Torre?

9          A.    Yes.

10          Q.    Would he have been in a separate car?

11          A.    Yes.

12          Q.    And I think you have already told me this; but

13     what information did you have, regarding the call,

14     before you got there?

15          A.    The call for service that was voiced was that a

16     -- what was believed to be a male Asian, wearing a

17     bullet proof vest, was walking down the street with an

18     assault style rifle, firing off rounds.

19          Q.    Did you consider that this person may be

20     suffering from a mental illness or mental health crisis?

21          A.    No. No.

22          Q.    Who was the first person that you spoke to

23     after arriving on scene?

24          A.    As I arrived to the area where the incident was

25     first voiced, there were several just civilians on the

1    Q.   So about 18 days later?  Does that sound more

2    or less correct?

3    A.   Yes.

4    Q.   And I think you already told me this; but you

5    had a chance to review your body worn camera footage

6    before your statement?

7    A.   Yes, immediately before my statement.

8    Q.   Did you have -- I don't want to know what you

9    spoke about, but did you have an opportunity to consult

10    with your attorney before your statement?

11    A.   Yes.

12    Q.   Had you ever gone back to the scene to do a

13    walk-through, before your statement?

14    A.   No.

15    Q.   Have you done a walk-through at any time, up

16    till today?

17    A.   No.

18    Q.   When you were on scene prior to hearing that

19    first shot you described, did you hear any other shots?

20    A.   No.

21    Q.   This woman who came to talk to you who asked

22    you not to shoot him or hurt him, could you tell if she

23    was stabbed or not?

24    A.   I couldn't, myself.  I just saw blood.  And De

25    la Torre said she had been stabbed.

1  his head that turned.

2      Q.    Could you see his eyes at that point?

3      A.    No.  He was too far.

4      Q.    And I think you estimated 150 to 200 feet at

5  that point?

6      A.    Yeah, about half a block; so I would say that's

7  accurate.

8      Q.    When you initially saw the rifle, was it

9  initially pointed downward?

10     A.    Yes.  It was slung over his neck and it was

11 kind of in a downward ready, pointing towards the

12 houses.

13     Q.    Did you see him pointing the gun at anyone?

14     A.    Right before the shooting.

15     Q.    Who did he point the gun at?

16     A.    In the direction of -- again, I didn't know it

17 was Barajas until after, but in the direction where

18 Deputy Barajas was and where there were multiple

19 civilian vehicles in and around her and behind her.

20     Q.    When you initially saw him, was he pointing the

21 gun at anyone?

22     A.    When I first saw him on Crooked Creek, he was

23 half a block.  Like I said, he was facing the houses.

24 There didn't appear to be any people around.

25     Q.    When you were yelling "Bring me a car," was

Jennie Quan v. County of Los Angeles, et al.                    Page: 61

Focus Litigation Solutions

1    that to Deputy Brodwicki?

2        A.    It wasn't to him.    I didn't know he was there.

3    I was just yelling, "Bring a car."

4        Q.    And one of the reasons you wanted the car, so

5    you had something to seek cover behind?

6        A.    Correct.

7        Q.    Did you tell Brodwicki at some point, "Go, man,

8    go."

9        A.    I don't know if those were my exact words, but

10    yeah, something to that effect.

11        Q.    Did you see anyone outside, around any of the

12    houses?

13        A.    No --

14        Q.    Other than those initial people you talked

15    about?

16        A.    Not on Crooked Creek, no.

17        Q.    Did you see anybody outside, other than the

18    cars on Diamond Bar?

19        A.    No.

20        Q.    Would you characterize the walk that you

21    observed the decedent doing on Diamond Bar as a slow,

22    steady walk?

23        A.    Yeah, it felt eerie.

24        Q.    At some point, did you tell Brodwicki, after he

25    pulled his car up, to move forward?

1      A.    Yes.

2      Q.    Why did you tell him that?

3      A.    If I recall correctly, when I told him that I

4    had a gun out of his vehicle, and I basically told him

5    to pull forward so he can continue to provide cover.

6      Q.    And did he pull forward at your request?

7      A.    Yes, slightly.

8      Q.    And then you would have ran on foot away from

9    the vehicle?

10     A.    Yes.

11     Q.    Towards the north sidewalk of Crooked Creek?

12     A.    Yes.

13     Q.    You reference in your statement that you knew

14   your partner's background -- backdrop was horrible.  Do

15   you remember saying that?

16     A.    Yes.

17     Q.    Who -- who were you referring to?

18     A.    Whoever was on radio saying they were detaining

19   at gunpoint.

20     Q.    You now know that to be Deputy Barajas?

21     A.    Correct.

22     Q.    And why did you feel that backdrop was

23   horrible?

24     A.    Because she would have been detaining the

25   suspect, facing him -- or they would have been facing

1        A.   No, I didn't focus in on that.

2        Q.   Your -- the weapon that you were firing slugs

3   from, was that like in a semi-automatic mode?   In other

4   words, you would have to press the trigger for each

5   shot?

6        A.   It's a pump shotgun.   And yes, each shot

7   requires a separate press of the trigger.

8        Q.   And do you know if that shotgun ejects casings

9   with each shot?

10       A.   When you pump it, it will eject a casing and

11   load the next round.

12       Q.   So when you fire, a casing ejects?

13       A.   When you pump it.

14       Q.   Is there a difference between the pump and the

15   firing?

16       A.   Yes.

17       Q.   Can you explain that, please?

18       A.   The firing is a pull of the trigger that causes

19   the round to ignite and go.   On the pump action shotgun,

20   you need to actually pump the handle on it to basically

21   cycle the weapon.   And it's that cycling that we eject

22   the expended round and load the next one.

23       Q.   I see.   So the shot may actually occur; and

24   then slightly after that, with the pump, the casing

25   would be ejected?

1        A.    Correct.

2        Q.    As part of your training in handling situations

3    like this, are you trained not to panic?

4        A.    I think that they try to do that, yes.

5        Q.    Okay.  I think you told me at the beginning

6    that you did watch some of the body-worn camera footage?

7        A.    Yes.

8        Q.    So we're going to try to just look at these

9    briefly.  And I may play it through or stop it and ask

10   you a few questions.  I have Exhibits 1 through 7, I'm

11   going briefly show you in a moment.  But if it's okay,

12   we're going to start with Exhibit 8, because I think

13   that's a portion of your body-worn camera footage, and

14   we're going to try to play it.  Hopefully you'll be able

15   to see it.

16            And for the record -- Hang, is it 2:08, in the

17   bottom left?

18            MS. LE:  Yeah.  So for the record, this is

19   Bates stamp COLA 00855.  We're starting in the video at

20   2:08; but on the Axon timestamp, it's 11:41 and 52

21   seconds.

22            (Exhibit Number 8 was marked.)

23            MR. GALIPO:  Okay.  Let's play.

24            (Video being played.)

25            MR. GALIPO:  Okay.  We stopped it at -- is that

1    does he still look to be northbound on Diamond Bar in

2    this frame?

3        A.    Yes.

4        Q.    Can we go to Exhibit 3, please.

5              (Exhibit Number 3 was marked.)

6    BY MR. GALIPO:

7        Q.    And this is at 11:45 and 9 seconds.  Does he

8    still appear to be walking or facing northbound on

9    Diamond Bar Boulevard?

10       A.    That's what it looks like in the still, yes.

11       Q.    Okay.  Can we go to Exhibit 4, please.

12             (Exhibit Number 4 was marked.)

13   BY MR. GALIPO:

14       Q.    And this is at 11:45 and 11 seconds.  Again, he

15   still appears to be facing or walking northbound on

16   Diamond Bar Boulevard here?

17       A.    Yes, that's what it looks like.

18       Q.    All right.  Can we go to Exhibit 5, please.

19             (Exhibit Number 5 was marked.)

20   BY MR. GALIPO:

21       Q.    And this is at 11:45:14.  Did you see some

22   smoke in this image?

23       A.    Not smoke, but there's a little blurriness or

24   -- I don't know what it is.

25       Q.    Okay.  Does he appear to be slightly bent over

1   in this image?

2        A.   He does.

3        Q.   Still generally facing northbound?

4        A.   Looks like it.

5        Q.   Okay.  Let's go to the next exhibit, I think

6   will be 6.

7              (Exhibit Number 6 was marked.)

8   BY MR. GALIPO:

9        Q.   And this is at 11:45:14.  Again, he appears to

10  be bent over, somewhat facing northbound in this image?

11       A.   I can't really tell.

12       Q.   Hard to tell?

13       A.   Yeah.  I'm having a hard time.  It's kind of

14  small.

15            MR. GALIPO:  Okay.  Are we able to zoom in at

16  all for him, Hang?

17  BY MR. GALIPO:

18       Q.   Is it easier to see now that's zoomed in a

19  little bit?

20       A.   I'm not -- no.

21            MR. HURRELL:  The question is, is he standing

22  upright or --

23  BY MR. GALIPO:

24       Q.   Yeah.  Can you -- well, first of all, can you

25  see him in this image?

1          THE VIDEOGRAPHER:  We're off the record at

2   11:10 a.m.

3          (Break taken.)

4          THE VIDEOGRAPHER:  We're back on the record at

5   11:20 a.m.

6          MR. GALIPO:  Thank you.

7   BY MR. GALIPO:

8       Q.   So, to your knowledge, was this the first time

9   you ever saw this -- this person that you shot?

10      A.   Yes.

11      Q.   Did you know anything about him, as far as his

12  background, prior to the day of the shooting?

13      A.   No.

14      Q.   For example, did you have any information that

15  he had a criminal history before that day?

16      A.   No.

17      Q.   Any information he was under the influence of

18  alcohol or drugs or anything like that?

19      A.   No.

20      Q.   So I think you also mentioned that you watched

21  the body-worn camera of Deputy Barajas recently?

22      A.   Yes.

23      Q.   Okay.  So we're going to, lastly, just look at

24  that.  That will be Exhibit 9.  And then I think we're

25  going to be done.  I may stop it a few times and ask you

```
1    a few questions.

2              MR. GALIPO:  See if we can play that Hang, and

3    I'll let you know if we need to stop it.

4              (Exhibit Number 9 was marked.)

5    BY MR. GALIPO:

6         Q.   And it looks like the time is --

7              MS. LE:  We're starting at 7:35.  And the time

8    stamp on the Axon body cam is 11:44 and 34 seconds.

9              MR. GALIPO:  Okay.  Thank you.

10             (Video being played.)

11             MR. GALIPO:  All right.  Can you stop it there?

12   Where did we stop it, Hang?

13             MS. LE:  This is 8:15.  And the video on the

14   timestamp on the Axon body cam 11:45 and 13 seconds.

15   BY MR. GALIPO:

16        Q.   Okay.  Are you able to see that on your screen,

17   Detective?

18        A.   Yes.

19        Q.   And have you heard a couple shots go off, so

20   far?

21        A.   It sounded like, yes.

22        Q.   Could you tell if any of those shots that went

23   on so far were yours?

24        A.   I don't know.

25        Q.   Okay.  Can you see the decedent in this image
```

1    on your screen?

2         A.    Yes.

3         Q.    Would you agree that his upper body appears to

4    be facing north in this image?

5         A.    It looks like it, yes.

6         Q.    Okay.  And -- and it's your understanding the

7    gun we're looking at here would be Deputy Barajas's gun;

8    correct?

9         A.    Yes.

10        Q.    Okay.

11             MR. GALIPO:  Can we go slightly forward and

12   stop again, please.

13             (Video being played.)

14             MR. GALIPO:  Okay.  Where are we stopped now?

15             MS. LE:  8:16.  And the Axon body time stamp is

16   11:45 and 15 seconds.

17   BY MR. GALIPO:

18        Q.    Can you see him in this image, Detective?

19        A.    Yes.

20        Q.    Does he appear to be somewhat bent or canted

21   forward at this point?

22        A.    Yes, somewhat.

23        Q.    Does he appear to be pointing the rifle at

24   anyone at this point, in this image?

25        A.    It looks like he has it gripped, but I can't

1    tell where it's pointing.

2        Q.    Okay.  Would you agree that he's still -- he's

3    not turned west, at least at this point?

4        A.    Well, his feet are starting to offset.  And in

5    the still it still looks like he's facing north.

6                MR. GALIPO:  What's the time frame on this

7    again, Hang?

8                MS. LE:  11:45 and 15 seconds.

9                MR. GALIPO:  Okay.  Go ahead and play.

10                (Video being played.)

11                MR. GALIPO:  Stop.

12        Q.    Do you know if that last shot was your shot or

13    not?

14        A.    I don't know.

15        Q.    Okay.  Let's just back it up and play it one

16    last time for the detective.

17                (Video being played.)

18                MR. GALIPO:  Not the whole thing, just the

19    shooting sequence.  Yeah.  Where are we starting?

20                MS. LE:  We're at 8:03, which is 11:45 and 2

21    seconds.

22                MR. GALIPO:  Okay.  Thank you.

23                (Video being played.)

24                MR. GALIPO:  Okay.  I think this is good to

25    stop here.  Where did we stop?

1    STATE OF CALIFORNIA)
                       ) ss:
2    COUNTY OF BUTTE    )

3           I, KIMBERLY E. D'URSO, do hereby certify:

4

5           That the witness named in the foregoing

6    deposition was present remotely and duly sworn to testify

7    to the truth in the within-entitled action on the day and

8    date and at the time and place therein specified;

9           That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12          That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15          Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 30th day of September, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25