**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
E-mail: dalekgalipo@yahoo.com
Hang D. Le (SBN 293450)
E-mail: hlee@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333; Fax: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIE QUAN, individually and as successor in interest to BENJAMIN CHIN, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR VAZQUEZ; and DOES 3-10, inclusive,<br><br>Defendants. | Case No. 2:24-cv-04805-MCS-KS<br><br>*Assigned to*:<br>Hon Mark C. Scarsi<br>Hon. Mag. Judge Karen L. Stevenson<br><br>**DECLARATION OF JEFFREY NOBLE** |

1
DECLARATION OF JEFFREY NOBLE
2:24-cv-04805-MCS-KS

I, Jeffrey Noble, hereby declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and am personally familiar with the facts contained herein and could competently testify thereto if called upon to do so.

3. I was retained in this action to render opinions regarding the incident that occurred on June 19, 2023 that resulted in the officer-involved shooting of death of Benjamin Chin.

4. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

5. I was a police officer for 28 years. I retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

6. In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police. My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct

department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

7. As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

8. My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

9. In forming my opinions, I reviewed the following documents: (1) First Amended Complaint; (2) Bodyworn camera video of Detective Hector Vazquez; (3) Bodyworn camera video of Deputy Marisol Barajas; (4) Deposition of Detective Hector Vazquez and exhibits thereto; (5) Deposition of Deputy Marisol Barajas and exhibits thereto; (6) Deposition of Deputy Kyle Toves and exhibits thereto; (7) Deposition of Paul Gliniecki, M.D.; (8) Police Report of the incident; (9) Recorded interview of Detective Hector Vazquez; (10) Recorded interview of Deputy Marisol Barajas; (11) Recorded interview of Deputy Kyle Toves.

10. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

11. Police officers are trained that the reasonableness of their use of force must be considered in relation to the totality of the circumstances. Police officers are trained that their force must be appropriate and that the level and manner of force must be proportional to the level of resistance and threat with which they are confronted. Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

12. Police officers are trained that whether or not the suspect poses an immediate threat to the safety of the officer is the most important factor in evaluating the reasonableness of a police officer's use of force. Officers are trained that there must be objective factors to justify an immediate threat and that a simple statement by an officer that he or she fears for his or her safety or the safety of others is insufficient. Officers are trained that subjective fear or a hunch will not justify the use of force by police. Police officers are trained that in order to justify the use of deadly force, the suspect must objectively present an immediate or imminent threat of death or serious bodily injury. The reasonableness is judge under the totality of the circumstances known to the officer at the time of the use of force.

13. Officers are trained that to use deadly force, the threat of death or serious bodily injury must be immediate or imminent. Officers are trained that a threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances known to the officer, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but one that, from appearances, must be instantly confronted and addressed.

14. Officers are taught that they must make use-of-force decisions based on

the threat that the subject's actions present at, or sometimes shortly before, the point at which force was used. As the International Association of Chiefs of Police wrote in a National Consensus Policy and Discussion Paper on Use of Force, "This evaluation as to whether or not force is justified is based on what was reasonably believed by the officer, to include what information others communicated to the officers, at the time the force was used and upon what a reasonably prudent officer would use under the same or similar circumstances."[1]

15. Officers are trained to control their emotions and to not panic when encountering situations similar this incident. Officers are trained that their subjective fear cannot be a justification for the use of deadly force and that their must be objective facts that show that the subject posed an immediate or imminent threat of death or serious bodily injury at the time of the use of deadly force. Officers are trained that an overreaction in using force is excessive force.

16. Officers are trained that they cannot shoot a person who they suspect or believe to have committed a violent felony simply for fleeing, unless the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. I agree with Detective Vazquez's opinion in this case that deadly force would not be justified against Mr. Chin for his simple act of walking away from officers and that the information known to the officers at the time is insufficient to justify the use of deadly force against Mr. Chin for walking away or fleeing, and Mr. Chin could not be shot as a "fleeing felon" under the standards that apply.

17. Officers are trained that deadly force is a last resort that should only be used in an immediate defense of life situation and when no other reasonable alternatives are available.

---

[1] International Ass'n of Chiefs of Police, National Consensus Policy & Discussion Paper on Use of Force 8 (2017) (emphasis in original) (internal quotation marks omitted).

18. It is well-recognized that an officer's use-of-force decisions (that is, whether, when, and how to use force) are predicated to a significant degree on events that occurred prior to the use of force itself. In most incidents, including the interaction in this case, an officer's use of force is the result of "a contingent sequence of decisions and resulting behaviors—each increasing or decreasing the probability of an eventual use of . . . force." Put differently, "[a]n officer's use-of-force decision . . . will almost always be affected by events that occur prior to the use of force itself, and often prior to the subject's noncompliance, resistance, or other physical actions upon which the use of force is immediately predicated." It follows that the use of force cannot be properly evaluated without considering the preceding actions of officers, subjects, or bystanders.

19. Detective Vazquez violated standard police practices and training when he left available cover to follow Mr. Chin onto Diamond Bar Boulevard. Detective Vazquez had information that the subject of the call was armed with a rifle, was wearing a possible bullet-proof vest, had fired shots in the air, and that a stabbing victim was associated with the call. Thus, Detective Vazquez's decision to use Deputy Bronowicki's patrol vehicle as cover when he encountered Mr. Chin and as he followed Mr. Chin towards Diamond Bar Boulevard was tactically appropriate pursuant to standard police practices and training. However, Detective Vazquez's decision to leave cover and position himself on the sidewalk of Diamond Bar Boulevard was tactically inappropriate and inconsistent with standard police practices and training under the totality of the circumstances known to Detective Vazquez. Detective Vazquez claims that he left cover because he was concerned about crossfire due to the initial position of his cover vehicle and the patrol vehicle and civilian vehicle on Diamond Bar Boulevard. However, Detective Vazquez could have asked Deputy Bronowicki to move his patrol vehicle to position itself alongside the sidewalk of Diamond Bar Boulevard so that Detective Vazquez could flank Mr. Chin's left side and avoid crossfire all the while maintaining cover. Detective

Vazquez's tactically inappropriate decision to leave cover contributed to his later use of deadly force against Mr. Chin, as evidenced by Detective Vazquez's testimony that being without cover was a factor in his decision to shoot at Mr. Chin.

20. Deputy Barajas's first shot at Mr. Chin violated standard police practices and training. Deputy Barajas's subjective fear that Mr. Chin might harm Deputy Barajas or somebody else simply because Mr. Chin was armed with a rifle and walking in Deputy Barajas and a white Tesla's direction is insufficient to justify the use of deadly force. Deputy Barajas testified that she had already started to panic when she first heard the priority call and experienced even more panic when she first saw Mr. Chin and when she saw Mr. Chin walking in her direction. However according to Deputy Barajas, the rifle was slung over Mr. Chin's body, Mr. Chin was not touching the rifle with either hand, and Deputy Barajas never saw Mr. Chin manipulate the rifle, raise the rifle, or point the rifle at anyone prior to or during the shots. Deputy Barajas also never heard Mr. Chin say anything, let alone make any verbal threats. The only information Deputy Barajas had regarding the call and Mr. Chin was that there had been reports of shots being fired, that Mr. Chin was wearing what looked like a bullet proof vest and was armed with a rifle, and that there was a stabbing victim associated with the call. Additionally, Mr. Chin was not fleeing as he was surrounded by police officers and walking in a slow, steady manner. Under these set of facts, a reasonably trained officer in Deputy Barajas's position would not have believed that Mr. Chin posed an immediate or imminent threat of death or serious bodily injury at the time of Deputy Barajas's first shot and would not have shot at all.

21. Detective Vazquez's first shot at Mr. Chin violated standard police practices and training. Detective Vazquez's claim that after Mr. Chin was struck by Deputy Barajas's first shot, he raised his right elbow in such a manner that led Detective Vazquez to believe he was accessing the rifle to shoot is inconsistent with the video evidence and Deputy Barajas's testimony. Detective Vazquez claims that his belief that Mr. Chin was accessing the rifle with his right hand is based on the

position of Mr. Chin's right arm and elbow, with the elbow pointing back behind Mr. Chin's back as if the arm is being bent toward the firearm. However, Detective Vazquez's bodyworn camera video shows that Mr. Chin's right arm was in that position throughout the time he walked in a northbound direction on Diamond Bar Boulevard. The bodyworn camera video shows that Mr. Chin's right arm never left the position in which the upper arm is angled backward, the elbow is pointing backwards and presenting behind Mr. Chin's back, and the forearm is angled forward. Additionally, Deputy Barajas testified that throughout her encounter with Mr. Chin, he never touched the gun with his hand, never manipulated the gun, never raised the gun, and never pointed the gun at anyone. Detective Vazquez's belief that Mr. Chin raised his elbow only after Deputy Barajas's first shot shows a gross lack of situational awareness. Moreover, approximately six seconds elapsed between Deputy Barajas's first shot and Detective Vazquez's first shot, which is sufficient time for Detective Vazquez to evaluate the situation and see that Mr. Chin was not making any threatening or furtive movement prior to Detective Vazquez's first shot. Under these set of facts, a reasonably trained officer in Detective Vazquez's position, acting pursuant to standard police practices and training, would have been aware of Mr. Chin's body and arm positioning throughout the encounter and would not have believed that Mr. Chin posed an immediate threat of death or serious bodily injury at the time of Detective Vazquez's first shot and would not have shot at all.

22. Deputy Barajas's second shot at Mr. Chin violated standard police practices and training. Deputy Barajas fired her second shot approximately seven seconds after her first shot, which is sufficient time for Deputy Barajas to reevaluate the situation. Deputy Barajas testified that after Mr. Chin continued to walk after Deputy Barajas's first shot, she started to panic even more. Deputy Barajas testified that the rifle was slung over Mr. Chin's body, that he was not holding the rifle, that he never manipulated the rifle, that he never raised the rifle, and that he never pointed the rifle at anyone. Deputy Barajas also never heard Mr. Chin say anything. Under

these set of facts, a reasonably trained officer in Deputy Barajas's position would not have believed that Mr. Chin posed an immediate or imminent threat of death or serious bodily injury at the time of Deputy Barajas's second shot and would not have shot at all.

23. Deputy Barajas's third shot at Mr. Chin violated standard police practices and training. Deputy Barajas fired her third shot approximately two seconds after her second shot, which is sufficient time to allow Deputy Barajas to reevaluate the situation. Deputy Barajas testified that the rifle was slung over Mr. Chin's body, that he was not holding the rifle, that he never manipulated the rifle, that he never raised the rifle, and that he never pointed the rifle at anyone. Deputy Barajas's bodyworn camera video shows that the rifle was slung over Mr. Chin's body on the right side, and Mr. Chin was not touching the rifle, manipulating the rifle, raising the rifle, or pointing the rifle at anyone prior to and at the time of Deputy Barajas's third shot. Under these set of facts, a reasonably trained officer in Deputy Barajas's position would not have believed that Mr. Chin posed an immediate or imminent threat of death or serious bodily injury at the time of Deputy Barajas's third shot and would not have shot at all.

24. Detective Vazquez's second shot violated standard police practices and training. Detective Vazquez claimed that after his first shot, Mr. Chin began to turn towards Detective Vazquez while the barrel of Mr. Chin's gun was also coming up in a raised position. Detective Vazquez further claimed that he was aiming at the front of Mr. Chin's body at the time of his second shot. However, Detective Vazquez's bodyworn camera video and Deputy Barajas's bodyworn camera video shows that Mr. Chin was not turned towards Detective Vazquez at the time of Detective Vazquez's second shot but was facing northbound. Additionally, according to Deputy Barajas's bodyworn camera video and Deputy Barajas's testimony, the rifle was slung to the right side of Mr. Chin's body, and Mr. Chin was not holding the rifle, had not manipulated the rifle, had not raised the rifle, had not pointed the rifle at

anyone, and was bent at the waist due to being shot by Deputy Barajas prior to and during Detective Vazquez's second shot. Moreover, the autopsy of Mr. Chin shows that Mr. Chin sustained a gunshot wound to the middle of his lower back, with a trajectory of left to right, back to front, and 45-degree angle upwards, which the medical examiner testified as consistent with Mr. Chin being bent forward at the waist and the shooter at Chin's back at the time Chin sustained that gunshot wound. Detective Vazquez's second shot occurred approximately five seconds after his first shot, which is sufficient time for Detective Vazquez to reevaluate the situation. Under these set of facts, a reasonably trained officer in Detective Vazquez's position, acting pursuant to standard police practices and training, would not have believed that Mr. Chin posed an immediate threat of death or serious bodily injury at the time of Detective Vazquez's second shot and would not have shot at all, particularly since Mr. Chin had already been shot, was bent over at the waist, and was not holding the firearm or turned towards Detective Vazquez (as can be seen in the videos).

25. Police officers are trained that they should give a warning that they are prepared to use deadly force, when feasible. Detective Vazquez and Deputy Barajas violated standard police practices and training when they failed to give Mr. Chin a warning that they were prepared to use deadly force despite it being feasible to do so. Deputy Barajas gave Mr. Chin several commands prior to firing her first shot and thus could have given Mr. Chin a warning regarding deadly force prior to firing her first shot. Approximately seven seconds elapsed between Deputy Barajas's first shot and second shot during which time Deputy Barajas provided several more commands but no warning. Approximately two seconds elapsed between Deputy Barajas's second shot and third shot. Moreover, Detective Vazquez provided several commands to Mr. Chin prior to his first shot but failed to provide a warning. Approximately six seconds elapsed between Deputy Barajas's first shot and Detective Vazquez's first shot. Approximately five seconds elapsed between Detective Vazquez's first shot and second shot. Thus, Detective Vazquez and Deputy

Barajas had ample opportunity to provide Mr. Chin with a warning that they were prepared to use deadly force but failed to do so.

26. The deputies had other reasonable alternatives available to them to take Mr. Chin into custody at the time of the shooting. As Detective Vazquez conceded, if Mr. Chin had just been walking northbound with the rifle slung around his neck, pointed down, and had not grabbed the rifle, raised the rifle, or turned towards Vazquez with the rifle, it would have been inappropriate to shoot based on his training and he would have let the situation play out and try to deescalate the situation further. As evidenced by Deputy Barajas's testimony and the video evidence, that is precisely what occurred prior to and during the shooting. The deputies had the time and opportunity to deescalate further by setting up a perimeter, as other units were on scene and on their way, and could have utilized less-lethal force, such as the 40mm, the beanbag shotgun, or the Taser in order to gain compliance.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this was executed this _10_ day of October 2025 at _Rancho Santa Margarita, CA_

Jeffrey Noble