Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrell-llp.com
Joseph K. Miller, State Bar No. 245685
E-Mail: jmiller@hurrell-llp.com
Jerad J. Miller, State Bar No. 334001
E-Mail: jjmiller@hurrell-llp.com
HURRELL-LLP
800 West 6th Street, Suite 700
Los Angeles, California 90017
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendants, COUNTY OF LOS ANGELES, MARISOL BARAJAS and HECTOR VAZQUEZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

<div style="vertical-align: sideways">HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000</div>

| | |
|---|---|
| JENNIE QUAN, individually and as successor in interest to BENJAMIN CHIN, deceased,<br><br>       Plaintiff,<br><br>       v.<br><br>COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR VAZQUEZ; and DOES 3-10, inclusive,<br><br>       Defendants. | Case No. 2:24-cv-04805-MCS(KSx)<br><br>**DEFENDANTS' MOTION IN LIMINE TO EXCLUDE, OR LIMIT, THE OPINIONS OF BENNET OMALU, MD**<br><br>Date: January 26, 2026<br>Time: 2:00 p.m.<br>Dept. 7C<br><br>[Assigned to Hon. Mark C. Scarsi, Courtroom "7C"] |

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

    **PLEASE TAKE NOTICE** that at the on January 26, 2026 at 2:00 p.m. or as soon thereafter as the matter may be heard, in Courtroom 7C of the above-entitled Court, located at the First Street Courthouse, 350 West 1st Street, Los Angeles, CA 90012, Defendants MARISOL BARAJAS, HECTOR VAZQUEZ and COUNTY OF LOS ANGELES (collectively, "Defendants") will move and do hereby submit their Motion in Limine No. 1 for an order *in limine* to exclude, or limit, the opinions of

Bennet Omalu, MD. Defendants bring this Motion on the grounds that such evidence is outside the scope of Dr. Omalu's qualifications and such evidence would only serve to unduly prejudice defendants, waste time, confuse the issues, and mislead the jury.

Defendants further move this Court to instruct Plaintiff and her counsel to require them to advise all witnesses:

1.      Not to attempt to convey to the jury, directly or indirectly, any of the facts mentioned in this Motion without first obtaining permission of the Court outside the presence and hearing of the jury;

2.      Not to make any reference to the fact that this Motion has been filed; and

3.      To warn and caution each of plaintiff's witnesses to strictly follow the same instructions.

This motion is made following compliance with the meet and confer requirements of *Local Rule* 7-3. This Motion is based upon the Memorandum of Points and Authorities served herewith, upon the pleadings and papers on file herein, and upon such other and further oral argument and evidence as may be presented at the hearing on this Motion.

DATED: January 5, 2026          HURRELL-LLP


                                By:  _____/s/ Jerad J. Miller_____
                                    THOMAS C. HURRELL
                                    JOSEPH K. MILLER
                                    JERAD J. MILLER
                                    Attorneys for Defendants, COUNTY OF
                                    LOS ANGELES, MARISOL BARAJAS
                                    and HECTOR VAZQUEZ

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1     **<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

2 **I.**     **<u>INTRODUCTION</u>**

3       On June 19, 2023, Deputy Marisol Barajas and Detective Hector Vazquez

4 (collectively, "Defendant Deputies") responded to a call involving Benjamin Chin

5 ("Decedent") wearing bullet-proof vest and carrying an AR-15 around Diamond Bar

6 Boulevard and Crooked Creek Drive. Prior to the Defendant Deputies arriving on

7 scene, each received dispatch reports that the Decedent fired his assault rifle in the air

8 multiple times, and that there was a stabbing victim. Deputy Barajas arrived to the

9 scene and positioned herself and her vehicle in front of the Decedent on Diamond Bar

10 Boulevard, and Detective Vazquez responded on Crooked Creek Drive behind the

11 Decedent as the Decedent walked onto Diamond Bar Boulevard heading northbound.

12 After ignoring numerous commands to drop his rifle and dangerously proceeding

13 forward toward deputy and civilian vehicles with at least one hand on his rifle, Deputy

14 Barajas and Detective Vazquez fired several shots at the Decedent. The Decedent

15 collapsed after being struck by multiple rounds. Medical aid was immediately

16 rendered to the Decedent by the deputies on-site. The Decedent was transported to

17 Pomona Valley Hospital, where he was pronounced dead later that same day.

18       Plaintiff retained Bennet Omalu, MD, as her forensic pathologist to opine on

19 the Decedent's pain and suffering during the subject incident. As part of her initial

20 expert disclosures, Plaintiff produced an expert report from Dr. Omalu, which was

21 subsequently followed by a supplemental report from Dr. Omalu rebutting the

22 opinions of Defendants' neurology expert, Jonathan Marehbian, MD. Dr. Omalu's

23 opinions are speculative, foundationless, prejudicial, unhelpful to the jury, lack

24 scientific validation and should be excluded under the Federal Rules of Evidence. In

25 the alternative, Dr. Omalu's opinions should be limited to the duration of the

26 Decedent's conscious pain and suffering from the time he was shot, which was

27 approximately 11:45 a.m., to when he was documented to have a Glasgow Coma

28 Score of 3, which was upon arriving at Pomona Valley Hospital at 11:59 a.m.

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

## II.    __EXPERT STANDARD__

The proponent of expert testimony has the burden of proving the proposed expert testimony is admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 188 S. Ct. 512 (1997).

Federal Rule of Evidence 702 provides:

[A] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702(a)-(d).

In *Daubert*, the Supreme Court announced that the key inquiry in evaluating expert scientific testimony centers on reliability; and trial judges are to act as gatekeepers in excluding unreliable expert scientific testimony. *Daubert*, 509 U.S. 579. The reliability analysis was extended to all expert testimony in *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999).

In guiding trial courts, the Supreme Court announced the following nonexclusive factors to use in evaluating expert testimony: (1) whether the expert's technique can or has been tested; (2) whether the technique or theory has been subjected to peer review and publication; (3) the technique or theory's rate of error; (4) the existence and maintenance of standards and controls; and (5) the technique or theory's general acceptance. See *Daubert*, 509 U.S. at 593-94.

In making this inquiry into reliability, trial judges are accorded significant discretion. *Id*., see also *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997) [holding that the trial court's decision in admitting or excluding expert testimony will be reviewed for abuse of discretion]. Even if an expert relies on valid scientific studies, a judge may properly exclude the conclusions where there is "too great an analytical

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

4

gap" between the data studies and the opinions proffered. *General Elec. Co.*, 522 U.S. at 146.    The Ninth Circuit requires exclusion where an expert's opinions are speculative, lack scientific validation, or exceed the expert's qualifications. *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997).

### A.    Dr. Omalu Lacks Qualification to Render Opinions on Delayed Medical Care

Dr. Omalu's opinion that there was a delay in medical care that contributed to the Decedent's pain and suffering is speculative, prejudicial, lacks foundation and calls for a legal conclusion that Dr. Omalu is unqualified to render. Dr. Omalu states the following opinion in his expert report: "[i]t is pertinent to note that after he was shot Benjamin Chin did not receive immediate medical assistance for several minutes while he lay on the roadway. According to the American Heart Association, every one-minute delay in providing medical aid and cardiopulmonary resuscitation decreases the risk of survival by 7-10%." Bennet Omalu's Expert Report ("Omalu Report"), p. 17; Exhibit A. Dr. Omalu concludes his opinion by stating, "[s]uch a delay in rendering medical aid and assistance significantly contributed to Mr. Chin's pain and suffering." *Id*.

Whether there was a delay in medical care requires an understanding of police practices, which is entirely outside of Dr. Omalu's qualifications as a forensic pathologist. Prior to rendering medical care, the responding deputies must ensure that it is safe to approach a suspect. Failing to do so puts themselves at risk of harm, especially with a suspect known to be violent and with an AR-15 within his wingspan. The responding deputies immediately provided medical care once they devised a plan to safely and securely approach the Decedent.  Moreover, Plaintiff has withdrawn her cause of action for Denial of Medical Care, further rendering Dr. Omalu's opinion as prejudicial and unhelpful to the jury.  Accordingly, any opinion by Dr. Omalu that a delay in medical care caused additional pain and suffering to the Decedent should be excluded.

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

## B.    Dr. Omalu Is Unqualified to Render Ballistics Opinions

Dr. Omalu should be excluded from testifying as to the trajectory of the gunshots because he is unqualified to render ballistics opinions and his testimony would be cumulative of the autopsy report. As a forensic pathologist, Dr. Omalu does not possess specialized knowledge that would qualify him to discuss the bullet trajectory of the two gunshot wounds suffered by the Decedent, or the biomechanics related to his body positioning relative to the shots. He even admitted as much in his deposition, stating that he does not possess any degree, license or qualification in biomechanics. Deposition of Bennet Omalu, p. 59:9-13; Exhibit B.

Moreover, Dr. Omalu's ballistics and biomechanical opinions are not helpful to the jury. There are multiple body-worn camera videos of the incident that depict the Decedent's body position and distance from the Defendant Deputies when they discharge their firearms. Dr. Omalu concludes that the Decedent suffered two distant gunshot wounds.  While the exact distance between the Defendant Deputies and the Decedent for each gunshot is disputed by the parties, Dr. Omalu considers distant gunshot wounds to be from a distance greater than 2 – 3 feet. This opinion is unhelpful to the jury because neither party is disputing that the gunshots occurred at a distance greater than 2 – 3 feet.

In addition, Dr. Omalu's opinions are unnecessarily duplicative of the autopsy report. When asked whether he intends to offer any opinions to contradict the autopsy report, Dr. Omalu responded, "[n]o, in terms of the specific questions and assignment of the case, no."  Deposition of Bennet Omalu, p. 50:24-25; Exhibit B. The trajectory of the bullets and the entrance/exit wounds are not in dispute and therefore do not require testimony beyond what is contained in the autopsy report. The autopsy report will be introduced as an exhibit during trial, rendering Dr. Omalu's opinions unnecessary and cumulative. The only use for Dr. Omalu's ballistics opinions would be to bolster his credibility as an expert, which would be unduly prejudicial in this context and afford him unmerited credence. As a result, the Court should prevent Dr.

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1  Omalu from testifying regarding ballistics matters and opinions already contained in

2  the autopsy report.

3      **C.    Dr. Omalu's Theories on the Decedent's Pre-Death Pain and**

4           **Suffering Are Not Reliable**

5          Dr. Omalu's opinions on the Decedent's pain and suffering while unconscious

6  fail *Daubert's* reliability requirement and are unduly prejudicial. Dr. Omalu's report

7  explains how the human body typically receives and responds to pain, and from that

8  he makes the following particularized conclusions:

9          "Benjamin Chin felt all types of gunshot induced pain within milliseconds of

10  contact . . ." *Id*. at p. 12;

11         "Action potentials were transmitted to the spinal cord and brain to cause high

12  levels of composite conscious pain and suffering." *Id*. at p. 16;

13          "Numerous nerve endings in his skin and tissues were activated, and elicited

14  millions of pain action potentials, which were transmitted to the spinal cord and brain

15  to cause conscious somatic pain, which caused conscious somatic suffering, which in

16  turn elicited novel mental and biochemical pain and suffering, which synergized with

17  the previously existing mental, somatic and biochemical pain and suffering." *Id*. at p.

18  15-16;

19         "Benjamin Chin continued to experience pre-death mental, somatic, and

20  chemical pain, and suffering, as the cascades of biochemical pain and suffering were

21  intensifying his pain and suffering.   Within milliseconds of his trauma, the

22  biochemical cycles and systems in his body began to express acute reactant proteins

23  and peptides in response to the high levels of traumatic stress, which elicited novel

24  chemical pain and suffering, and further accentuated his global conscious pain and

25  suffering" *Id*. at p. 16;

26         "Benjamin Chin experienced the highest levels of high-scale conscious

27  somatic, mental, and biochemical pain and suffering which correspond with, and were

28  caused by the serious bodily injuries he suffered." *Id.* at p. 18;

HURRELL·LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

1    "[Benjamin Chin] suffered pre-death pain and suffering for a mean, mode, and
2    median period of less than 12 hours [11 hours 27 minutes] beginning from 11:36 a.m.
3    and ending at 11:09 p.m." *Id.* at p. 19.

4    Dr. Omalu lists a variety of different medical literature and texts at the end of
5    his report that he presumably relied on in forming his opinions, but he fails to describe
6    within his report the methodology used to determine the Decedent's alleged pain and
7    suffering. Instead, Dr. Omalu relies on improper generalities in describing the
8    Decedent's pain in violation of the *Daubert* standards. "[B]ald assurance of validity
9    is not enough. Rather, the party presenting the expert must show that the expert's
10   findings are based on sound science, and this will require some objective, independent
11   validation of the expert's methodology. *Daubert*, at p. 1316. His failure explain how
12   he reached his opinions regarding the Decedent's subjective pain and suffering
13   renders his opinions unreliable and thus, inadmissible. *See Id.* at p. 1319 ("[P]laintiffs
14   rely entirely on the experts' unadorned assertions that the methodology they employed
15   comports with standard scientific procedures . . . they neither explain the methodology
16   the experts followed to reach their conclusions nor point to any external source to
17   validate that methodology. We've been presented with only the experts'
18   qualifications, their conclusions and their assurances of reliability. Under *Daubert*,
19   that's not enough.").

20   Moreover, Dr. Omalu's opinions are unspecific and undefined. Dr. Omalu uses
21   unquantifiable measurements such as "Benjamin Chin experienced the **highest levels**
22   of high-scale…pain and suffering," and "**high levels** of composite conscious pain and
23   suffering (emphasis added)." Omalu Report, p. 18.  Quantifying a measurement as
24   "high level" without defining the different levels or providing a standard of
25   measurement is unscientific and unreliable.

26   In addition, Dr. Omalu fails to consider physiological responses that may
27   mitigate the traditional levels of pain that accompany pain signals throughout the
28   body. Dr. Omalu acknowledges that the shooting caused the Decedent to suffer

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

8

trauma, "hypovolemic shock" and "traumatic shock," causing him to "pass through the levels and spectrum of consciousness with diminishing sensorium." Omalu Report, p. 17.  He further opines that "the cascades of biochemical pain and suffering were intensifying his pain and suffering." *Id.* at p. 16.  Dr. Omalu freely discusses physiological changes after the shooting that may heighten the Decedent's alleged pain and suffering, but conveniently absent from his report is how physiological changes may diminish the Decedent's ability to feel pain, such as through the loss of oxygen to his brain and his body's state of shock. Because Dr. Omalu has omitted his methodology for calculating the Decedent's pain and suffering after the shooting, it can objectively be stated that there is just as much evidence that he experienced "heightened" pain and suffering as there is he experienced very little pain and suffering once his body went into shock. As it is the expert's burden to meet the standards for reliability, Dr. Omalu's opinions must be excluded for failing to reach this threshold.

     In addition, expert testimony that speculates on the level of pain and suffering the Decedent may have experience is not helpful to the jury. "Under [F.R.E.] 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009). Here, there is video footage of the shooting from the perspective of both Defendant Deputies. There is footage of the responding deputies rendering medical care to the Decedent after the shooting where the jury will be able to assess the Decedent's pain levels. Describing pain through the lens of action potentials generating within a few "10,000ths" of a second and transmitting through "peripheral nerves in the A8 and C fibers for fast and slow pain," is unnecessary, as it "improperly addresses matters within the understanding of the average juror." *Id.* at p. 12; *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993).

     Further, even "[o]therwise admissible expert testimony may be excluded under [F.R.E.] 403 if its probative value is substantially outweighed by the danger of unfair

HURRELL·LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE   (213) 426-2000

prejudice, confusion of the issues, or undue delay." *United States v. Hoac*, 990 F.2d 1099, 1103 (9th Cir. 1993). The danger particular to expert testimony is that "witnesses who testify as an expert may receive unmerited credibility for their lay testimony, because expert testimony is likely to carry special weight with the jury." *United States v. Gadson*, 763 F.3d 1189, 1212 (9th Cir. 2014) (internal quotations omitted); see also *Jinro Am. Inc. v. Secure Investments, Inc*., 266 F.3d 993, 1004 (9th Cir. 2001), amended on denial of reh'g, 272 F.3d 1289 (9th Cir. 2001) (testimony from a witness that is "cloaked with the mantle of an expert" is "likely to carry special weight with the jury"; thus, "care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of [F.R.E.] 702.").

Here, Dr. Omalu's opinions on the Decedent's pain and suffering will have little probative value because the jury will have access to the entire incident from multiple angles with audio. Rather, the only discernable purpose of Omalu's pain/suffering testimony would be to bolster Plaintiffs' damages claims, to draw sympathy from the jury, and to bias the jury against the Defendants. This would not merely present a "risk" of substantial prejudice to the Defendants at trial - it would be a certainty.

For the reasons stated above, Dr. Omalu's opinions on the Decedent pre-death pain and suffering should be excluded, or limited.

**D.    Dr. Omalu's Opinions That the Decedent Experienced Pain and Suffering Before the Shooting are Unreliable**

Furthermore, Dr. Omalu's opinions that the Decedent experienced pain and suffering *before* the shooting must be dismissed as unreliable and completely speculative. According to Dr. Omalu's report, the Decedent's first terminal trauma event occurred at 11:36 a.m. when the Decedent first encountered LASD deputies. *Id*. at p. 15. In sum, Dr. Omalu concludes that the Decedent's encounter with LASD deputies caused the Decedent to experience fear, and "[t]his fear, fright and flight

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

adrenergic response caused high levels of mental pain and suffering. His heart started pumping faster [chronotropic effect] and stronger [ionotropic effect] due to the nor-adrenergic/adrenergic response." *Id*.    Dr. Omalu's opinion that the Decedent experienced fear is not only speculative, but the conclusion that the Decedent's alleged fear led to mental pain and suffering also lacks foundation. There is no basis for concluding that the Decedent experienced fear during the incident, or to what degree. Even if we accept Dr. Omalu's proposition that the Decedent experienced fear, he has provided no method for quantifying his fear and the resulting physiological response. Dr. Omalu should therefore be precluded from testifying that the Decedent experienced pre-shooting pain and suffering.

## III.    <u>CONCLUSION</u>

Based on the foregoing, Dr. Omalu's testimony should be excluded, or in the alternative, limited to exclude pre-shooting pain and suffering, ballistics and delay in medical care, and pre-death pain and suffering opinions.


DATED:  January 5, 2026          HURRELL-LLP



By:    <u>*/s/ Jerad J. Miller*</u>
        THOMAS C. HURRELL
        JOSEPH K. MILLER
        JERAD J. MILLER
        Attorneys for Defendants, COUNTY OF LOS ANGELES, MARISOL BARAJAS and HECTOR VAZQUEZ

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

# DECLARATION OF JERAD J. MILLER

I, Jerad J. Miller, declare:

1.      I am an attorney duly licensed to practice before this Court and am an associate with Hurrell-LLP, attorneys of record for MARISOL BARAJAS, HECTOR VAZQUEZ and COUNTY OF LOS ANGELES (collectively, "Defendants") herein. The facts set forth herein are of my own personal knowledge and if sworn I could and would testify competently thereto.

2.      On December 22, 2025, I met and conferred with Hang D. Le from the Law Offices of Dale K. Galipo to discuss the filing of the Motion in Limine to Exclude, or Limit, the Opinions of Bennet Omalu, MD. Defendants proceeded with the Motion in Limine herein because a resolution was not reached regarding Dr. Omalu's opinions.

3.      A true and correct copy of Bennet Omalu's, MD, expert report is attached as Exhibit A.

4.      A true and correct copy of Bennet Omalu's, MD, deposition is attached as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 5, 2026, at Los Angeles, California.


_/s/ Jerad J. Miller_
Jerad J. Miller

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

# EXHIBIT "A"

# BENNET OMALU
## P A T H O L O G Y

Phone: 279-345-1300
Fax: 866-402-6875
bennetomalu@bennetomalu.com

Autopsy and Anatomic Pathology
Clinical Pathology and Toxicology
Forensic Pathology

Neuropathology
Epidemiology
Medico-Legal Consultations

Dale Galipo, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

October 18, 2025

Dear Mr. Galipo,

**Re:    Benjamin Edward Huan Ming Chin, Deceased**
**Medico-Legal Report**

## Summary of Education, Training and Experience

I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon graduating from medical school, I completed a one-year clinical housemanship at the University of Nigeria Teaching Hospital in the fields of Pediatrics, Internal Medicine, General Surgery, Obstetrics, and Gynecology. After housemanship, I worked as an emergency room physician at a university hospital in Nigeria for approximately three years. I sat for and passed my United States Medical Licensing Examinations [USMLE] while I worked as an emergency room physician. I came to the United States in 1994 through a World Health Organization scholarship to become a visiting research scholar for eight months at the Department of Epidemiology, Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and Clinical Pathology. In 1999, I proceeded to the University of Pittsburgh in Pittsburgh, Pennsylvania, to complete residency training in Forensic Pathology and Neuropathology. I hold four board certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology. I also hold a Masters in Public Health [MPH] in Epidemiology from the Graduate School of Public Health at the University of Pittsburgh in Pittsburgh, Pennsylvania. I also hold a Masters in Business Administration [MBA] degree from the Tepper School of Business at Carnegie Mellon University in Pittsburgh, Pennsylvania, one of the leading business schools in the world. I am a Certified Physician Executive and an Honorary Fellow of the American Association of Physician Leadership [AAPL]. I also hold a fifth board certification in Medical Management from the AAPL. I am currently licensed to practice Medicine and Surgery in the State of California.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a California medico-legal consulting firm, and a Clinical Professor at the Department of Medical

Benjamin Edward Huan Ming Chin, Deceased
Medico-Legal Report

Page 12 of 21

The manner of Mr. Chin's death was a homicide. He was shot and killed by other persons. He died in the hands of another. A medical homicide may be deemed as a death that occurs, directly or indirectly, as a result of another person's actions.

**2.    Did Benjamin Chin experience pain and suffering when he was shot and killed on June 19, 2023, and for how long?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of traumas/injuries generated by blunt force impacts, gunshots, firearms and ballistics weapons, and the mechanisms of sustenance of these patterns of traumas/injuries are very well established in the medical literature and have become common knowledge.

**Patho-physiology of conscious pain and suffering**
Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following contact of any part of the body with an impacting surface and following all types of mechanical tissue damage caused by kinetic energy and blunt force trauma. Similarly, nerve endings for pain and heat sensations generate electrical action potentials following contact of any part of the body with flames and heat and following all types of tissue damage caused by flames and heat. The fundamental mechanism of injury sustenance for gunshots is kinetic energy transference, which causes mechanical destruction of tissues. Action potentials are the sub-cellular physiological basis for noxious conscious sensations and originate from voltage gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses.

It takes a few 10,000ths of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain respectively at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is therefore a double pain sensation, a fast-sharp pain, and a slow pain. The sharp pain apprises the person rapidly of imminent danger and prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes resulting in continued intolerable pain and suffering prompting the person to continue to try to relieve the cause of the pain and flee from imminent danger.

At autopsy Benjamin Chin measured 69 inches [1.75 meters]. Benjamin Chin felt all types of gunshot induced pain within milliseconds of contact of the bullet with his skin, and within milliseconds of direct blunt force impact and contact of his body with any unyielding surface. One millisecond is one second divided into 1000 parts. For the slowest nervous mechanisms of pain sensation and consciousness, a man like Benjamin Chin felt pain within 100 milliseconds.

Nerve pathways transmitting pain, terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus, tertiary pathways transmit pain to other basal ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla; to the tectal midbrain and the periaqueductal gray



**Benjamin Chin's conscious pain and suffering**

The terminal trauma event which resulted in the violent death of Benjamin Chin began at about 11:36 a.m. on 06/19/2023 when Benjamin Chin first encountered the police. At this time, more likely than not, Benjamin Chin was fully conscious and aware of his surroundings with a GCS of 15/15. He was not suffering from any known neurological disease or drug intoxication that may have impaired his capacity to process noxious stimuli and experience the full spectrum of pain and suffering. Pain and suffering moreover are primitive autonomic reflexes of humankind. Patients who suffer neurological diseases like delirium, neurosis, psychosis and dementia and all forms of cognitive impairment, congenital and acquired intellectual disabilities and autism spectrum disorders still possess the autonomic capacity for primitive reflexes like pain and suffering, thirst and hunger and fear.

His reticular activating center was completely intact and functional. As a 30-year-old adult male he had the mental capacity and learned behavior to identify and classify the presence of the police officers, their guns and weapons, the noises of the police sirens, the visual effects of the police lights, the firing and explosive noises of the gun(s), and the bullets hitting him as imminent dangers and threats to his life.

At this time, the brainstem nuclei, the frontal cortex, pre-frontal cortex, basal forebrain, and limbic cortex of Benjamin Chin's brain initiated, within 10,000th of a second, action potentials, which initiated within milliseconds, the primitive human reflexes of fright, flight, and fight. This mental awareness of imminent danger initiated the nor-adrenergic and adrenergic biochemical neural responses of fear, fright, and flight, when the locus ceruleus of the brainstem released large amounts of noradrenalin to the cerebral hemispheres. This fear, fright and flight adrenergic response caused high levels of mental pain and suffering. His heart started pumping faster [chronotropic effect] and stronger [ionotropic effect] due to the nor-adrenergic/adrenergic response. His respiratory rate and general muscle tonicity increased as well due to the nor-adrenergic/adrenergic response. His gastrointestinal system increased bowel peristalsis and acid secretion in the stomach. All these patho-physiologic processes culminated in high levels of conscious mental pain and suffering, which resulted in attendant somatic and biochemical pain and suffering as a result of the body's pathophysiological and biochemical responses to mental pain and suffering. The fear, fright and flight autonomic response prompted him to flee from the police. Firing the guns generated loud blast noises which instigated mechanical ossicular noxious stimuli and pain from transmission of such loud noises.

The various domains of his brain and cerebral functioning were intact and identified the imminent danger within 1000ths of a second. His limbic system instigated high levels of primitive adrenergic fright-flight-fight response, which caused high levels of mental, somatic, and biochemical pain and suffering.

When Benjamin Chin was shot, the forces of the bullets and the cranial and spinal nerve reflexes made him fall to the ground and he impacted different regions of his body on the roadway. He suffered additional multiple blunt force impacts and trauma of his body, some of which caused discernible abrasions and contusions of his body.

Benjamin Chin suffered gunshot wounds and blunt force trauma. Each gunshot wound, and each impact initiated multimodal transfer of kinetic energy to his body. At this time, Benjamin Chin experienced physical and mechanical somatic pain caused by the constellation of gunshot wounds and blunt force impacts. Numerous nerve endings in his skin and tissues were activated, and elicited millions of pain action potentials, which were transmitted to the spinal cord and brain to


Bennet Omalu
PATHOLOGY

cause conscious somatic pain, which caused conscious somatic suffering, which in turn elicited novel mental and biochemical pain and suffering, which synergized with the previously existing mental, somatic and biochemical pain and suffering. The biochemical cycles and systems in his body expressed acute reactant proteins and peptides in response, which sustained biochemical pain and suffering, and further accentuated his global conscious mental, somatic and biochemical pain, and suffering.

Following the gunshots, the bullets traveled through air, hit, and perforated Benjamin Chin's body. When the bullets perforated Benjamin Chin's skin, soft tissues, organs, and skeleton they transferred high levels of kinetic energy[6] and thermal energy to the tissues causing mechanical tissue damages and destruction, which activated thousands to millions of nerve endings and action potentials. She experienced more somatic pain and suffering with the attendant and accompanying mental and biochemical pain and suffering within 100 milliseconds of sustenance of his gunshot wounds.

The bullets perforated and damaged the skin, soft tissues, skeleton and viscerae which have been described above. Perforations, contusions and lacerations of soft tissues, blood vessels and visceral parenchyma precipitated soft tissue and cavity bleeding, which eventually resulted in acute decompensation of the vascular pressure, acute cardio-pulmonary arrest, and cerebral hypoperfusion. The constellation of these injuries resulted in acute traumatic shock, which in turn activated millions of nerve endings and action potentials, generated more and higher levels of somatic and biochemical pain and suffering combined with the attendant mental pain and suffering in response.

The multimodal transfer of kinetic energy, including the gunshot wounds and the multifocal blunt force impacts of different regions of his body induced physical and mechanical somatic pain and suffering, accompanied by attendant mental and biochemical pain and suffering. Action potentials were transmitted to the spinal cord and brain to cause high levels of composite conscious pain and suffering. Given the large amounts of kinetic energy a bullet generates, and the matching degree of tissue damage and destruction, the levels of pain and suffering were expectedly high-scale. At this time, the novel mental, somatic and biochemical pain and suffering synergized with the pre-existing and continuing mental, somatic, and biochemical pain and suffering. This synergism caused increasingly higher levels of pain and suffering.

Benjamin Chin continued to experience pre-death mental, somatic, and chemical pain, and suffering, as the cascades of biochemical pain and suffering were intensifying his pain and suffering. Within milliseconds of his trauma, the biochemical cycles and systems in his body began to express acute reactant proteins and peptides in response to the high levels of traumatic stress, which elicited novel chemical pain and suffering, and further accentuated his global conscious pain and suffering.

During this time, his traumatic and hypovolemic shock progressed and began to cause hypoxic-ischemic brain injury. The attendant pathophysiological and biochemical responses of the body including but not limited to systemic inflammatory response, enzymatic, proteomic, and biochemical cyclic responses and expression in addition generated more and novel biochemical pain, which added to and accentuated the global pre-death mental, somatic, and biochemical pain Benjamin Chin was experiencing.

---

[6] A bullet traveling at a linear velocity of over 1200 feet per second possesses large amounts of kinetic energy.



Benjamin Edward Huan Ming Chin, Deceased
Medico-Legal Report

Page 17 of 21

As he continued to suffer the sequelae of his trauma, traumatic shock progressed, and he began to lose his orientation and consciousness. He began to pass through the levels and spectrum of consciousness with diminishing sensorium. He was shot at about 11:45 a.m. After he was shot, he fell to the ground and lay on the ground until officers approached and reached him at about 11:47 a.m. when he was noted to move his head and neck in response to the officers. He was admitted into the ER at 11:59 a.m. and received multifaceted medical and surgical treatments and interventions including emergent thoracostomies and laparostomies. After his first emergency surgery he developed traumatic coagulopathy and his traumatic shock continued. He was returned to the operating room for re-exploration. He eventually succumbed to his injuries and was pronounced dead at about 11:09 p.m. on 06/19/2023. Upon arrival at the ER at about 11:59 a.m. his GCS was noted to be 3/15. As part of his traumatic shock, he developed shock bowel with infarction and underwent bowel resection. His liver lacerations and contusions were debrided and removed, and his injured right kidney was also resected.

As has been stated above, the specified trauma-induced mechanisms of death instigated by his fatal gunshot wound do not result in instantaneous death. Such mechanisms of death take time to occur and eventually result in death. Benjamin Chin did not die at the instant he sustained gunshot wound #1 or #2. Also, as has been stated above, the standard reference time interval for the sustenance of such fatal gunshot wounds and irreversible brain damage is about a mean of 3 to 5 minutes. Therefore, after Benjamin Chin was shot, he began suffering the patho-physiological consequences, cascades, and sequelae of his wounds, which culminated in irreversible brain damage, coma, and eventual death.

It is pertinent to note that after he was shot Benjamin Chin did not receive immediate medical assistance for several minutes while he lay on the roadway. According to the American Heart Association, every one-minute delay in providing medical aid and cardiopulmonary resuscitation decreases the risk of survival by 7-10%[7]. According to the American Heart Association, immediate CPR increases a patient's chances of survival by over 200-300%[8]. It is also pertinent to note that the primary and fundamental prognostic factor in fatal exsanguination is a timely intervention[9,10,11]. It is also vital to note that one of the most preventable causes of death in trauma patients is exsanguination as we, in part, have in this case[12,13,14]. This is because the mechanisms of death for exsanguination involve the delayed pathophysiological mechanisms of hypoxic-ischemic brain injury, which can take from 3-5 minutes to over 45 minutes to one hour to occur depending

[7] Every Second Counts - AED fact sheet 2013 - Final (heart.org)
[8] CPR Facts and Stats | American Heart Association CPR & First Aid
[9] Hemorrhage - StatPearls - NCBI Bookshelf (nih.gov)
[10] Huber-Wagner S, Qvick M, Mussack T, Euler E, Kay MV, Mutschler W, Kanz KG; Working Group on Polytrauma of German Trauma Society (DGU). Massive blood transfusion and outcome in 1062 polytrauma patients: a prospective study based on the Trauma Registry of the German Trauma Society. Vox Sang. 2007 Jan;92(1):69-78. doi: 10.1111/j.1423-0410.2006.00858.x. PMID: 17181593.
[11] Tien HC, Spencer F, Tremblay LN, Rizoli SB, Brenneman FD. Preventable deaths from hemorrhage at a level I Canadian trauma center. J Trauma. 2007 Jan;62(1):142-6. doi: 10.1097/01.ta.0000251558.38388.47. PMID: 17215745.
[12] Hemorrhage - StatPearls - NCBI Bookshelf (nih.gov)
[13] Huber-Wagner S, Qvick M, Mussack T, Euler E, Kay MV, Mutschler W, Kanz KG; Working Group on Polytrauma of German Trauma Society (DGU). Massive blood transfusion and outcome in 1062 polytrauma patients: a prospective study based on the Trauma Registry of the German Trauma Society. Vox Sang. 2007 Jan;92(1):69-78. doi: 10.1111/j.1423-0410.2006.00858.x. PMID: 17181593.
[14] Tien HC, Spencer F, Tremblay LN, Rizoli SB, Brenneman FD. Preventable deaths from hemorrhage at a level I Canadian trauma center. J Trauma. 2007 Jan;62(1):142-6. doi: 10.1097/01.ta.0000251558.38388.47. PMID: 17215745.

on a multiplicity of metabolic factors[15,16]. Such a delay in rendering medical aid and assistance significantly contributed to Mr. Chin's pain and suffering.

In spite of his gunshot wounds, Benjamin Chin's brain and neural axis remained functionally intact. His spinal nerves and nerve roots, and spinal reflexes remained intact. His subcortical ganglia and brainstem nuclei of the cranial nerves remained intact. His reticular activating system remained electrochemically intact. The distinctive anatomy of his injuries enabled him to continue to experience increasingly higher levels of somatic pain and suffering, mental pain and suffering, biochemical pain, and suffering.

As he received medical and surgical treatments and interventions, the secondary traumatic sequences of his injuries progressed as he lost blood. Traumatic shock, hemorrhagic shock, acute cardio-respiratory arrest, and hypoxic-ischemic cerebral injury persisted. As he continued to suffer the sequelae of his injuries, he progressed into deeper levels of traumatic and hypovolemic shock, as he developed more severe and advanced stages of acute respiratory arrest, acute cardiac arrest, cerebral hypoperfusion and cerebral hypoxic-ischemic injury. Traumatic shock and composite biochemical acute responses to injury progressed to multi-organ-system failure before he died.

As has been stated above, the human body continues to experience debilitating trauma-induced and physiologic chemical pain and suffering until there is a complete cessation of all bodily functions and death. The patient who suffers a disorder of consciousness remains in a state of high human suffering especially due to biochemical pain and suffering because of the ongoing biochemical and molecular responses and systems in the body, especially in response to traumatic shock.

In fact, one of the clinical tests for the evaluation of the depth or severity of unconsciousness is to intentionally inflict somatic pain to an extremity of the unconscious patient and observe the patient to see if he withdraws his extremity from the source of pain, moans, or grimaces. Again, this is one of the medical reasons why the majority of unconscious patients in the intensive care unit of hospitals are on strong pain medications and narcotic analgesics like Morphine and Fentanyl although they are in a coma. This is also why the lowest score for the Glasgow Coma Scale is 3/15 and not 0/15, and in part why analgesics and narcotic analgesics are given to patients who are under anesthesia and are components of drug panels and cocktails used for anesthesia.

As the case of Benjamin Chin shows, although loss of consciousness and death are frequently immediate, they are rarely instantaneous since loss of consciousness and death are processes that involve cascades of patho-physiologic events. The adjective "immediate," within a forensic context, and within the prevailing forensic scenario in this case should be interpreted as death occurring as a result of gunshot wounds without the intervention of another novel or independent object, cause, or factor. It should not be forensically construed as instantaneous.

Based on the global prevailing forensic scenarios in this case and based on the generally accepted principles and common knowledge of medicine and science, including the central limit theorem, Benjamin Chin experienced the highest levels of high-scale conscious somatic, mental, and biochemical pain and suffering which correspond with, and were caused by the serious bodily

---

[15] Hall, John E. 2015. Guyton and Hall Textbook of Medical Physiology. 13th ed. Guyton Physiology. London, England: W B Saunders.

[16] DiMaio, V.J.M., & Molina, D.K. (2021). DiMaio's Forensic Pathology (3rd ed.). CRC Press. https://doi.org/10.4324/9780429318764



Benjamin Edward Huan Ming Chin, Deceased
Medico-Legal Report

Page 19 of 21

injuries he suffered. His conscious mental, somatic and biochemical pain and suffering began at about 11:36 a.m. when he first encountered the police, continued through the time he was shot at about 11:45 a.m. and through the onset and sustenance of his traumatic shock, ending at about 3-5 minutes after he was shot and began suffering global hypoxic-ischemic brain injury, for a composite mean, mode and median period of less than 14 minutes[17,18]. He was transferred to the hospital and was eventually pronounced dead at about 11:09 p.m. on 06/19/2023. He suffered pre-death pain and suffering for a mean, mode, and median period of less than 12 hours [11 hours 27 minutes] beginning from 11:36 a.m. and ending at 11:09 p.m.[19,20].

I have provided all my opinions and conclusions with a reasonable degree of medical certainty.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available.

Thank you.

Very truly yours,

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology

---

[17] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine in part based on the principles of the central limit theorem.

[18] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.

[19] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine, in part based on the principles of the central limit theorem.

[20] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.


Bennet Omalu
PATHOLOGY

Benjamin Edward Huan Ming Chin, Deceased
Medico-Legal Report

Page 20 of 21

## ENDNOTE REFERENCES

1. Hill AB. The Environment and Disease: Association or Causation? Proc R Soc Med. May 1965;58(5):295–300.

2. Burke DC. Pain in paraplegia. Paraplegia. Feb 1973;10(4):297–313. doi:10.1038/sc.1973.54

3. de Oliveira RC, de Freitas LB, Gomes RR, Cliquet A. Orthopedic Related Comorbidities in Spinal Cord-Injured Individuals. Acta Ortop Bras. Jul–Aug 2020;28(4):199–203. doi:10.1590/1413-785220202804224403

4. Cragg JJ, Haefeli J, Jutzeler CR, et al. Effects of Pain and Pain Management on Motor Recovery of Spinal Cord-Injured Patients: A Longitudinal Study. Neurorehabil Neural Repair. Sep 2016;30(8):753–61. doi:10.1177/1545968315624777

5. D'Angelo R, Morreale A, Donadio V, et al. Neuropathic pain following spinal cord injury: what we know about mechanisms, assessment and management. Eur Rev Med Pharmacol Sci. Dec 2013;17(23):3257–61.

6. Finnerup NB, Baastrup C. Spinal cord injury pain: mechanisms and management. Curr Pain Headache Rep. Jun 2012;16(3):207–16. doi:10.1007/s11916-012-0259-x

7. Hagen EM. Acute complications of spinal cord injuries. World J Orthop. Jan 18 2015;6(1):17–23. doi:10.5312/wjo.v6.i1.17

8. Masri R, Keller A. Chronic pain following spinal cord injury. Adv Exp Med Biol. 2012;760:74–88. doi:10.1007/978-1-4614-4090-1_5

9. Yasko JR, Mains RE. Chronic pain following spinal cord injury: Current approaches to cellular and molecular mechanisms. Trends Cell Mol Biol. 2018;13:67–84.

10. Rosner J, Negraeff M, Belanger LM, et al. Characterization of Hyperacute Neuropathic Pain after Spinal Cord Injury: A Prospective Study. J Pain. Jan 2022;23(1):89–97. doi:10.1016/j.jpain.2021.06.013

11. Vierck C. Mechanisms of Below-Level Pain Following Spinal Cord Injury (SCI). J Pain. Mar–Apr 2020;21(3-4):262–280. doi:10.1016/j.jpain.2019.08.007

12. Waring WP, Maynard FM. Shoulder pain in acute traumatic quadriplegia. Paraplegia. Jan 1991;29(1):37–42. doi:10.1038/sc.1991.5

13. Zasler ND, Formisano R, Aloisi M. Pain in Persons with Disorders of Consciousness. Brain Sci. Feb 23 2022;12(3)doi:10.3390/brainsci12030300

14. Chatelle C, Thibaut A, Whyte J, De Val MD, Laureys S, Schnakers C. Pain issues in disorders of consciousness. Brain Inj. 2014;28(9):1202–8. doi:10.3109/02699052.2014.920518

15. Di Perri C, Thibaut A, Heine L, Soddu A, Demertzi A, Laureys S. Measuring consciousness in coma and related states. World J Radiol. Aug 28 2014;6(8):589–97. doi:10.4329/wjr.v6.i8.589

16. Calabro RS, Pignolo L, Muller-Eising C, Naro A. Pain Perception in Disorder of Consciousness: A Scoping Review on Current Knowledge, Clinical Applications, and Future Perspective. Brain Sci. May 20 2021;11(5)doi:10.3390/brainsci11050665

17. Schnakers C, Zasler ND. Pain assessment and management in disorders of consciousness. Curr Opin Neurol. Dec 2007;20(6):620–6. doi:10.1097/WCO.0b013e3282f169d9

18. Schnakers C, Chatelle C, Demertzi A, Majerus S, Laureys S. What about pain in disorders of consciousness? AAPS J. Sep 2012;14(3):437–44. doi:10.1208/s12248-012-9346-5

19. Pistoia F, Sacco S, Stewart J, Sara M, Carolei A. Disorders of Consciousness: Painless or Painful Conditions?-Evidence from Neuroimaging Studies. Brain Sci. Oct 8 2016;6(4)doi:10.3390/brainsci6040047



20.    Fins JJ, Shapiro ZE. Pain Management, Disorders of Consciousness, and Tort Law: An Emergency Tort to Fix a Longstanding Injustice. Indiana Law Journal. 2023;98(3)(1):693–720.

21.    Riganello F, Soddu A, Tonin P. Addressing Pain for a Proper Rehabilitation Process in Patients With Severe Disorders of Consciousness. Front Pharmacol. 2021;12:628980. doi:10.3389/fphar.2021.628980

22.    Bodien YG, Allanson J, Cardone P, et al. Cognitive Motor Dissociation in Disorders of Consciousness. N Engl J Med. Aug 15 2024;391(7):598–608. doi:10.1056/NEJMoa2400645

23.    Naro A, Bramanti P, Bramanti A, Calabro RS. Assessing pain in patients with chronic disorders of consciousness: Are we heading in the right direction? Conscious Cogn. Oct 2017;55:148–155. doi:10.1016/j.concog.2017.08.009



# EXHIBIT "B"

Deposition of

# Dr. Bennet Omalu

November 18, 2025

Volume I

Jennie Quan

vs.

County of Los Angeles



www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JENNIE QUAN, INDIVIDUALLY AND     )
AS SUCCESSOR IN INTEREST TO       )
BENJAMIN CHIN, DECEASED,          )
                                  )
                    PLAINTIFF,    )   CASE NO.
                                  ) 2:24-CV-04805-MCS
          VS.                     ) (KSX)
                                  ) VOLUME I
COUNTY OF LOS ANGELES;            ) (PAGES 1-72)
MARISOL BARAJAS; HECTOR           )
VAZQUEZ; AND DOES 3-10,           )
INCLUSIVE,                        )
                                  )
                    DEFENDANTS.   )
_____)

REMOTE DEPOSITION OF DR. BENNET OMALU

TUESDAY, NOVEMBER 18, 2025

JOB NO.:  10177355

REPORTED BY HEIDI FUEHRER, CSR 14145

```
1   DEPOSITION OF DR. BENNET OMALU, TAKEN ON BEHALF OF THE

2   DEFENDANT, AT 3:05 P.M., TUESDAY, NOVEMBER 18, 2025, AT

3   SACRAMENTO, CALIFORNIA, BEFORE HEIDI FUEHRER, CSR NUMBER

4   14145.

5

6   APPEARANCES OF COUNSEL:

7

8   FOR THE PLAINTIFF:

9            LAW OFFICES OF DALE K. GALIPO
             BY:  HANG D. LE, ATTORNEY AT LAW
10           21800 BURBANK BOULEVARD
             SUITE 310
11           WOODLAND HILLS, CALIFORNIA 91367
             818-347-3333
12           HLEE@GALIPOLAW.COM

13

14  FOR THE DEFENDANTS:

15           HURRELL CANTRALL LLP
             BY:  JERAD J. MILLER, ATTORNEY AT LAW
16           800 WEST 6TH STREET
             SUITE 700
17           LOS ANGELES, CALIFORNIA 90017
             213-426-2000
18           JJMILLER@HURRELLCANTRALL.COM

19

20

21

22

23

24

25
```

Page 2

```
 1                    I N D E X

 2   DEPONENT           EXAMINED BY                        PAGE

 3   DR. BENNET OMALU

 4                    BY MR. MILLER                          4

 5

 6

 7                    E X H I B I T S

 8

 9   NO.           PAGE      DESCRIPTION

10   EXHIBIT A     5         CURRICULUM VITAE

11   EXHIBIT B     31        REPORT

12   EXHIBIT C     50        AUTOPSY REPORT

13

14

15

16              INFORMATION REQUESTED:

17                    PAGE      LINE

18

19

20      QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER:

21                    PAGE      LINE

22

23

24

25
```

 1                    SACRAMENTO, CALIFORNIA;

 2              TUESDAY, NOVEMBER 18, 2025, 3:05 P.M.

 3

 4          (Prior to the deposition commencing,

 5              all counsel stipulated to waive the

 6              reporter read on and read off pursuant

 7              to Federal Rule 30.)

 8

 9       THE COURT REPORTER:  For the record, my name is

10   Heidi Fuehrer, and my license number is 14145.

11

12                    DR. BENNET OMALU,

13          HAVING BEEN FIRST DULY SWORN BY THE REPORTER,

14              WAS EXAMINED AND TESTIFIED AS FOLLOWS:

15

16                         EXAMINATION

17   BY MR. MILLER:

18       Q    Good afternoon, doctor.  My name is Jerad

19   Miller.  I'm counsel for the defendants in this case,

20   and I will be taking your deposition today, and before

21   we get started, is it Dr. Omalu?

22       A    Yes, sir.

23       Q    Great.  Can you please state and spell your

24   name for the record.

25       A    Bennet, B-E-N-N-E-T, Omalu, O-M-A-L-U.

1  me.  He opened his eyes.  I said I'm a physician.

2  Are you okay?  I said to his wife what's his name?

3  He blinked his eyes, but all the rest of his body was

4  unresponsive.  So I told him to relax.  I was taking

5  his pulse, that 911 is coming.  I'll be here with

6  you.  He started crying, but he was unresponsive,

7  meaning he wasn't moving.  So Glasgow Coma Scale is

8  abnormal that has to be used within context, not by

9  itself independent of context.

10      **Q    Doctor, you reviewed the autopsy report in this**

11  **case, correct?**

12      A    Yes, sir.

13          MR. MILLER:  I'm going to mark this as Exhibit

14  C and introduce it really quickly.

15          (Defendant's Exhibit C was marked for

16          identification and is attached

17          hereto.)

18  BY MR. MILLER:

19      **Q    Does this look like the autopsy report you**

20  **reviewed?**

21      A    I believe so.

22      **Q    Are you going to be offering any opinions to**

23  **contradict the findings of the autopsy report?**

24      A    No, in terms of the specific questions and

25  assignment of the case, no.

1    wounds, we can opine on the mechanism of sustenance

2    of the gunshot wound, the type of ballistics, the

3    range of shot, the type of gun, the positioning of

4    the victim in relation to the shooting, and many

5    other things I described in my report and more, and

6    not just for ballistics.  When there is a plane

7    crash, when there is an automobile crash, we can

8    testify to the medical aspects of biomechanics.

9        Q    Do you have any degree, license or

10    qualification in biomechanics?

11        A    No, no, but as a forensic pathologist, we

12    are trained extensively in the medical aspects of

13    biomechanics.  That is why if I see an autopsy, I can

14    reasonably tell you the range of the speed of the car

15    upon impact.  These are the medical aspects of

16    biomechanics, but do I have a formal independent

17    degree in mechanics?  No, sir.

18        Q    In your report you describe three categories of

19    pain, mechanical, thermal and chemical.  Can you briefly

20    explain the differences between the three.

21        A    Those are the types of energy that cause

22    pain.  Thermal means heat.  Mechanical means anything

23    mechanics that can destroy tissue.  Chemical is

24    anything involving the chemicals in the body, and

25    then kinetics, any transfer of kinetic energy to the

1          MR. MILLER:  We can take a break.

2          THE WITNESS:  No, not a break.  I'm tired.

3  It's almost 6 o'clock.  Maybe we reschedule for a

4  another time.

5          MR. MILLER:  Okay.  If I had to guess, doctor,

6  I have about an hour left, maybe.  So, doctor, if you

7  want to schedule a second session, we can do that.  It's

8  up to you, and, Hang, you can give your input as well.

9          THE WITNESS:  Yes, these questions, I'm getting

10  tired.  It has nothing to do with the case, just

11  hypothetical.  My brain is, I'm tired.

12          MS. LE:  It's up to Dr. Omalu, if he wants to

13  continue his deposition to another day, I'm fine with

14  that.

15          THE WITNESS:  Please.  I'm really tired cause

16  if you notice, he is not asking me questions related,

17  I'm beginning to lose my focus.

18          MR. MILLER:  Okay, that's fine.  We can

19  reschedule for a second session.

20          MS. LE:  Okay, I will try to facilitate more

21  dates for you.

22          MR. MILLER:  Okay, I guess the transcript we'll

23  do by Code.

24          (Whereupon, at 5:14 P.M., the

25          deposition of DR. BENNET OMALU was adjourned.)

```
 1   STATE OF CALIFORNIA          )

 2   COUNTY OF LOS ANGELES        )   ss.

 3

 4          I, HEIDI FUEHRER, CSR No. 14145, in and for the

 5   State of California, do hereby certify:

 6          That prior to being examined, the witness named

 7   in the foregoing deposition was by me duly sworn to

 8   testify to the truth, the whole truth, and nothing but

 9   the truth;

10          That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction,

13   and the same is a true, correct, and complete transcript

14   of said proceedings;

15          That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the transcript

18   { X } Was { } was not required.

19          I further certify that I am not interested in

20   the event of the action.

21          Witness my hand this 5 day of December,

22   2025.

23                       _____
                                  Heidi Fuehrer

24                       Certified Shorthand Reporter

25                          for the State of California
```

Page 69