# Exhibit 1

# SUSS CONSULTING

### Applying Cognitive Science and Human Factors to Law Enforcement

Calgary, Alberta, Canada / Ph: 368-993-8255 / Email: joel.suss@gmail.com

JENNIE QUAN, individually and as successor in interest to
BENJAMIN CHIN, deceased, Plaintiffs,

VS.

COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR VAZQUEZ; and DOES 3-10, inclusive, Defendants

Case No. 2:24-cv-04805-MCS-KS

**Expert Report** submitted by:

      Joel Suss, Ph.D.
      Calgary, Alberta, Canada
      Mobile phone: 368 993 8255
      Email: joel.suss@gmail.com

Date: October 20, 2025

## Table of Contents

1.  Summary of knowledge, education, and experience …………..…………………….....    3

2.  Material provided for review …………………………………………………………    6

3.  Introduction …………………………………………………………………………..    8

4.  Description of Deputy Barajas's perceptions and actions ……………….…………..    10

5.  Description of Deputy Vazquez's perceptions and actions ……………….…………..    13

6.  Why the decedent posed an immediate threat at the time the deputies fired ……........    19

7.  Why the deputies' shot sequence indicates a measured response with specific regard    29
    for the decedent ………………………………………………………………………..

8.  The totality of circumstances as it relates to the deputies' decision-making ……........    32

9.  The deputies' determination that deadly force was necessary …………………………    36

10. Summary ……………………………………………………………………………    38

11. References ……………………………………………………………………………    39

12. Signature Page ………………………………………………………………………    40

1. **Summary of Knowledge, Education, and Experience**

1.1. My full name is Joel Matthew Suss.

1.2. I currently reside in Calgary, Alberta, Canada.

1.3. I served as a combat fitness instructor in the Israel Defense Force (1992–1994).

1.4. My first undergraduate degree was a Bachelor of Applied Science (Human Movement) at Deakin University (Australia), which I completed in 1997. My studies covered topics including exercise science, biomechanics, motor control and learning, anatomy, and physiology.

1.5. Prior to pursuing undergraduate studies in psychology, I worked as a security guard and trainer for a private security company in Australia (1995–2003). As part of that job, I qualified as a security guard and as a firearms instructor; I also completed a Certificate IV in Workplace Training and Assessment. In my various training roles, I planned and conducted firearms training sessions, defensive-tactics training sessions, and scenario training sessions. I was also responsible for the development of the instructional cadre.

1.6. I completed a Graduate Diploma of Psychological Studies at Deakin University (Australia) in 2005, and then an honors degree in Behavioral Science at La Trobe University (Australia) in 2006. After completing honors, I led a project that developed decision-making training for senior fire commanders in the New South Wales Rural Fire Service.

1.7. In August 2007 I moved to the United States to undertake postgraduate (Ph.D.) studies. I began my studies at Florida State University in the Cognitive Psychology program.

1.8. While at Florida State University, I completed a citizen police academy with the Florida State University Police Department. This program is designed to acquaint community residents who are not sworn police officers with the activities of their local police department. As part of this program, I attended lectures on the use of force and went on a ride-along with a police officer.

1.9. While at Florida State University, I volunteered with the Training Department of the Leon County Sheriff's Office. As part of my volunteer activities, I observed training sessions, discussed the application of scientific principle to training methodologies, and helped maintain firearms.

1.10. While at Florida State University, I conducted several research studies in collaboration with the Florida Public Safety Institute (formerly known as the Pat Thomas Law Enforcement Academy). In 2009 I presented the results of a live-fire shooting study at the 1st High Liability Instructor Conference hosted at the Florida Public Safety Institute.

1.11. In August 2010, I followed my academic advisor when he moved to Michigan Technological University. In 2013 I obtained my Ph.D. in Applied Cognitive Science and Human Factors from Michigan Technological University. My doctoral dissertation

addressed the cognitive processes underlying police officers' decision making. As part of that research, I (a) travelled to police departments in the United States, (b) presented less-experienced and experienced police officers with video scenarios, and (c) used cognitive-task-analysis techniques to elicit officers' in-the-moment assessments, thoughts, and considerations. My research was funded by a grant from the US National Science Foundation.

1.12. After completing my Ph.D., I worked as a Human Factors Analyst at the US Federal Aviation Administration's (FAA) Research Development and Human Factors Laboratory, where I researched pilots' decision-making.

1.13. I then completed postdoctoral studies in Cognitive Engineering at Laval University in Quebec, Canada, where I focused on perceptual and cognitive aspects of monitoring multiple CCTV feeds in the context of a security control center.

1.14. In 2015, following my postdoctoral studies, I started as a tenure-track Assistant Professor at Wichita State University, Kansas, USA. In my academic role at Wichita State University, I specialize in Human Factors Psychology. Human factors "is concerned primarily with the performance of one or more persons in a task-oriented environment interacting with equipment, other people, or both" (National Research Council, 1992, p. 9).

1.15. Within the field of Human Factors Psychology, my research focuses on the cognitive aspects of human performance—especially decision-making—in volatile, uncertain, complex, and ambiguous situations. My main domain of interest is law enforcement. My aims have been to understand how experts or skilled performers make decisions, and how to design training to accelerate the acquisition of adaptive expertise. In line with this, I direct the Applied Cognition and Expertise (ACE) laboratory at Wichita State University. I have received grant funding from the US National Institute of Justice to study police decision-making.

1.16. In 2015, while at Wichita State University, I completed a second citizen police academy with Sedgwick County/City of Wichita. As part of this program, I attended lectures on the use of force and went on a ride-along with a police officer.

1.17. In 2016, I completed a 2-day Force Science Basics Program at the Midwest Criminal Justice Institute in the USA.

1.18. In 2016, I participated in a training session for corrections deputies during which I was exposed to OC (pepper) spray. I also volunteered to be Tasered, to better understand the degree of incapacitation associated with conducted-energy devices.

1.19. In 2017, I completed a 3-day Simunition Scenario Instructor and Safety Certification Course held at the Northern Virginia Criminal Justice Academy (USA). Simunition is a brand of non-lethal training ammunition—similar to paintball—that is used in police/corrections scenario training.

1.20.   In 2018, I was invited to present my decision-making research at the US Federal Law Enforcement Training Centre's (FLETC) Psychology Symposium.

1.21.   From 2020–2022, I served as research consultant for the US Navy's Naval Health Research Center, focusing on marksmanship (shooting) training and decision-making. In that capacity I have co-authored several peer-reviewed publications.

1.22.   In 2021, I was promoted to Associate Professor of Psychology—with tenure—at Wichita State University.

1.23.   In 2021, I was invited to observe the 1-week Instructor Development Course delivered to law enforcement personnel at the Kansas Law Enforcement Training Centre (USA). At the trainer's request, I provided feedback on the course content, structure, and delivery.

1.24.   In 2022, I contributed to a research report on the current state of police control and defensive-tactics training in the USA. The report was supported by a grant from the US Bureau of Justice Assistance. As part of the project, I participated in a presentation at the International Association of Chiefs of Police (IACP) Officer Safety & Wellness Symposium.

1.25.   In 2023, I presented research on decision-making at a police use-of-force trainers' conference held at the Justice Institute of British Columbia, Canada.

1.26.   I have discussed use-of-force cases with expert witnesses in the USA and guided them to scientific research relevant to their cases (2015–present).

1.27.   I have discussed research related to use of force and police decision-making on four podcasts intended for use-of-force trainers (2020, 2021, 2022, 2023).

1.28.   In 2023, I prepared a report on decision making for a criminal case in Australia, in which a corrections officer was charged with murder. I was retained by the defense.

1.29.   In December 2023, I resigned from my tenured, Associate Professor position at Wichita State University. In March 2024, I started a new role as Principal Human Performance and Behavior Researcher in the Officer Safety Tactics & Training Unit at Calgary Police Service in Alberta, Canada.

1.30.   As an academic researcher, I have authored or co-authored 29 peer-reviewed journal publications on topics related to human factors. Many of those have focused on aspects of police performance. I co-authored a book chapter on expertise in law enforcement in The Oxford Handbook of Expertise (2019). I co-edited a Research Topic on police education and training in the journal Frontiers of Psychology (2022).

## 2. Material Provided for Review

2.1. Complaint

    2.1.1. 2024-1021 Service Docs FAC Barajas Vazquez.pdf

2.2. Civilian interviews (audio files)

    2.2.1. brandon wiseman interview 06.19.23.MP3
    2.2.2. janet johansen interview 06.21.23.MP3
    2.2.3. jennie quann 06.19.23.MP3
    2.2.4. syed razvi interview 06.21.23.MP3
    2.2.5. vergel sandifer interview 06.21.23.MP3

2.3. Sworn interviews (audio files)

    2.3.1. carlos de la torre 6221115 interview 06.19.23.MP3
    2.3.2. chad holland 519897 interview 06.19.23.MP3
    2.3.3. chad holland 519897 interview 07.07.23.MP3
    2.3.4. christopher bronowicki 438096 interview 06.21.23.MP3
    2.3.5. german perez 443554 interview 06.19.23.MP3
    2.3.6. hector vazquez 526304 interview 06.19.23.MP3
    2.3.7. hector vazquez 526304 interview 07.07.23.MP3
    2.3.8. kyle toves 550853 interview 06.19.23.MP3
    2.3.9. kyle toves 550853 interview 07.07.23.MP3
    2.3.10. marisol barajas 609672 interview 06.19.23.MP3
    2.3.11. marisol barajas 609672 interview 1 07.07.23.MP3
    2.3.12. marisol barajas 609672 interview 2 07.07.23.MP3

2.4. Sworn interviews (transcripts)

    2.4.1. HOM 023-04539-2927-013 - MARISOL BARAJAS 06-19-23.docx
    2.4.2. HOM 023-04539-2927-013 - MARISOL BARAJAS 07-07-23.docx
    2.4.3. HOM 023-04539-2927-013 HECTOR VAZQUEZ 06-19-23.docx
    2.4.4. HOM 023-04539-2927-013 HECTOR VAZQUEZ 07-07-23.docx

2.5. Body-worn-camera footage (video clips)

    2.5.1. 1 - Clip of Axon_Body_3_Video_2023-06-19_1138_X60A19414.mp4
    2.5.2. 2 - Clip of Axon_Body_3_Video_2023-06-19_1140_X60A16554.mp4
    2.5.3. 3 - Clip of Axon_Body_3_Video_2023-06-19_1137_X60A1078T.mp4
    2.5.4. 4 - Clip of 998-5.mp4   .mp4
    2.5.5. 5 - Clip of Axon_Body_3_Video_2023-06-19_1149_X60A1773R.mp4
    2.5.6. 6 - Clip of Axon_Body_3_Video_2023-06-19_1142_X60A18242.mp4
    2.5.7. 7 - Clip of Axon_Body_3_Video_2023-06-19_1145_X60342573.mp4
    2.5.8. 8 - Clip of Axon_Body_3_Video_2023-06-19_1143_X60A14313.mp4

2.6. Reports and Homicide File

    2.6.1. 023-04539-2927-013 CHIN, BENJAMIN.pdf
    2.6.2. LASD Supp Report.pdf

---

2.7. Autopsy Report

    2.7.1. Autopsy Report.pdf

2.8. Forensic Video Analysis

    2.8.1. Shot 1.jpg
    2.8.2. Shot 2.jpg
    2.8.3. Shot 3.jpg
    2.8.4. Shot 4.jpg
    2.8.5. Shot 5.jpg
    2.8.6. Synchronized BWC Video.mp4
    2.8.7. X60A1078T+Frame Numbers.mp4
    2.8.8. X60A16554+Frame Numbers.mp4
    2.8.9. X60A16554+Frame Numbers+Enlarged Window.mp4

2.9. Depositions

    2.9.1. 092525 Hector Vasquez.pdf
    2.9.2. 092625 Marisol Barajas.pdf

3. **Introduction**

3.1. I have been retained as a Human Factors expert by counsel for the defendants in Case No. 2:24-cv-04805-MCS-KS.

3.2. I was retained on June 10, 2025, to perform a Human Factors analysis of a deputy-involved shooting that occurred in Los Angeles County on June 19, 2023.

3.3. This analysis involves understanding the interaction between the individuals involved (Deputies Barajas and Vazquez, the decedent, innocent bystanders), tools and instruments that those parties had accessible and available (e.g., weapons, cover), and environment.

3.4. In this report, I focus on addressing the bolded portions of the following paragraphs from the complaint's FIRST CLAIM FOR RELIEF: Unreasonable Search and Seizure— Excessive Force (42 U.S.C. § 1983):

| Para. | Detail |
|---|---|
| 30 | **Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES used excessive and unreasonable force against DECEDENT when they shot him several times.** Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES' unjustified use of force deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment. |
| 32 | **At all relevant times, DECEDENT did not forcibly resist, nor did he pose an immediate threat of death or serious bodily injury to Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES or anyone else.** |
| 34 | **Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES did not exhaust all reasonable available alternative measures prior [to] using deadly force on DECEDENT.** Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES failed [to] provide adequate commands and warnings prior to using deadly force, despite it be[ing] feasible to do so. |
| 36 | **The conduct of Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff** and therefore warrants the imposition of exemplary and punitive damages as to Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES. |

3.5. My report is structured as follows:

Section 4:       Description of Deputy Barajas's Perceptions and Actions

Section 5:       Description of Deputy Vazquez's Perceptions and Actions

Section 6:       Why the Decedent Posed an Immediate Threat at the Time the Deputies Fired

Section 7:       Why the Deputies' Shot Sequence Indicates a Measured Response with Specific Regard for the Decedent

Section 8:       The Totality of Circumstances as it Relates to the Deputies' Decision-Making

Section 9:       The Deputies' Determination that Deadly Force was Necessary

Section 10:     Summary

Section 11:     References

---

## 4. Description of Deputy Barajas's Perceptions and Actions

4.1. Deputy Barajas gave two interviews, on 06/19/2023 and 07/07/2023. I compiled the following summary of her perceptions and actions from the interview transcripts. I refer to specific parts of the interview transcripts using the interview date, page number (P), and line number (L). Where applicable, I have also noted specific points in Deputy Barajas's body-worn-camera video file (file name: 3 - Clip of Axon_Body_3_Video_2023-06-19_1137_X60A1078T.mp4).

4.1.1. On 06/19/2023, she was working a day shift from 07:00–15:00 (06/19/2023:P1:L29; 07/07/2023:P4:L24–P5:L1–11)

4.1.2. She was working by herself. (07/07/2023:P5:L4–5)

4.1.3. She was driving a marked patrol vehicle. (07/07/2023:P14:L1–8)

4.1.4. She was wearing her sheriff's uniform. (07/07/2023:P14:L9–10)

4.1.5. She was armed with her department-issued 9 mm Smith & Wesson M&P 2.0. (06/19/2023:P2:L9–12, 06/19/2023:P3:L10, 20)

4.1.6. Her department-issued pistol was equipped with a tactical light. (06/19/2023:P3:L21–22)

4.1.7. While driving, she heard a radio call reporting a suspect brandishing a weapon or firearm on Crooked Creek Drive. (07/07/2023:P6:L9, P9,L1–5)

4.1.8. She heard additional information—via radio—that identified the weapon as an AR-type rifle. (07/07/2023:P6:L10–11)

4.1.9. At the time of the call, she was driving southbound on South Diamond Bar Boulevard, around Grand Avenue (cross street). (07/07/2023:P6:L12–15)

4.1.10. She continued driving southbound on South Diamond Bar Boulevard, looking for the suspect, but did not spot him.  (07/07/2023:P7:L7–8, P9,L21–23)

4.1.11. At some point, figuring she had missed the suspect, she turned her vehicle around and headed northbound on South Diamond Bar Boulevard. (07/07/2023:P7:L8–9)

4.1.12. She did not see the suspect while driving northbound on South Diamond Bar Boulevard. (07/07/2023:P7:L8–9)

4.1.13. She heard an update on the radio that the suspect was on the southbound side of South Diamond Bar Boulevard. (07/07/2023:P7:L–10)

4.1.14. She turned her vehicle around to head southbound on South Diamond Bar Boulevard. (07/07/2023:P7:L10–11)

4.1.15. She noted that there was other vehicular traffic on South Diamond Bar Boulevard. (07/07/2023:P10,L20–23)

4.1.16. She encountered the decedent walking northbound in the southbound lanes of South Diamond Bar Boulevard, facing toward her. (07/07/2023:P11:L11–20)

4.1.17. When she first encountered the decedent, she estimated that he was approximately 15–20 feet away; she stopped her patrol vehicle. (07/07/2023:P12:L20–23, P13:L5–6)

4.1.18. She observed that the decedent was wearing a ballistic vest and sweatpants. (07/07/2023:P12:L4–5, 07/07/2023:P22:L17–18)

4.1.19. She observed that the decedent was carrying an AR-type rifle that was on a sling. (07/07/2023:P26:L10–19)

4.1.20. She exited her patrol vehicle and took up a position between the open driver's door and the driver's seat, facing the decedent. (07/07/2023:P15:L7–12)

4.1.21. She observed that the decedent was standing stationary. (07/07/023:P15:L13–16)

4.1.22. She detained the decedent at gunpoint, using her pistol, and gave verbal commands. (07/07/2023:P16:L10–16)

    4.1.22.1. Body-worn video: 2023-06-19 11:44:46–11:45:03

4.1.23. While detaining the decedent at gunpoint, she considered using her Taser, but decided that it would not be effective given the decedent's ballistic vest and baggy pants. (07/07/2013:P16:L17–20)

4.1.24. While detaining the decedent at gunpoint, she also considered retrieving the 40 mm less-lethal launcher that was stored in the trunk of her patrol vehicle, but decided not to do that because if she went to retrieve it, she would momentarily lose sight of the decedent—something that she did not want to do. (07/07/2023:P16:L20–23)

4.1.25. She noted that the decedent did not comply with her commands to put his gun down and then walked in her general direction. (07/07/2023:P24:L7–14)

4.1.26. She noted that the decedent was not manipulating the rifle or pointing it at anyone, but that it was still slung on his body and within reach. (07/07/2023:P24:L20–23, P25:L4–7)

4.1.27. She was concerned that the decedent might shoot her or another person. (07/07/2023:P17:L1)

4.1.28. She fired one shot at the decedent and noted that he did not react to the shot. (07/07/2023:P17:L1–2)

4.1.28.1. Body-worn video: 2023-06-19 11:45:05

4.1.29. She estimated that she was approximately 7–10 feet from the decedent when she fired at him. (07/07/2023:P17:L6–8)

4.1.30. She started to panic, as the shot did not stop the decedent. (07/07/2023:P17:L3–4)

4.1.31. She noted that the decedent took additional steps toward the white Tesla that was stopped to her left. (07/07/2023:P17:L4)

4.1.32. She issued additional verbal commands for the decedent to stop. (07/07/2023:P18:L19–20)

4.1.32.1. Body-worn video: 2023-06-19 11:45:06–11:45:10

4.1.33. She noted that the decedent did not comply with her commands to stop. (07/07/2023:P18:L21–22)

4.1.34. She fired two additional shots at the decedent and then noted that he fell to the ground with the rifle still within arm's reach. (07/07/2023:P17:L4–5, P20:L4–8)

4.1.34.1. Body-worn video: 2023-06-19 11:45:12–11:45:14

4.1.35. She was part of the team that approached the downed decedent. (07/07/2023:P21:L10–14, 21–22)

4.1.35.1. Body-worn video: 2023-06-19 11:47:07

**5. Description of Deputy Vazquez's Perceptions and Actions**

5.1. Deputy Vazquez gave two interviews, on 06/19/2023 and 07/07/2023. I compiled the following summary of his perceptions and actions from the interview transcripts. I refer to specific parts of the interview transcripts using the interview date, page number (P), and line number (L). Where applicable, I have also noted specific points in Deputy Barajas's body-worn-camera video file (file name: 2 - Clip of Axon_Body_3_Video_2023-06-19_1140_X60A16554.mp4).

5.1.1. On 06/19/2023, he was working an overtime shift from 06:00–14:00. (06/19/2023:P1:L28–29)

5.1.2. He was working by himself. (07/07/2023:P4:L5–6)

5.1.3. He was in his patrol vehicle when he heard a radio call reporting an Asian male, wearing a bulletproof vest and armed with an assault rifle, firing rounds into the air. (07/07/2023:P4:L7–10,18–21 and P5:L1–2)

5.1.4. The call location was the intersection of Crooked Creek Drive and Rising Star Drive. (07/07/2023:P5:L2–3).

5.1.5. He pulled over to consult his maps and determine the route to the call location. (07/07/2023:P5:L3–4).

5.1.6. While he was pulled over, he saw Deputy De La Torre driving from the opposite direction.

5.1.7. Deputy De la Torre pulled over and he (Deputy Vazquez) determined that Deputy De La Torre was the lead on the call and that Deputy De La Torre knew how to get to the location of the call. (07/07/2023:P5:L4–7)

5.1.8. He followed Deputy De La Torre to the location of the call.

5.1.9. While driving, he heard updates over the radio. The updates noted that multiple callers reported the male suspect was firing his weapon and was now walking on Crooked Creek Drive towards South Diamond Bar Boulevard. (07/07/2023:P5:L8–11)

5.1.10. After hearing these reports, he started to feel nervous. (07/07/2023:P5:L11–13)

5.1.11. As he arrived at the call location on Crooked Creek Drive, he saw many people massed outside and noted that they looked scared. (07/07/2023:P5:L14–16)

5.1.12. Based on their demeanor, he felt that it was a serious incident. (07/07/2023:P5:L16–17)

5.1.13. He considered that the suspect was reportedly armed with a rifle. He assessed that his own pistol was no match for the suspect's rifle, and that his shotgun would be a

more appropriate weapon. In light of this, he began to retrieve his shotgun from its vehicle mount. (07/07/2023:P5:L21–24)

5.1.14. As he was driving on Crooked Creek Drive, he continued to hear updates of the suspect's location over the radio. Those updates indicated that the suspect was walking on Crooked Creek Drive, toward South Diamond Bar Boulevard.

5.1.15. He saw Deputy De La Torre come to a stop near the bend on Crooked Creek Drive. (07/07/2023:P6:L16–17)

5.1.16. He heard a radio report that someone had been stabbed. (07/07/2023:P6:L17–18)

5.1.17. He heard Deputy De La Torre report that there is someone who has been stabbed; Deputy De La Torre also reported that he could see the suspect. (07/07/2023:P6:L23–24)

5.1.18. He stopped his car, exited, and went to speak with Deputy De La Torre to identify where the suspect was located. (07/07/2023:P7:L1–2)

5.1.19. At that point, he was approached by an Asian female and noted that she had blood on her hands. He ascertained that the female was related to the suspect but was uncertain as to whether the blood had come from a gunshot or a knife wound. The female asked him not to hurt the suspect. (07/07/2023:P7:L2–6)

    5.1.19.1. Body-worn video: 2023-06-19 11:42:09–11:42:11

5.1.20. Based on the fact that the female was wounded, he assessed that the suspect has the intention to hurt people. (07/07/2023:P7:L8–11)

5.1.21. He felt nervous, shaky, and scared. (07/07/2023:P7:L21–22)

5.1.22. He spotted the decedent approximately 150–200 feet away, about halfway between the bend on Crooked Creek Drive and South Diamond Bar Boulevard. (07/07/2023:P7:L23–24)

5.1.23. He observed that the decedent was wearing a bulletproof vest and was armed with an AR-type rifle. He noted that the rifle had an optical sight mounted on it. (07/07/2023:P8:L2–3)

5.1.24. He assessed that—with that type of weapon and sight—the decedent had the ability to engage him from a distance. (07/07/2023:P8:L3–11)

5.1.25. He considered the type of ammunition he had in his shotgun (buckshot) and felt that he could not effectively engage the decedent at that distance. He knew that he had slug rounds—which have a greater effective range—in a carrier mounted to the left side of his shotgun. (07/07/2023:P8:L5)

5.1.26. He ejected the four buckshot rounds that were in the shotgun's magazine tube and loaded two of the slug rounds that were in the carrier on the left side of the shotgun. (07/07/2023:P8:L5, P10:L6–21)

    5.1.26.1. Body-worn video: 2023-06-19 11:42:25–11:42:52

5.1.27. He retained one of the ejected buckshot rounds. (07/07/2023:P10:L19)

5.1.28. He took cover behind a berm and repeatedly yelled verbal commands—in English—for the decedent to drop the gun. (07/07/2023:P8:L16–24)

    5.1.28.1. Body-worn video: 2023-06-19 11:42:18–11:42:23

    5.1.28.2. Body-worn video: 2023-06-19 11:42:52–11:42:57

5.1.29. He observed the decedent turn and look in his direction but noted that the decedent did not comply with his commands. (07/07/2023:P8:L17–18, P9:L1–6)

5.1.30. He considered that he might need to shoot at the decedent from his current location, at a relatively long distance from the decedent. Understanding the potential for missing the decedent or for the shot to penetrate through the decedent, he considered the safety of others by looking at what lay behind the decedent, which was South Diamond Bar Boulevard. (07/07/2023:P10:L12–13)

5.1.31. He noted a substantial amount of vehicle traffic—in both directions—on South Diamond Bar Boulevard. (07/07/2023:P10:L13–14)

5.1.32. He saw that the decedent continued walking away, in the direction of South Diamond Bar Boulevard. (07/07/2023:P10:L21)

5.1.33. He assessed that the decedent had the advantage and could engage the deputies at any point. (07/07/2023:P11:L1–2)

5.1.34. He looked for something to use as mobile cover as he followed the decedent, in case the decedent turned and fired. He asked another deputy—Deputy Bronowicki, who was in a patrol vehicle and arriving at the scene—to bring his car forward. Armed with his shotgun, he got in the front passenger seat of Deputy Bronowick's patrol vehicle and Deputy Bronowicki drove up Crooked Creek Drive following the decedent in the direction of South Diamond Bar Boulevard. (07/07/2023:P10:L22–P11:L5)

    5.1.34.1. Body-worn video: 2023-06-19 11:43:01–11:43:27

5.1.35. He told Deputy Bronowicki to drive faster to catch up to the decedent before the decedent reached South Diamond Bar Boulevard. (07/07/2023:P11:L16–17)

    5.1.35.1. Body-worn video: 2023-06-19 11:43:29–11:43:31

5.1.36. While seated in Deputy Bronowicki's patrol vehicle and following the decedent, he gave additional verbal commands to the decedent to drop his gun. The decedent continued walking and did not comply. (07/07/23:P11:L5–6)

5.1.36.1. Body-worn video: 2023-06-19 11:43:51–11:43:52

5.1.37. He heard Deputy Bronowicki use the vehicle's PA system to give additional verbal commands to the decedent to drop his gun. The decedent did not react to the verbal commands and continued walking toward South Diamond Bar Boulevard. (07/07/2023:P11:L–7)

5.1.37.1. Body-worn video: 2023-06-19 11:43:55–11:43:59

5.1.38. He anticipated that—due to the decedent's weapon, bulletproof vest, lack of compliance with commands, demeanor, and the amount of traffic on South Diamond Bar Boulevard—the decedent would likely shoot at vehicles if the decedent made it to South Diamond Bar Boulevard. (07/07/2023:P11:L8–16, P12:L1–2)

5.1.39. He noted that when the decedent reached South Diamond Bar Boulevard, something to the left caught the decedent's attention, and the decedent turned to the left on South Diamond Bar Boulevard. (07/07/2023:P12:L3–5)

5.1.40. He exited Deputy Bronowicki's vehicle and moved toward the decedent —using Deputy Bronowicki's vehicle as mobile cover—and repeatedly commanded the decedent to drop the gun. (07/07/2023:P12:L8–9)

5.1.40.1. Body-worn video: 2023-06-19 11:44:17–11:44:45

5.1.41. He momentarily lost sight of the decedent as the decedent turned left onto South Diamond Bar Boulevard. (07/07/2023:P12:L10–11)

5.1.42. He abandoned the cover afforded by Deputy Bronowicki's patrol vehicle and ran toward the (northeast) corner of South Diamond Bar Boulevard and Crooked Creek Drive to catch sight of the decedent. (07/07/2023:P12:L13–15)

5.1.42.1. Body-worn video: 2023-06-19 11:44:48–11:44:57

5.1.43. As he rounded the corner, he saw the decedent facing cars that had stopped in the southbound lanes on South Diamond Bar Boulevard (i.e., the decedent was walking on South Diamond Bar Boulevard against the flow of traffic). He noted that the first two cars that were stopped were a patrol vehicle and a white car, with other cars stopped behind those two vehicles. (07/07/2023:P12:L19–20)

5.1.43.1. Body-worn video: 2023-06-19 11:44:58–11:45:04

5.1.44. He assessed that the decedent could open fire on the vehicles at any time. (07/07/2023:P13:L1)

5.1.45. He considered the position of the deputy with the stopped patrol vehicle and assessed that they had a poor backdrop (i.e., South Diamond Bar Boulevard), in case they needed to shoot. (07/07/2023:P13:L2–4)

5.1.46. He noted the potential for a crossfire situation between himself and the deputy with the stopped vehicle, given their relative positioning. (07/07/2023:P13:L6)

5.1.46.1. Body-worn video: 2023-06-19 11:44:59

5.1.47. He noticed a berm behind the decedent (i.e., on the northbound side of South Diamond Bar Boulevard) that provided a natural backstop and subsequently ran north on the sidewalk on the southbound side of South Diamond Bar Boulevard to flank the decedent. This flanking movement reduced the risk of crossfire with the other deputy. At this point, he was positioned to the rear and left of the decedent. (07/07/2023:P13:L1–6)

5.1.47.1. Body-worn video: 2023-06-19 11:45:03–11:45:05

5.1.48. He noted that the decedent's right arm grasped the rifle—which was slung, muzzle down, on the right side of the decedent's torso—and saw the decedent's right elbow move in a such a manner that he assessed that the decedent was going to raise the rifle to shoot. (07/07/2023:P13:L13–17)

5.1.48.1. Body-worn video: 2023-06-19 11:45:04

5.1.49. He looked at the decedent and heard a shot but did not know the source of the shot. (07/07/2023:P13:L7)

5.1.49.1. Body-worn video: 2023-06-19 11:45:05

5.1.50. He assessed that he needed to stop the decedent because the decedent was going to shoot the other deputy and bystanders. (07/07/2023:P13:L24–P14:L2)

5.1.51. Standing approximately 30–40 feet from the decedent, he fired one slug from his shotgun and saw that it hit the decedent in the vest. At that point, he assessed that the decedent was 10–15 feet from the other deputy's patrol vehicle. (07/07/2023:P14:L2–13)

5.1.51.1. Body-worn video: 2023-06-19 11:45:18–11:45:05

5.1.52. He saw the decedent react to the shot by slumping over a little and then straightening back up. (07/07/2023:P13:L8–10)

5.1.52.1. Body-worn video: 2023-06-19 11:45:13

5.1.53. He saw that his shot did not stop the decedent. (07/07/2023:P14:L13–14)

5.1.54. He realized that he was on the sidewalk with no cover. (07/07/2023:P14:L17–19)

5.1.55. He perceived that the decedent started turning toward him and he thought that the decedent was going to engage him. (07/07/2023:P14:L19)

    5.1.55.1. Body-worn video: 2023-06-19 11:45:13

5.1.56. He fired another slug at the decedent. (07/07/2023:P14:L20–21)

    5.1.56.1. Body-worn video: 2023-06-19 11:45:15

5.1.57. He saw the decedent fall to the ground and the rifle fall away from the decedent's body. (07/07/2023:P14:L22–15:L2)

    5.1.57.1. Body-worn video: 2023-06-19 11:45:16

5.1.58. He realized that he was still in the open with no cover and ran north on the southbound side of South Diamond Bar Boulevard to take cover behind another deputy's vehicle. (07/07/2023:P15:L11–12)

    5.1.58.1. Body-worn video: 2023-06-19 11:45:20–11:45:36

5.1.59. He realized that he had fired the two slugs he had loaded into his shotgun and that the shotgun was now empty. While taking cover, he loaded another slug into his shotgun, in case the decedent—who was laying on the road—reached for the rifle. He reasoned that a slug would be more effective than buckshot, given the decedent was wearing a ballistic vest. (07/07/2023:P15:L17–19)

    5.1.59.1. Body-worn video: 2023-06-19 11:45:53–11:42:56

5.1.60. He called for someone to bring a ballistic shield so they could approach the decedent. (07/07/2023:P15:L16–17)

    5.1.60.1. Body-worn video: 2023-06-19 11:46:01–11:46:02

6.  **Why the Decedent Posed an Immediate Threat at the Time the Deputies Fired**

6.1. In this section, I will focus on two aspects of threat:

6.1.1. The deputies' perception of threat at the time they fired. I will explain why the decedent posed an immediate threat even though he did not raise or point his rifle. In doing so, I will explain the concept of *perception-response time*.

6.1.2. A third party's (e.g., juror's) perception of threat when viewing video footage of the incident. I will explain why a third party's (e.g., juror's) perception of threat might differ from the deputies' perception, and why the deputies' actions should be judged according to their perception, and not the perception of a third party. In doing so, I will explain the concept of *response bias* (i.e., decision tendency or strategy).

6.2. The deputies' perception of threat at the time of the incident.

6.2.1. It is evident from the deputies' body-worn-camera footage that the decedent had his rifle slung, with the muzzle (barrel) pointing down. As per the complaint (p. 6 of 22, lines 1–3), the decedent "never raised, attempted to raise, or pointed the rifle at Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES nor anyone else at the time of the shooting."

6.2.2. However, the fact that the decedent did not raise or point his rifle at deputies or members of the public does not mean that he did not pose an immediate threat.

6.2.3. The decedent had the means and opportunity to act immediately. At any point, the decedent could have—very rapidly—raised the muzzle of his rifle toward either Deputy Barajas—who was standing behind her driver's door, nearly in front of the decedent—or Deputy Vazquez, who was flanking the decedent (behind the decedent and to his left).

6.2.4. The decedent could have fired his rifle one-handed, using his right hand—which although not visible in most of the BWC footage—appeared to be in a position consistent with gripping the rifle's pistol grip. Gripping the rifle's pistol grip—even with one hand—would have afforded the decedent excellent control over the rifle, including the ability to raise the muzzle (i.e., point the rifle).

6.2.5. The motion of raising the muzzle and pointing the rifle would have been facilitated by the rifle's sling. Using his right hand only, the decedent could have pushed down and forward on the pistol grip, causing the muzzle to rise as the rifle rotated around the sling's contact point on the shoulder. The sling would have acted as a pivot or fulcrum, allowing the rifle to swing upward with minimal effort. The sling would have slid over the shoulder, reducing friction and allowing smooth elevation of the muzzle.

6.2.6. It is not known whether the rifle's safety selector was in the "Fire" position (meaning that the rifle could be instantly fired by pulling the trigger), or if the safety selector in the "Safe" position, meaning that the decedent would have had to move the safety with his right thumb to the "Fire" position before pulling the trigger. Regardless, the

action of moving the safety selector from "Safe" to "Fire" can be accomplished very quickly. Many shooters perform this action while raising the rifle to a shooting position (i.e., it need not take any extra time to move the safety selector from "Safe" to "Fire", over the time needed to raise the rifle to a shooting position).

6.2.7. It is also important to note that although rifles are traditionally fired using two hands, it is not necessary to use two hands to fire the rifle. Given that the rifle was slung across his body, the decedent could have used the sling to support the rifle while he used to right hand—assuming it was gripping the rifle's pistol grip—to lever the barrel up. If the decedent was gripping the rifle's pistol grip with his right hand, he would have been able to manipulate the safety selector with his right thumb, pull the trigger with his right index finger, and manipulate/control the rifle's position, all without moving his right hand from the pistol grip and without using his left hand. The decedent could have, of course, also used his left hand to assist in pointing the rifle.

6.2.8. I have not been able to locate any scientific evidence for how quickly someone carrying a slung rifle and gripping the rifle's pistol grip could raise it and fire. However, from my own experience carrying slung rifles similar to the decedent's rifle, I am confident that this action could easily be performed in less than 1 second (including moving the safety selector from "Safe" to "Fire," if necessary).

6.2.8.1.    I believe that the decedent could have (a) raised his rifle from the slung position with the muzzle pointing down pointed, (b) pointed it at either the driver of the white Tesla or at Deputy Barajas, and (c) fired in less than 1 second.

6.2.8.2.    I believe that the decedent could have (a) turned to face Deputy Vazquez—who was positioned behind him and to his left, (b) raised his rifle in Deputy Vazquez's direction, and (c) fired at Deputy Vazquez in less than 1 second.

6.2.9. Another consideration is the asymmetry between the decedent and the deputies in terms of aiming. The decedent did not necessarily have to take careful aim to pose a threat. He could have raised his rifle and fired in the general direction of a deputy or member of the public. However, deputies are generally taught to aim before firing. Aiming typically takes additional time, over and above the time required to merely point in the general direction of a threat and fire (without regard for shooting accurately).

6.2.10. I believe that the decedent's ability to raise his rifle and fire in less than 1 second constituted an immediate threat.

6.2.11. The complaint alleges that the decedent was not an imminent threat, despite the fact that he (a) was armed with a rifle, (b) had already fired said rifle, (c) had not complied with verbal commands, (d) was approaching Deputy Barajas and members of the public at close distance, and (e) was gripping the rifle's pistol grip.

6.2.12. Based on the complaint (First Claim for Relief, paragraph 32), I contend that the plaintiff would only classify the decedent as posing an imminent threat if he had been

raising, attempting to raise, or pointing his rifle at the deputies or a member of the public.

6.2.13. To understand why the decedent was an immediate threat—despite the fact that he had not raised, attempted to raise, or point his rifle at the deputies or members of the public—it is necessary to understand that both perceiving a stimulus (e.g., a suspect starting to raise their rifle) and responding to that stimulus (e.g., a deputy taking aim and firing) take time. This notion is captured in the concept of perception-response time (Green, 2023).

6.2.14. To illustrate the concept of perception-response time, consider the following situation: Imagine you are driving down a city street, approaching a traffic light. The car in front of you is moving, and you are following at a reasonable distance. Suddenly, that car slams on its brakes — maybe the light turned yellow, or a pedestrian stepped into the crosswalk.

6.2.14.1.   You do not hit your brakes the very instant the brake lights on the car in front of you come on. First, your brain has to: (a) perceive that the brake lights came on and the car is slowing down, (b) process what that means (realize you need to stop to avoid hitting them), and (c) respond by moving your foot from the gas to the brake and pressing down on the brake.

6.2.14.2.   That entire sequence—from seeing the brake lights to physically pressing your brake pedal—is your perception-response time.

6.2.14.3.   Perception time will vary depending on the salience ("obviousness") of the stimulus and whether the perceiver was attending to the stimulus (and not looking elsewhere) when the stimulus becomes visible.

6.2.14.4.   Because it takes time to perceive and respond, there is a chance that you will not be able to stop in time—you might hit the car in front. This, of course, depends on factors such as how fast you were driving, how closely you were following the car in front, and whether you were focusing on something else (e.g., distracted) when the car in front started to brake.

6.2.14.5.   Remember that rear-end collisions can happen even to very experienced drivers. Having experience driving is no guarantee that you will be able to avoid a rear-end collision.

6.2.15. Just as it takes you time to perceive the car in front of you slowing down, it takes a deputy time to (a) perceive that a suspect is moving their weapon, (b) process what that means (e.g., the suspect is about to shoot), and (c) respond by taking aim and firing accurately.

6.2.16. It is important to remember that all of the components of the perception-response cycle can happen within a very short space of time (i.e., less than 1 second).

6.2.16.1.    For example, take the case of a simple laboratory experiment in which two people sit at a table, facing each other. In front of each person are three buttons. Both people must complete a sequence of three button pushes, with the goal of each person being to finish first. Either person can initiate movement, creating a competitive situation: sometimes person A will move first, with person B needing to react to try and beat them. Other times, person B will move first, forcing person A to try and beat them. Under these simple conditions—with no repercussions for losing—the average perception time was 207 milliseconds (i.e., approximately one-fifth of a second; Welchman et al., 2010). This was the time from the start of the first person's movement to the start of the second person's movement.

6.2.17. The main question is then: Could either deputy have reacted—by shooting accurately at the decedent—in less time than it would have taken the decedent to raise his rifle and fire?

6.2.18. Research on reaction time in shooting situations generally shows that deputies/officers are only able to fire a shot after the suspect has already fired.

6.2.18.1.    Blair et al. (2011) conducted a reaction-time study with high trained police officers. Part of the study involved a "suspect" who was standing still and holding a training handgun pointed at the ground. At the start of each trial, a highly trained officer faced the "suspect" at a distance of 10 feet and aimed their training handgun at them. On most trials, the "suspect" would raise their handgun and attempt to fire at the officer (on the other trials, the "suspect" would surrender). The officer's task was to react as quickly as possible and shoot the "suspect" when they raised their handgun. Across the entire study, the:

> "officers fired at the same time or later than the suspect 61% of the time. Additionally, even in situations where the officer was faster, there was less than a .2 s[econd] difference, suggesting that the suspect would still get a shot off in most of these encounters" (Blair et al., 2011, p. 335–336).

6.2.19. There are of course, differences between Blair et al.'s (2011) study and the incident in the complaint (e.g., the decedent was carry/holding a rifle, and not a handgun). Nonetheless, Blair et al.'s study shows that even highly trained officers—when standing 10 feet from a suspect with their weapon drawn and ready to fire—were unable to fire before the "suspect" most of the time.

6.2.20. As Blair et al.'s (2011) study highlights, the pertinent question is not just whether a deputy can—sometimes—fire at the suspect before the suspect fires. The pertinent question is whether a deputy can guarantee that they will always be able to fire before the suspect fire. The research shows that deputies cannot guarantee that they will be able to fire before a suspect fires at them—even under ideal conditions.

6.2.20.1.    Furthermore, there were serious consequences (i.e., death, injury) if a deputy had not been able to react before the decedent was able to fire. Therefore, I expect that deputies were compelled—in the face of the immediate threat—to act before the decedent had a chance to raise his rifle. This is simply due to the time it takes to perceive and accurately react to a suspect's movement. If the deputies waited until the decedent started to raise his rifle, they would almost certainly have risked being shot before being able to react and stop the threat. Deputies are not required to take unnecessary risks to protect their own lives and the lives of innocent bystanders; they are inclined to act when they are sure there is an immediate threat and when there is still time for them to take decisive action that minimizes the danger to themselves and members of the public.

6.2.21. Caveat: There has been research (Welchman et al., 2010) that found—in a laboratory experiment in which two people simulated a duel by pressing a sequence of buttons—that when people react to someone else's movement, the initial part of their movement is performed faster than when they initiated the movement. However, this research also found that—because of the time it takes to perceive the initiator's movement (i.e., the perception time, which was an average of 207 milliseconds)—the reactor nearly always finished their button-press sequence *after* the initiator.

6.2.21.1.    A misinterpretation and misapplication of this research would be as follows: Because the reactor moved slightly faster (compared to their same movement when they were initiating the button-press sequence), a deputy could have afforded to wait until the decedent was raising his rifle before reacting (because the deputy will still be able to aim, fire, and stop the decedent before the decedent fires).

6.2.21.2.    However, such a conclusion does not accord with what is known about perception-response time: Action generally beats reaction, especially when conditions afford both parties equal opportunity to act.

6.2.22. In this specific case, recall that there was an asymmetry (i.e., mismatch) between the decedent's ability to act and the deputies' ability to respond. The decedent did not have to aim and fire accurately to pose a threat, while the deputies were expected to fire accurately to stop the threat. In other words, the deputies—who already had to contend with being in the disadvantageous position of reacting to the decedent—were further disadvantaged in their ability to react rapidly because they had been trained to aim and shoot accurately (which takes additional time beyond merely shooting in the decedent's general direction).

6.2.23. Even if the deputies were already aiming toward the decedent, it is likely that they would have been "looking over their sights" (rather than "through" their sights at the decedent), so that they could monitor the decedent's actions and movements. The point is that even if they waited for the decedent to raise his rifle, they would likely have still needed some time to aim before firing.

6.3. A third party's (e.g., juror's) perception of threat when viewing video footage of the incident.

    6.3.1. To help understand how the deputies' perception of threat could differ to a third party's perception of the same threat, I introduce the concept of *response bias* (Macmillan & Creelman, 2005). Simply put, this is a person's tendency toward making either a *yes* or *no* decision in a given situation.

        6.3.1.1.    It is important to note that the term *response bias* has no connection with racial bias. It is a technical term used to describe a person's tendency to respond *yes* or *no* in a given situation.

    6.3.2. For example, take the case of a Transport Security Administration (TSA) officer at a baggage-scanning machine at an airport. If there has been a specific, credible threat, then the TSA agent will likely be more cautious than normal. That is, they will be more likely than normal to label an item within a bag as suspicious, leading to secondary screening (hand searching). A consequence of this decision strategy is that the screening line slows down as more bags are sent for secondary screening. Another way to think about this is that the TSA officer moved their internal tendency to label an item as "suspicious" from fairly relaxed (before there was a credible threat) to quite cautious. Their ability to detect unusual items did not change; what changed was their tendency for labeling an unusual item as suspicious. This example shows how a person can change their tendency toward making a yes ("It is suspicious") versus a no ("It is not suspicious") decision when the context changes (e.g., when the consequences of failing to detect a weapon or bomb could result in the loss of life).

    6.3.3. Many people can relate to the experience of turning left from a side road onto a busy two-way road. If you are relaxed and in no rush, you might be happy to wait for a long break in the traffic before you turn. But, if you have been waiting to turn left for several minutes without seeing a long break, you might become impatient and turn left when there is a shorter break in the traffic. That shift in your tendency from being relaxed (i.e., waiting for a long break) to being more eager (i.e., turning when there is a smaller break than you would like) is an example of a change in your response bias. Again, this is an example of how a person's response bias can vary over time within a given situation (e.g., due to task demands, context, information).

    6.3.4. Although a person's tendency to make a yes or no decision can change, it is also important to note that different people can naturally have different tendencies. In the "turning left" situation described above, imagine the following two people: Mark, an ageing retiree who is not in a hurry, and Jim, a young delivery-truck driver who must stick to a strict delivery schedule. Mark, the retiree, will be happy to wait for a long, clear break in the traffic, especially since he feels he is not as quick to respond as he was when he was younger. Mark's decision threshold is set to "cautious;" in technical terms, he has a *conservative* response bias or a tendency to say "No, best to wait for a proper break in the traffic." Jim, on the other hand, has no time to waste. He feels that he must keep moving so he can stick to his delivery schedule.

He is not happy to wait for a long, clear break in the traffic; he wants to go now. His threshold is set to "eager;" in technical terms, he has a *liberal* response bias or a tendency to say "Yes, go now and take advantage of even a short break in traffic." If Jim was a passenger in Mark's car, he would probably describe Mark as being overly cautious; Jim would probably be frustrated with Mark. On the other hand, if Mark was a passenger in Jim's delivery truck, he might think that Jim is impatient and taking unnecessary risks. However, Mark's strategy of making sure there is a substantial break in traffic before turning is the safer (more secure, less risky) strategy.

6.3.5. Understanding that different people (e.g., Mark versus Jim, deputies versus civilians) can have different tendencies is directly relevant to understanding the deputies' actions with respect to the shots they fired and when they stopped firing.

6.3.6. The deputies initially fired because they perceived that the decedent posed an immediate threat to them and to members of the public. They continued to fire because the decedent still posed an immediate threat. They stopped firing when the decedent no longer posed an immediate threat. But what constitutes an immediate threat?

6.3.7. Deputies—perhaps as a result of their training—have a different tendency to civilians (who do not have law-enforcement training) with respect to making a yes/no decision about whether a threat is imminent. I submit that deputies have a conservative response bias when it comes to deciding if a threat is (still) imminent. That is, they are like Mark in the "turning left" example. Mark is cautious (risk averse)—he needs a clear long break in the traffic before he makes the decision to turn left. Similarly, deputies are cautious (risk averse) in making a decision that an armed person is not (or no longer) a threat. They want to be very certain that a suspect is no longer an immediate threat.  That is for good reason: If deputies adopted the opposite tendency—of being relatively quick/eager to label an armed person as "no longer an imminent threat"—they risk injury or death to themselves or others if they are wrong.

6.3.8. I contend that—based on their training and experience—Deputy Barajas and Deputy Vazquez had a tendency to be cautious in deciding when the decedent was no longer an immediate threat. From their behavior (i.e., when they stopped shooting), it appears that they labeled the decedent as "no longer an immediate threat" once (a) he had fallen to the ground, (b) his rifle was not within easy reach, (c) he was not moving toward another person, and (d) he was not attempting to access his rifle or another weapon (e.g., that he may have had on his person).

6.3.9. When civilians—with no law-enforcement training—watch slow-motion or frame-by-frame footage of the incident, they are essentially privileged observers who (a) do not need to decide and act in real time, as the deputies did; and (b) have the time to make detailed comparisons (e.g., from one frame to the next) that the deputies did not have the opportunity to do during the incident.

---

6.3.10. I contend that reviewing and scrutinizing body-worn-camera footage in this way naturally leads people to have tendency to focus on small changes in a suspect's posture and/or motion that are detectable in a frame-by-frame analysis, but that are not easy to detect in real time. They might be tempted to look at each small change in a suspect's motion/posture—from one from to the next—and use that information to decide whether the suspect still poses an immediate threat. For example, a change in the suspect's posture—from standing erect to bending forward slightly at the waist—might be construed as "no longer posing an immediate threat" when comparing one video frame to the next. But focusing on that detail—in a frame-by-frame analysis—can obscure that fact that suspect is still armed, still on their feet, and still moving forward. Engaging in this type of analysis can be misleading, because it can entice people to think that small differences in a suspect's posture/motion that can be detected while comparing video frames should have been detectable by deputies in real time.

6.3.11. In other words, comparing small changes in a suspect's posture/motion from one frame to another can lead people to adopt a liberal response bias. That is, armed with privileged information about small changes in a suspect's posture/motion, people without law-enforcement training may tend to be eager to label the suspect as "no longer posing an imminent threat." A consequence of this is that once the observer labels the suspect as "no longer posing an imminent threat," it is natural to think that any additional shots fired by deputies are not justified.

6.3.12. The difference between a deputy's and a civilian's tendency to label the suspect as "no longer posing an immediate threat" is the difference between the deputy's cautious decision in the moment and a civilian's eager decision when reviewing video after the fact. Which tendency is the "correct" one? The reasonableness standard advises that a deputy's actions must be judged in light of what a reasonable deputy would do in the same circumstances (i.e., and not what a civilian would do).

6.3.13. I contend that in the situation encountered by Deputy Barajas and Deputy Vazquez, it is appropriate and reasonable for any deputy to be cautious in deciding that the suspect is no longer an imminent threat. Adopting a cautious strategy maximizes their own safety and the safety of others (e.g., innocent bystanders).

6.4. To conclude this section on the immediacy of the threat posed by the decedent, it is worth reviewing the decedent's behavior prior to, and during, the deputies' shot sequence. Based on the forensic video analysis conducted by Parris Ward, the deputies collectively fired five shots. I will analyze the timing of the shot sequence in Section 7. For the purpose of showing that the decedent posed an immediate threat before and during the firing sequence, it is sufficient to understand that the deputies collectively fired a total of five shots.

6.4.1. The table below describes the decedent's actions before, after, and between the shots, from the perspective of the two deputies' body-worn cameras (BWC).

| Shot # | Decedent's Behavior | |
| --- | --- | --- |
| | **Deputy Barajas's BWC** | **Deputy Vazquez's BWC** |
| 1 | Prior to shot #1 being fired, the decedent was not visible in the video, because his body was obscured by the patrol vehicle's door and side mirror. | Prior to shot #1, the decedent was walking in the number 1 lane (i.e., closest to the median) toward the white Tesla; rifle was slung on right side of decedent's body; decedent's right elbow is positioned such that it appears his right hand is gripping the rifle's pistol grip; his left hand appears to be hanging down at left side (not gripping the rifle) |
| 2 | After shot #1, the decedent was not visible in the video, because his body was obscured by the patrol vehicle's door and side mirror. The very top of the decedent's head started to become visible over the top of the driver's side mirror as shot #2 was fired. | After shot #1, the decedent appears to stop walking briefly after the first shot is fired, possibly because he was hit; he turns slightly to his right while standing, and then keeps walking toward the white Tesla (one step with his right foot, a step with his left foot, a step with his right foot, a step 4with his left foot, and a5 step with his right foot). All during this time, his right elbow appears to be consistent with someone holding the rifle's pistol grip. |
| 3 | After shot #2, the decedent's head and upper torso become visible—above the driver's side mirror—as he moved toward the white Tesla. The decedent appeared to be focused directly ahead (in direction of the white Tesla). The decedent's rifle was not visible, because it is on the far (right) side of his body. | After shot #2, the decedent takes a step forward with his left foot and appears to be about to take a step forward with his right foot. The position of the decedent's right elbow is consistent with a person who is using that hand to hold (e.g., by gripping the rifle's pistol grip) or steady the rifle in place. The decedent's left arm/hand is hanging down by his left side. |
| 4 | After shot #3, the left side of the decedent's whole body becomes visible as he walked forward (so that the camera's view is no longer obscured by the driver's side mirror). The decedent's left arm/hand was hanging by his left side. The decedent's right hand was not visible (obscured by his body). Decedent's rifle was slung on the right side (far) side of his body. | After shot #3, the decedent took a step with his right foot, a step with his left foot, a step with his right foot, and was in the process of starting to take another step with his left foot. The decedent's right elbow was in a fixed position, visible behind his body. This is consistent with a person who is using that hand to hold (e.g., by gripping the rifle's pistol grip) or steady the rifle in place. The decedent's left arm/hand was hanging down by his left side. |

| Shot # | Decedent's Behavior | |
|---|---|---|
| | **Deputy Barajas's BWC** | **Deputy Vazquez's BWC** |
| 5 | After shot #4, the decedent took a step with his left foot as he bent forward at the waist. The decedent's left hand moved up from where it was hanging by his left side to the front of his left hip. It is unclear what the decedent's right hand was doing. The decedent's rifle remained slung on the right side of his body. The decedent took a step forward with his right foot. | After shot #4, the decedent took a step with his left foot and bent forward from his waist. His left hand moved up from where it was hanging by his left side, as if he were clutching the front of his left hip or lower stomach area. The decedent's right elbow was still visible behind his body; his right hand was obscured by his body. The decedent took a step forward with his right foot. |

6.4.2. According to the behaviors described in the table, the deputies would have perceived that the decedent posed an immediate threat to themselves and members of the public because he (a) was moving toward the white Tesla (which was also in the general direction of Deputy Barajas); (b) appeared to be gripping the rifle's pistol grip; and (c) was not complying with verbal commands.

6.4.3. The deputies stopped firing once the decedent no longer posed an immediate threat. This occurred when: (a) the decedent had fallen to the ground, (b) his rifle was not within easy reach, (c) he was not moving toward another person, and (d) he was not attempting to access his rifle or another weapon (e.g., that he may have had on his person).

**7. Why the Deputies' Shot Sequence Indicates a Measured Response with Specific Regard for the Decedent**

7.1. According to the forensic video analysis of body-worn-camera footage performed by Parris Ward, Deputies Barajas and Vazquez fired a total of five shots.

7.2. Using the times on the five still frames produced by Parris Ward, I compiled the following table describing the shot sequence.

| Shot # | Fired by Deputy | Deputy's Shot # | Type of Weapon | Time Since Shot #1 (seconds) | Time Between Shots (seconds) | Time Since Deputy's Previous Shot (seconds) | |
|---|---|---|---|---|---|---|---|
| | | | | | | Barajas | Vazquez |
| 1 | Barajas | 1 of 3 | Handgun | 0.000 | - | - | - |
| 2 | Vazquez | 1 of 2 | Shotgun | 5.632 | 5.632 | - | - |
| 3 | Barajas | 2 of 3 | Handgun | 6.532 | 0.900 | 6.532 | - |
| 4 | Barajas | 3 of 3 | Handgun | 8.465 | 1.933 | 1.933 | - |
| 5 | Vazquez | 2 of 2 | Shotgun | 10.031 | 1.566 | - | 4.399 |

7.3. The data reveal that both deputies fired more than once: Deputy Barajas fired three shots from her handgun and Deputy Vazquez fired two shots from his shotgun.

7.4. One question that can be answered using these data is whether each deputy was firing as fast as they could. This question is relevant because firing at a rapid rate could be construed—by the defense—as an indication that a deputy's actions were willful, wanton, malicious, and done with reckless disregard for the decedent's safety.

7.5. If the deputies did not fire as fast as they possibly could, that is an indication that they took extra time between shots to assess the situation and decide whether an additional shot(s) was necessary to stop the imminent threat. In this case, assessment likely involved (a) observing the decedent's motion and posture to decide if he was still an imminent threat and (b) considering how changes in the decedent's position relative to the deputies might increase the chance of crossfire between the officers.

7.6. In the following subparagraphs, I consider whether the deputies were firing as fast as they possibly could.

7.6.1.1. Deputy Barajas was armed with a 9 mm Smith & Wesson M&P 2.0 semiautomatic handgun.

7.6.1.1.1. Although I have not been able to find firing-rate data for this specific handgun in the scientific literature, it is reasonable to expect that all modern recoil-operated, locked-breech semiautomatic handguns—such as the Smith & Wesson M&P 2.0—function in similar ways and therefore allow people to fire at similar rates.

7.6.1.1.2. Haag and Haag (2011) reported average shot-to-shot intervals for rapid, directed fire (i.e., aiming at a target, and not simply firing as fast as one could with no regard for accuracy) with a variety of 9 mm handguns that ranged from 0.23–0.76 seconds.

7.6.1.1.3. My own experience observing a wide range of people firing 9 mm semiautomatic handguns at targets at short distances—as well as research I have conducted using video-based judgment-and-decision-making simulators— suggests that 0.76 seconds (i.e., the upper limit found by Haag & Haag's [2011]) is a relatively long shot-to-shot interval. In my experience, trained people can typically fire multiple rounds at a target with intershot intervals of less than 0.5 seconds.

7.6.1.1.4. I have no reason to believe that Deputy Barajas was not capable of firing her handgun rapidly with intershot intervals of less than 0.76 seconds.

7.6.1.1.5. However, the minimum time between any of Deputy Barajas's three shots was 1.933 seconds (i.e., longer than the typical intershot interval of someone firing rapidly). Therefore, it is unlikely that Deputy Barajas was firing at the decedent as fast as she possibly could. My opinion is supported by the fact that Deputy Barajas took the time to issue verbal commands to the decedent between her first and second shots (law enforcement officers do not typically issue verbal commands *while* firing, as they are unlikely to be heard).

7.6.1.1.6. Given that Deputy Barajas did not fire at the suspect as fast as she possibly could have, it is evident that she took time—beyond the minimum intershot interval—to assess each shot, give verbal commands where possible, and decide whether each additional shot was necessary. This is supported by the fact that Deputy Barajas noted that the decedent did not react to her first shot.

7.6.1.1.7. Therefore, the timing between Deputy Barajas's three shots—as well as her other actions (i.e., issuing verbal commands)—shows that her shooting actions were not willful, wanton, or malicious, and were not done with reckless disregard for the decedent's safety.

7.6.1.2. Deputy Vazquez was armed with a 12-gauge Remington 870 pump-action shotgun.

7.6.1.2.1. I sought data on intershot intervals for a 12-gauge Remington 870 pump-action shotgun. Using a sample of five untrained civilians, McGuire (2002) reported average intershot times ranging from 1.41–2.70 seconds.

7.6.1.2.2. I have no reason to believe that Deputy Vazquez was not capable of firing his shotgun rapidly, with an intershot interval of between 1.41–2.70 seconds (i.e., at least as fast as untrained civilians).

7.6.1.2.3. However, the time between Deputy Vazquez's two shots was 4.399 seconds, which is substantially longer than the maximum average intershot time of 2.70 seconds observed by McQuire (2002). Therefore, it is my opinion that it is unlikely that Deputy Vazquez was firing at the decedent as fast as he possibly could have.

7.6.1.2.4. Given that Deputy Vazquez did not fire at the suspect as fast as he possibly could have, it is evident that he took time—beyond the minimum intershot interval—to assess whether the additional shot was necessary.

7.6.1.2.5. Therefore, the timing between Deputy Vazquez's two shots shows that his shooting actions were not willful, wanton, or malicious, and were not done with reckless disregard for the decedent's safety.

7.7. Conclusion: Based on my analysis in subsection 7.6, it is my opinion that Deputy Barajas and Deputy Vazquez were the very opposite of willful, wanton, and malicious.

8. **The Totality of Circumstances as it Relates to the Deputies' Decision-Making**

8.1. After considering—in considerable detail—how perception-response time and response bias factor into deputies' decision-making, it is worth reviewing the totality of circumstances in which the deputies took action to end what they perceived to be an immediate threat.

8.2. Prior to final stage of the incident—during which the deputies fired at the decedent—the deputies knew that:

8.2.1. The decedent had attacked someone who was known to him.

8.2.1.1. From this, it is reasonable that the deputies inferred that the decedent had violent intentions and had disregard for others.

8.2.2. The decedent was armed with a rifle.

8.2.2.1. From this, it is reasonable that the deputies inferred that the decedent had the means to cause substantial harm to people (including the deputies themselves). It is also reasonable that the deputies felt they were "outgunned" and that their body armor may not offer substantial protection from rifle fire.

8.2.3. The decedent had fired shots from the rifle.

8.2.3.1. From this, it is reasonable that the deputies inferred that the decedent's rifle was a functioning weapon and not a toy.

8.2.4. The decedent was moving from a relatively quiet residential area (Crooked Creek Drive) toward a major thoroughfare (South Diamond Bar Boulevard).

8.2.4.1. From this, it is reasonable that the deputies inferred that the decedent intended to place himself in a situation where he would encounter members of the public.

8.2.5. The decedent walked northward in the southbound lanes of Diamond Bar Boulevard.

8.2.5.1. From this, it is reasonable that the deputies inferred that the decedent had little regard for his own safety and that he did not follow legal and social conventions.

8.2.6. The decedent was wearing what appeared to be a bulletproof vest.

8.2.6.1. From this, it is reasonable that the deputies inferred that handgun rounds may not stop the decedent and that it might require more shots than normal to stop the decedent.

8.2.7. The decedent did not respond to the deputies' verbal commands.

8.2.7.1. From this, it is reasonable that the deputies inferred that the decedent had no intention of complying with their commands and was determined to carry out a plan—a plan which was unknown to them, causing uncertainty.

8.2.8. The decedent was approaching the white Tesla (and also getting closer to Deputy Barajas).

8.2.8.1. From this, it is reasonable that the deputies inferred that unless they stopped the decedent, the decedent would reach the white Tesla. As the decedent's intent was not clear, it is reasonable that deputies considered the possibility that the decedent may harm the driver of the white Tesla.

8.2.9. The decedent had his rifle slung over his shoulder and was likely gripping the rifle's pistol grip with his right hand.

8.2.9.1. From this, it is reasonable that the deputies inferred that the decedent could raise his rifle and fire at them before they might be able to fire at him.

8.3. In addition to these factors, Deputy Vazquez noted his concern regarding "crossfire." I believe that Deputy Vazquez was referring to the possibility of Deputy Barajas shooting in his general direction and unintentionally wounding or killing him. At the same time, Deputy Vazquez would have been concerned about the possibility that he might fire in Deputy Barajas's general direction and unintentionally wound/kill her (although he did not know Deputy Barajas's identity). This possibility occurred because the two deputies arrived at the incident from different (i.e., opposite) directions. and individuals may be unintentionally caught in the intersecting lines of fire.

8.3.1. It is reasonable that Deputy Vazquez's decision to move north on the western sidewalk of South Diamond Bar Boulevard was influenced by his concern for (a) the potential of crossfire between himself and Deputy Barajas, and (b) his concern about what lay beyond/behind the decedent (e.g., members of the public stopped in their vehicles in the southbound lanes of South Diamond Bar Boulevard). I believe that Deputy Vazquez tried to place himself in a position that reduced or eliminated the possibility of crossfire, while trying to remain behind the decedent (i.e., to avoid entering the decedent's line of sight). This was especially important given that Deputy Vazquez did not have any cover.

8.3.2. But Deputy Vazquez also had additional considerations:

8.3.2.1. Given that the decedent was moving northbound in the southbound lanes of South Diamond Bar Boulevard, the longer Deputy Vazquez waited to act, the closer his line of fire would come to the white Tesla and to Deputy Barajas (see Figure 1). It is reasonable that Deputy Vazquez perceived that he had a diminishing window of time during which he could take decisive action to stop the decedent's progress toward the white Tesla and Deputy Barajas. If he did not act within that window, he risked the decedent getting too close to the white Tesla and Deputy Barajas. If this had happened, he would have been forced to withhold fire out of concern for unintentionally hitting the white Tesla (and its occupant) and Deputy Barajas.



**Figure 1.** Overview of the scene on South Diamond Bar Boulevard near the intersection with Crooked Creek Drive. Note the approximate relative positions of Deputy Barajas (behind the open driver door of her patrol vehicle), Deputy Vazquez (on the western sidewalk of South Diamond Boulevard), the white Tesla, and the decedent at the time the shots were fired. The numbered yellow circles represent the decedent's approximate path if had continued to walk north in the southbound number 1 lane (closest to the median) of South Diamond Bar Boulevard. Generally, as the decedent moved toward the white Tesla (i.e., progressing from position 1 to position 3), Deputy Vazquez's lines of fire toward the decedent—represented by the dashed blue lines—became increasing close to the white Tesla and Deputy Barajas's position. With respect to crossfire, Deputy Vazquez would have been concerned about the possibility of (a) his shot missing the decedent and hitting a person behind the decedent and (b) a shotgun slug hitting the decent, then exiting his body and hitting a person behind the decedent (having continued either on a straight path or having been deflected). Therefore, Deputy Vazquez had to act to stop the imminent threat before the risk of crossfire became too great.

8.3.2.2. Given that Deputy Vazquez was armed with a shotgun—which has superior stopping power compared to a handgun—and regardless of whether he knew what weapon the other deputy (Deputy Barajas) was armed with, he is likely to have thought that he alone possessed a weapon powerful enough to stop the decedent (given that the decedent was wearing a bulletproof vest).

8.3.3. Therefore, I believe that Deputy Vazquez had no other option to fire when he did to stop the immediate threat posed by the decedent.

9. **The Deputies' Determination that Deadly Force was Necessary**

9.1. The plaintiff claimed that the deputies:

9.1.1. did not exhaust all reasonable available alternative measures prior to using deadly force on the decedent, and

9.1.2. failed to provide adequate commands and warnings prior to using deadly force, despite it being feasible to do so.

9.2. The language used in the claim—that is, "exhaust all reasonable available alternatives"—could be construed to suggest that deputies must first attempt to use all alternative measures before resorting to lethal force in *every* situation.

9.2.1. Section 835a of the Penal Code states (I have added bolding and underlining for emphasis): "In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques **if reasonably safe and feasible to an objectively reasonable officer**."

9.3. Other available resources and techniques can include verbal warnings, calling for backup, or de-escalation.

9.4. Given the totality of circumstances that Deputies Barajas and Vazquez found themselves in, I believe that they considered other available resources and techniques to the extent that they could.

9.4.1. Both deputies issued repeated verbal commands to the decedent to stop and put down his weapon.

9.4.2. Both deputies were aware that—due to the serious nature of the call—backup was already on scene. Therefore, there was no need for either deputy to call for additional backup.

9.4.3. Deputy Barjas reported that while detaining the decedent at gunpoint on South Diamond Bar Boulevard, she considered retrieving the 40 mm less-lethal launcher that was stored in the trunk of her patrol vehicle. However, in light of the immediacy of the threat posed by the decedent, she decided that was not a viable option.

9.4.3.1. It is likely that it would have taken her at least 10 seconds to retrieve the less-lethal launcher and ready it for use. Had she done that, she would have had to holster her handgun at some point—leaving her without the ability to respond to the armed decedent—and she would have momentarily lost sight of the decedent.

9.4.3.2. As she was the deputy who was directly in front of the decedent, she would have endangered herself and the bystanders by losing sight of the decedent and not being armed and ready to fire.

9.4.3.3. Furthermore, it is likely that before retrieving the less-lethal launcher, Deputy Barajas would have wanted to coordinate with other deputies to ensure that there was another deputy armed with a lethal-force option who was covering the decedent. This step is generally taken to ensure that (a) there is someone in position to deal with the threat while the less-lethal option is being retrieved and (b) a lethal-force option is available in case the less-lethal launcher is not effective.

9.4.4. When Deputy Vazquez arrived at the call location and spotted the decedent at a distance armed with a rifle, he made the decision to retrieve his shotgun. In making this decision, Deputy Vazquez would have assessed that other force options he may have been carrying (e.g., baton, Taser, spray) were not appropriate options for dealing with a person armed with a rifle.

9.4.5. Similarly, Deputy Barajas—upon seeing the decedent on South Diamond Bar Boulevard—drew her handgun, which she assessed to be the most appropriate option with which to detain the decedent. Deputy Barajas was carrying a Taser, but she realized—through training and experience—that Tasers are not always effective, and that the probes were unlikely to penetrate the decedent's bulletproof vest or make contact with skin through his baggy pants.

9.4.5.1. Had Deputy Barajas armed herself with a Taser (i.e., a less-lethal option), then she would have placed herself in a precarious position in the likely event that the Taser was not effective against the decedent. She would have then been forced to transition from her Taser to her handgun. Transitioning between force options takes time; in a laboratory task, experienced police officers took an average of 2.49 seconds to perceive a visual stimulus and transition from Taser to handgun (Taylor et al., 2022).

9.4.6. If the decedent had complied with the deputies' commands (e.g., stopped moving forward) and taken his right hand away from the rifle, I expect that the deputies would have perceived the threat posed by the decedent to be less than it had been when he was walking forward and holding the rifle with his right hand. If the decedent had stopped and complied, I expect that Deputies Barajas and Vazquez—as well as other deputies on scene—would have attempted to communicate with the decedent to de-escalate the situation. They may have also perceived that they had the time to coordinate and deploy less-lethal force options.

**10. Summary**

10.1. Deputies Barajas and Vazquez ascertained that the decedent posed an immediate threat, based on his ability to raise his rifle and shoot at them before they would be able to return accurate fire. Even if they had been able to perceive his actions and respond by firing accurately, it was likely that the decedent would have been able to fire at least one shot before the deputies fired. Also, there is no guarantee that the deputies would have been able to stop the threat posed by the decedent with just one shot. This means that the decedent may have had the opportunity to fire multiple shots before the deputies would have been able to stop the threat he posed.

10.2. The sequence and order of the deputies' shots show that their response was measured. They did not fire as fast as they could; this indicates that they were assessing the situation between shots to determine if additional shots were required to stop the threat posed by the decedent.

10.3. Collectively, Deputies Barajas and Vaquez stopped firing when the decedent was clearly no longer a threat (i.e., when he was on the ground, separated from his rifle). The deputies' decision strategy (i.e., response bias) was to designed to ensure their safety and the safety of other deputies and bystanders: They were cautious in deeming that the decedent no longer posed a threat, because if they adopted the opposite decision strategy, they may have stopped shooting while the decedent still on his feet, holding his rifle, and capable of shooting.

## 11. References

Blair, J. P., Pollock, J., Montague, D., Nichols, T., Curnutt, J., & Burns, D. (2011). Reasonableness and reaction time. *Police Quarterly*, *14*(4), 323–343. https://doi.org/10.1177/1098611111423737

Green, M. A. (2023). *Roadway human factors: From science to application* (2nd ed.). Lawyers & Judges Publishing Company.

Haag, M. G., & Haag, L. C. (2011). *Shooting incident reconstruction*. Academic Press.

Macmillan, N. A., & Creelman, C. D. (2005). *Detection theory: A user's guide* (2nd ed.). Lawrence Erlbaum Associates.

McGuire, B. E. (2002). *The advantages of the 5.56 mm/.223 semi-automatic rifle versus the shotgun or pistol cartridge carbine for police patrol applications* [Unpublished administrative research paper]. The Bill Blackwood Law Enforcement Management Institute of Texas. https://shsu-ir.tdl.org/server/api/core/bitstreams/8919f3d2-8619-46c5-8647-6be215e1d240/content

Taylor, P. L., Sipe, P., & Bartel, L. (2021). Lost in transition: The effects of transitioning between firearms and electronic control devices (ECDs) on perception-response times (PRTs). *The Police Journal*, *96*(1), 103–116. https://doi.org/10.1177/0032258x211044135

Welchman, A. E., Stanley, J., Schomers, M. R., Miall, R. C., & Buelthoff, H. H. (2010). The quick and the dead: When reaction beats intention. *Proceedings of the Royal Society B-Biological Sciences*, *277*(1688), 1667–1674. https://doi.org/10.1098/rspb.2009.2123

## 12. Signature Page

12.1.  This report was produced on October 20, 2025.

12.2.  Signature of Joel Suss: