# Exhibit 3

**Edward T. Flosi, M.S.**
Law Enforcement Practices Expert
Law Enforcement Trainer
Justitia Consulting
1519 E Chapman Ave #34
Fullerton, CA 92831
Cell: (408) 315-0520
Email: ed.flosi@gmail.com

1    I have been retained by Hurrell Cantrall as an expert witness in the civil action of Quan v County
2    of Los Angeles, et al. I am therefore submitting the following information and report as required by Rule
3    26 of the Federal Rules of Civil Procedure.

4    The findings and opinions in this report are based upon my review of the documents as
5    presented to me by counsel and other evidence related to this incident. These findings are an overview
6    analysis based on the information currently available.

7    My findings and opinions are formed from: (1) the materials I have reviewed to date thus far
8    which provides me with information concerning the facts and circumstances as perceived by the officers
9    about what occurred during this incident, and (2) how a reasonable officer would have acted when
10   presented with similar circumstances, based upon his or her law enforcement and other related
11   professional training and experience.

12   As is my custom and practice, I reserve the right to amend, alter, enhance or delete findings and
13   opinions based upon my receipt and review of any subsequent new information pertaining to this case.

14   I have been retained by the Santa Clara County District Attorney's Office on thirteen occasions.
15   In each of these cases I was consulted on the officer's use of force regarding a case where a defendant
16   had resisted, delayed or obstructed the officer's arrest process. In each of these cases, I was not
17   consulted until after the Santa Clara County District Attorney's Office had already made the decision to
18   prosecute the case believing the elements had been satisfied. I had not been consulted on any cases
19   prior to the filing of the case.

20   A more detailed list of my consultations/retentions and testimony history can be found in the
21   attached Curriculum Vitae.

22   In 2007, I was contacted by the San Mateo County District Attorney's Office to provide
23   testimony in a case where a police officer was being prosecuted. I had agreed to provide testimony to
24   assist in the prosecution of the officer but was prohibited from doing so by the San Jose Police
25   Department Assistant Chief of Police.

26   I have been retained as the "person most knowledgeable" witness in civil proceedings by the
27   San Jose City Attorney's Office on six occasions and have given depositions in three of the cases. These
28   cases involved my testimony regarding the San Jose Police Department Use of Force Policy and Training.
29   In one case, I provided consultation that the officers had acted outside of policy and training.

30   I have been consulted three times by the San Jose Police Department Internal Affairs Unit
31   regarding a complaint of excessive force. In these consultations, I was asked several questions regarding

1

**Edward T. Flosi, M.S.**

Justitia Consulting

1   the training standards specifically related to the use of force.  I was never told the specific details of the

2   case being investigated and was not asked to render an opinion as to the conformance with San Jose

3   Police Policy.

4        The breakdown of my case retention is described on the table below (as of 9/25/2025). It should

5   be noted that retention on any of the cases does not necessarily imply that my opinion would have

6   supported or not supported the officer's actions. For example, on several retentions by the attorney

7   representing the officer, my opinion(s) of the officer's actions did not support the defense.

| Type | Number | Deposition Given | Testimony |
|---|---|---|---|
| Criminal Prosecution (during PD) | 12 | | 3 |
| Criminal Prosecution (after PD) | 12* | | 7 |
| Criminal Defense | 2 | | |
| Civil Defense | 348 | 98 | 51 |
| Civil Plaintiff | 19 | 4 | 1 |
| Civil Plaintiff (Sub-contractor) | 2 primary expert / 3 assisting | 1 | |
| PMK for CSJ | 7 | 4 | |
| SJPD IA Consults | 3 | | |
| Other IA Consults | 3 | | |
| Employment Arbitration | 6 | | 4 |
| Civilian Civil Defense | 1 | | 1 |

8        * Five cases involved the prosecution of an on-duty deputy/officer

9        I was a full-time sworn Peace Officer for the City of San Jose from December 9, 1984, to

10   December 30, 2011.  I was awarded an Advanced Peace Officer (December 1990) and Supervisory Peace

11   Officer (September 2004) certificate from the California Commission on Peace Officer Standards and

12   Training (POST).

13        I have a Master of Science degree from the California State University at Long Beach in

14   Emergency Services Administration.  I graduated with Honors and was selected to the Graduate Dean's

15   List of University Scholars and Artists.  This honor is reserved for the top 1% of the graduating class.

16        I have a Clear Designated Subjects (Law Enforcement Occupations) Adult Teaching Credential

17   from the California Commission on Teacher Credentialing.  I was an Adjunct Instructor at West Valley

18   College for the Administration of Justice Department.  I was a member of the West Valley College

19   Administration of Justice Advisory Board.

20        I am currently an Adjunct Instructor at Fullerton College (Administration of Justice Department)

21   and El Camino College (Administration of Justice Department).

22        As a fulltime sworn member of the San Jose Police Department, I served in several capacities

23   that lend to my expertise in rendering my opinions.  One such assignment was from March 2005 to

24   September 2007.  During this period, I was assigned to the Research and Development Unit.  One of my

25   assigned tasks was to assist in updating the Use of Force Policy and to create a Force Response

**Edward T. Flosi, M.S.**
Justitia Consulting

1      Reporting System.  In this position, I became intimately familiar with the genesis of the policy and the
2      reasoning and meaning of the involved sections.

3          I was a defensive tactics instructor (California POST Learning Domain 33) at the South Bay
4      Regional Training Consortium and/or the San Jose Police Department Academy for approximately twelve
5      years.  In my capacity as a defensive tactics instructor for the San Jose Police Department, I commonly
6      taught the legal aspects of an officer's use of force and policy concerns as they related to arrest and
7      control techniques and defensive tactics.  I have attended an 80-hour California POST approved
8      Defensive Tactics Instructor course to become a POST certified Defensive Tactics Instructor.  For a period
9      of approximately seven years I acted as a lead instructor for Defensive Tactics for both organizations.  In
10     my capacity as a lead instructor, I have assisted in the instruction of two Defensive Tactics Instructor
11     courses and had been the primary lead instructor in four other Defensive Tactics Instructor courses.

12         I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the
13     South Bay Regional Training Consortium and/or the San Jose Police Department Academy for
14     approximately nine years.  In my capacity as a Use of Force – cognitive instructor for the San Jose Police
15     Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they
16     related to use of force.  I have been directly involved as a California POST committee member in two
17     prior revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

18         I have been a California POST approved Force Options Simulator (FOS) instructor since January
19     2000. In order to become a FOS instructor, I attended the 40-hour California POST approved FOS
20     Instructor Course. I was a Force Options Simulator (FOS) Instructor for the San Jose Police Department
21     starting in the year 2000 when I was designated as the lead instructor for the San Jose Police
22     Department FOS program.  Shortly after becoming the lead instructor, I was asked by California POST to
23     become the lead instructor for the FOS Instructor course for the Northern California Regional Skills
24     Centers.  In my capacity as a FOS instructor for the San Jose Police Department, I commonly taught the
25     legal aspects of an officer's use of force and policy concerns as they related to use of force.  I retained
26     this title until my promotion in September 2001.  I continued to teach the FOS program for South Bay
27     Regional Training Center for several years after my promotion.

28         I was an active member of the California POST FOS committee from 2000 up until my
29     retirement.  This committee met approximately every six months to discuss training trends and use of
30     force issues within the curriculum.  I have been directly involved in developing the past and present
31     curriculum for the California POST FOS program.  I was the supervisor for the San Jose Police
32     Department FOS program from March 2009 to December 2011.

33         I was a member of the California POST Law Enforcement Officers Killed and Assaulted (LEOKA)
34     Council for approximately six years.  In this capacity, I reviewed the facts and circumstances surrounding
35     several officer involved killings.  I assisted in the preparation of the California POST LOEKA 2000-2004
36     report and in the production of the California POST LOEKA 2005-2009 report. In 2017, I was invited to
37     rejoin the LEOKA committee.

**Edward T. Flosi, M.S.**
Justitia Consulting

1       I have been retained as a "Subject Matter Expert" to assist California POST on two video
2  productions involving the use of force by a peace officer.  These projects developed training guidelines
3  for the use of O.C. Spray, Electronic Weapons and Projectile Impact Weapons.

4       I participated as a "Subject Matter Expert" in a California POST committee to develop an end-
5  user and instructor level Electronic Weapons Course.

6       As a "Subject Matter Expert" I assisted California POST in the production of the web-based
7  training program designed to test an officer's perception of danger which could lead to an assault.

8       I have been a TASER instructor since September 2005.  I attended my original TASER Instructor
9  course in September 2005 and recertified as a TASER Instructor in May 2009, July 2011 and June 2014.
10  These courses were certified as instructor level courses by TASER International.

11       From 2005 – 2007, I taught "Force Documentation" at the San Jose Police Department
12  Supervisors Course.  This course is given to newly promoted supervisors.  My block of instruction
13  covered how to; (1) properly document a force response event, and (2) properly evaluate an officer's
14  use of force.

15       I was one of the primary developers of the Institute for the Prevention of In-Custody Deaths
16  (IPICD) Amendment based use of force training course titled, "Use of Force by the Numbers: 4, 8, 14."
17  This 16-hour course was designed to teach students how to train officers to make force options
18  decisions and evaluate an officer's use of force without a continuum model.  The course focuses on
19  using the 4th, 8th, and 14th Amendment based analyses and based on judicial interpretation of various
20  case law decisions.  My primary responsibility was to assist in the development of curriculum and to
21  present on the topic of the 4th Amendment application as described in Graham v Connor (490 U.S. 386,
22  397 (1989)).

23       I presented twice at the IPICD Forensic Analyst Course on Amendment-based Force Analysis in
24  Criminal and Internal Investigations, once in Nevada and once in Maryland.  My two-hour presentation
25  topic included how to properly evaluate a police officer's use of force using Amendment based analyses
26  based on judicial interpretation of various case law decisions specifically including discussion on; (1) the
27  Supreme Court's decision in Graham v. Connor and its application to the 4th Amendment, and (2)
28  California Penal Code § 835a as an example of State statutory law.

29       In September of 2006, I attended an eight (8) hour training session from the Force Science
30  Institute taught by Dr. Bill Lewinski.  I also attended and successfully completed the certification process
31  of the forty (40) hour Force Science Institute Certification Course in June of 2009. Attendees who
32  successfully complete the program are certified in "Force Science Analysis."  This designation attests
33  that the holder has been trained to recognize and articulate important psychological, biological, and
34  physiological factors that can influence human behavior and memory in force encounters and pursuit
35  situations.

**Edward T. Flosi, M.S.**
Justitia Consulting

1    I have published several articles involving a police officer's use of force and/or defensive tactics
2    issues. I am a regular contributor to PoliceOne.com on the topic of police training specifically involving
3    defensive tactics and the use of force.

4    I attended a 40-hour California POST certified Crisis Intervention Team (CIT) Academy in
5    November of 2008 and remained a San Jose Police Department CIT member until my retirement in
6    December of 2011.

7    I have taught the Excited Delirium Response segment at the San Jose Police Department CIT
8    Academy from 2007-2019 and at the Santa Clara County CIT Academy from 2010-2012.

9    In April of 2010, I attended an eight (8) hour Threat Assessment, De-Escalation of EDP
10    (Emotional Disturbed Persons) training provided by Edgework Crisis Intervention Training.

11    I served as a "Subject Matter Expert" assisting the Santa Clara County Mental Health
12    Department with "Innovation Project 8." This project involved the use of interactive video simulation
13    training for Crisis Intervention Team (CIT) training and was designed to teach officers to effectively
14    communicate and problem solve with a person with mental illness.

15    My qualifications to provide expert testimony about perception, memory and reaction time of
16    law enforcement officers and eyewitnesses; and the interactions of officers and suspects during use-of-
17    force encounters are based on:
18    •    My education, personal experiences, and training (both formal and informal) I have received and
19         have conducted for other police officers;
20    •    The scope of my expertise in these areas concerns investigating and analyzing police use-of-
21         force events, how involved officers and eyewitnesses perceive and remember these events, why
22         involved officers and/or witnesses to such events might have inaccurate recall, reaction time,
23         lag time, and officer-suspect interactions;
24    •    My analysis is similar to that of other police practices experts in these areas and has a factual
25         foundation based on widely accepted and consistently cited facts about the dynamics of human
26         perception and memory and research during officer-suspect interactions;
27    •    My understanding of the facts of this case; and
28    •    My recognition that there will be factors or evidence that may either support, not support, or
29         have a neutral effect upon my opinion.

30    Like many other police practices experts, I have taken classes taught by Dr. William Lewinski,
31    founder of the Force Science Institute (FSI) and other instructors, speakers and presenters. The FSI is
32    comprised of three divisions, including the Force Science Research Center (FSRC). The FSRC conducts
33    scientific research designed to increase the understanding of officer and suspect behaviors in force
34    encounters. While much of the research has focused on deadly force encounters, the same human
35    performance factors apply to events involving less or non-deadly encounters. In addition to attending a
36    total of 8 hours of classroom instruction from Dr. Lewinski and others in September of 2006, I
37    successfully completed the 40-hour Force Science Certification Course in June of 2009.

**Edward T. Flosi, M.S.**
Justitia Consulting

1       The Certification Course covers the basics of anatomy and physiology of perception, including
2    how people acquire, retain and recall memories; the biomechanics of officer movements in relation to
3    suspect movements during force encounters; reaction time; and exploring why an officer's or witness'
4    account of an incident might be in conflict with physical evidence.  In addition to conducting a case
5    study and presentation within a work group, I had to pass a 60-question, multiple-choice exam to
6    graduate from the course as a certified "Force Analyst."

7       FSI also has published articles and studies on these topics for several years.  I consistently read
8    the articles and studies published by FSI prior to attending the classes and Certification Course.  I also
9    have continued my reading to increase and reinforce my understanding of these areas.

10       Based on my training, experience and research, I have a good comprehension of the mechanics
11    of these areas and have applied it in my teaching and actual field work.

12       I have published articles on police tactics that included reaction time and lag time and that have
13    been used to teach law enforcement officers on these subjects, including a peer-reviewed article
14    including the topic (2003, Submission Recognition, *The Police Chief*).

15       I have taught law enforcement defensive tactics to recruit officers and in-service officers for
16    over 15 years. In teaching this subject, I include human factor issues.  I also assisted in creating a drill to
17    teach officers how to mitigate/shorten reaction time to a fisted strike attack. The drill was tested to
18    measure its efficacy.

19       I have taught law enforcement use of force for about 20 years. In these teachings, I have used
20    lecture-based learning to reinforce tactics and techniques to mitigate/shorten reaction times based on
21    my education on the topic and on my own personal experiences. I have used scenario-based training to
22    observe human performance issues and to create strategies to mitigate reaction time and stress factors
23    based on my education on the topic and on my own personal experiences. In these scenario training
24    settings, I have witnessed perception/reaction time gaps thousands of times and used those examples in
25    the debriefing of the officer taking the training, including possible tactics/techniques to mitigate the gap
26    in future encounters.

27       I taught law enforcement emergency vehicle operations for approximately 10 years and the Law
28    Enforcement Driving Simulator (LEDS) program for approximately 5 years. As a driving instructor, I had
29    to have a better than average understanding of reaction time issues and how to address them in
30    lecture-based training and on-track training. Some of the basic principles that were reinforced were; (1)
31    scanning your surroundings, keeping a high visual horizon and keeping a safe distance around your
32    vehicle, and (2) how fatigue or drowsiness can affect your vision and increase reaction time to hazards.
33    It is noted that these same principles are so generally accepted that they are included in the California
34    Driver's Handbook.

35       As a law enforcement practitioner, I have experienced the perception/reaction time gap several
36    hundreds of times in both driving situations and in situations dealing with subjects involved in use of
37    force investigations.

**Edward T. Flosi, M.S.**
Justitia Consulting

1    I have received advanced training through the Force Science Institute (including the 40-hour
2    Force Analyst certification course) – as well as law enforcement training sessions/articles – in and have
3    instructed law enforcement personnel on the topic of human performance science, including:
4    • The physiological effects of stress
5    • The reactionary gap at the beginning of a force response
6    • The reactionary gap at the end of a force response
7    • Visual narrowing
8    • Audio exclusion
9    • Focal attention
10   • Memory recall
11   • Fear and anger management in a force response incident

12   I have testified in federal court trials on the subject of human factors.

13   I have received advanced training through the Force Science Institute (including the 40-hour
14   Force Analyst certification course) – as well as law enforcement training sessions/articles – and have
15   instructed law enforcement personnel on the topic of the limitations of video evidence, including:
16   • Angle of view
17   • Distance from subject(s)
18   • Two dimensional limitations
19   • Environmental factors
20   • Video may not show what the officer was looking at
21   • Video may show more than what the officer's focus was
22   • Video cannot capture emotion

23   I have testified in federal court trials on the subject of the limitations of video evidence.

24   My training and experience in regard to the investigation and documentation of law
25   enforcement force responses includes:
26   • I have used various tools and techniques in order to control subjects in field situations.
27   • I have applied this training and experience to multiple situations involving violent subjects.
28   • I am a POST-certified Force-options Simulator (FOS) Instructor and I served as an instructor
29      for the San Jose Police Department and the South Bay Regional Public Safety Training
30      Consortium. The FOS program concentrated on teaching the state and constitutional laws
31      regarding the use of force by peace officers, as well as the decision-making involved in using
32      various force options.
33   • I was recruited by POST and taught the Train-the-Trainer course for the FOS program for
34      instructor candidates for the POST Perishable Skills Program presentation.
35   • As a supervisor in the Training Division at the San Jose Police Department, I supervised the
36      POST FOS program, which was implemented in order to fulfill POST Perishable Skills Program
37      requirements. In this program, my staff and I delivered this training to the sworn members of
38      the San Jose Police Department, as well as other peace officers within Santa Clara County.
39   • I am a POST-certified arrest and control / defensive-tactics / baton instructor. I served as an
40      arrest  and control / defensive tactics/ baton instructor in the basic academy at the San Jose

**Edward T. Flosi, M.S.**
Justitia Consulting

1  Police Department and the South Bay Regional Public Safety Training Consortium as a lead
2  instructor.
3  • I have taught the 80-hour POST certified arrest and control / defensive-tactics / baton
4    instructor course for instructor candidates.
5  • I have taught force response investigation and documentation in POST certified courses to
6    law enforcement personnel.
7  • I have taught the POST Regular Basic Academy Learning Domain 20 (Use of Force) to
8    academy recruits that includes a chapter on force response documentation.
9  • I have taught in-service team training sessions upon request within the San Jose Police
10   Department.
11 • While in the SJPD Training Unit, I supervised and taught classes in defensive tactics and
12   officer safety.
13 • I was three times certified as a TASER device instructor.
14 • I am a POST certified OC Spray instructor.
15 • I taught Police Report Writing at West Valley College.
16 • I have personally responded to several force-response incidents and investigated them as a
17   patrol supervisor.

18     I am currently the President of Justitia Consulting, Inc. My duties in this capacity include case
19 consultation and expert witness testimony.  I am currently the Principal Instructor for PROELIA Defense
20 and Arrest Tactics.  My duties in this capacity include use of force and defensive tactics instruction,
21 curriculum development and course coordination.

22     A more detailed list of my education, publications, training and experience can be found in the
23 attached Curriculum Vitae.

24     I am an impartial investigator and expert.

25     As of January 2025, I am being compensated for my services at the following rates:
26 • $225/hour* – Report review/report writing
27 • $350/hour* – Live or telephonic conferencing/consulting
28 • $350/hour – Deposition and/or testimony
29 • $2000/day – Daily rate for consultation/trial or site visit
30 • $100/hour* – Travel rate (not including travel expenses)
31 • $100/hour* – Trial or testimony stand-by time
32 • $150 – Filing, billing, administrative and office supply fee (one-time fee per case)
33 • Travel expenses will be billed at actual costs, including but not limited to; (1) airfare, (2)
34   ground transportation, (3) lodging, and (4) meals at GSA rate, and (5) reasonable
35   incidentals
36 • *billed per half hour
37 ///

**Edward T. Flosi, M.S.**
Justitia Consulting

1            **DOCUMENTS REVIEWED FOR THIS ANALYSIS**

2            Commencing in August 2025, counsel began presenting me with a compilation of evidentiary
3     documents for my review in preparation for opining on this case.

4            As is usually the practice in cases such as this, I am aware that there will be additional
5     documents or other evidence that might subsequently become available during the discovery process
6     that I will want to review which may assist me in developing more detailed findings and opinions.
7     Therefore, I reserve the right to amend my findings and opinions at some later date based upon my
8     ability to review any additional records and/or items of evidence I might subsequently receive.

9            The documents, evidence and research I have reviewed and performed to date are listed below:

10    1.   Complaint, June 7, 2024
11    2.   Plaintiff's Production 00002-00085
12         a.   Autopsy Report
13         b.   Lab Report
14         c.   Certificates
15         d.   Photos
16    3.   Los Angeles County Sheriff's Department Homicide Bureau Report 023-04539-2927-013
17    4.   Los Angeles County Sheriff's Department Supplemental Reports
18    5.   Los Angeles County Sheriff's Department Use of Force Policy
19    6.   Audio Interviews and Transcribed Interviews
20         a.   Deputy Carlos De La Torre
21         b.   Deputy Chad Holland (2 interview files)
22         c.   Detective Christopher Bronowicki
23         d.   Deputy German Perez
24         e.   Detective Hector Vasquez (2 interview files)
25         f.   Deputy Kyle Toves (2 interview files)
26         g.   Deputy Marisol Barajas (3 interview files)
27    7.   Video Files
28         a.   1 - Clip of Axon_Body_3_Video_2023-06-19_1138_X60A19414
29         b.   2 - Clip of Axon_Body_3_Video_2023-06-19_1140_X60A16554 (Vasquez BWV)
30         c.   3 - Clip of Axon_Body_3_Video_2023-06-19_1137_X60A1078T (Barajas BWV)
31         d.   4 - Clip of 998-5
32         e.   5 - Clip of Axon_Body_3_Video_2023-06-19_1149_X60A1773R
33         f.   6 - Clip of Axon_Body_3_Video_2023-06-19_1142_X60A18242
34         g.   7 - Clip of Axon_Body_3_Video_2023-06-19_1145_X60342573
35         h.   8 - Clip of Axon_Body_3_Video_2023-06-19_1143_X60A14313
36    8.   Media from Parris Ward
37         a.   Photos
38              i.   Shot 1
39              ii.  Shot 2
40              iii. Shot 3
41              iv.  Shot 4
42              v.   Shot 5

**Edward T. Flosi, M.S.**
Justitia Consulting

    b.  Video
        i.  Synchronized BWC Video
        ii.  X60A1078T+Frame Numbers
        iii.  X60A16554+Frame Numbers
        iv.  X60A16554+Frame Numbers+Enlarged Window
9. Depositions
    a.  Deputy Barajas
    b.  Deputy Vasquez
10. California POST Basic Academy Workbook Learning Domain 3 – Principled Policing in the Community
11. California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
12. California POST Basic Academy Workbook Learning Domain 16 – Search and Seizure
13. California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
14. California POST Basic Academy Workbook Learning Domain 21 – Patrol Techniques
15. California POST Basic Academy Workbook Learning Domain 23 – Crimes in Progress
16. California POST Basic Academy Workbook Learning Domain 33 – Arrest and Control
17. California POST Basic Academy Workbook Learning Domain 34 – First Aid, CPR, and AED
18. California POST Basic Academy Workbook Learning Domain 35 – Firearms/Chemical Agents
19. California POST Basic Academy Workbook Learning Domain 37 – People with Disabilities
20. California POST Basic Academy Workbook Learning Domain 39 – Crimes Against the Justice System
21. California POST Basic Academy Workbook Learning Domain 40 – Weapons Violations
22. California Peace Officer's Legal Sourcebook

**DETAILS OF THE INCIDENT**

**Complaint**

       On June 19, 2023, Los Angeles County Sheriff's Department (LASD) deputies responded to the 2900 block of Crooked Creek Drive in Diamond Bar, California regarding reports of a man with a rifle. The deputies encountered Jennie Quan, who begged the deputies not to shoot Benjamin Chin. The deputies subsequently located Chin walking on the sidewalk along Crooked Creek Drive.

       The deputies followed Chin as he walked to the intersection of Crooked Creek Drive and Diamond Bar Boulevard. Chin stood in the middle of Diamond Bar Boulevard as the deputies positioned themselves in front of and behind Chin.

       As Chin slowly walked towards the deputies in front of him with the rifle pointed towards the ground, the deputies in front and from behind Chin discharged their firearms at Chin, striking Chin several times.

**Los Angeles County Sheriff's Department Homicide Bureau Report 023-04539-2927-013**

       On June 19, 2023, the Los Angeles County Sheriff's Department (LASD) received a call for service to respond to 2962 Crooked Creek Drive, Diamond Bar regarding a man with a gun call. The call was updated that the male (later identified as Benjamin Chin) was walking on Crooked Creek Drive toward

**Edward T. Flosi, M.S.**

Justitia Consulting

1  Diamond Bar Boulevard with an assault rifle. The call stated the male was wearing body armor and had
2  fired multiple rounds from his firearm.

3    Deputies responded to the location regarding a man with a gun call for service. The call stated a
4  male was walking south on Crooked Creek Drive carrying an assault rifle. The male proceeded to walk
5  south on Crooked Creek Drive until he reached Diamond Bar Boulevard. Once at Diamond Bar Boulevard,
6  the male entered the southbound lanes of travel next to the center median. The male was holding an
7  assault rifle, wore a black outer bullet proof vest and a deputy involved shooting occurred.

8    The location where the deputy involved shooting incident occurred were the southbound lanes
9  of Diamond Bar Boulevard, just north of Crooked Creek Drive.

10  Written Summary Statement of LASD Detective Hector Vasquez

11    Detective Vazquez was assigned to Detective Bureau at the Walnut Sheriff's Station and was
12  working overtime on the day of this incident. At the start of his shift, Vazquez loaded his shotgun
13  (identified as Shotgun #8) with four 00 buck (or double-aught buckshot) shotgun shells in the tube and
14  four shotgun slugs in a saddle which was attached to the stock. During the incident, Vazquez unloaded all
15  four 00 buck shotgun shells from the tube and loaded two slugs in the shotgun tube. Vazquez fired two
16  rounds from the shotgun and subsequently loaded a third slug into the chamber of the shotgun. After
17  the shooting incident, Vazquez placed the shotgun inside his patrol vehicle.

18    Vazquez responded to a call regarding a male Asian armed with a rifle and was firing rounds in
19  the air. The call additionally stated the suspect was wearing body armor. Vazquez traveled south on
20  Crooked Creek Drive from Cold Springs Lane. He saw residents outside of their houses with the look of
21  fear on their faces. Vazquez grabbed his shotgun and continued south, following Deputy De La Torre. De
22  La Torre advised of a stabbing victim, and he had seen the suspect. Vazquez contacted the stabbing
23  victim (later identified as Jennie Quan, the suspect's mother) who had blood on her hands and yelled,
24  "please don't shoot him, please don't shoot him."

25    Vazquez joined De La Torre who pointed toward Chin. Chin was walking on Crooked Creek Drive
26  toward Diamond Bar Boulevard. Vazquez ordered Chin several times to drop the rifle. Chin ignored the
27  commands and continued to walk north in the southbound lanes of Diamond Bar Boulevard. Vazquez
28  removed four 00 buck shotgun shells from his shotgun and loaded his shotgun with two slugs. He
29  flanked Chin north on Diamond Bar Boulevard, along the west sidewalk. He saw Chin continue to walk
30  toward a patrol unit and a civilian vehicle at which time a deputy involved shooting occurred.

31  Written Summary Statement of LASD Deputy Marisol Barajas

32    Deputy Barajas responded to a call regarding a stabbing and a man armed with an AR-15 style
33  rifle. As she traveled southbound Diamond Bar Boulevard, Chin suddenly appeared, walking northbound
34  in the southbound lanes of Diamond Bar Boulevard. Barajas estimated that Chin was approximately 20
35  feet from her vehicle. She saw there was a civilian driving a white Tesla to her left. She could not create
36  distance due to the fact there were several other vehicles behind her and the white Tesla. She
37  immediately drew her weapon, exited her vehicle, and gave Chin several commands to stop and drop his
38  weapon. Chin ignored the commands and continued to walk toward her direction and the direction of
39  the male seated in the white Tesla at which time a deputy involved shooting occurred.

11

**Edward T. Flosi, M.S.**
Justitia Consulting

1    <u>Written Summary Statement of LASD Deputy German Perez</u>

2    Deputy Perez was on an unrelated traffic stop when he heard a radio call advising of an assault
3    with a deadly weapon, man armed with rifle in the area of Crooked Creek Lane and Diamond Bar
4    Boulevard, Diamon Bar. Perez responded to the incident, traveling south on Diamond Bar Boulevard.
5    After Perez passed Crooked Creek Lane he saw two patrol vehicles stopped directly in front of him and
6    several civilian vehicles near the patrol vehicles. One patrol vehicle was being driven by Deputy Barajas
7    and the other patrol vehicle was being driven by Deputies Holland and Toves. It was at this time that
8    Perez saw Chin walking north in the #1 southbound lane of Diamond Bar Boulevard, armed with a rifle.
9    Perez feared for the lives of the civilians and was going to have them reverse, northbound on Diamond
10   Bar Boulevard, when he heard 2-3 gunshots. Perez was seated in his patrol vehicle when he heard the
11   gunshots and did not see who discharged their firearm.

12   <u>Written Summary Statement of LASD Deputy Carlos De La Torre</u>

13   Deputy De La Torre was dispatched to a call in the area of Crooked Creek Lane and Cold Springs
14   Lane regarding a man with a rifle, shots fired and the suspect was wearing body amor. De La Torre
15   coordinated the response and met with Detective Hector Vasquez at Diamond Bar Boulevard and Cold
16   Springs Lane. Both deputies drove south on Crooked Creek Lane from Cold Springs Lane when De La
17   Torre saw residents in the street pointing south on Crooked Creek Lane. One of the residents informed
18   De La Torre that somebody had been stabbed. De La Torre continued south and as he approached the
19   portion of Crooked Creek Lane where it bends toward Diamond Bar Boulevard, he saw a female on the
20   sidewalk bleeding from the lower back. De La Torre exited his vehicle to attend to the victim at which
21   time he saw Chin standing in the street, directly south, carrying an AR-15 style rifle and wearing body
22   armor. De La Torre immediately broadcasted emergency traffic and advised of his observations.

23   De La Torre and Vasquez ordered Chin several times to drop the weapon. Chin ignored the
24   commands and slowly walked toward Diamond Bar Boulevard. Detective Bronowicki arrived at this time.
25   De La Torre and Vasquez walked along side Bronowicki's vehicle as they continued to follow Chin,
26   ordering Chin several times to drop the weapon. When Chin reached Diamond Bar Boulevard, De La
27   Torre positioned himself on the passenger side of Bronowicki's vehicle and once again, continued to
28   order Chin to drop the weapon. From this position, De La Torre saw that other deputies had arrived and
29   were positioned on Diamond Bar Boulevard, north of his location. Chin proceeded to walk into the
30   southbound lanes of Diamond Bar Boulevard, towards deputy personnel.

31   De La Torre saw Vasquez walk northbound Diamond Bar Boulevard along the west sidewalk
32   parallel to Chin. Chin was now in the #1 southbound lane, continuing to walk north towards deputies
33   when De La Torre heard a single gunshot. De La Torre did not know who discharged their weapon, so he
34   retreated to the rear of Bronowicki's vehicle to avoid crossfire. At this time, De La Torre heard several
35   gunshots and saw that Chin was struck by gunfire. De La Torre did not see who fired their weapons.

36   <u>Written Summary Statement of LASD Detective Christopher Bronowicki</u>

37   Detective Bronowicki heard a radio call of a man armed with an AR-15, suspect was wearing
38   body armor and shots were fired. The suspect was seen walking in the neighborhood. Bronowicki
39   responded to the call and upon arrival he saw some roofers working on a nearby roof. He contacted
40   them and was advised they heard gunshots coming from the area of Crooked Creek Drive. Bronowicki

12

**Edward T. Flosi, M.S.**

Justitia Consulting

1  proceeded south on Crooked Creek Drive and saw Detective Vazquez and Deputy De La Torre with their
2  weapons drawn and pointing them in an easterly direction where Crooked Creek Drive bends to the east
3  toward Diamond Bar Boulevard. Bronowicki joined the deputies at which time he saw Chin on the north
4  sidewalk, walking toward Diamond Bar Boulevard. Chin was wearing dark clothing, body armor and was
5  armed with an AR-15 style rifle. Vazquez and De La Torre were giving Chin several commands to drop the
6  gun. Chin ignored the commands and continued to hold the rifle in a "tactical low ready" position.

7      Bronowicki, Vazquez and De La Torre used Bronowicki's vehicle as cover and followed the
8  suspect. Vazquez deployed a shotgun and positioned himself in the wedge of the front passenger door.
9  Chin proceeded to walk out into traffic on Diamond Bar Boulevard and walked north. Bronowicki saw
10  multiple civilian vehicles swerve around Chin. At this time, Vazquez walked away from the patrol vehicle
11  and followed Chin onto Diamond Bar Boulevard. Bronowicki remained at the intersection of Crooked
12  Creek Drive and Diamond Bar Boulevard when he heard 4-5 gunshots. He did not see who discharged
13  their weapons but saw that Chin was struck by gunfire and immediately dropped to the ground.

14  Written Summary Statement of LASD Deputy Chad Holland

15      Deputy Holland and Deputy Kyle Toves responded to a call on Crooked Creek Drive regarding a
16  man armed with a gun and had stabbed his mother. They responded Code-3, Holland was driving, and
17  Toves was the right front passenger. As they traveled south on Diamond Bar Boulevard, passing Cold
18  Springs Lane, they saw a patrol car stopped in the middle of the southbound lanes. Holland thought the
19  patrol car was conducting traffic control to prevent vehicles from continuing south on Diamond Bar
20  Boulevard and pulled to the right of the patrol car to pass the vehicle and continue south. It was at this
21  time that Holland saw Chin walking northbound in the southbound lanes, toward his direction. Chin was
22  wearing a white face mask, body armor and was armed with a rifle. Holland backed up a short distance
23  and exited his vehicle. Holland heard someone yelling commands, specifics unknown. Holland heard 3-4
24  gunshots but did not know who discharged their weapon. Holland ran to the passenger side of his
25  vehicle and joined Toves and Detective Vazquez.

26  Written Summary Statement of LASD Deputy Kyle Toves

27      Deputy Holland and Deputy Toves responded to a call on Crooked Creek Drive regarding a man
28  armed with a gun and was wearing body armor. As they traveled to the call, they were updated by
29  dispatch that the suspect was armed with a rifle and fired several rounds. As they traveled south on
30  Diamond Bar Boulevard, passing Cold Springs Lane, they saw a patrol car stopped in the middle of the
31  southbound lanes with its rear flashing lights activated. Toves believed the patrol car was conducting a
32  traffic break to prevent vehicles from continuing south on Diamond Bar Boulevard. As Toves and Holland
33  pulled to the right of the patrol car to pass the vehicle and continue south, they saw Chin walking
34  northbound in the southbound lanes, toward their direction. Chin was approximately 20 feet south of
35  them. Chin was wearing a face mask, body armor and was armed with a rifle. Toves exited his vehicle
36  and went to the rear compartment of his vehicle and retrieved his department issued AR-15 rifle. While
37  retrieving his rifle, he heard approximately 3 gunshots.

38  Written Summary Statement of Witness Brandon Wiseman

39      Brandon was traveling alone in the city of Diamond Bar, driving his white Tesla vehicle. As he
40  traveled southbound Diamond Bar Boulevard in the #1 lane toward the 57 freeway, he saw Chin armed

**Edward T. Flosi, M.S.**
Justitia Consulting

1   with what he described as a shotgun walking in his direction. Chin was walking north in the #1
2   southbound lane (same lane Brandon was traveling in). Chin waved the car in front of Brandon to pass.
3   The vehicle went around Chin and continued out of view. Brandon stopped and put his car in park in fear
4   of being shot. Brandon saw that he was parked directly next to a deputy. He saw the deputy draw their
5   weapon. Brandon said Chin was approximately 6-7 feet from his vehicle at which time he ducked. He
6   heard 2-3 gunshots.

7   <u>Written Summary Statement of Witness Vergel Sandifer</u>

8        Vergel was inside his residence when he heard a loud noise of something impacting the front of
9   his residence. He walked outside his front door to further investigate when he saw Chin armed with a
10  rifle standing directly across the street. Chin raised the rifle and pointed it directly at Verge!. Vergel
11  believed the suspect pulled the trigger, but it malfunctioned. Verge! saw Chin lower the rifle from the
12  shoulder mount and manipulate the weapon as if he was ejecting or loading a round into the chamber.
13  Vergel Immediately went back inside his residence and called 911.

14       Vergel said that Chin proceeded to fire sporadically, approximately 7-8 shots. Shortly thereafter
15  deputies arrived, and Vergel heard deputies yelling to drop the gun. Chin and deputies proceeded
16  toward Diamond Bar Boulevard and out of view.

17  <u>Written Summary Statement of Witness Janet Johansen</u>

18       Janet was driving home and traveled west on Crooked Creek Drive from Diamond Bar Boulevard.
19  As she drove on Crooked Creek Drive, she heard approximately 4 gunshots but did not know where they
20  were coming from. She then saw a male standing on the sidewalk near the passenger side of her vehicle.
21  The male was wearing a surgical style mask and possessed a black rifle. Janet observed the male suspect
22  slowly raise the rifle, pointing the muzzle toward the sky and fired a round. Janet sped home and
23  notified law enforcement of her observations.

24  **<u>Video Evidence</u>**

25       It must be noted that much of the following summary was derived from body worn video files. It
26  must be noted that body worn video is an investigative tool and like any other tool will have certain
27  limitations. Body worn video does not capture the exact angle of view of the officer wearing the camera
28  and does not necessarily capture everything an officer sees or perceives. At the same time, the camera
29  may capture something an officer did not see.

30       Body worn video will always have a set angle of view, while an officer may have a much
31  narrower angle view due to specific attention and focus on a particular action or item. At the same time,
32  the body worn camera may pick up audio that the officer did not hear due to attention and focus on a
33  particular action or item.

34       Body worn video cannot capture what an officer is feeling or experiencing at the time of the
35  incident.

36       Recorded evidence may depict the events differently than a person recalls and it may not depict
37  all of the events that the person saw or heard. Recordings have a limited field of view and may not
38  capture events normally seen by the human eye.

**Edward T. Flosi, M.S.**
Justitia Consulting

1   The frame rate of the recording may limit the camera's ability to capture movements normally
2   seen by the human eye. Lighting, as seen on the recording, may be different than that which is seen by
3   the human eye.

4   Recordings are two dimensional, may not capture depth, distance or positional orientation, as
5   well as the human eye. Audio recordings capture sound only and may represent what was heard is
6   different than how the person recalled hearing it.

7   3 - Clip of Axon_Body_3_Video_2023-06-19_1137_X60A1078T

8   This is Barajas' BWV. It is noted that much of Chin's actions and behaviors are not captured due
9   to the positioning of the BWC and the open driver's door blocking the view of the BWC until
10  approximately 11:45:12 hours.

11  At approximately 11:45:05 hours, Barajas fired her first round, Chin is not visible.

12  At approximately 11:45:11 hours, a shot is heard from Vasquez. It is noted that there is no recoil
13  from Barajas's pistol at this time. Chin's upper body becomes visible. Chin is seen walking in the #1 lane
14  towards where the Tesla would have been stopped. Chin is facing towards the Tesla.

15  At approximately 11:45:12 hours, Barajas fires a second round as Chin is seen walking in the #1
16  lane towards where the Tesla would have been stopped. Chin is facing towards the Tesla and as Chin
17  continues to move forward, the rifle is seen slung to Chin's right side with the muzzle mostly downward.

18  At approximately 11:45:13 hours, Barajas fires a third round. Chin is seen bending slightly
19  forward.

20  At approximately 11:45:15 hours, another round is heard from Vasquez. It is noted that there is
21  no recoil from Barajas's pistol at this time. Chin is seen falling to the ground.

22  2 - Clip of Axon_Body_3_Video_2023-06-19_1140_X60A16554

23  This is Vasquez's BWV. As Chin was walking northbound on Diamond Bar Blvd, much of Chin's
24  actions and behaviors were not captured due to the positioning of the BWC and shotgun and Vasquez's
25  hands blocking the view of the BWC.

26  At approximately 11:44:58 hours, Chin is seen walking in the #1 lane towards where the Tesla
27  was stopped. Chin's right arm is bent at the elbow and appears to be in a position that would be holding
28  the grip of the rifle near the trigger guard while the left arm is hanging freely as he walks. It is noted that
29  the right arm maintains this position through the course of fire until Chin bends forward at the waist and
30  falls backwards near the center median.

31  **Audio File Interviews**

32  marisol barajas 609672 interview 1 07.07.23

33  Barajas noted that the original call involved a "417 suspect" that had just stabbed someone. The
34  suspect was armed with a AR type rifle.

**Edward T. Flosi, M.S.**

Justitia Consulting

1    As Barajas was driving southbound on Diamond Bar Blvd, she noted that the broadcast indicated
2    that Chin was headed towards Diamond Bar Blvd. Barajas said at first the information was that Chin was
3    moving north but then south.

4    As Barajas was going southbound, she saw Chin about 15-20 feet away causing her to stop.
5    There was a white Tesla next to her. She looked behind her to check if there was room to create distance
6    but there were too many vehicles behind her.

7    Barajas took off her seat belt and took out her pistol. She gave Chin commands and told Chin to
8    put the gun down from where he was. Barajas broadcasted her location and where she had contacted
9    Chin at gunpoint.

10    From the distance that Chin was with the other vehicles, Chin was too close for Barajas'
11    "comfort, for the for everybody's comfort, for the civilians around me." Barajas continued to give Chin
12    commands and Chin was not complying.

13    As Chin approached the white Tesla, Barajas was in fear that Chin was either going to harm the
14    person in the Tesla and/or harm her.

15    Barajas fired one round and gave Chin more commands. Chin was not complying and then Chin
16    took more steps towards the Tesla. Chin did not react to the first shot at all.

17    Barajas became more concerned for the safety of herself and others and fired again.

18    Barajas said that in reviewing her video, during her second interview she believed that she fired
19    3-4 shots.[1]

20    <u>marisol barajas 609672 interview 2 07.07.23</u>

21    Barajas added that when she first saw Chin, he was walking north in the southbound lanes. At
22    first Chin was in the #2 land but then moved into the #1 lane, closest to the center median. Chin had
23    baggy clothes and was wearing a ballistic vest. Chin was carrying an AR type rifle on a sling.

24    Barajas stopped in the #2 lane and noted that the distance between her and Chin was about 15-
25    20 feet. When Barajas first noticed Chin, he was stopped in the roadway standing and facing Barajas with
26    the rifle slung to Chin's side.

27    Barajas maintained a position behind the open driver's door as she broadcasted the information
28    to other deputies.

29    Barajas considered deploying her TASER device or the 40mm launcher but due to tactical
30    consideration did not and rather drew her pistol. Barajas said, "At that time where I'm detaining him, I I
31    was thinking of you utilizing my TASER, but then I was. I noticed that since he was wearing a ballistic vest.
32    And the baggy pants. I knew that I only had one cartridge and based on what he was wearing, I didn't
33    think it would be an effective tool. I then thought I remember having my my multi 40. But then I was like,
34    if I did that, I would lose visual."

---

[1] It is noted that in her first interview, Barajas believed she fired 2-3 shots (marisol barajas 609672 interview 06.19.23)

**Edward T. Flosi, M.S.**

Justitia Consulting

1       Barajas said that after she had given Chin commands to drop the gun and Chin failed to comply
2  with those commands. Chin was non-reactionary and had a blank stare. Chin kept walking towards the
3  Tesla. Barajas said, "Fearing that he might like shoot that person or shoot me, that's when I shot him
4  once."

5       Barajas believed that Chin was going to shoot the driver of the Tesla as Chin had moved to about
6  7-10 feet from the Tesla at the time Barajas fired the first round.

7       Barjas gave Chin more commands to put the gun down and noted that Chin had no reaction to
8  the first shot. Chin kept walking towards the Tesla and that is when Barajas fired 3 more consecutive
9  rounds. Chin then fell to the ground.

10      Barajas believed that if she had not responded with deadly force, that she or someone else was
11  going to die.

12      Barajas understood the fact that Chin possessed a superior weapon that could easily defeated
13  her door and/or ballistic vest.

14      Barajas believed that although Chin had the rifle slung to his side, that Chin could have gained
15  possession of the rifle in both hands making it ready to fire in "seconds."

16  <u>hector vazquez 526304 interview 07.07.23</u>

17      As Vasquez was enroute, he was receiving updates of multiple calls with reports that Chin was
18  firing rounds.

19      As Vasquez reached the area of Crooked Creek, he saw masses of people outside walking around
20  on their cell phones. They had a look on their face like they were scared.

21      Vasquez took notice that Chin was armed with a superior firearm that had a greater distance and
22  penetration ability. Due to this, Vasquez decided to deploy with the shotgun instead of his pistol.

23      Vasquez understood the Chin had harmed a loved one and Vasquez believed that Chin was going
24  to hurt more people.

25      Vasquez saw that Chin had a ballistic vest and an AR type rifle that appeared to have an optic on
26  it. Due to this, Vasquez decided to arm himself with his shot gun and to exchange the 00 buck shells with
27  slug rounds.

28      It is noted that in this situation, slug rounds would have been a more tactically feasible option
29  due to the area with potentially other people driving by or nearby. The slug round is a single projectile
30  with better range and stopping ability while the 00 buck shell contains multiple projectiles that spread
31  after leaving the muzzle. The range of the spread would vary depending on the choke of the shotgun
32  barrel but would still begin to spread regardless.

33      Vasquez used a raised berm of one of the residences for cover and yelled to Chin to drop the gun
34  twice,  but Chin did not comply with the direction. Vasquez believed that Chin heard the direction due to
35  Chin turning to look towards Vasquez.

**Edward T. Flosi, M.S.**
Justitia Consulting

1    When Vasquez first saw Chin, Vasquez described the manner that Chin was holding the rifle as
2    slung and down to Chin's right side in a "downward ready position." Vasquez said that Chin was not
3    pointing the rifle at anybody at this point in time.

4    As Chin moved onto Diamond Bar, Vasquez call to Bronowicki to bring up Bronowicki's vehicle for
5    cover. Vasquez got into the passenger seat of Bronowicki's vehicle and they drove towards Chin. Vasquez
6    gave Chin more commands to drop the gun but Chin failed to comply. Bronowicki gave Chin commands
7    to drop the gun but Chin failed to comply.

8    Vasquez expressed a concern that since this was a residential area and since Diamond Bar Blvd
9    was a major roadway, that Chin was "ready to go to war" and "going to unleash hell on people."

10    Vasquez said that as Chin made it to Diamond Bar Blvd, Chin was walking "steady" and as if Chin
11    "was on a mission." Chin did not look back at Vasquez.

12    Vasquez said that when Chin made it onto Diamond Bar Blvd, it appeared that something caught
13    Chin's attention to Chin's left and Chin turned to his left.

14    Vasquez jumped out of the car and asked Bronowicki to bring to car forward for cover. Vasquez
15    yelled to Chin to drop the gun again but Chin continued north on Daimond Bar Blvd and failed to comply
16    with the commands, where Vasquez momentarily lost visual surveillance of Chin.

17    Vasquez then ran forward towards the corner of Crooked Creek and Diamond Bar where he
18    reacquired visual surveillance of Chin. Vasquez said Chin was walking straight towards vehicles that were
19    stopped in the southbound lanes of Diamond Bar Blvd. One of the vehicles was a white car and the other
20    was an LASD vehicle, with other vehicles stopped behind.

21    Vasquez feared that Chin would start firing at the people in/nearby the vehicles.

22    Vasquez determined that there was a berm in the background of Chin from Vasquez's position so
23    Vasquez decided to use this opportunity to flank Chin and to remove himself from any crossfire from the
24    deputy in the southbound lanes of Diamond Bar Blvd.

25    As Vasquez was running to flank Chin, Vasquez heard a gunshot. Vasquez saw Chin slump for a
26    moment but came back up as if the shot had no effect on Chin.

27    Vasquez described Chin's actions after the shot as, "So his arm, his right arm, his, his rifle's slung
28    over to the side, and after that shot I see his arm like on the rifle. Like if it's holding the rifle over here.
29    On the side. So I'm standing to his left flank. The rifle was on his right flank, and I can see his elbow kind
30    of come up like this behind behind his back. So I know he's like going for that gun."

31    Vasquez continued, "So he's reaching pretty much right at his midsection, which is, like covered
32    by his body, which is where the receiver of the gun is. So the receiver and like the handle and and all
33    that. So not the barrel because the barrel was pointing up here (interviewer interjects, "forward?") and
34    he's yeah. So he's he's reaching towards the receiver area and when he does it does that I think, man,
35    he's he's he's going to fire back. He's ready. He's he's going to shoot my partners and and all these
36    people and I think I I need to I need to stop this and I need to stop him and and he's going to hurt people
37    so I fired one one shot with the with the I knew I had a slug so I figured the slug will do the job. Stop him
38    and I fired the shot and I got to see the the the slug impact the vest. Like I saw where it where it hit the

18

**Edward T. Flosi, M.S.**
Justitia Consulting

1  vest and looks like the vest blows up. So as I'm as I'm looking at him and I see that happen, it didn't stop
2  him. He he. I know he felt it because at that point he started to to he took the hit and then kind of did
3  like a little sideways movement. Towards my direction, so I'm thinking."

4  Vasquez estimated his distance from Chin at this point to be about 30-40 feet.

5  Vasquez estimated the distance between Chin and the stopped vehicles as about 10-15 feet.

6  Vasquez believed that his first round was ineffective in stopping Chin. As Chin began to turn his
7  body in Vasquez's direction, Vasquez believed that Chin was going to shoot at Vasquez.

8  Vasquez said, "He's starting to turn. He's going to take me out. He that that thing's going to
9  pierce my vest and that'll be it. So as he's doing that, I hit him again with the slug. I don't. I don't. I don't
10 remember where that impact. Like I didn't get. To see that impact. But I know that immediately after my
11 my second shot, he has like the motion that he had started to turn left. He continued it, but in a falling
12 motion there. And his arm that had gone to the rifle basically as he's falling down, he, like, tosses the
13 rifle and he falls kind of in the angle facing the sidewalk that I was standing on."

14 Vasquez described Chin's actions just prior to the second shot as, "Yeah, like I said, as he was
15 turning and I and I shot him the second time. His hand being on that rifle as I had described, like his right
16 hand going to that rifle, it seems like with the motion as he was turning left, that arm grabbed the rifle
17 and started to lift it and lift it over his head and the slung the sling that was over his head and shoulder
18 basically came off and as he as he fell backward and kind of like on a sideways angle, the sling came off
19 and and he basically dropped the gun as he was falling and it it fell to the above his head basically."

20 Vasquez said that if he had not responded with deadly force that Chin "would have killed
21 somebody, he. He would have. He would open fire on people for sure."

22        **ANALYSIS OF INCIDENT, POLICE PRACTICES AND**
23    **LAW ENFORCEMENT ACTIONS TAKEN; EXPERT'S OPINIONS & FINDINGS**

24 The findings and opinions are based upon my initial review of the documents as presented to
25 me by the defense counsel and other evidence related to this incident. My findings and opinions are
26 formed from: (1) the totality of facts and circumstances known/perceived by the officers, (2) my own
27 training and experience, (3) California POST standards, and (4) what the appropriate reactions would
28 have been from an officer when presented with similar circumstances, based upon their law
29 enforcement and other related professional training and experience.

30 I reserve my right as expert to alter, amend, enhance, or delete my findings and opinions as
31 necessary following my review of any additional discovery in this case.

32 Based on the totality of my training, education, and experience in law enforcement; as a law
33 enforcement trainer; as a criminal justice educator; and, as a police practices consultant, I have
34 developed the following opinions to a reasonable degree of professional certainty in the field of law
35 enforcement practice.

**Edward T. Flosi, M.S.**
Justitia Consulting

1    **1. The Los Angeles County Sheriff's Department (LASD) deputies had a legitimate law enforcement**
2    **purpose and reasonable suspicion – based on current law enforcement training – to contact and**
3    **detain Chin. The deputies' actions were consistent with current law enforcement training and**
4    **practices.**

5        Officers are trained that they should recognize how principled policing contributes to legitimacy
6    and benefits the officer, agency, and community. Principled policing is the integration of procedural
7    justice, legitimacy, implicit bias, and historical events. Legitimacy is described as the public view of law
8    enforcement as permitted to exercise authority to maintain social order and resolve problems.
9    Legitimacy is enhanced through procedural justice.[2]

10        Officers are trained that legitimacy refers to feelings of obligation to obey the law and to defer to
11    the decisions made by legal authorities.[3]

12        Officers are trained that the four tenets of procedural justice are important components in
13    building legitimacy across cultures. Legitimacy reflects an increased belief among the public that they
14    will be treated fairly and respectfully by law enforcement. The four tenets of procedural justice are:
15        • Voice: People want to be heard and understood
16        • Neutrality: Unbiased decision-making
17        • Respect: Treating people with dignity
18        • Trustworthiness: Consistently demonstrate professionalism[4]

19        Peace officers are trained that to lawfully detain a person, reasonable suspicion is needed.  A
20    detention is a temporary stop of a person in order to investigate whether or not the person had been
21    engaged, is currently engaging or is about to engage in criminal activity.  It is known that many times an
22    officer may have reasonable suspicion to detain a person only to find out through an investigation that
23    the detained person was not actually the correct person or involved in criminal activity.

24        Officers are trained that for an investigative stop or detention to be valid, there must be
25    reasonable suspicion that: (1) criminal activity may be afoot and (2) the person about to be detained is
26    connected with that possible criminal activity.  To establish reasonable suspicion, both the quality and
27    quantity of the information needed is considerably less than the probable cause needed to arrest or
28    search.[5]

29        Officers are trained that the purpose of a detention is to resolve whether suspicious behavior is
30    innocent or relates to crime.  Therefore, the possibility of an innocent explanation does not deprive the
31    officer of the capacity to entertain a reasonable suspicion of criminal activity. Detention law accepts the
32    risk that officers may stop innocent people.[6]

33        Officers are trained that whether they are detaining someone (1) to investigate the officer's
34    reasonable suspicion or (2) to issue a citation, the subject has an obligation to stop. The subject has no

---

[2] California POST Basic Academy Workbook Learning Domain 3 – Principled Policing in the Community
[3] California POST Basic Academy Workbook Learning Domain 3 – Principled Policing in the Community
[4] California POST Basic Academy Workbook Learning Domain 3 – Principled Policing in the Community
[5] California Peace Officers Legal Sourcebook
[6] California Peace Officers Legal Sourcebook

**Edward T. Flosi, M.S.**
Justitia Consulting

1  right to resist a lawful detention.  If the subject does not stop, he/she has violated California Penal Code
2  §148 by obstructing or delaying the officer in the performance of the officer's duties and the officer may
3  use physical force to make him stop.[7]

4      Peace Officers are trained that they are permitted to use reasonable force to effect a detention
5  as described in the California Penal Code section 835:

6          An arrest is made by an actual restraint of the person, or by submission to the custody of an
7          officer. The person arrested may be subjected to such restraint as is reasonable for his arrest
8          and detention.[8]

9      Peace Officers are trained that they are permitted to effect a detention as described in the
10  California POST Learning Domain 15.

11         Peace officers may need to detain a person to investigate involvement in criminal activity. To be
12         lawful, a detention must be based on reasonable suspicion that criminal activity has taken place,
13         is taking place, or is about to take place, and that the person detained is connected to that
14         activity.[9]

15         Reasonable suspicion is when a peace officer has enough facts and circumstances present to
16         make it reasonable to suspect that criminal activity is occurring and the person detained is
17         connected to that activity.[10]

18         Reasonable suspicion may be based on observation, personal training and experience, or
19         information from eyewitnesses, victims, or other officers (totality of the circumstances).

20         Some factors that contribute to establishing reasonable suspicion include:
21         • appearance or condition of a person (intoxicated, resemblance to wanted person)
22         • actions (hiding objects, furtive movements, running from a crime scene)
23         • knowledge of the person's "history" (criminal record or conduct)
24         • demeanor (non-responsive, nervous)
25         • location of the stop (near crime scene, known criminal activity in area)
26         • officer training and experience (modus operandi, expertise in certain area such as narcotics
27           or gang activity)[11]

28      It should be noted that my opinion and use of the term "reasonable suspicion" is solely based on
29  current law enforcement training provided to officers and as described in the above paragraphs. It is not
30  intended to be taken as a legal conclusion or to usurp the role of the jury.

---

[7] California Peace Officers Legal Sourcebook
[8] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[9] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[10] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[11] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest

**Edward T. Flosi, M.S.**
Justitia Consulting

1

2       On June 19, 2023, the Los Angeles County Sheriff's Department (LASD) received a call for service
3   to respond to 2962 Crooked Creek Drive, Diamond Bar regarding a man with a gun call. The call was
4   updated that the male (later identified as Benjamin Chin) was walking on Crooked Creek Drive toward
5   Diamond Bar Boulevard with an assault rifle. The call stated the male was wearing body armor and had
6   fired multiple rounds from his firearm.

7       It is noted that this area is a heavily residential area with a well-traveled roadway in the
8   immediate vicinity. A reasonable officer could conclude that locating and immediately isolating that
9   subject described in the call would be a legitimate law enforcement purpose.

10      A reasonable officer could conclude that the subject described in the call for service was
11  involved or preparing to become involved in criminal activity (e.g., unlawful/negligent discharge of a
12  firearm, assault with a deadly weapon).

13      It is my professional opinion that the LASD deputies had a legitimate law enforcement purpose
14  and reasonable suspicion – based on current law enforcement training – to contact and detain Chin. The
15  deputies' actions were consistent with current law enforcement training and practices.

16  **2. The LASD deputies had a legitimate law enforcement purpose and probable cause – based on**
17  **current law enforcement training – to arrest Chin. The deputies' actions were consistent with current**
18  **law enforcement training and practices.**

19      Officers are trained the Fourth Amendment of the U.S. Constitution requires probable cause to
20  make arrests and/or conduct searches because searches or arrests conducted without probable cause
21  infringe on a person's privacy.[12]

22      Officers are trained that probable cause for an arrest is a set of facts that would cause a person
23  of ordinary care and prudence to entertain an honest and strong belief that the person to be arrested is
24  guilty of a crime. Probable cause is required before an arrest is made and is based on the totality of the
25  circumstances.[13]

26      It must be pointed out that the standard of probable cause does not require absolute certainty
27  that the person to be arrested did in fact commit the crime.

28      Officers are trained that whether probable cause exists depends upon the reasonable
29  conclusions that can be drawn from the facts known to the arresting officer at the time of the arrest.
30  Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.
31  Probable cause does not require certain, positive information, or even enough to convict someone.  It
32  requires only a probability or substantial chance of criminal activity, not an actual showing of such
33  activity.[14]

34      Officers are trained that the facts required to establish probable cause may include, but are not
35  limited to:

---

[12] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[13] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[14] California Peace Officers Legal Sourcebook

**Edward T. Flosi, M.S.**
Justitia Consulting

1    • direct investigation or reports
2    • circumstantial evidence
3    • second-hand statements from reliable sources[15]

4    Officers are trained that an officers' expertise is part of the equation for determining probable
5    cause. For officers versed in a specific field of law enforcement, an activity which might otherwise
6    appear innocent may provide probable cause to a trained eye.[16]

7    Officers are trained that Penal Code §836 establishes the legal basis for an arrest by peace
8    officers. Officers may make an arrest:
9        • pursuant to a warrant
10       • without a warrant
11           o whenever they have probable cause to believe the person to be arrested has
12             committed a public offense (felony or misdemeanor) in their presence;
13           o when the person arrested has committed a felony, although not in the officer's
14             presence;
15           o whenever they have probable cause to believe the person to be arrested has
16             committed a felony, whether or not a felony has in fact been committed.[17]

17   Officers are trained that an arrest is taking a person into custody, in a case and in the manner
18   authorized by law. The arrest must be based on probable cause.[18]

19   It should be noted that my opinion and use of the term "probable cause" is solely based on
20   current law enforcement training provided to officers and as described in the above paragraphs. It is not
21   intended to be taken as a legal conclusion or to usurp the role of the jury.

22   Officers are trained that resisting, delaying or obstructing peace officers in the discharge of their
23   duties is a crime. The crime, often referred to as "resisting arrest," involves preventing officers from
24   performing their duties. The crime of resisting, delaying, or obstructing any public officer, peace officer,
25   or emergency technician is covered under California Penal Code §148(a)(1). The crime of resisting,
26   delaying, or obstructing any public officer, peace officer, or emergency technician is a misdemeanor.[19]

27   Officers are trained that in order to arrest a subject for resisting, delaying, or obstructing any
28   public officer, peace officer, or emergency technician, the necessary crime elements are, "Every person
29   who willfully resists, delays, or obstructs any public officer, peace officer, or emergency technician in the
30   discharge or the attempt to discharge any duty of that officer's office or employment."[20]

31   As previously noted, a reasonable officer could conclude that locating and immediately isolating
32   that subject described in the call would be a legitimate law enforcement purpose. Therefore, Chin would
33   not have a right to delay, obstruct and/or resist the deputies in the performance of their duties.

---

[15] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[16] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[17] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[18] California POST Basic Academy Workbook Learning Domain 15 – Laws of Arrest
[19] California POST Basic Academy Workbook Learning Domain 39 – Crimes Against the Justice System
[20] California POST Basic Academy Workbook Learning Domain 39 – Crimes Against the Justice System

**Edward T. Flosi, M.S.**
Justitia Consulting

In this incident, Chin was verbally and visually contacted by uniformed deputies that were driving a marked LASD vehicle on Crooked Creek and prior to walking onto Diamond Bar Blvd. The deputies gave commands to Chin to drop the gun in order to de-escalate the situation. Chin failed to comply with the commands and continued to walk away from the deputies efforts to detain Chin.

A reasonable officer could have an honest and strong belief that Chin's actions were in violation of California Penal Code §148(a)(1).

It is my professional opinion that the LASD deputies had a legitimate law enforcement purpose and probable cause – based on current law enforcement training – to arrest Chin. The deputies' actions were consistent with current law enforcement training and practices.

**3. The LASD deputies' pre-force tactics were consistent with current law enforcement training and practices considering the totality of facts and circumstances known/perceived by them at the time.**

It must be noted that officers are trained that tactics are not a one-size-fits-all approach but rather based on principles to consider based on the facts and circumstances known/perceived at the time and the environment that they were operating within. The principles are not a pre-designed checklist of things that must all be completed in order to be correctly applied. There is no possible compendium of checklists that could be created and accessed by officers in the field that would cover each and every situation an officer can encounter over a career.

It is not always necessary for officers to conduct a "tactical huddle" prior to responding to an incident. The time allowed by the current actions of the subjects believed to been involved in criminal activity is a factor in this determination. Also, it must be strongly noted that officers that work together and trained together gain an understanding of what should be done in these types of situations. Indeed, no amount to pre-planning can account for every possible situation that an officer may encounter in these fluid and rapidly evolving situations.

There was a need to act quickly if they were going to be able to contain Chin based on Chin's actions and behaviors. There was not enough time to stage and have a tactical huddle if they wanted to be able to contact and detain Chin.

Officers are trained that sometimes they must take reasonable risks in order to accomplish a legitimate law enforcement objective. Indeed, officers are trained that, "Although officer safety is always an officer's chief concern, there are circumstances where officers must consider placing their safety in jeopardy to protect the innocent. The community has a right to expect that peace officers will "step into harm's way" on behalf of those endangered by violent crime. While an officer should not sacrifice their safety merely to apprehend a suspect, their ultimate duty is to protect others."[21]

Allowing too much distance would have given Chin an opportunity to flee which would have thwarted the ability to further investigate the incident. Indeed, officers are trained to optimize distance depending on the facts and circumstances at the time.

De-escalation

---

[21] California POST Basic Academy Workbook Learning Domain 23 – Crimes in Progress

**Edward T. Flosi, M.S.**
Justitia Consulting

1    De-escalation is a goal. It is a desired end. A preferred result. It is not a series of words or an
2    algorithmic formula which simply needs to be plugged into any irrational interaction. There is no one
3    correct way to the end goal of de-escalation. There are no known phrases or techniques that force a
4    subject to de-escalate their actions and behaviors.  It is known that for de-escalation tactics to be
5    effective, both parties must be willing and able to participate in the process.

6    The false premise that some operate from is that anyone can be de-escalated if an officer
7    chooses to utilize a de-escalation tactic. Taking that false premise to the next degree, those same people
8    would then claim that if the person was not de-escalated, then the officer in question simply and/or
9    purposely chose not to, or neglected to, utilize a well-established and proven de-escalation tactic.

10    It must be clearly noted that the situation was primarily being driven by the actions and
11    behaviors of Chin and the deputies were reacting to such actions and behaviors. The deputies' attempts
12    to control and de-escalate the situation were not successful as Chin appeared unwilling to participate in
13    the de-escalation process and maintained his resistant and eventually aggressive posture.

14    It is said that sometimes decisive action mitigates escalation. The display of a force option
15    and/or a warning can be a valid de-escalation technique in that it gives the subject a warning that his
16    current actions and behaviors are threatening to the officer and should modify those actions and
17    behaviors accordingly. It also provides an understanding to the subject that the officer is prepared to
18    defend himself and should act as a deterrent to any attack by the subject.

19    There is no evidence in the record to show that another type of de-escalation tactic would have
20    caused a change in Chin's behavior or willingness to participate in the de-escalation process or would
21    have eventually complied with the officers' verbal directions.

22    It must be noted that the lab report showed that Chin tested presumptive positive for
23    Fentanyl.[22]

24    <u>Mental Illness Tactics</u>

25    Officers are trained that they must first deal with any dangerous actions and behaviors of a
26    subject in order to stabilize the situation prior to making any effort to evaluate if a subject; (1) is possibly
27    suffering from mental psychosis, or (2) has a pre-existing mental illness. In this incident, Chin did not
28    allow the opportunity for the officers to conduct any such evaluation.

29    Even if the officers had formed a belief that Chin; (1) could possibly be suffering from mental
30    psychosis, or (2) had a pre-existing mental illness, current law enforcement practices and training dictate
31    that the subject first needs to be contained/controlled and attempts must be made to mitigate any
32    potential danger from that subject.

33    It is noted that there is evidence in the record that Chin had previous alleged mental illness
34    episodes and a Welfare and Institutions Code §5150 hold. There is also evidence in the record that Chin
35    had suicidal ideations. It is unknown to what extent that the involved deputies were aware of these past
36    incidents.

---

[22] PLAINTIFF 00019

**Edward T. Flosi, M.S.**
Justitia Consulting

1         It is noted that I have attended a POST approved 40-hour Crisis Intervention Team (CIT) training.
2   In successfully completing this course, I became a certified CIT officer. As a certified CIT officer, it is my
3   opinion that the deputies conducted themselves within the contemporary law enforcement standards
4   and training when dealing with Chin.

5   <u>Cover</u>

6         The term "cover" is generally understood to mean an object that will stop/provide protection to
7   the officer against the type of weapon a subject may use against the officer. It must be noted that
8   different types of weapons would require different types of cover. In this case, Chin was in possession of
9   a high-powered rifle, which would require a cover that would stop bullets from penetrating.

10         The idea of using cover against a firearm threat is to be able to protect as much of the officer's
11   body while still being able to visually surveil that subject's actions. In most cases, this need to visually
12   surveil the subject will leave portions of the officer's body unprotected, including vital areas (e.g., head,
13   neck, upper torso, and arms). Therefore, the officers in this incident were not completely protected and
14   safe against a firearm threat.

15         Indeed, in this incident, the deputies' ballistic vests would likely have provided no protection
16   against a high-powered rifle.

17         Officers are trained that they should not hide completely behind cover and not be able to
18   visually surveil the subject's actions. In hiding without being able to surveil the subject, an officer would
19   not be able to take action to protect themselves or others if the subject were to suddenly change the
20   situation and become a threat. The officer would be unaware if the subject were to attempt an escape
21   with the weapon into an unsecured area.

22         Officers are trained that they are not required to wait to until the subject actually fires at them
23   prior to responding with deadly force. Officers may respond with deadly force if there is an objectively
24   reasonable belief that the subject is about to shoot at the officers, based on the totality of facts and
25   circumstances known/perceived by the officers, to prevent the subject from firing at the officers.

26         It is noted that Vasquez moved away from the cover of the LASD vehicle in order to achieve a
27   better flanking angle on Chin as Chin moved northbound on Diamond Bar Blvd. Officers are trained that
28   sometimes they must take reasonable risks in order to accomplish a legitimate law enforcement
29   objective. Indeed, officers are trained that, "Although officer safety is always an officer's chief concern,
30   there are circumstances where officers must consider placing their safety in jeopardy to protect the
31   innocent. The community has a right to expect that peace officers will "step into harm's way" on behalf
32   of those endangered by violent crime. While an officer should not sacrifice their safety merely to
33   apprehend a suspect, their ultimate duty is to protect others."[23]

34         It is my professional opinion that this tactic of moving away from cover in order to be able to
35   better stop Chin with a better background was consistent with current law enforcement training and
36   practices.

---

[23] California POST Basic Academy Workbook Learning Domain 23 – Crimes in Progress

**Edward T. Flosi, M.S.**
Justitia Consulting

1   It is my professional opinion that the LASD deputies' pre-force tactics were consistent with
2   current law enforcement training and practices considering the totality of facts and circumstances
3   known/perceived by them at the time.

4   **4. The deadly force responses by Vasquez and Barajas were appropriate and reasonable to prevent a**
5   **perceived imminent and credible threat of serious bodily injury or death. The deadly force responses**
6   **were appropriate and consistent with current law enforcement training standards in consideration of**
7   **the "totality of circumstances" presented to Vasquez and Barajas at the moments force was used.**

8   The location where the deputy involved shooting incident occurred were the southbound lanes
9   of Diamond Bar Boulevard, just north of Crooked Creek Drive.

10   Chin was wearing a black nylon body armor plate carrier and was armed with a black and white
11   colored AR15 style rifle which contained a rifle magazine inside the weapons magazine well. It is noted
12   that he video evidence appears to show that Chin's right arm is bent at the elbow and appears to be in a
13   position that would be holding the grip of the rifle near the trigger guard while the left arm is hanging
14   freely as he walks. The rifle in this position could be simply lifted with the right arm/hand and fired
15   without the need to place the left hand onto the fore stock of the rifle.

16   Barajas was armed with a Smith & Wesson, Model M&P 2.0, 9mm semi-automatic pistol. During
17   the round count after the incident, it was revealed that Barajas had a 17 round magazine and had 12 left
18   in the magazine. This would tend to show that Barajas may have fired 5 rounds. Barajas noted that she
19   was not aware of how many rounds were in the magazine prior to the incident and believed at first that
20   she fired 2-3 rounds. The video evidence appears to show that she fired 3 rounds.

21   Vasquez fired two slug rounds from the Remington, 870 Police Magnum, Pump Action Shotgun.

22   Barajas BWV

23   The video evidence appears to capture the sound of 5 gunshots. If it is accepted that Vasquez
24   fire 2 rounds, then it can be concluded that Barajas fired 3 rounds. The video appears to show the
25   following sequence of fire:
26   • Barajas at approximately 11:45:05
27   • Vasquez
28   • Barajas
29   • Barajas – Chin bends at waist
30   • Vasquez at approximately 11:45:15

31   Police officers are trained that they are permitted to use reasonable force to effect an arrest,
32   prevent the escape or to overcome the resistance of a suspect:

33   Any peace officer who has reasonable cause to believe that the person to be arrested has
34   committed a public offense may use reasonable force to:

35       • effect the arrest,
36       • prevent escape, or
37       • overcome resistance.

38   A peace officer who makes or attempts to make an arrest:

27

**Edward T. Flosi, M.S.**
Justitia Consulting

1      • need not retreat or desist from his efforts by reason of the resistance or threatened
2        resistance of the person being arrested
3      • shall not be deemed an aggressor
4      • shall not lose his right to self-defense by the use of reasonable force to effect the arrest
5        or to prevent escape or to overcome resistance.[24]

6      Police Officers receive training that the United States Supreme Court established how force
7   must be judged from an objectively reasonable standard (Graham v. Connor, 490 U.S. 386, 109 S.Ct.
8   1865 (1989)).[25] The Court's analysis began by considering the subject's Fourth Amendment right to
9   remain free from any unreasonable seizure against the government's interest in maintaining order
10  through effective law enforcement.

11      When reviewing and analyzing an officer's use of force under a standard of "objective
12  reasonableness," officers are trained that the Graham decision gave an overarching guideline to those
13  that are charged with analyzing an officer's force response. Officers are told that the calculus of
14  reasonableness must embody allowance for the fact that police officers are often forced to make split-
15  second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount
16  of force that is necessary in a particular situation.[26]

17      The California POST Learning Domain 20 workbook states, "In some instances, peace officers
18  may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions
19  must be made."[27]

20      The California POST Learning Domain 20 workbook states:

21      The Court noted that determining the objective reasonableness for the use of force must be fact
22  specific, and established the following components for determining reasonableness:

23      The reasonableness of a particular use of force must be...
24      1. judged from the perspective of a reasonable officer.
25      2. examined through the eyes of an officer on the scene at the time the force was applied, not
26         the 20/20 vision of hindsight.
27      3. based on the facts and circumstances confronting the officer without regard to the officer's
28         underlying intent or motivation.[28]

29      A reasonable officer is defined as would another officer, facing a similar set of circumstances,
30  act in the same way or use similar judgement.[29]

---

[24] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[25] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[26] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[27] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[28] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[29] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

In addition to the guideline listed above, other important factors to consider include, but are not limited to; (1) the severity of the crime at issue, (2) whether the subject poses an immediate threat to the safety of the officers or others, (3) and whether the subject is actively resisting.[30] These factors are described as "governmental interests" and weighed as a totality of the circumstances and balanced against the quantum (or level) of force used by the officers.  The quantum of force is determined by the type of force option used and the manner in which it was used.

Since the Graham decision, officers are trained that other courts have added to and rearranged the factors listed. Officers within the 9th Circuit have been trained to recognize these factors listed in "importance" as:

1. The threat of the suspect to officer/others
2. The resistance of the suspect
3. The "Pace of the Event"
4. The severity of the crime at issue
5. The nature of the escape attempt

Other factors that have been identified and that officers have been trained to understand that may or may not be applicable to the specific situation are:

1. Number of Officers vs. Suspects
2. Were cover officers enroute or on-scene?
3. Access to Potential Weapons
4. Age; Size; Relative Strength
5. Special Knowledge or Skill Level
6. Injury or Exhaustion
7. Mental Illness or Drug Usage
   a. Higher pain tolerance
   b. Unable to understand commands
8. Prior Contacts
9. Environmental Factors
   a. Lighting, space limitations, footing, crowds, traffic
10. Availability of other reasonable force options
11. Was there an opportunity to warn and was there a warning given?
12. Was the subject able to cease resistance and/or comply with commands?

Officers are trained that there are three general categories of force options, including:

- Non-Deadly Force: Force which creates a minimal risk of injury
- Intermediate Non-Deadly Force: Force which has a significant risk of injury
- Deadly Force: Force which has a substantial risk of serious bodily injury or death[31]

---

[30] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[31] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1      Understanding the importance of what an officer reasonably believed based on facts and
2 circumstances known or perceived is paramount to the analysis of any force response by an officer. As
3 previously stated, the force must be judged from the perspective of a reasonable officer and examined
4 through the eyes of an officer on the scene at the time the force was applied. To understand the
5 perspective, one must understand the perception of the officer on scene. While it is important to learn
6 the perception of other involved parties to better understand the incident in an overall sense, the
7 appropriateness of the force response must rely upon the perception of the officer responding with the
8 force option.

9      The evaluation must be made from the perspective of the officer. In simple terms, the officer
10 does not need to be correct for his/her actions to be objectively reasonable under the totality of the
11 facts and circumstances known and perceived by the officer.

12      Perception is the process of applying stored knowledge to sensory input (see, feel, hear, smell,
13 taste) and forming an interpretation and is truly key to evaluating the reasonableness of any force
14 application. It is important to also note that perception is individual to each officer based on the facts
15 and circumstances known to the officer and his training and experience. It is important to also
16 understand that sometimes an action outside the expected can raise a perceived threat level.

17      In evaluating the objective reasonableness of an officer's use of force, there must be a
18 reasonable balance between; (1) "why" the officer used the force option (governmental interests), and
19 (2) "what" type of force option was used and "how" it was used (level/quantum of force).

20      One way police officers are trained to determine the reasonable level/quantum of force is to
21 examine the reasonably likely injury expectation of the force option.  It is important to evaluate the
22 expectation based on what the officer knew and perceived rather than the actual outcome as they can
23 be drastically different in some cases.

24      Police officers are trained that they need not use lesser intrusive force options that may be
25 ineffective or not feasible before using a reasonable force option for the facts and circumstances.
26 Considering all possible options may be difficult and even impossible in high-risk environments due to
27 the time pressure, task complexity, and environmental uncertainty. In these types of situations officers
28 often must rely on intuitive decision making during potential use of force encounters.

29      In any incident, there are uncertainties and there are numerous option choices available to the
30 officer(s) throughout the incident as it unfolds. Many of them are not well defined. Much of what
31 officers do is based on; (1) experience, and (2) the totality of the facts and circumstances
32 known/perceived by the officer. Manuals and training simply cannot cover everything. Officers do not
33 have the ability to predict the future with 100% certainty.

30

**Edward T. Flosi, M.S.**
Justitia Consulting

1    Officers are trained that there is no legal requirement that an officer choose the "best" or
2    "most" reasonable force, but one that is objectively reasonable under the totality of the circumstances,
3    and conforms to agency policy, federal and state law.[32]

4    In the California POST Basic Academy, officers receive training regarding the use of force.  On
5    two occasions while still an active peace officer I participated directly in assisting California POST review
6    and update the Learning Domain 20 (Use of Force) workbook giving me a unique understanding of the
7    content of the workbook and I base my opinions on these writings.  In the 2015 update, I participated
8    remotely.

9    By definition, the use of a firearm is deadly force.  Police officers are taught that deadly force is
10   force that creates a substantial risk of causing death or serious bodily injury.[33]

11   Police officers are trained that they may use deadly force under certain circumstances.

12   Deadly Force Training Standards: "Force on Force"

13   "Force on Force" refers to a situation when an officer perceives that a subject is presenting an
14   imminent threat of serious bodily injury or death to the officer or to others based on the totality of the
15   facts and circumstances known/perceived by the officer at the time.

16   Officers are trained that imminent means, "a threat of death or serious injury is "imminent"
17   when, based upon the totality of the circumstances, a reasonable officer in the same situation would
18   believe that a person has the present ability, opportunity, and apparent intent to immediately cause
19   death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a
20   fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm,
21   but is one that, from appearances, must be instantly confronted and addressed."[34]

22   Officers are trained that they are not required to wait to until the subject actually points a gun
23   at them or fires at them prior to responding with deadly force. Officers may respond with deadly force if
24   there is an objectively reasonable belief that the subject is about to shoot at the officers, based on the
25   totality of facts and circumstances known/perceived by the officers, to prevent the subject from firing at
26   the officers.

27   In training, officers are given examples of what an imminent threat of serious bodily injury or
28   death may include:
29   - A subject is reaching for/drawing a firearm with the apparent intent to use the
30     object/weapon against the officer or others.
31   - A subject is moving the muzzle of a firearm in the direction of an officer or others with
32     the apparent intent to use the object/weapon against the officer or others.

---

[32] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[33] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[34] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1         • A subject is armed with a object/weapon perceived to be able to cause serious bodily
2           injury or death, and his/her actions and behaviors demonstrate the ability and apparent
3           intent to use the object/weapon against the officer or others.

4        Examples of this would be a subject; (1) drawing/accessing a firearm in the presence of an
5  officer, (2) moving the muzzle of a firearm towards an officer or another, (3) shooting at an officer or
6  another person, and/or (4) moving towards an officer or another person, with a weapon that could
7  reasonably be believed to be able to create serious bodily injury or death while having the ability to use
8  that weapon against the officer or another.

9        This is taught as "to protect life" and reads in relevant part, "a peace officer is justified in using
10  deadly force upon another person only when the officer reasonably believes, based on the totality of the
11  circumstances, that such force is necessary to defend against an imminent threat of death or serious
12  bodily injury to the officer or to another person."[35]

13        Reverence for all life is the foundation on which the use of deadly force rests.  This reverence is
14  not solely directed at the subject, it includes the life of the officer him/herself and of others.

15        One of the primary objectives in using deadly force is to immediately stop the subject from
16  continuing their actions.  To this end, police officers are trained to shoot for center mass of the subject
17  in order to increase the likelihood of hitting the subject in a location that would stop the subject.  It is
18  well known that under stress conditions marksmanship will decrease and that shooting at smaller
19  targets such as hands or limbs becomes extremely difficult.  These targets also may not have the desired
20  effect of immediately stopping the subject's actions.  Targeting these non-center mass areas commonly
21  leads to missing the target completely due to the size and the speed of movement of the limbs and
22  hands.  With each miss the officer takes more risk that the subject will continue his/her actions to cause
23  serious bodily injury or death.

24        If the situation has risen to the level that the officer reasonably believes that officer's or other
25  person's life is in imminent danger of serious bodily injury or death, officers are trained to shoot until
26  the threat is stopped.  If officers are justified in firing at a suspect in order to end a severe threat to
27  public safety, they need not stop shooting until the threat has ended. Officers are trained that there is
28  no specific time requirement to pause between shots to reassess the threat. Officers are taught to
29  continually assess the threat while shooting.

30        The limitations of sidearms being able to immediately stop the threat are well-known. In
31  research involving "deanimation," a threatening subject's cessation of movement after he or she has
32  been shot, most cardiologists agree with the five-second rule. When blood pressure drops suddenly to
33  near zero, most people will still remain animated for at least five more seconds before ceasing to be a
34  threat. Five seconds is considered the minimum. Some cardiologists insist the real figure is closer to 10
35  seconds or more.

---

[35] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1    Officers are trained that they may reasonably use deadly force when confronted by a perceived
2    armed suspect in close proximity whose actions indicate an intent to attack. An officer is not required to
3    wait in order to find out if the suspect will, in fact, injure or kill the officer.

4    Officers are trained that if they are justified in firing at a suspect in order to end a severe threat
5    to public safety, they need not stop shooting until they perceive the threat has ended. Officers are
6    trained to shoot until the threat is stopped.

7    Learning Domain 20 demonstrates that officers do not need to always exhaust all other means
8    of force applications if the situation dictates a deadly force application as a reasonable option.  In the
9    immediate case in question, it would not be an appropriate tactical decision to try lesser intrusive means
10    to stop Chin based on the immediacy of the perceived threat and the need to immediately stop his
11    actions.

12    Officers are trained that they need not wait until the gun is actually pointed at them or until a
13    gun is fired at them to respond with deadly force to prevent the attack from happening. Based on the
14    totality of the circumstances known and perceived by the deputies, it would be reasonable for an officer
15    in the same situation to believe that Chin was moving closer to available targets in preparation to shoot
16    at the people stopped in the roadway.

17    It is noted that based on the video evidence, it appears to Chin had his right hand holding the
18    grip of the rifle near the trigger guard. In that position with that grip, a person could likely raise the rifle
19    and fire quicker than; (1) another person could react and move to safety, and/or (2) an officer could
20    respond with deadly force to effectively stop that action.

21    It is also noted that this rifle could have been fired one-handed.

22    Chin displayed no indications of surrender or compliance with the commands of the deputies to
23    drop the rifle.

24    A reasonable officer could conclude that there would be no legitimate reason for Chin to
25    continue walking forward towards others when holding the grip of the rifle near the trigger guard other
26    than to get closer to available targets and/or compromise the cover of Barajas.

27    It must be clearly pointed out that it is the actions of Chin that was creating this life-threatening
28    situation and forced the deputies to react quickly and decisively.

29    <u>Barajas</u>

30    <u>The threat to the safety of the officer or others</u>: Barajas articulated that the perceived/known
31    threat posed by Chin at the time of the deadly force applications was high and life-threatening.

32    Based on the totality of the facts and circumstances perceived/known at the time, Barajas
33    believed that Chin was moving closer to the driver of the white Tesla and herself in order to shoot at
34    them.

**Edward T. Flosi, M.S.**
Justitia Consulting

1    <u>The level of resistance by the subject</u>: The level of Chin's perceived resistance was articulated by
2    the individual detectives at the time of the deadly force application in the incident as high.  The amount
3    and type of control is dependent on the level of resistance offered by the subject.  The California POST
4    workbook for Use of Force (Learning Domain 20) describes four levels of resistance and provides
5    possible force option solutions for each level.  In this incident at the time of the deadly force
6    applications, Chin's perceived resistance by Barajas can be classified as "life-threatening resistance."
7    Life-threatening resistance is defined as:

8        "Any action likely to result in serious injury or possibly the death of the officer or another
9        person."[36]

10    The California POST workbook suggests possible force options when a subject is perceived to be
11    displaying life-threatening resistance as:

12        "Utilizing firearms or any other available weapon or action in defense of self and others."[37]

13    Based on the totality of the circumstances related to the perceived level of resistance by
14    Barajas, it can only be concluded that the level of resistance was high and weighs heavily towards the
15    need to use significant levels of appropriate force including deadly force to immediately and quickly stop
16    Chin's actions.

17    <u>Pace of the Event</u>: The pace of this event at the moments that Barajas responded with deadly
18    force can only be described as tense, uncertain and rapidly evolving. Barajas' life defending decisions
19    had to be made quickly and in a time compressed manner. Officers are trained on how the pace of the
20    event can be a factor in the overall reasonableness evaluation.[38] During the deadly force application,
21    Barajas was forced to make time compressed decisions that required split-second life-threatening
22    decision making.

23    <u>Severity of the Crimes at Issue</u>: Barajas reasonably believed several serious and life-threatening
24    crimes had been committed, were about to be (imminently) committed or being committed at the time
25    of the event and specifically at the time of the deadly force applications. These crimes included:

26    •   California Penal Code §245(b): Any person who commits an assault upon the person of
27        another with a semiautomatic firearm.
28    •   California Penal Code §245(d)(2): Any person who commits an assault upon the person
29        of a peace officer or firefighter with a semiautomatic firearm and who knows or
30        reasonably should know that the victim is a peace officer or firefighter engaged in the
31        performance of his or her duties, when the peace officer or firefighter is engaged in the
32        performance of his or her duties.

---

[36] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[37] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[38] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

- California Penal Code §187(a): Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.
- California Penal Code §664: Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration.

The nature of the escape attempt: At the moments leading into the deadly force response, Chin was not perceived to have been attempting escape.

Taking into consideration the facts and circumstances observed and perceived by Vasquez and Barajas prior to and at the time of the deadly force responses (as detailed in the section titled, "Details of the Incident"), and based on the factors listed above in this section, a reasonable officer could conclude that a subject with a ballistic vest and carrying an AR type rifle in a residential and heavy traffic area; (1) after firing multiple rounds from the rifle, (2) after harming a loved one, (3) after failing to drop the rifle after being ordered to do so multiple times, (4) continuing to walk towards occupied vehicles and other law enforcement personnel, that Chin was an imminent threat of serious bodily injury or death.

Vasquez

The threat to the safety of the officer or others: Vasquez articulated that the perceived/known threat posed by Chin at the time of the deadly force applications was high and life-threatening.

Based on the totality of the facts and circumstances perceived/known at the time, Vasquez believed that Chin was moving closer to the driver of the white Tesla and Barajas in order to shoot at them.

The level of resistance by the subject: The level of Chin's perceived resistance was articulated by the individual detectives at the time of the deadly force application in the incident as high. The amount and type of control is dependent on the level of resistance offered by the subject. The California POST workbook for Use of Force (Learning Domain 20) describes four levels of resistance and provides possible force option solutions for each level. In this incident at the time of the deadly force applications, Chin's perceived resistance by Barajas can be classified as "life-threatening resistance." Life-threatening resistance is defined as:

"Any action likely to result in serious injury or possibly the death of the officer or another person."[39]

The California POST workbook suggests possible force options when a subject is perceived to be displaying life-threatening resistance as:

"Utilizing firearms or any other available weapon or action in defense of self and others."[40]

---

[39] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[40] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1        Based on the totality of the circumstances related to the perceived level of resistance by
2    Vasquez, it can only be concluded that the level of resistance was high and weighs heavily towards the
3    need to use significant levels of appropriate force including deadly force to immediately and quickly stop
4    Chin's actions.

5        <u>Pace of the Event</u>: The pace of this event at the moments that Vasquez responded with deadly
6    force can only be described as tense, uncertain and rapidly evolving. Vasquez's life defending decisions
7    had to be made quickly and in a time compressed manner. Officers are trained on how the pace of the
8    event can be a factor in the overall reasonableness evaluation.[41] During the deadly force application,
9    Vasquez was forced to make time compressed decisions that required split-second life-threatening
10   decision making.

11       There is a well-known training principle in law enforcement referred to as the reactionary gap.
12   This is the time that it takes a person to perceive a stimulus and then react to that stimulus. On the
13   average, it takes a person approximately 0.7-1.5 seconds to perceive and react to the stimulus. These
14   times may vary depending on certain factors, but one thing is consistent within the principle. The person
15   that creates the stimulus (actor) is always ahead of the person having to react to the stimulus (reactor).

16       This is the reality of human performance and response. Reactions to changes in stimuli do not
17   occur instantaneously. For every second an officer is forced to wait, the subject has a higher potential of
18   successfully completing the attack that had already been perceived by the officer as imminent. Thereby
19   placing the lives of others at unnecessary peril due to the actions and behaviors of the subject. The
20   subject may also move to a position that limits the officer's ability to respond with deadly force in
21   defense of life.

22       There are examples of this response time gap in other than police use of force scenarios. A
23   person is ending a phone call and are reaching for the end button when the other caller says, "Oh, one
24   more thing" but your finger hits the button, ending the call. You heard it, it registered in your brain at
25   some level, but your brain could not catch up to the motor program already being executed to stop it.
26   Another example is a basketball player going up on a layup, but the ball is rejected by a defender. The
27   shooter's hands still complete the motion of the shot, even though the ball is no longer in his or her
28   hands. It takes time to register the change in stimuli and generate a response.

29       It has been known for decades that reaction time will increase proportionally to the number of
30   possible responses until a point in which it maintains constant despite the increases in possible
31   responses. This is known as Hick's Law, named after William E. Hick, who discovered it in 1952.

32       Tueller drill published in 1983. It is the principle that an average person can sprint 21 feet in
33   roughly 1.5 seconds. That is about the same time it takes an officer perceive the threat and draw a
34   firearm and fire two unaimed shots. The drill has been replicated by other researchers.

35       I have received advanced training in the reactionary gap and have read various studies on this
36   topic. I have seen and experienced this reactionary gap in practice. I have personally witnessed this

---

[41] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1  reactionary gap thousands of times in training scenarios that I conducted with in-service and recruit
2  officers.

3          I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the
4  South Bay Regional Training Consortium and/or the San Jose Police Department Academy for
5  approximately nine years.  In my capacity as a Use of Force – cognitive instructor for the San Jose Police
6  Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they
7  relate to use of force. In total, I have taught law enforcement use of force for about 20 years. As a use of
8  force instructor, I commonly taught and trained officers on perception-reaction time and on the ways
9  officers could enhance their reaction time. In POST Learning Domain 20, officers are taught that "[s]elf-
10  control reflects one's confidence in their skills and abilities which can be improved through training,
11  practice, and experience; thereby enhancing decision-making and reaction time." In my teachings on
12  Learning Domain 20, I have used lecture-based learning to reinforce tactics and techniques to
13  mitigate/shorten reaction times based on my education on the topic and on my own personal
14  experiences. As an instructor, I used scenario-based training to observe human performance issues and
15  to create strategies to mitigate reaction time and stress factors. In these scenario training settings, I have
16  witnessed perception/reaction time gaps thousands of times and used those examples in the debriefing
17  of the officer taking the training, including possible tactics/techniques to mitigate the gap in future
18  encounters. I have also been directly involved as a California POST committee member in two prior
19  revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

20          I am a POST certified Force Options Simulator instructor. In order to become a Force Options
21  Simulator instructor, I had to attend a 40-hour instructor level course.

22          I was the lead FOS instructor for the SJPD In-Service Training Unit. I trained thousands of officers
23  in Santa Clara County.

24          I was the POST "Train the Trainer" instructor for this block of instruction.

25          I was a Force Options Simulator instructor for the South Bay Regional Training Consortium. I
26  trained hundreds of officers in the bay area.

27          The Force Options Simulator (FOS) is a tool used to train the concepts of an objectively
28  reasonable force response based on current law enforcement training guidelines and principles. The
29  student officer will face different scenarios shown on a screen. The student officer will interact with the
30  subjects on the screen and evaluate the subject's actions and behaviors. Some scenarios will resolve with
31  no force response and others will require some type of force response to stop a threat including some
32  that will require a deadly force response to stop an imminent threat of serious bodily injury or death.

33          When the student officer responds with deadly force, the simulator would capture the amount
34  of time that it took from when the threat began to when the deadly force was applied. As an instructor, I
35  saw this happen thousands of times and found it consistent with the findings of previous reactionary gap
36  studies.

37          In addition, during the portion of the training where the simulator is used, and when an officer
38  would respond with deadly force, we would replay the video portion showing the "hits" that were
39  recorded by the simulator. On numerous occasions, the time of the "hit" would show a different body

**Edward T. Flosi, M.S.**

Justitia Consulting

1    position of the subject portrayed on the screen as described by the officer during the debriefing of the
2    scenario. I would take this opportunity to discuss the reactionary gap to describe why the "hit" appeared
3    after the perception of danger.

4        In my capacity as a FOS instructor for the San Jose Police Department, I commonly taught the
5    legal aspects of an officer's use of force and policy concerns as they related to use of force. I also taught
6    the principle of reactionary gaps at the end of force responses.

7        I was an active member of the California POST FOS committee from 2000 up until my retirement.
8    This committee met approximately every six months to discuss training trends and use of force issues
9    within the curriculum. I have been directly involved in developing the past and present curriculum for
10   the California POST FOS program. I was the supervisor for the San Jose Police Department FOS program
11   from March 2009 to December 2011.

12        I am a POST certified Learning Domain 33 (Arrest and Control)  instructor. In order to become a
13   Learning Domain 33 instructor, I had to attend a 80-hour instructor level course.

14        I was a lead instructor for the SJPD Basic Academy. I taught hundreds of recruits.

15        I was a lead instructor for the South Bay Regional Training Consortium Basic Academy. I taught
16   hundreds of recruits.

17        This domain included the defensive principles of time and distance in reference to the
18   reactionary gap.

19        At one point, I was involved in creating a blocking drill to mitigate the reactionary gap. This drill
20   was taught and a significant improvement was noted in the recruits' performance.

21        I am a POST certified Learning Domain 19 (Emergency Vehicle Operations) instructor. In order to
22   become a Learning Domain 19 instructor, I had to attend a two instructor level courses.

23        The concepts of "Perception - reaction time" are included in this learning domain as shown
24   below:

25        The average driver's perception time is .75 seconds and their reaction time (which includes the
26   decision making process) is another .75 seconds. It takes a total of 1.5 seconds to perceive and
27   react to a problem on the road. Depending on the speed of the vehicle, a significant distance can
28   be covered during the 1.5 second period.

29        For example, a vehicle traveling at 60 MPH will cover 132 feet in 1.5 seconds during an average
30   driver's perception-reaction time. The calculation for the distance covered during 1.5 seconds is:

31        Speed x 1.1 = distance traveled in .75 seconds (perception time)

32        Speed x 1.1 = distance traveled in .75 seconds (reaction time)

33        (60 x 1.1 = 66) + (60 x 1.1 = 66) = 132 feet

34        A safe minimum following distance is at least three seconds of time between

35        vehicles. This allows sufficient time for a driver to react to sudden hazards.

**Edward T. Flosi, M.S.**
Justitia Consulting

1  For example, a vehicle traveling at 60 MPH should be approximately 270 feet from the vehicle in
2  front.

3  Speed x 1.5 = feet per second (approximately)

4  (60 x 1.5 = 90) x 3 seconds = 270 feet

5  I am a POST certified Law Enforcement Driving Simulator instructor. In order to become a Law
6  Enforcement Driving Simulator instructor, I had to attend a 32-hour instructor level course.

7  The Law Enforcement Driving Simulator is a tool used to introduce/train the concepts of
8  emergency vehicle operations in a simulated environment. This includes introduction to driving in a
9  simulator, decision making processes, emergency response and pursuit. The concepts of perception-
10  reaction time and the reactionary gap were covered during the instructor course. The same driving
11  principles on the reactionary gap, as provided in Learning Domain 19, apply to the LEDS training as well. I
12  taught the LEDS program for approximately 5 years.

13  It is noted that reaction time is referenced in the California DMV Handbook. In several places,
14  the handbook references allowing enough time to react to hazards.

15  After I retired, I co-authored a POST approved 8-hour course, "Use of Force Liability Prevention
16  for Supervisors." This was an 8-hour course that I designed and taught as a POST approved course
17  through my company. The course included aspects of the reactionary gap to help instruct reviewing
18  supervisors to understand certain human performance concerns. To lead into the discussion, one of the
19  PowerPoint slides read, "The actions of the individual subject will determine the type of force applied by
20  peace officers…subject actions cause officer reactions."

21  In September of 2006, I attended an eight (8) hour training session from the Force Science
22  Institute (FSI) taught by Dr. Bill Lewinski. I also attended and successfully completed the certification
23  process of the forty (40) hour Force Science Institute Certification Course in June of 2009. The FSI is
24  comprised of three divisions, including the Force Science Research Center (FSRC). The FSRC conducts
25  scientific research designed to increase the understanding of officer and suspect behaviors in force
26  encounters.  While much of the research has focused on deadly force encounters, the same human
27  performance factors apply to events involving less or non-deadly encounters.

28  In my training from the Force Science Institute and in my experience and training, I have learned
29  how the reactionary gap can have an effect on where and when a subject is shot versus when the officer
30  had perceived the subject as an imminent threat of serious bodily injury or death and made the decision
31  to respond with deadly force. As a law enforcement practitioner, I have experienced the
32  perception/reaction time gap several hundreds of times in both driving situations and in situations
33  dealing with subjects involved in use of force investigations.

34  The FSI Certification Course covers the basics of anatomy and physiology of perception, including
35  how people acquire, retain and recall memories; the biomechanics of officer movements in relation to
36  suspect movements during force encounters; reaction time; and exploring why an officer's or witness'
37  account of an incident might be in conflict with physical evidence.  In addition to conducting a case study
38  and presentation within a work group, I had to pass a 60-question, multiple-choice exam to graduate
39  from the course as a certified "Force Analyst." Attendees who successfully complete the program are

**Edward T. Flosi, M.S.**

Justitia Consulting

1  certified in "Force Science Analysis." This designation attests that the holder has been trained to
2  recognize and articulate important psychological, biological, and physiological factors that can influence
3  human behavior and memory in force encounters and pursuit situations.

4        Dr. Lewinski published his article, "Why is the suspect shot in the back" in December 2000.

5        It is noted that Dr. Lewinski's reactionary gap study published in National Criminal Justice
6  Reference Service Virtual Library. This is part of the US DOJ Office of Justice Programs.
7  https://www.ojp.gov/ncjrs/virtual-library/abstracts/force-science-reactionary-gap.

8        Based on my training and experience in the area of the reactionary gap, I know that an officer
9  can perceive facts and circumstances that combine to make the decision to respond with force, but there
10  is a gap in time between the perception of those facts and circumstances and the actual application of
11  force. It is therefore possible that the situation has changed at the very moment of the force application.

12        The reactionary gap as it applies to an OIS can be simply explained as the measurable time
13  between when an officer recognizes the threat and the time that the officer reacts to the threat. The
14  time would necessarily include; (1) the sensory perception of the subject's action(s) that have created an
15  imminent threat of serious bodily injury or death, (2) the decision to respond to the threat, (3) the motor
16  movements of bringing the firearm into a firing position and gaining a sight picture, and (4) the motor
17  movements to fire the gun.

18        At the time that an officer makes the decision to respond with a firearm, the officer would need
19  to change his/her focus onto his/her front sight. Without changing focus to the front sight, an officer
20  would not be able to be as accurate with his/her shooting and would; (1) create a danger to people in
21  the background that were not necessarily in the perceived line of fire, and (2) not be able to stop the
22  threat effectively by missing the target.

23        It is noted that this change in focus may cause the officer to lose some specific focus on the
24  subject, but the officer would still be able to see gross movements to help determine if the threat has
25  stopped. It is also noted that bringing the firearm up into the officer's line of sight would necessarily
26  create some visual obstruction as to what is happening below the officer's firearm and extended arm(s).

27        It must be noted that just as there is a reactionary gap at the beginning of an action (the time
28  between when an officer recognizes the threat and the time that the officer reacts to the threat), there is
29  a reactionary gap at the end of an action (the time that an officer is able to recognize that a threat has
30  stopped and the time that the officer is able to discontinue the force response). Simply put, an officer
31  that is in a perceived life-threatening situation must first perceive that the threat has stopped through
32  sensory input before he/she can physiologically react and stop firing. I have seen this reactionary gap at
33  the end of an action hundreds of times in Force Option Simulator training.

34        In previous cases that I was retained on involving an officer's force response, I have made this
35  observation in Rule 26 reports and have testified in federal court and state court on the effects of the
36  reactionary gap.

37        <u>Severity of the Crimes at Issue:</u> Vasquez reasonably believed several serious and life-threatening
38  crimes had been committed, were about to be (imminently) committed or being committed at the time
39  of the event and specifically at the time of the deadly force applications. These crimes included:

**Edward T. Flosi, M.S.**
Justitia Consulting

1   • California Penal Code §245(b): Any person who commits an assault upon the person of
2     another with a semiautomatic firearm.
3   • California Penal Code §245(d)(2): Any person who commits an assault upon the person
4     of a peace officer or firefighter with a semiautomatic firearm and who knows or
5     reasonably should know that the victim is a peace officer or firefighter engaged in the
6     performance of his or her duties, when the peace officer or firefighter is engaged in the
7     performance of his or her duties.
8   • California Penal Code §187(a): Murder is the unlawful killing of a human being, or a
9     fetus, with malice aforethought.
10  • California Penal Code §664: Every person who attempts to commit any crime, but fails,
11    or is prevented or intercepted in its perpetration.

12      <u>The nature of the escape attempt</u>: At the moments leading into the deadly force response, Chin
13  was not perceived to have been attempting escape.

14      Taking into consideration the facts and circumstances observed and perceived by Vasquez and
15  Barajas prior to and at the time of the deadly force responses (as detailed in the section titled, "Details
16  of the Incident"), and based on the factors listed above in this section, a reasonable officer could
17  conclude that a subject with a ballistic vest and carrying an AR type rifle in a residential and heavy traffic
18  area; (1) after firing multiple rounds from the rifle, (2) after harming a loved one, (3) after failing to drop
19  the rifle after being ordered to do so multiple times, (4) continuing to walk towards occupied vehicles
20  and other law enforcement personnel, (5) taking ahold of the rifle in what appeared to be in preparation
21  to fire it at the people stopped in the roadway first shot by Vasquez, and (6) then turning towards
22  Vasquez while taking ahold of the rifle in what appeared to be in preparation to fire it – second shot by
23  Vasquez, that Chin was an imminent threat of serious bodily injury or death.

24  <u>Additional Commentary: Warning</u>

25      The video evidence shows that Barajas told Chin to put the gun down approximately 7 times
26  prior to her first shot over a time frame of approximately 19 seconds.

27      It is noted that the complaint alleges that the deputies failed to provide a warning prior to their
28  deadly force response.

29      Officers are trained that the evaluation of whether their force response would be objectively
30  reasonable may include whether there was an opportunity to warn about the use of force prior to force
31  being used and, if so, was such a warning given.[42]

32      Officers are trained that they should give "some warning" prior to a deadly force response
33  "where feasible." The training does not dictate any particular language that must be used.[43]

34      The warning may include – based on the time allowed by the subject's actions and behaviors –
35  that the officer is a law enforcement officer and that deadly force may be used. In certain situations,

---

[42] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[43] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

41

**Edward T. Flosi, M.S.**
Justitia Consulting

1   officers are trained that they may not need to give a warning if the officer has objectively reasonable
2   grounds to believe the person is aware of those facts.[44]

3          The warning must take into consideration the pace of the event and the totality of facts and
4   circumstances at the time. In tense, uncertain and rapidly evolving situations when an officer reasonably
5   believes that he/she is facing a life-threatening imminent threat of serious  bodily injury or death, there
6   may not be enough time allowed by the subject's actions and behaviors to give any warning at all.

7          In these situations, officers must focus on immediately stopping the subject from continuing
8   their actions. Any delay in stopping the subject's actions by formulating and providing a verbal warning
9   may create an increased and unnecessary danger to the officer or others.

10         In other situations, there may only be time allowed by the subject's actions and behaviors to
11  give a short warning.

12         In some situations, where time and space allow and based on the subject's actions/behaviors, an
13  officer may be able to provide a warning that would include a command and a consequence (i.e., "Drop
14  the gun or I will shoot you!").

15         Taking into consideration the facts and circumstances observed and perceived by Vasquez and
16  Barajas prior to and at the time of the deadly force responses (as detailed in the section titled, "Details
17  of the Incident"), and based on the factors listed above in this section, it is my professional opinion that
18  the deadly force responses by the deputies were appropriate and reasonable to prevent a perceived
19  credible threat of injury created by Chin's actions and behaviors. The deadly force responses by Vasquez
20  and Barajas were appropriate and consistent with current law enforcement training standards in
21  consideration of the "totality of circumstances" presented to them at the moments non-deadly force
22  was used.

23  **5. There is no independent and objective evidence to support a claim that the LASD deputies denied**
24  **Chin of medical care. Indeed, this claim is demonstrably false.**

25         A simple review of the material and video evidence reveals that this claim is unsupported and
26  demonstrably false. The following is shown clearly in Barajas' BWV:
27     • The last shot was at approximately 11:45:15
28     • The approach to Chin began at approximately 11:47:07
29     • Contact with Chin at approximately 11:47:17
30     • Chin was handcuffed at approximately 11:47:40
31     • Placed on side while searching
32     • A deputy confirmed that the fire department personnel was responding at 11:47:58
33     • The unhandcuffing of Chin began to render medical aid at approximately 11:48:16
34     • Fire department personnel on scene at approximately 11:48:42
35         After being shot, Chin fell next to the rifle. There would be a legitimate tactical need to get a
36  shield and contact team formed with non-deadly and deadly force options prior to moving to where Chin

---

[44] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1  fell. It is also noted that there was information that Chin had stabbed another person and the edged
2  weapon was currently unaccounted for.

3          Sgt Coussa, Deputy Perez, Deputy Barajas and Deputy Sotelo approached Chin to provide first aid
4  and to secure the scene. Los Angeles County Fire Department, Station 120, Captain Ferrel was advised to
5  respond to the location from their previous staged location for further medical treatment. Sotelo
6  removed the black body armor from Chin's upper body area so that Sotelo was able to get an
7  assessment of Chin's injuries. Sotelo started to provide first aid to Chin addressing his visible wounds.
8  Sotelo saw what appeared to be a gunshot wound below Chin's right breast area.

9          Sotelo also saw what appeared to be a gunshot wound to Chin's right abdomen area. Sotelo
10  further assessed Chin's body and located what appeared to be a gunshot wound to his lower right side
11  back, approximately one half inch to the right of his spine. Sotelo provided direct pressure and pressure
12  bandages to Chin to stop the bleeding from his wounds. Los Angeles County Fire Department arrived and
13  took over the treatment of Chin. Chin was transported via ambulance to Pomona Valley Hospital by Los
14  Angeles County Fire Department.

15          It is my professional opinion that there is no independent and objective evidence to support a
16  claim that the LASD deputies denied Chin of medical care. Indeed, this claim is demonstrably false.

17  **6. There is no objective and independent evidence in the record that the LASD failed to adequately**
18  **train the involved deputies.**

19          Each officer involved in this incident would have had to complete a POST Basic Academy. In this
20  academy, the officers receive statewide approved standardized training on several learning domains –
21  including those listed in the material reviewed section of this report – and are tested to determine
22  competence. These tests include written tests, physical demonstration evaluations, and scenario based
23  evaluations.

24          In successfully completing a California POST approved academy, the officers have received
25  training to at least the minimum level to become a peace officer.

26          As an agency participating in POST, the LASD would be required to maintain the ongoing training
27  requirements set forth by POST. POST conducts regular agency audits to make sure that the agency and
28  its deputies have completed the required training.

29          It is my professional opinion that there is no objective and independent evidence in the record
30  that the LASD failed to adequately train the involved deputies.

31  **7. There is no objective and independent evidence that the LASD maintains unconstitutional customs,**
32  **practices and/or policies.**

33          I have review the available LASD Use of Force Policy Section 3-10/000.000 – 3-10/140.00.[45]

34          During my tenure at the San Jose Police Department, I was assigned to the Research and
35  Development Unit. This unit was directly under the Office of the Chief. In this assignment, I was tasked

---

[45] https://file.lacounty.gov/SDSInter/bos/supdocs/2024-7-26_UseofForcePolicy.pdf

**Edward T. Flosi, M.S.**
Justitia Consulting

1   with writing various policies for the agency. Prior to these policies being enacted, they were reviewed by

2   the San Jose City Attorney's Office. In this assignment, I learned how to review and write agency policy

3   that was; (1) consistent with current law enforcement training and practices, and (2) consistent with

4   Constitutional standards.

5         It is my professional opinion that there is no objective and independent evidence that the LASD

6   maintains unconstitutional customs, practices and/or policies.

7         I would so testify to the aforementioned findings and opinions under penalty of perjury if called

8   upon in any subsequent civil proceedings. Signed under penalty of perjury in accordance with the laws

9   of California and of the United States on October 20, 2025, in Fullerton, California.

10  Respectfully submitted,

11

12  Edward T. Flosi, M.S.
13  Justitia Consulting, Inc.