Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrell-llp.com
Joseph K. Miller, State Bar No. 245685
E-Mail: jmiller@hurrell-llp.com
Jerad J. Miller, State Bar No. 334001
E-Mail: jjmiller@hurrell-llp.com
HURRELL-LLP
800 West 6th Street, Suite 700
Los Angeles, California 90017
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendants, COUNTY OF LOS ANGELES, MARISOL BARAJAS and HECTOR VAZQUEZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JENNIE QUAN, individually and as successor in interest to BENJAMIN CHIN, deceased,<br><br>                    Plaintiff,<br><br>          v.<br><br>COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR VAZQUEZ; and DOES 3-10, inclusive,<br><br>                    Defendants. | Case No. 2:24-cv-04805-MCS(KSx)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT JOEL SUSS, PHD FROM TRIAL**<br><br>Date: January 26, 2026<br>Time: 2:00 p.m.<br>Crtrm: 7C<br><br>[Assigned to Hon. Mark C. Scarsi, Courtroom "7C"] |

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Defendants MARISOL BARAJAS, HECTOR VAZQUEZ (collectively, "Defendant Deputies") and COUNTY OF LOS ANGELES hereby submit their opposition to Plaintiff's Motion in Limine No. 1 to Exclude Testimony of Defense Expert Joel Suss, Ph.D from Trial ("Motion").

/ / /

/ / /

/ / /

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff JENNIE QUAN seeks to exclude the opinions of Dr. Joel Suss, Defendants' human factors expert, on the grounds that his testimony is not supported by scientific evidence, is beyond the scope of the witnesses' expertise and is not the proper subject of expert testimony. Plaintiff's Motion is overbroad and seeks to exclude testimony that clearly falls within the *Daubert* standards prescribed by the Court for admitting expert testimony. Dr. Suss' report is based on his extensive background and involvement in the fields of human factors and law enforcement practices, which is reflected in his CV. (Exhibit A). In 2013, Dr. Suss received his Ph.D in Applied Cognitive Science and Human Factors, which addressed the cognitive processes underlying police officers' decision making. Since obtaining his Ph.D, Dr. Suss has continued applying his knowledge of the cognitive aspects of human performance through teaching, publishing peer-reviewed research reports in the field, and working as a Principal Human Performance Behavior Researcher in the Officer Safety Tactics & Training Unit at Calgary Police Service in Alberta, Canada.

Dr. Suss' extensive experience in cognitive science and human factors provide a reliable and well-supported foundation for his opinions on the Defendant Deputies' use of force during the subject incident, including their perception of Benjamin Chin ("Decedent") as a lethal imminent threat. Although Dr. Suss has not been retained as a police practice expert, he has spent over a decade applying his human cognition expertise to the field of law enforcement and thus possesses the qualifications to discuss certain police procedures as they relate to his human factors analysis of the subject incident. His testimony will assist the jury in understanding Plaintiff's claim that his testimony is unsupported or unqualified has not been established and should result in the denial of her Motion.

/ / /

/ / /

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

## II.    LEGAL ARGUMENT

### A.    Dr. Suss' Opinions Satisfy the Daubert Factors and Will Assist the Jury

Federal Rule of Evidence 702 permits an expert to testify "in the form of an opinion or otherwise" if their specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 is to be applied consistent with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion testimony.'" *Id.* at 588 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). Accordingly, trial courts are afforded wide discretion in acting as gatekeepers for the admissibility of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151–52 (1999).

*Daubert* emphasizes that the appropriate method to challenge an expert's opinion is vigorous cross-examination, presentation of contrary evidence, and careful jury instructions, not exclusion. *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994); accord *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005); *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001). Maintaining the distinction between reliability and correctness preserves the jury's fact-finding role. *In re TMI Litig.*, 193 F.3d 613, 665 n.90 (3d Cir. 1999).  Additionally, in the event that the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment... These conventional devices, rather than wholesale exclusion ... are the appropriate safeguards where the basis of [expert] testimony meets the standards of Rule 702." *Daubert* 509 U.S. at 596.

Further, Courts have repeatedly held that challenges to an expert's factual assumptions, methods, or conclusions generally go to the weight of the testimony, not its admissibility. *Hartley v. Dillards, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002); *Kennedy v.*

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

*Collagen Corp.*, 161 F.3d 1226, 1230–31 (9th Cir. 1998). Only if an opinion is "so fundamentally unsupported that it can offer no assistance to the jury" may it be excluded. *Hartley*, 310 F.3d at 1061.

Plaintiff argues that Dr. Suss' report and opinions are not tethered to any reliable method of analysis, and that his discussion on perception-response time is an attempt to place scientific gloss on an argument that the Defendant Deputies' conduct was reasonable. Dkt. #66 (Plaintiff's Motion in Limine No. 1), at p. 2:16-21; Exhibit C. This gross mischaracterization overlooks the purpose of Dr. Suss' opinions and the federal requirements for introducing such opinions. In satisfaction of *Daubert's* requirement that expert testimony be based on sufficient data, principles, and scientific knowledge, Dr. Suss cites various studies on human perception and reaction time. Dr. Suss Report, p. 19 – 23; Exhibit B. The studies involve a participant's ability to perform a reaction in response to another participant first-mover's reaction in different contexts. In effect, the studies cited by Dr. Suss demonstrate the limitations of human perception and reaction time, which he then applies to the present case and the lethal and imminent threat posed by the Decedent.

The results of the studies are particularly relevant because Plaintiff alleges that the Decedent did not pose an imminent threat of deadly harm because he never pointed, raised, fired, or manipulated his rifle during the encounter with the Defendant Deputies. Dr. Suss cites relevant studies demonstrating that the absence of weapon raising, manipulation, pointing, or firing is not dispositive of the absence of an imminent threat, as such actions can be completed rapidly and before the Defendants would have had time to react. This opinion is rendered in conjunction with other factors establishing that the Decedent was a lethal threat, including stabbing the Plaintiff, wearing a bullet-proof vest, firing multiple rounds from his AR-15, and ignoring numerous commands to stop and drop his weapon.

Dr. Suss' human factors analysis also provides assistance regarding the fifth and final gunshot, fired by Detective Vazquez. After the fourth gunshot, fired by

HURRELL–LLP

800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

Deputy Barajas, the Decedent begins to bend forward at the waist prior to the fifth gunshot being discharged. The fifth gunshot was fired approximately 1.566 seconds after the fourth shot. Dr. Suss Report, p. 29. The fifth gunshot entered the Decedent's liver and was determined to be rapidly fatal by the coroner, Paul Gliniecki, MD. Dr. Suss' explanation of Detective Vazquez's ability to perceive the Decedent bending forward prior to firing the fifth gunshot is relevant because Plaintiff may argue that the fifth shot was particularly excessive. An explanation of human perception and reaction time will therefore assist the jury in assessing the reasonableness of the fifth shot by demonstrating the limitations on Detective Vazquez's ability to perceive the Decedent bending at the waist before firing.

Plaintiff further argues that Dr. Suss offers impermissible and speculative opinions throughout his report, and specifically Section 8, regarding the Defendant Deputies' and the Decedent's state of mind. Dr. Suss' opinions under Section 8 concerning the Defendant Deputies' perception that the Decedent posed an imminent threat are not based on speculation, but instead are based on the evidentiary totality of circumstances. Dr. Suss even states, "[a]s the Decedent's intent was not clear, it is reasonable that the deputies considered the possibility that the decedent may harm the driver of the white Tesla." Dr. Suss Report, p. 33. Rather than providing baseless speculation, as Plaintiff portrays, Section 8 serves to provide a step-by-step analysis of the Defendant Deputies' perception of the Decedent up to the point of the shooting. This timeline establishes the reasonableness of the Defendant Deputies' perception that the Decedent posed an imminent threat – based on evidence such as the Decedent wearing a bullet-proof vest, carrying an AR-15, stabbing his mother, and ignoring commands – and explains the aggravating factors supporting this perception. Declaration of Jerad J. Miller, ("Miller Decl.") at ¶ 6.) This testimony is highly relevant because it articulates why factors such as the Decedent failing to raise, fire, manipulate, point the rifle at the Defendant Deputies during the encounter discredits the Plaintiff's argument that the Decedent was not an imminent threat based on the

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

totality of circumstances. Section 8 should therefore be admitted in its entirety.

### B.    Dr. Suss' Testimony is Not Unduly Prejudicial or Contradictory to Ninth Circuit Law

Plaintiff argues that Dr. Suss' testimony in Section 6 of his report is prejudicial and not in accordance with the Ninth Circuit caselaw. The Plaintiff uses *Harris v. Roderick* 126 F.3d 1189, 1203 – 04 (9th Cir. 1997) to articulate the law that "it [is] clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions…even in circumstances in which the suspect has allegedly committed a violent crime in the immediate past," but Plaintiff's use of *Harris* is misguided. First, Dr. Suss is not contradicting the Ninth Circuit regarding when deadly force is acceptable in Section 6. Rather, he is elaborating on the lethal imminent threat posed by the Decedent despite him failing to raise, point, or fire his rifle at the Defendant Deputies. Second, in *Harris,* the plaintiff was shot by a federal agent sniper through a window in his residence *a day after* the plaintiff, federal agents, and other individuals engaged in a gunfight outside an area near the residence. The Ninth Circuit found that "[FBI Agent] Horiuchi gave [plaintiff] no warning and no opportunity to surrender or to otherwise cease his resistance to the exercise of lawful authority," thus constituting excessive force under the Fourth Amendment.

The present case can easily be distinguished from the Fourth Amendment violations found in *Harris.* In this case, surveillance footage from the incident area shows the Decedent stabbing his mother at approximately 11:33 a.m., with 911 calls being received about the Decedent wearing a bullet-proof vest, firing multiple rounds in the air, and carrying an AR-15 being received shortly around this time. Deputy Vazquez then encountered the Decedent and the Plaintiff around approximately 11:42 a.m., and Deputy Barajas encountered the Decedent at approximately 11:44 a.m. The first gunshot was discharged at approximately 11:45 a.m. The Decedent never attempted to retreat or hide, as the plaintiff did in *Harris*, but rather advanced towards

Hurrell-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

a civilian and ignored several commands to drop his weapon. As demonstrated, this case does not lack the threatening, futile, or harrowing actions absent from the *Harris* case, and thus Dr. Suss' opinions are in accordance with Ninth Circuit law.

### C.    Adequate Foundation Exists for the Decedent's Arm Position

An adequate foundation exists for Dr. Suss' opinions on the Decedent's right arm position. Dr. Suss opines that based on the angle of the Decedent's right arm, his hand is likely on the pistol grip of the AR-15. This opinion aligns with Detective Vazquez's observation, who stated in his deposition that "[he] saw [the Decedent's] hand in the position of gripping the pistol grip." Deposition of Hector Vazquez, p. 37:21-22. Dr. Suss' testimony is helpful to the jury because it further lays a foundation for the imminency in which the Decedent could have caused mass casualties by simply raising his right arm and pulling the trigger of his AR-15. It further requires specialized knowledge of firearms because a lay person is unlikely to know that the angle of the elbow might indicate the hand position on the firearm, or that an AR-15 could be fired one-handed. Moreover, a lay person might overlook the angle of the Decedent's right elbow entirely, or fail to see the significance of its position without expert guidance. Accordingly, Dr. Suss should be allowed to testify that the Decedent's right elbow position indicates that his hand is likely on the pistol grip of the rifle.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

## III.     <u>CONCLUSION</u>

Based on the foregoing, Plaintiff's Motion in Limine No. 1 should be denied.

DATED:  January 12, 2026          HURRELL-LLP


By:      */s/ Jerad J. Miller*
           THOMAS C. HURRELL
           JOSEPH K. MILLER
           JERAD J. MILLER
           Attorneys for Defendants, COUNTY OF
           LOS ANGELES, MARISOL BARAJAS
           and HECTOR VAZQUEZ

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

## DECLARATION OF JERAD J. MILLER

I, Jerad J. Miller, declare:

1.    I am an attorney duly licensed to practice before this Court and am an associate with Hurrell-LLP, attorneys of record for MARISOL BARAJAS, HECTOR VAZQUEZ and COUNTY OF LOS ANGELES herein.  The facts set forth herein are of my own personal knowledge and if sworn I could and would testify competently thereto.

2.    The parties met and conferred on December 22, 2025 to discuss Plaintiff's Motion in Limine No. 1. An agreement regarding Joel Suss, Ph.D's testimony was not reached, and Plaintiff proceeded with the filing of the motion herein.

3.    This declaration is made in support of Defendants' Opposition to Plaintiff's Motion in Limine No. 1 to Exclude Testimony of Defense Expert Joel Suss, Ph.D from Trial.

4.    A true and correct copy of Dr. Suss' CV is attached as Exhibit A.

5.    A true and correct copy of Dr. Suss' Rule 26 report is attached as Exhibit B.

6.    A true and correct copy of Plaintiff's Motion in Limine No. 1 to Exclude Testimony of Defense Expert Joel Suss, Ph.D from Trial is attached as Exhibit C.

7.    Dispatch reported prior the Defendant Deputies' encounter with the Decedent that the Decedent possessed an AR-15 and fired it multiple times in the air, he was wearing a bullet-proof vest, and that there was a stabbing victim in the area. The Defendant Deputies observed the Decedent wearing a bullet-proof vest, carrying an AR-15, and approaching a civilian inside a Tesla after responding to the subject incident.

8.    Surveillance footage of the subject incident produced to Plaintiff in discovery depicts the Decedent stabbing his mother at approximately 11:33 a.m., with 911 calls being received about the Decedent wearing a bullet-proof vest, firing

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

9

1  multiple rounds in the air, and carrying an AR-15 being received shortly around this
2  time. Deputy Vazquez then encountered the Decedent and the Plaintiff around
3  approximately 11:42 a.m., and Deputy Barajas encountered the Decedent at
4  approximately 11:44 a.m. The first gunshot was discharged at approximately 11:45
5  a.m.

6      I declare under penalty of perjury under the laws of the United States of
7  America that the foregoing is true and correct.

8      Executed on January 12, 2026, at Los Angeles, California.

9

10                                  _____/s/ Jerad J. Miller_____
11                                  Jerad J. Miller

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

# EXHIBIT "A"

# Joel Suss, Ph.D.
## Curriculum Vitæ

Calgary, Alberta, Canada          Mobile: +1 368 993 8255          e-mail: joel.suss@gmail.com

## EDUCATION

| | |
|---|---|
| Ph.D. | Applied Cognitive Science and Human Factors, Michigan Technological University, 2013 |
| BBSc | Behavioral Science/Psychology (*Hons*), La Trobe University, Australia, 2006 |
| GradDip | Psychological Studies, Deakin University, Australia, 2005 |
| BAppSc | Human Movement (Exercise and Sport Science/Kinesiology), Deakin University, Australia, 1997 |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2024–present | Principal Human Performance and Behavior Researcher, Calgary Police Service |
| 2021–2023 | Associate Professor, Department of Psychology, Wichita State University |
| 2015–2021 | Assistant Professor, Department of Psychology, Wichita State University |
| 2014–2015 | Postdoctoral Fellow, Co-DOT Cognitive Ergonomics Research Lab, School of Psychology, Université Laval, Canada |
| 2013–2014 | Human Factors Analyst (Contractor), Federal Aviation Administration (FAA) Research Development & Human Factors Laboratory, William J. Hughes Technical Center, New Jersey |
| 2007 | Research Officer, Cognitive Decision Research Group, La Trobe University, Australia |

## EXTERNAL GRANT FUNDING

| Awarding Agency | Title | Dates | Amount |
|---|---|---|---|
| Federal Aviation Administration | Review and Analysis of Human Error Methodologies, Frameworks and Taxonomies; **Suss, J. (co-PI)** | 10/2021–09/2022 | $100,000 |
| US National Institute of Justice | Assessment of Cognitive Performance-based Training to Improve Police Decision-Making; **Suss, J. (co-PI)** | 01/2019–03/2022 | $453,158 (co-PI) $846,536 (total) |

| Awarding Agency | Title | Dates | Amount |
|---|---|---|---|
| Psi Chi - The International Honor Society in Psychology | Graduate Research Assistantship Grant; **Suss, J. (PI)** | 01/2013–05/2013 | $3,000 |
| Psi Chi - The International Honor Society in Psychology | Graduate Research Grant; **Suss, J. (PI)**, Ward, P. (co-PI) | 01/2012–12/2012 | $1,485 |
| US National Science Foundation | Doctoral Dissertation Research Improvement Grant; Ward, P. (PI), **Suss, J. (co-PI)** | 07/2011–06/2013 | $13,920 |

## PUBLICATIONS

**Peer-Reviewed Journal Articles** (*Indicates student coauthor)

1. Jenkins, B.*, Semple, T.*, **Suss, J.,** & Bennell, C. (2024). Primed to use force? A systematic review examining the relationship between tactical officers and use of force. *Journal of Police and Criminal Psychology*, *39*(3), 509–526. https://doi.org/10.1007/s11896-024-09647-0

2. Scott, D.*, Blake, D., & **Suss, J.** (2023). Examining the use of interactive video-based simulators in law enforcement human performance research: A scoping review. *Journal of Experimental Criminology*. Advance online publication. https://doi.org/10.1007/s11292-023-09606-5

3. Biggs, A. T., Hamilton, J., Thompson, A. G., Jensen, A., **Suss, J.,** Kelly, K., & Markwald, R. R. (2023). Not according to plan: Effects of expertise, unknown environments, and the likelihood of shooting unintended targets. *Applied Ergonomics*, *112*, Article 104058. https://doi.org/10.1016/j.apergo.2023.104058

4. Connelly, M.*, **Suss, J.,** & Vangsness, L. (2023). Using biological motion to investigate perceptual–cognitive expertise in law enforcement use-of-force decisions. *Journal of Police and Criminal Psychology*, *38*(3), 567–583. https://doi.org/10.1007/s11896-023-09575-5

5. Ta-Johnson, V., **Suss, J.,** & Lande, B. (2023). Using natural language processing to measure cognitive load during use-of-force decision-making training. *Policing: An International Journal*, *46*(2), 227–242. https://doi.org/10.1108/PIJPSM-06-2022-0084

6. Blake, D. M., **Suss, J.,** Wolfe, D., & Arsal, G. (2023). "Curb-sitting": An evidence-based policing practice or an officer safety myth? *Police Practice and Research*, *24*(1), 109–121. https://doi.org/10.1080/15614263.2022.2057982

7. Biggs, A. T., **Suss, J.,** Sherwood, S., Hamilton, J. A., Olson, T. (2022). Perception over personality in lethal force: Aggression, impulsivity, and big five traits in threat assessments and behavioral responses due to weapon presence and posture. *American Journal of Psychology*, *135*(2), 195–214. https://doi.org/10.5406/19398298.135.2.06

8. Scott, D.*, Vangsness, L., & **Suss, J.** (2022). Perceptual–cognitive expertise in law enforcement: An object-identification task. *Journal of Cognitive Engineering and Decision Making*, *16*(3), 157–176. https://doi.org/10.1177%2F15553434221104600

9.  Arsal, G., **Suss, J.,** Eccles, D. W., & Ward, P. (2022). Do you know how people who are blind cross streets? Mentally stepping into another's shoes through imitation. *Journal of Visual Impairment and Blindness*, *116*(2), 252–264. https://doi.org/10.1177%2F0145482X221092049

10. Arsal, G., **Suss, J.,** Ta, V., Ward, P., Ringer, R., & Eccles, D. W. (2021). The modified imitation game: A method for measuring cognitive aspects of interactional expertise. *Frontiers in Psychology*, Article 730985. https://doi.org/10.3389/fpsyg.2021.730985

11. Biggs, A. T., Hamilton, J. A., Jensen, A. E., Huffman, G. H., **Suss, J.,** Dunn, T. L., Sherwood, S., Hirsch, D. A., Rhoton, J., Kelly, K. R., & Markwald, R. R. (2021). Perception during use-of-force and the likelihood of firing upon an unarmed person. *Scientific Reports*, *11*(1), Article 13313. https://doi.org/10.1038/s41598-021-90918-9

12. Ta, V., Lande, B., & **Suss, J.** (2021). Emotional reactivity and police expertise in use-of-force decision-making. *Journal of Police and Criminal Psychology*, *36*(3), 513–522. https://doi.org/10.1007/s11896-020-09428-5

13. **Suss, J.,** & Petushek, E. (2021). Tête, épaule ou poitrine : est-ce que le positionnement des caméras portatives a une incidence sur la visibilité d'informations cruciales ? [Head, shoulders, chest: Does mounting location affect visibility of key information in police bodyworn-camera footage?]. *Criminologie*, *54*(1), 97–133. https://doi.org/10.7202/1076695ar

14. Hamilton, J. A., Roush, G., Kinney, M. J., **Suss, J.,** & Biggs, A. T. (2020). Comparison of night-vision technology for close-quarters combat operations: How field of view impacts live-fire scenarios. *Human Factors and Mechanical Engineering for Defense and Safety*, *4*, Article 8. https://doi.org/10.1007/s41314-020-00036-z

15. Mangels, L., **Suss, J.,** & Lande, B. (2020). Identifying correlates of police decision-making expertise during police–citizen interactions: Analysis of text responses to macrocognitive probe questions. *Journal of Police and Criminal Psychology*, *35*(3), 294–303. https://doi.org/10.1007/s11896-020-09364-4

16. **Suss, J.,** & Raushel, A.[*] (2019). Wallet or gun? Evaluating factors that affect anticipation ability in a use-of-force scenario. *Journal of Police and Criminal Psychology*, *34*(3), 292–302. https://doi.org/10.1007/s11896-019-09329-2

17. Taverniers, J., & **Suss, J.** (2019). A user-centred assessment of a less-lethal launcher: The case of the FN 303® in a high-pressure setting. *Ergonomics*, *62*(9), 1162–1174. https://doi.org/10.1080/00140139.2019.1626916

18. Hamilton, J., Lambert, G., **Suss, J.,** & Biggs, A. (2019). Can cognitive training improve shoot/don't-shoot performance with live ammunition? Preliminary evidence from live fire exercises. *American Journal of Psychology*, *132*(2), 179–194. https://doi.org/10.5406/amerjpsyc.132.2.0179

19. Taverniers, J., **Suss, J.,** Delcourt, G., & De Neve, Y. (2019). The tides of the Zodiac MK VI HD: Comparing the usability of inflatable boats for seaborne operations. *IISE Transactions on Occupational Ergonomics and Human Factors*, *7*(1), 22–30. https://doi.org/10.1080/24725838.2019.1584775

20. **Suss, J.,** & Ward. P. (2018). Revealing perceptual–cognitive expertise in law enforcement: An iterative approach using verbal-report, temporal-occlusion, and option-generation methods. *Cognition, Technology & Work*, *20*(4), 585–596. https://doi.org/10.1007/s10111-018-0493-z

21. **Suss, J.,** Armijo, A. J.[*], Raushel, A.[*], & White, B. (2018). Design considerations in the proliferation of police body-worn cameras. *Ergonomics in Design, 26*(3), 17–22. https://doi.org/10.1177/1064804618757686

22. Raisbeck, L., **Suss, J.,** Diekfuss, J., Petushek, E., & Ward, P. (2016). Skill-based changes in motor performance from attentional focus manipulations: A kinematic analysis. *Ergonomics, 59*(7), 941–949. https://doi.org/10.1080/00140139.2015.1094578

23. Ahlstrom, U., & **Suss, J.** (2015). Change blindness in pilot perception of METAR symbology. *International Journal of Industrial Ergonomics, 46*(1), 44–58. https://doi.org/10.1016/j.ergon.2015.01.006

24. Belling, P. K., **Suss, J.,** & Ward, P. (2015). The effect of time constraint on anticipation, decision-making, and option-generation in complex and dynamic environments. C*ognition, Technology & Work, 17*(3), 355–366. https://doi.org/10.1007/s10111-015-0334-2

25. Belling, P. K., **Suss, J.,** & Ward, P. (2015). Advancing theory and application of cognitive research in sport: Using representative tasks to explain and predict skilled anticipation, decision-making and option-generation behavior. *Psychology of Sport & Exercise, 16*(1), 45–59. https://doi.org/10.1016/j.psychsport.2014.08.001

26. Petushek, E., **Suss, J.,** Ward, P., & Roemer, K. (2012). The effects of attentional resource allocation and skill level on movement variability and performance during a handgun shooting task. *Journal of Sport and Exercise Psychology, 34,* S121–S122.

27. Ward, P., **Suss, J.,** Eccles, D. W., Williams, A. M., & Harris, K. R. (2011). Skill-based differences in option generation in a complex task: A verbal protocol analysis. *Cognitive Processing, 12*(3), 289–300. https://doi.org/10.1007/s10339-011-0397-9

28. Ward, P., **Suss, J.,** & Basevitch, I. (2009). Expertise and expert performance-based training (ExPerT) in complex domains. *Technology, Instruction, Cognition and Learning, 7*(2), 121–146. http://ticl.coe.uh.edu/B54DF3A7-F05C-45D9-9647-68C7A512A956.pdf

**In-Progress, Peer-Reviewed Journal Articles** ([*]Indicates student coauthor)

1. **Suss, J.,** & Arsal, G. (2025). *Training scars in police training: A concept synthesis via rapid, integrative review.* Manuscript in preparation.

2. Scott, D.[*], **Suss, J.,** Lande, B., McLean, K., & Rojek, J. (2025). *Cognitive skill training approach in law enforcement.* Manuscript in preparation.

3. Ta-Johnson, V. P., Swafford, I., Tillyer, R., **Suss, J.,** & Lande, B. (2025). E*motional reactivity and officer decision-making: Unpacking the complex relationship between arousal, valence, and use of force.* Manuscript submitted for publication.

4. Scott, D.[*], Blake, D., & **Suss, J.** (2023). *Law enforcement officer tactical firearm ready positions: Evaluating response time and accuracy to spontaneous attacks.* Manuscript submitted for publication.

**Editorials**

1. Staller, M. S., Koerner, S., Bennell, C., & **Suss, J.** (2022). Police education and training revisited: Drawbacks and advances [Editorial]. *Frontiers in Psychology.* https://doi.org/10.3389/fpsyg.2022.1045924

## Book Chapters

1. Ward, P., **Suss, J.,** Belling, P., & Williams, A. M., (2020). Anticipation and expertise. In D. Hackfort & R. J. Schinke (Eds.), *The Routledge international encyclopedia of sport and exercise psychology: Vol. 1. Theoretical and methodological concepts* (pp. 31–44). Routledge.

2. **Suss, J.,** & Boulton, L. (2019). Expertise in law enforcement. In P. Ward, J. M. Schraagen, J. Gore, & E. Roth (Eds.), *Oxford handbook of expertise* (pp. 765–791). Oxford University Press.

3. Ward, P., Wilson, K., **Suss, J.,** Woody, W. D., & Hoffman, R. R. (2019). A historical perspective on introspection: Guidelines for eliciting verbal and introspective-type reports. In P. Ward, J. M. Schraagen, J. Gore, & E. Roth (Eds.), *Oxford handbook of expertise* (pp. 378–407). Oxford University Press.

4. **Suss, J.,** & Ward, P. (2015). Predicting the future in perceptual-motor domains: Perceptual anticipation, option generation, and expertise. In J. L. Szalma, M. Scerbo, R. Parasuraman, P. A. Hancock, & R. R. Hoffman (Eds.), *The Cambridge handbook of applied perception research* (pp. 951–976). Cambridge University Press.

5. McLennan, J., Strickland, R., Omodei, M., & **Suss, J.** (2014). Stress and wildland firefighter safety-related decisions and actions. In C. Owen (Ed.), Human factors challenges in emergency management: Enhancing individual and team performance in fire and emergency services (pp. 19–34). Ashgate.

6. McLennan, J., Birch, A., Cowlishaw, S., & **Suss, J.** (2007). Save that brigade! Recruiting and retaining fire service volunteers to protect your community. In J. Handmer & K. Haynes (Eds.), *Community bushfire safety* (pp. 157–168). CSIRO Publishing.


## Conference Proceedings Papers (*Indicates student coauthor)

1. Martin, J., & **Suss, J.** (2023). A potential case of change blindness in an officer-involved shooting. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting, 67*(1), 354–359.

2. Scott, D.*, & **Suss, J.** (2019). Perceptual anticipation in a shoot/don't shoot task. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting, 63*, 1358–1362.

3. Connelly, M.*, & **Suss, J.** (2019). Assessing officer performance and standardizing training procedures to improve expertise in local law enforcement. *Proceedings of the Human Factors and Ergonomic Society Annual Meeting, 63*, 2144–2148.

4. Smith, D.*, Granados, J.*, & **Suss, J.** (2019). Evaluating the comprehensiveness of VR PLAY guidelines using Elder Scrolls: Skyrim VR. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting, 63*, 2287–2291.

5. Taverniers, J. & **Suss, J.** (2019, May). *The usability of the FN 303 in operational conditions: Nonlethal, less-lethal, or somewhat too lethal after all?* Paper presented at the 10th European Symposium on Non-Lethal Weapons, Royal Military Academy, Brussels, Belgium.

6. Vachon, F., Vallières, B. R., **Suss, J.,** Thériault, J.-D., & Tremblay, S. (2016). The CSSS microworld: A gateway to understanding and improving CCTV security surveillance. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting, 60*, 265–269.

7. **Suss, J.,** Vachon, F, Lafond, D., & Tremblay, S. (2015). Don't overlook the human! Applying the principles of cognitive systems engineering to the design of intelligent video

surveillance systems. *Proceedings of the IEEE International Conference on Advanced Video and Signal based Surveillance (AVSS), 12,* 1–6.

8. Pelletier, S., **Suss, J.**, Vachon, F, & Tremblay, S. (2015). Atypical visual display for monitoring multiple CCTV feeds. *Proceedings of the Annual ACM Conference on Human Factors in Computing (CHI), 33,* 1145–1150.

9. **Suss, J.**, Belling, P. K., & Ward, P. (2014). Use of cognitive task analysis to probe option-generation in law enforcement. *Proceedings of the Human Factors and Ergonomic Society Annual Meeting, 58,* 280–284.

10. Belling, P. K., **Suss, J.**, & Ward, P. (2014). Cognitive processes supporting recognition in complex and dynamic tasks. *Human Factors and Ergonomics Society Annual Meeting Proceedings, 58,* 290–294.

11. **Suss, J.**, & Ward, P. (2013). Investigating perceptual anticipation in a naturalistic task using a temporal occlusion paradigm: A method for determining optimal occlusion points. *Human Factors and Ergonomics Society Annual Meeting Proceedings, 57,* 304–308.

12. McLennan, J., Strickland, R., Omodei, M., & **Suss, J.** (2013). Wildfire safety-related decisions and actions: Lessons from stress and performance research. *International Association of Wildland Fire Safety Summit Proceedings, 12,* 33–45.

13. **Suss, J.**, & Ward, P. (2012). Use of an option generation paradigm to investigate situation assessment and response selection in law enforcement. *Human Factors and Ergonomics Society Annual Meeting Proceedings, 56,* 297–301.

14. McLennan, J., Elliott, G., Omodei, M., McNeill, I., Dunlop, P., & **Suss, J.** (2011). Bushfire survival-related decision making: What the stress and performance research literature tells us. In R. P. Thornton (Ed.), *Proceedings of the Bushfire CRC & AFAC 2011 Conference Science Day* (pp. 307–319). Melbourne, Australia: Bushfire Cooperative Research Center.

15. **Suss, J.**, & Ward, P. (2010). Skill-based differences in the cognitive mechanisms underlying failure under stress. *Human Factors and Ergonomics Society Annual Meeting Proceedings, 53,* 1062–1066.

16. Ward, P., Harris, K. R., Eccles, D. W., **Suss, J.**, & Ehrlinger, J. (2010). Domain-general, domain-specific and study-related predictors of performance in Advanced Placement science. *Proceedings paper presented at the Annual Meeting of the American Education Research Association,* Denver, CO. 30 April–4 May, 2010.

## Technical Reports

1. Brown, M., Gulla, D., Horner, M., Lande, B., O'Neill, M., Pulliam, A., Silapaduriyang, T., **Suss, J.**, Wender, J., & Yep, K. (2022). *ADAPT research report: The current state of police control and defensive tactics training.* Dallas, TX, Polis Solutions.

2. Ahlstrom, U., & **Suss, J.** (2014). *Now you see me, now you don't: Change blindness in pilot perception of weather symbology* (Report No. DOT/FAA/TC-14/16). Washington, DC: Federal Aviation Administration.

3. **Suss, J.** (2007). *Annotated bibliography summarising material related to fire service volunteering by people from non-english speaking backgrounds (NESB) and cultural and linguistic diversity (CALD) backgrounds* (Report 1:2007). Melbourne, Australia: Bushfire Cooperative Research Centre.

4. McLennan, J., Birch, A., Cowlishaw, S., & **Suss, J.** (2007). *Retaining fire service volunteers* (AFAC Volunteer Management Sub-group Report No. 2007:2). Melbourne, Australia: Bushfire Cooperative Research Centre.


## PRESENTATIONS

### Oral Presentations

1. Jenkins, B., Semple, T., **Suss, J.,** &. Bennell, C. (2023, June 23). *Primed to use force? A systematic review examining the relationship between tactical officers and use of force.* 5th North American Correctional Criminal Justice Psychology Conference, Toronto, Ontario, Canada.

2. **Suss, J.** (2023, May 5). *Seeing inside the mind's eye: Eliciting cognitive aspects of decision making.* The Use of Force Expert Conference, The Law Enforcement Training Association, in partnership with the Justice Institute of British Columbia and the Vancouver Police Department Force Options Training Unit, Vancouver, BC, Canada.

3. **Suss, J.** (2019, December 5). *Online cognitive-skills training for improving police decision making: Can it work?* International Centre for Comparative Criminology, University of Montreal, Canada.

4. **Suss, J.** (2018, August 8). *Macro-cognition, naturalistic decision making, and cognitive skills training for law enforcement.* Psychology Consortium, Federal Law Enforcement Training Center (FLETC), Glynco, GA, USA.

5. **Suss, J.,** & Arsal, G. (2017). *Developing skill in military cyber security operations.* Oklahoma/Kansas Judgment and Decision Making Group (OKJDM) Annual Workshop. April 8, 2017. Norman, OK, USA.

6. **Suss, J.** (2017). *Developing skill in military cyber security operations.* Human Factors and Ergonomics Society Annual Meeting. October 13, 2017. Austin, TX, USA.

7. **Suss, J.,** & Ward, P. (2016). *A cognitive human factors approach to understanding and training police decision-making in use-of-force incidents.* Academy of Criminal Justice Sciences (ACJS) Annual Meeting. March 29–April 2, 2016. Denver, CO, USA.

8. **Suss, J.,** & Ward, P. (2016, April 23). *Decision making heuristics in law enforcement use-of-force situations.* Oklahoma–Kansas Judgment and Decision Making Workshop, Oklahoma City, OK, USA.

9. Vachon, F., Vallières, B. R., **Suss, J.,** Thériault, J.-D., & Tremblay, S. (2016*). The CSSS microworld: A gateway to understanding and improving CCTV security surveillance.* Human Factors and Ergonomics Society Annual Meeting. September 19–23, 2016. Washington, DC, USA.

10. Pelletier, S., **Suss, J.,** Vachon, F., & Tremblay, S. (2015). *Atypical visual display for monitoring multiple CCTV feeds.* Annual ACM Conference on Human Factors in Computing Systems, Seoul, South Korea, April 18–23.

11. **Suss, J.,** Vachon, F., Lafond, D., & Tremblay, S. (2015). *Don't overlook the human! Applying the principles of cognitive systems engineering to the design of intelligent video surveillance systems.* IEEE International Conference on Advanced Video and Signal based Surveillance, Karlsruhe, Germany, August 25–28.

12. **Suss, J.** (2011, March*). Failure under pressure: Is performance moderated by attentional focus and skill level?* Graduate School Colloquium. Michigan Technological University, Houghton, Michigan, USA.

13. **Suss, J.** (2010, December). *Skill-based differences in the cognitive mechanisms underlying failure under stress.* Applied Cognitive Science and Human Factors Brown Bag Seminar. Michigan Technological University, Houghton, Michigan, USA.

14. **Suss, J.** (2010, April). *Failure under pressure: Is performance moderated by attentional focus and skill level?* Department of Psychology Graduate Research Day. Florida State University, Tallahassee, Florida, USA.

15. **Suss, J.** (2009, October). *Shooting and attention: A research study.* High Liability Instructor Conference. Florida Institute of Public Safety, Quincy, Florida, USA.

**Poster Presentations** (*Indicates student coauthor)

1. Pedryc, W.*, Ta-Johnson, V., Motzer*, A., Smilnakova*, Z., Krupica*, I., Rasof*, S., Wright*, L., Loberg*, C., Yu*, X., Fonolla*, M., Lande, B., Suss, J., & Imomdodova, N. (2024, April 20). *Force reasonability as a mediator between police experience and use-of-force.* 96th Annual Meeting of the Midwestern Psychological Association, Chicago, IL, USA.

2. Scott, D.*, & **Suss, J.** (2019, October 30). *Perceptual anticipation in a shoot/don't shoot task.* Interactive Posters Session and Reception. Human Factors and Ergonomics Society Annual Meeting, Seattle, WA, USA.

3. Misasi, P.*, & **Suss, J.** (2019, June 19). *A cognitive engineering approach to improve the design of paramedic protocols and clinical decision support.* 14th International Naturalistic Decision Making Conference, San Francisco, CA, USA.

4. Connelly, M.*, & **Suss, J.** (2019, April 20). *Using biological motion to investigate perceptual cognitive expertise in law enforcement use-of-force decisions.* Oklahoma–Kansas Judgment & Decision Making Workshop, Norman, OK, USA.

5. Scott, D.*, & **Suss, J.** (2019, April 20). *Perceptual anticipation in a shoot/don't shoot task.* Interactive Posters Session and Reception. Oklahoma–Kansas Judgment & Decision Making Workshop, Norman, OK, USA.

6. Armijo, A.*, & **Suss, J.** (2018, October 2). *Use of an ecologically-valid test of firearm functioning to assess differences between perceived and actual firearm safety knowledge.* Interactive Posters Session and Reception. Human Factors and Ergonomics Society Annual Meeting, Philadelphia, PA, USA.

7. Armijo, A.*, & **Suss, J.** (2018, April 26). *Concealed carry on WSU campuses: Attitudes, behaviors, and safety knowledge before and after July 1, 2017.* Graduate Research and Scholarly Projects (GRASP) Symposium. Wichita State University, Wichita, KS, USA.

8. Raushel, A.*, & **Suss, J.** (2018, April 26). *Wallet or gun? Evaluating factors that affect anticipation ability in a use-of-force scenario.* Graduate Research and Scholarly Projects (GRASP) Symposium. Wichita State University, Wichita, KS, USA.

9. Chowdhury, N.*, & **Suss, J.** (2018, April 19). *Camera perspective bias in police body-worn videos.* Department of Psychology's Research Roundup. Wichita State University, Wichita, KS, USA.

10. Drake, K.[*], & **Suss, J.** (2018, April 19). *Applying cognitive task analysis to accelerate expertise in military cyber-defense operations.* Department of Psychology's Research Roundup. Wichita State University, Wichita, KS, USA.

11. Kha, J.[*], & **Suss, J.** (2018, April 19). *Viability of the FN 303® status post induced psychological and physiological stress.* Department of Psychology's Research Roundup. Wichita State University, Wichita, KS, USA.

12. Chowdhury, N.[*], & **Suss, J.** (2018, April 6). *Camera perspective bias in police body-worn videos.* Undergraduate Research and Creative Activity Forum, Wichita State University, Wichita, KS, USA.

13. Armijo, A.[*], & **Suss, J.** (2017, April 28). *Identifying incongruence of actual and perceived performance on firearm safety.* Graduate Research and Scholarly Projects (GRASP) Symposium. Wichita State University, Wichita, KS, USA.

14. Raushel, A.[*], & **Suss, J.** (2017, April 28). *Optimal placement of police body-worn cameras.* Graduate Research and Scholarly Projects (GRASP) Symposium. Wichita State University, Wichita, KS, USA.

15. Armijo, A.[*], & **Suss, J.** (2017, April 19). *Identifying incongruence of actual and perceived performance on firearm safety.* Department of Psychology's Research Roundup. Wichita State University, Wichita, KS, USA.

16. Raushel, A.[*], & **Suss, J.** (2017, April 19). *Optimal placement of police body-worn cameras.* Department of Psychology's Research Roundup. Wichita State University, Wichita, KS, USA.

17. **Suss, J.** (2010, September). *Skill-based differences in the cognitive mechanisms underlying failure under stress.* Capital Campaign. Michigan Technological University, Houghton, MI, USA.


## TEACHING EXPERIENCE

**Wichita State University, Sole Instructor**

     Research Methods in Psychology

     Cognitive Psychology

     Cognitive/Learning Foundations of Behavior (graduate)

     Psychological Principles of Human Factors (graduate)

     Human Factors Methods (graduate)

**Michigan Technological University, Instructor of Record**

     Cognitive Psychology

**Michigan Technological University, Co-Instructor**

     Human Factors Psychology

     Human Performance

**Florida State University, Teaching Assistant**

     Cognitive Psychology Lab

## RESEARCH EXPERIENCE

2010–2013      **Graduate Research Assistant,** Applied Cognition and Expertise Lab Department
               of Cognitive and Learning Sciences, Michigan Technological University
               Advisor: Paul Ward

2008–2010      **Graduate Research Assistant,** Applied Cognition and Expertise Lab Department
               of Psychology, Florida State University
               Advisor: Paul Ward

2008–2009      **Graduate Research Assistant**, Center for Expert Performance
               Learning Systems Institute, Florida State University
               Advisors: David Eccles, Paul Ward

2007–2008      **Graduate Research Assistant**, Florida Center for Research in Science,
               Technology, Engineering and Mathematics (FCR-STEM)
               Learning Systems Institute, Florida State University
               Advisor: Paul Ward

2007           **Research Officer**, Cognitive Decision Research Group
               La Trobe University, Australia
               Advisors: Mary Omodei, Jim McLennan

2006           **Research Assistant**, Bushfire Cooperative Research Centre
               La Trobe University, Australia
               Advisors: Mary Omodei, Jim McLennan

2006           **Research Assistant**, Center for Cognitive Work and Safety Analysis Defense
               Science & Technology Organization, Australia
               Advisor: Neelam Naikar

## MENTORING EXPERIENCE

**Doctoral Dissertation Committees**

2024           Paul Misasi, Department of Psychology (Human Factors), Wichita State
               University. **Member.**

               *Recalibrating the design of paramedics' clinical decision support: A cognitive systems
               engineering approach.*

2024           Monica Connelly, Department of Psychology (Human Factors), Wichita State
               University. **Chair.**

               *Level (design) up: Acquisition and use of virtual environment Knowledge by gamers
               and esports athletes.*

2023           Dakota Scott, Department of Psychology (Human Factors), Wichita State
               University. **Chair.**

               *Police decision-making and response in police–citizen encounters: Investigations using
               immersive simulators and online training.*

2021        Christina Siu, Department of Psychology (Human Factors), Wichita State University. **Chair.**

*Waste not, want not: Creating visibility on household food waste through eco-feedback intervention.*

2021        Kirsten Carter, Department of Psychology (Human Factors), Wichita State University. **Member.**

*User data disclosure behavior on smart home devices: Unifying the privacy paradox & the privacy calculus model*

2021        Inga Sogaard, Department of Psychology (Human Factors), Wichita State University. **Member.**

*Longitudinal associations of pickleball-playing with cognitive function and balance in community-dwelling older adults.*

2020        Mohammadreza Jalaeian, Department of Curriculum and Instruction, Southern Illinois University. **External Member.**

*Using video-occlusion to test and train law enforcement officers' perceptual-cognitive skills.*

2020        Duy Nguyen, Department of Psychology (Human Factors), Wichita State University. **Chair.**

*Exploring fit between competitiveness and competition in gamification.*

2020        David Blake, College of Doctoral Studies, Grand Canyon University. **Content Expert/External Mentor.**

*Mistake-of-fact shootings by American police: A contextual exploration through the Human Factors Analysis and Classification System.*

2020        Angela Cathey, Department of Psychology (Clinical), Wichita State University. **Member.**

*An evaluation of interoceptive exposure methods for derealization and depersonalization symptoms in a sample exhibiting high anxiety sensitivity.*

2019        William Choi, Department of Psychology (Human Factors), Wichita State University. **Member.**

*The effects of different in-vehicle display locations on semi-autonomous driving performance.*

2019        Lucy Aragon, Department of Industrial, Systems, and Manufacturing Engineering, Wichita State University. **External Member.**

*Analytical methods for integrating state-of-the-art healthcare quality frameworks into decision-making.*

2019        Ali Cheraghi, Department of Electrical Engineering and Computer Science, Wichita State University. **External Member.**

*Beacon-based wayfinding for people with disabilities.*

2019    Tiffany Leverenz, Department of Psychology (Human Factors), Wichita State University. **Chair.**

*The development and validation of a heuristic checklist for clinical decision support mobile applications.*

2019    Christal Patzer, Department of Psychology (Human Factors), Wichita State University. **Member.**

*Is 4K really worth it? A mixed-methods approach to exploring the uses and benefits of high-resolution computer displays for different users populations.*

2019    John Paul Plummer, Department of Psychology (Human Factors), Wichita State University. **Member.**

*The effect of depth on the useful field of view.*

2018    Erin Gannon, Department of Psychology (Human Factors), Wichita State University. **Chair.**

*Satisfaction with leisure reading in older adults with low vision.*

2017    Robert Wood, Department of Psychology (Human Factors), Wichita State University. **Chair.**

*Evaluation of the Whitlarkian method of consumer decision map creation.*

2017    Dustin Smith, Department of Psychology (Human Factors), Wichita State University. **Member.**

*Modeling free-to-play video game decision making.*

2017    Navaneethan Siva, Department of Psychology (Human Factors), Wichita State University. **Member.**

*Non-linear redundant mapping of contrast in multivariate glyph displays.*

**Master's Projects**

2021    Dakota Scott, Department of Psychology (Human Factors), Wichita State University. **Primary Advisor.**

*Examining the role of expertise in the perceptual anticipation ability of law enforcement officers in a shoot/don't shoot task.*

2020    Monica Connelly, Department of Psychology (Human Factors), Wichita State University. **Primary Advisor.**

*Using biological motion to investigate perceptual–cognitive expertise in law enforcement use-of-force decisions.*

2019    Adam Armijo, Department of Psychology (Human Factors), Wichita State University. **Primary Advisor.**

*Measuring firearm safety knowledge to identify the unskilled and unaware.*

| 2019 | Alexis Raushel, Department of Psychology (Human Factors), Wichita State University. **Primary Advisor.** |
| --- | --- |
| | *Wallet or gun? Evaluating factors that affect anticipation ability in a use-of-force scenario.* |
| 2019 | Daniel Smith, Department of Psychology (Human Factors), Wichita State University. **Second Reader.** |
| | *Multiple-object tracking in wide fields-of-view.* |
| 2019 | Jasmine Granados, Department of Psychology (Human Factors), Wichita State University. **Second Reader.** |
| | *A usability and safety study of bone-conduction headphones during driving while listening to audiobooks.* |
| 2018 | Taylor Shupsky, Department of Psychology (Human Factors), Wichita State University. **Second Reader.** |
| | *Effects of in-vehicle display type and level of driving control on police officer performance and workload.* |

## AWARDS AND HONORS

| 2019 | Faculty Recognition of Service Award, Psychology Graduate Student Organization, Wichita State University |
| --- | --- |
| 2018 | Appreciation of Participation, 2018 Panasonic Executive Customer Advisory Council |
| 2017 | Creative Works Award, Wichita State University Innovation |
| 2014 | Certificate of Excellence, UX Leadership Development Workshop @ HFES 2014 |
| 2013 | Graduate Research Colloquium Oral Presentation Award (1st place), Michigan Technological University |
| 2013 | Outstanding Teaching Award, Michigan Technological University |
| 2012 | Human Factors and Ergonomics Society Council of Technical Groups Student Travel Honorarium |
| 2012 | Summer Institute on Bounded Rationality, Max Planck Institute for Human Development, Berlin, Germany |
| 2012 | Outstanding Scholarship Award, Michigan Technological University |
| 2011 | Human Factors and Ergonomics Society Student Member with Honors Award |
| 2011 | Graduate Research Colloquium Oral Presentation Award (2nd place), Michigan Technological University |
| 2010 | Awarded membership of Psi Chi –The International Honor Society in Psychology |
| 2009 | Nominee, University Fellowship, Florida State University |
| 2006 | Honors degree in Psychology, La Trobe University |

| 1997 | Golden Key National Honor Society Scholarship, Deakin University |
| 1997 | Head of School Scholarship, Deakin University |
| 1996–1997 | Gordon Council Scholarship, Deakin University |
| 1996 | Melbourne Co-operative Bookshop Prize, Deakin University |

## PROFESSIONAL SERVICE

| 2021–2022 | Co-Chair for the Human Factors and Ergonomics Society (HFES) Jerome H. Ely Human Factors Award |
| 2021 | Member, Organizing Committee, Joint Meeting – 15th Conference on Naturalistic Decision Making and 9th Symposium on Resilience Engineering |
| 2017–2022 | Faculty Adviser, Wichita State University Student Chapter of the Human Factors and Ergonomics Society (HFES) |
| 2019 | Member, Organizing Committee, NDM 2019: The 14th International Conference on Naturalistic Decision Making |
| 2018 | Civilian representative, Defensive Tactics Instructor Oral Boards, Wichita Police Department |
| 2018 | Invited attendee, National Body-Worn Camera Perception Summit, Johns Hopkins Applied Physics Laboratory/Department of Homeland Security |
| 2017 | Co-Organizer, Doctoral Consortium, NDM 2017: The 13th International Conference on Naturalistic Decision Making |
| 2012–2013 | Member, Task Force on Impact of Federal Spending on the Human Factors and Ergonomics Society |
| 2011–2013 | President, Michigan Technological University Student Chapter of the Human Factors and Ergonomics Society (HFES) |
| 2011 | Member, Conference Organizing Committee, NDM 2011: The 10th International Conference on Naturalistic Decision Making |
| 2011 | Co-Organizer, Doctoral Consortium, NDM 2011: The 10th International Conference on Naturalistic Decision Making |

## REVIEWING ACTIVITY

Topic editor:
Frontiers of Psychology: Police Education and Training Revisited: Drawbacks and Advances

Ad hoc reviewer:
Applied Ergonomics

Cognition, Technology & Work

Ergonomics

Ergonomics in Design

Frontiers of Psychology

Human Factors and Ergonomics Society Annual Meeting

IEEE Transactions on Human-Machine System

International Journal of Environmental Research and Public Health

Journal of Cognitive Engineering and Decision Making

Journal of Environmental Research and Public Health

Journal of Experimental Psychology: Applied

Journal of Expertise

Psychological Research

Psychology of Sport & Exercise

Research Quarterly for Exercise and Sport

US National Science Foundation


## PROFESSIONAL MEMBERSHIPS

Human Factors and Ergonomics Society (HFES)

American Psychological Association (APA) Division 21 (Applied Experimental and Engineering Psychology)

# EXHIBIT "B"

# SUSS CONSULTING

**Applying Cognitive Science and Human Factors to Law Enforcement**

Calgary, Alberta, Canada / Ph: 368-993-8255 / Email: joel.suss@gmail.com

JENNIE QUAN, individually and as successor in interest to
BENJAMIN CHIN, deceased, Plaintiffs,

VS.

COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR VAZQUEZ; and DOES 3-10,
inclusive, Defendants

Case No. 2:24-cv-04805-MCS-KS

**<u>Expert Report</u>** submitted by:

> Joel Suss, Ph.D.
> Calgary, Alberta, Canada
> Mobile phone: 368 993 8255
> Email: joel.suss@gmail.com

Date: October 20, 2025

6. **Why the Decedent Posed an Immediate Threat at the Time the Deputies Fired**

6.1. In this section, I will focus on two aspects of threat:

6.1.1. The deputies' perception of threat at the time they fired. I will explain why the decedent posed an immediate threat even though he did not raise or point his rifle. In doing so, I will explain the concept of *perception-response time*.

6.1.2. A third party's (e.g., juror's) perception of threat when viewing video footage of the incident. I will explain why a third party's (e.g., juror's) perception of threat might differ from the deputies' perception, and why the deputies' actions should be judged according to their perception, and not the perception of a third party. In doing so, I will explain the concept of *response bias* (i.e., decision tendency or strategy).

6.2. The deputies' perception of threat at the time of the incident.

6.2.1. It is evident from the deputies' body-worn-camera footage that the decedent had his rifle slung, with the muzzle (barrel) pointing down. As per the complaint (p. 6 of 22, lines 1–3), the decedent "never raised, attempted to raise, or pointed the rifle at Defendants BARAJAS, VAZQUEZ, and DOE DEPUTIES nor anyone else at the time of the shooting."

6.2.2. However, the fact that the decedent did not raise or point his rifle at deputies or members of the public does not mean that he did not pose an immediate threat.

6.2.3. The decedent had the means and opportunity to act immediately. At any point, the decedent could have—very rapidly—raised the muzzle of his rifle toward either Deputy Barajas—who was standing behind her driver's door, nearly in front of the decedent—or Deputy Vazquez, who was flanking the decedent (behind the decedent and to his left).

6.2.4. The decedent could have fired his rifle one-handed, using his right hand—which although not visible in most of the BWC footage—appeared to be in a position consistent with gripping the rifle's pistol grip. Gripping the rifle's pistol grip—even with one hand—would have afforded the decedent excellent control over the rifle, including the ability to raise the muzzle (i.e., point the rifle).

6.2.5. The motion of raising the muzzle and pointing the rifle would have been facilitated by the rifle's sling. Using his right hand only, the decedent could have pushed down and forward on the pistol grip, causing the muzzle to rise as the rifle rotated around the sling's contact point on the shoulder. The sling would have acted as a pivot or fulcrum, allowing the rifle to swing upward with minimal effort. The sling would have slid over the shoulder, reducing friction and allowing smooth elevation of the muzzle.

6.2.6. It is not known whether the rifle's safety selector was in the "Fire" position (meaning that the rifle could be instantly fired by pulling the trigger), or if the safety selector in the "Safe" position, meaning that the decedent would have had to move the safety with his right thumb to the "Fire" position before pulling the trigger. Regardless, the

action of moving the safety selector from "Safe" to "Fire" can be accomplished very quickly. Many shooters perform this action while raising the rifle to a shooting position (i.e., it need not take any extra time to move the safety selector from "Safe" to "Fire", over the time needed to raise the rifle to a shooting position).

6.2.7. It is also important to note that although rifles are traditionally fired using two hands, it is not necessary to use two hands to fire the rifle. Given that the rifle was slung across his body, the decedent could have used the sling to support the rifle while he used to right hand—assuming it was gripping the rifle's pistol grip—to lever the barrel up. If the decedent was gripping the rifle's pistol grip with his right hand, he would have been able to manipulate the safety selector with his right thumb, pull the trigger with his right index finger, and manipulate/control the rifle's position, all without moving his right hand from the pistol grip and without using his left hand. The decedent could have, of course, also used his left hand to assist in pointing the rifle.

6.2.8. I have not been able to locate any scientific evidence for how quickly someone carrying a slung rifle and gripping the rifle's pistol grip could raise it and fire. However, from my own experience carrying slung rifles similar to the decedent's rifle, I am confident that this action could easily be performed in less than 1 second (including moving the safety selector from "Safe" to "Fire," if necessary).

6.2.8.1.    I believe that the decedent could have (a) raised his rifle from the slung position with the muzzle pointing down pointed, (b) pointed it at either the driver of the white Tesla or at Deputy Barajas, and (c) fired in less than 1 second.

6.2.8.2.    I believe that the decedent could have (a) turned to face Deputy Vazquez—who was positioned behind him and to his left, (b) raised his rifle in Deputy Vazquez's direction, and (c) fired at Deputy Vazquez in less than 1 second.

6.2.9. Another consideration is the asymmetry between the decedent and the deputies in terms of aiming. The decedent did not necessarily have to take careful aim to pose a threat. He could have raised his rifle and fired in the general direction of a deputy or member of the public. However, deputies are generally taught to aim before firing. Aiming typically takes additional time, over and above the time required to merely point in the general direction of a threat and fire (without regard for shooting accurately).

6.2.10. I believe that the decedent's ability to raise his rifle and fire in less than 1 second constituted an immediate threat.

6.2.11. The complaint alleges that the decedent was not an imminent threat, despite the fact that he (a) was armed with a rifle, (b) had already fired said rifle, (c) had not complied with verbal commands, (d) was approaching Deputy Barajas and members of the public at close distance, and (e) was gripping the rifle's pistol grip.

6.2.12. Based on the complaint (First Claim for Relief, paragraph 32), I contend that the plaintiff would only classify the decedent as posing an imminent threat if he had been

raising, attempting to raise, or pointing his rifle at the deputies or a member of the public.

6.2.13. To understand why the decedent was an immediate threat—despite the fact that he had not raised, attempted to raise, or point his rifle at the deputies or members of the public—it is necessary to understand that both perceiving a stimulus (e.g., a suspect starting to raise their rifle) and responding to that stimulus (e.g., a deputy taking aim and firing) take time. This notion is captured in the concept of perception-response time (Green, 2023).

6.2.14. To illustrate the concept of perception-response time, consider the following situation: Imagine you are driving down a city street, approaching a traffic light. The car in front of you is moving, and you are following at a reasonable distance. Suddenly, that car slams on its brakes — maybe the light turned yellow, or a pedestrian stepped into the crosswalk.

6.2.14.1.    You do not hit your brakes the very instant the brake lights on the car in front of you come on. First, your brain has to: (a) perceive that the brake lights came on and the car is slowing down, (b) process what that means (realize you need to stop to avoid hitting them), and (c) respond by moving your foot from the gas to the brake and pressing down on the brake.

6.2.14.2.    That entire sequence—from seeing the brake lights to physically pressing your brake pedal—is your perception-response time.

6.2.14.3.    Perception time will vary depending on the salience ("obviousness") of the stimulus and whether the perceiver was attending to the stimulus (and not looking elsewhere) when the stimulus becomes visible.

6.2.14.4.    Because it takes time to perceive and respond, there is a chance that you will not be able to stop in time—you might hit the car in front. This, of course, depends on factors such as how fast you were driving, how closely you were following the car in front, and whether you were focusing on something else (e.g., distracted) when the car in front started to brake.

6.2.14.5.    Remember that rear-end collisions can happen even to very experienced drivers. Having experience driving is no guarantee that you will be able to avoid a rear-end collision.

6.2.15. Just as it takes you time to perceive the car in front of you slowing down, it takes a deputy time to (a) perceive that a suspect is moving their weapon, (b) process what that means (e.g., the suspect is about to shoot), and (c) respond by taking aim and firing accurately.

6.2.16. It is important to remember that all of the components of the perception-response cycle can happen within a very short space of time (i.e., less than 1 second).

6.2.16.1.    For example, take the case of a simple laboratory experiment in which two people sit at a table, facing each other. In front of each person are three buttons. Both people must complete a sequence of three button pushes, with the goal of each person being to finish first. Either person can initiate movement, creating a competitive situation: sometimes person A will move first, with person B needing to react to try and beat them. Other times, person B will move first, forcing person A to try and beat them. Under these simple conditions—with no repercussions for losing—the average perception time was 207 milliseconds (i.e., approximately one-fifth of a second; Welchman et al., 2010). This was the time from the start of the first person's movement to the start of the second person's movement.

6.2.17. The main question is then: Could either deputy have reacted—by shooting accurately at the decedent—in less time than it would have taken the decedent to raise his rifle and fire?

6.2.18. Research on reaction time in shooting situations generally shows that deputies/officers are only able to fire a shot after the suspect has already fired.

6.2.18.1.    Blair et al. (2011) conducted a reaction-time study with high trained police officers. Part of the study involved a "suspect" who was standing still and holding a training handgun pointed at the ground. At the start of each trial, a highly trained officer faced the "suspect" at a distance of 10 feet and aimed their training handgun at them. On most trials, the "suspect" would raise their handgun and attempt to fire at the officer (on the other trials, the "suspect" would surrender). The officer's task was to react as quickly as possible and shoot the "suspect" when they raised their handgun. Across the entire study, the:

> "officers fired at the same time or later than the suspect 61% of the time. Additionally, even in situations where the officer was faster, there was less than a .2 s[econd] difference, suggesting that the suspect would still get a shot off in most of these encounters" (Blair et al., 2011, p. 335–336).

6.2.19. There are of course, differences between Blair et al.'s (2011) study and the incident in the complaint (e.g., the decedent was carry/holding a rifle, and not a handgun). Nonetheless, Blair et al.'s study shows that even highly trained officers—when standing 10 feet from a suspect with their weapon drawn and ready to fire—were unable to fire before the "suspect" most of the time.

6.2.20. As Blair et al.'s (2011) study highlights, the pertinent question is not just whether a deputy can—sometimes—fire at the suspect before the suspect fires. The pertinent question is whether a deputy can guarantee that they will always be able to fire before the suspect fire. The research shows that deputies cannot guarantee that they will be able to fire before a suspect fires at them—even under ideal conditions.

6.2.20.1.    Furthermore, there were serious consequences (i.e., death, injury) if a deputy had not been able to react before the decedent was able to fire. Therefore, I expect that deputies were compelled—in the face of the immediate threat—to act before the decedent had a chance to raise his rifle. This is simply due to the time it takes to perceive and accurately react to a suspect's movement. If the deputies waited until the decedent started to raise his rifle, they would almost certainly have risked being shot before being able to react and stop the threat. Deputies are not required to take unnecessary risks to protect their own lives and the lives of innocent bystanders; they are inclined to act when they are sure there is an immediate threat and when there is still time for them to take decisive action that minimizes the danger to themselves and members of the public.

6.2.21. Caveat: There has been research (Welchman et al., 2010) that found—in a laboratory experiment in which two people simulated a duel by pressing a sequence of buttons—that when people react to someone else's movement, the initial part of their movement is performed faster than when they initiated the movement. However, this research also found that—because of the time it takes to perceive the initiator's movement (i.e., the perception time, which was an average of 207 milliseconds)—the reactor nearly always finished their button-press sequence *after* the initiator.

6.2.21.1.    A misinterpretation and misapplication of this research would be as follows: Because the reactor moved slightly faster (compared to their same movement when they were initiating the button-press sequence), a deputy could have afforded to wait until the decedent was raising his rifle before reacting (because the deputy will still be able to aim, fire, and stop the decedent before the decedent fires).

6.2.21.2.    However, such a conclusion does not accord with what is known about perception-response time: Action generally beats reaction, especially when conditions afford both parties equal opportunity to act.

6.2.22. In this specific case, recall that there was an asymmetry (i.e., mismatch) between the decedent's ability to act and the deputies' ability to respond. The decedent did not have to aim and fire accurately to pose a threat, while the deputies were expected to fire accurately to stop the threat. In other words, the deputies—who already had to contend with being in the disadvantageous position of reacting to the decedent—were further disadvantaged in their ability to react rapidly because they had been trained to aim and shoot accurately (which takes additional time beyond merely shooting in the decedent's general direction).

6.2.23. Even if the deputies were already aiming toward the decedent, it is likely that they would have been "looking over their sights" (rather than "through" their sights at the decedent), so that they could monitor the decedent's actions and movements. The point is that even if they waited for the decedent to raise his rifle, they would likely have still needed some time to aim before firing.

**7. Why the Deputies' Shot Sequence Indicates a Measured Response with Specific Regard for the Decedent**

7.1. According to the forensic video analysis of body-worn-camera footage performed by Parris Ward, Deputies Barajas and Vazquez fired a total of five shots.

7.2. Using the times on the five still frames produced by Parris Ward, I compiled the following table describing the shot sequence.

| Shot # | Fired by Deputy | Deputy's Shot # | Type of Weapon | Time Since Shot #1 (seconds) | Time Between Shots (seconds) | Time Since Deputy's Previous Shot (seconds) | |
|---|---|---|---|---|---|---|---|
| | | | | | | Barajas | Vazquez |
| 1 | Barajas | 1 of 3 | Handgun | 0.000 | - | - | - |
| 2 | Vazquez | 1 of 2 | Shotgun | 5.632 | 5.632 | - | - |
| 3 | Barajas | 2 of 3 | Handgun | 6.532 | 0.900 | 6.532 | - |
| 4 | Barajas | 3 of 3 | Handgun | 8.465 | 1.933 | 1.933 | - |
| 5 | Vazquez | 2 of 2 | Shotgun | 10.031 | 1.566 | - | 4.399 |

7.3. The data reveal that both deputies fired more than once: Deputy Barajas fired three shots from her handgun and Deputy Vazquez fired two shots from his shotgun.

7.4. One question that can be answered using these data is whether each deputy was firing as fast as they could. This question is relevant because firing at a rapid rate could be construed—by the defense—as an indication that a deputy's actions were willful, wanton, malicious, and done with reckless disregard for the decedent's safety.

7.5. If the deputies did not fire as fast as they possibly could, that is an indication that they took extra time between shots to assess the situation and decide whether an additional shot(s) was necessary to stop the imminent threat. In this case, assessment likely involved (a) observing the decedent's motion and posture to decide if he was still an imminent threat and (b) considering how changes in the decedent's position relative to the deputies might increase the chance of crossfire between the officers.

7.6. In the following subparagraphs, I consider whether the deputies were firing as fast as they possibly could.

7.6.1.1. Deputy Barajas was armed with a 9 mm Smith & Wesson M&P 2.0 semiautomatic handgun.

7.6.1.1.1. Although I have not been able to find firing-rate data for this specific handgun in the scientific literature, it is reasonable to expect that all modern recoil-operated, locked-breech semiautomatic handguns—such as the Smith & Wesson M&P 2.0—function in similar ways and therefore allow people to fire at similar rates.

8.2.8. The decedent was approaching the white Tesla (and also getting closer to Deputy Barajas).

8.2.8.1. From this, it is reasonable that the deputies inferred that unless they stopped the decedent, the decedent would reach the white Tesla. <mark>As the decedent's intent was not clear, it is reasonable that deputies considered the possibility that the decedent may harm the driver of the white Tesla.</mark>

8.2.9. The decedent had his rifle slung over his shoulder and was likely gripping the rifle's pistol grip with his right hand.

8.2.9.1. From this, it is reasonable that the deputies inferred that the decedent could raise his rifle and fire at them before they might be able to fire at him.

8.3. In addition to these factors, Deputy Vazquez noted his concern regarding "crossfire." I believe that Deputy Vazquez was referring to the possibility of Deputy Barajas shooting in his general direction and unintentionally wounding or killing him. At the same time, Deputy Vazquez would have been concerned about the possibility that he might fire in Deputy Barajas's general direction and unintentionally wound/kill her (although he did not know Deputy Barajas's identity). This possibility occurred because the two deputies arrived at the incident from different (i.e., opposite) directions. and individuals may be unintentionally caught in the intersecting lines of fire.

8.3.1. It is reasonable that Deputy Vazquez's decision to move north on the western sidewalk of South Diamond Bar Boulevard was influenced by his concern for (a) the potential of crossfire between himself and Deputy Barajas, and (b) his concern about what lay beyond/behind the decedent (e.g., members of the public stopped in their vehicles in the southbound lanes of South Diamond Bar Boulevard). I believe that Deputy Vazquez tried to place himself in a position that reduced or eliminated the possibility of crossfire, while trying to remain behind the decedent (i.e., to avoid entering the decedent's line of sight). This was especially important given that Deputy Vazquez did not have any cover.

8.3.2. But Deputy Vazquez also had additional considerations:

8.3.2.1. Given that the decedent was moving northbound in the southbound lanes of South Diamond Bar Boulevard, the longer Deputy Vazquez waited to act, the closer his line of fire would come to the white Tesla and to Deputy Barajas (see Figure 1). It is reasonable that Deputy Vazquez perceived that he had a diminishing window of time during which he could take decisive action to stop the decedent's progress toward the white Tesla and Deputy Barajas. If he did not act within that window, he risked the decedent getting too close to the white Tesla and Deputy Barajas. If this had happened, he would have been forced to withhold fire out of concern for unintentionally hitting the white Tesla (and its occupant) and Deputy Barajas.

---

## 12. Signature Page

12.1.  This report was produced on October 20, 2025.

12.2.  Signature of Joel Suss:

# EXHIBIT "C"

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
E-mail: dalekgalipo@yahoo.com
Hang D. Le (SBN 293450)
E-mail: hlee@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333; Fax: (818) 347-4118

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIE QUAN, individually and as successor in interest to BENJAMIN CHIN, deceased,<br><br>                    Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; MARISOL BARAJAS; HECTOR VAZQUEZ; and DOES 3-10, inclusive,<br><br>                    Defendants. | Case No. 2:24-cv-04805-MCS-KS<br><br>*Assigned to*:<br>Hon Mark C. Scarsi<br>Hon. Mag. Judge Karen L. Stevenson<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT JOEL SUSS, PHD FROM TRIAL**<br><br><u>Final Pretrial Conference</u>:<br>Date:   January 26, 2026<br>Time:  2:00 p.m.<br>Crtrm: 7C<br><br><u>Trial</u>:<br>Date:   February 10, 2026 |

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** that Plaintiff Jennie Quan hereby moves the Court, by way of this Motion in Limine No. 1, to exclude defense expert Joel Suss, PhD, from testifying on certain subject areas and offering certain opinions at trial in this matter. Plaintiff makes this Motion under Federal Rules of Evidence 401, 402, 403, 702, 703, 704.

**Statement of Local Rule 7-3 Compliance**: This motion is made following a conference of counsel during which no resolution could be reached.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the records and files of this Court, and upon such other oral and documentary evidence as may be presented at the time of the hearing.

DATED:  January 5, 2026         LAW OFFICES OF DALE K. GALIPO


By_____ */s/ Hang D. Le*_____
        Dale K. Galipo
        Hang D. Le
        Attorneys for Plaintiff

PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT JOEL SUSS, PHD FROM TRIAL

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This civil rights case arises from the officer-involved shooting death of Benjamin Chin on June 19, 2023 by County of Los Angeles Sheriff's Department Deputies Marisol Barajas and Hector Vazquez. Plaintiff now moves, by way of this Motion, to exclude Defendant's retained human factors expert from testifying at trial.

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;
> I       the testimony is the product of reliable principles and methods; and
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court has a "gatekeeping role" to screen expert testimony, and judges have discretion to determine whether such testimony is admissible, depending on its reliability and relevance. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-97 (1993); *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 147 (1999). "[T]he law grants the [court] broad latitude" in analyzing and determining the reliability of proffered expert witness testimony. *Kumho*, 526 U.S. at 139, 142. "The inquiry [under Rule 702] is a flexible one[,]" and its focus "must be solely on principles and methodology, not on the conclusions [the expert] generate[s]." *Daubert*, 509 U.S. at 594-95. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid," whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–593. "[A]ny step that renders

the analysis unreliable…renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PC Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994). Consequently, the Court may exclude an expert's opinions based on obvious mistake in the expert's investigation or reasoning process, *see* E.E.O.C. v. Freeman, 778 F.3d 463, 467 (4th Cir. 2015), when there are analytical gaps between the data and the opinion, *Conde v. Velsicol Chem. Corp.*, 24 F.3d 809 (6th Cir. 1994), or where the opinion is purely speculative, *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001), among other things.

Ultimately, Defendants have the burden for laying the proper foundation for the admission of their police practices experts' opinions and must do so by a preponderance of evidence. *Daubert*, 509 U.S. at 592. When objections are made, the Court must make a preliminary determination regarding the admissibility of such opinion and qualifications of the person attempting to officer such evidence. Fed. Rule Evid. 104(a); Fed. Rule Evid. 702, Advisory Comm.

## III.   ARGUMENT

The entirety of Dr. Suss's report appears to be opinions offered to advocate on behalf of the defendant deputies and to bolster their credibility without any showing that these opinions are tethered to any reliable method of analysis. Dr. Suss's discussion on "perception-response time" is simply an attempt to place some scientific gloss on argument that the defendant deputies conduct was reasonable as he fails to adequately apply the findings of the studies to the evidence in this case. He further attempts to use the studies to supplant the defendant deputies' under-oath testimony regarding their justification for the shooting. The vast majority of Dr. Suss's opinions consist largely of him offering justifications and making factual and legal arguments that the defendant deputies or their attorneys can provide to the jury without the need for expert opinion. Accordingly, Dr. Suss's testimony will not be helpful to the jury and would be unduly prejudicial to Plaintiff.

Respectfully submitted,

DATED:  January 5, 2026          LAW OFFICES OF DALE K. GALIPO


                                  By _____ */s/ Hang D. Le* _____
                                       Dale K. Galipo
                                       Hang D. Le
                                       Attorneys for Plaintiff

PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 1 TO EXCLUDE TESTIMONY OF
DEFENSE EXPERT JOEL SUSS, PHD FROM TRIAL