Thomas C. Hurrell, State Bar No. 119876
E-Mail: thurrell@hurrell-llp.com
Joseph K. Miller, State Bar No. 245685
E-Mail: jmiller@hurrell-llp.com
Jerad J. Miller, State Bar No. 334001
E-Mail: jjmiller@hurrell-llp.com
HURRELL-LLP
800 West 6th Street, Suite 700
Los Angeles, California 90017
Telephone: (213) 426-2000
Facsimile: (213) 426-2020

Attorneys for Defendants, COUNTY OF LOS ANGELES, MARISOL BARAJAS
and HECTOR VAZQUEZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

JENNIE QUAN, individually and as
successor in interest to BENJAMIN
CHIN, deceased,

        Plaintiff,

    v.

COUNTY OF LOS ANGELES;
MARISOL BARAJAS; HECTOR
VAZQUEZ; and DOES 3-10, inclusive,

        Defendants.

Case No. 2:24-cv-04805-MCS(KSx)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 2 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT EDWARD T. FLOSI FROM TRIAL**

[Assigned to Hon. Mark C. Scarsi, Courtroom "7C"]

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF

RECORD:

      Defendants MARISOL BARAJAS, HECTOR VAZQUEZ ("Defendant

Deputies") and COUNTY OF LOS ANGELES (collectively, "Defendants") hereby

submit their opposition to Plaintiff's Motion in Limine No. 2 to Exclude Testimony

of Defense Expert Edward T. Flosi from Trial.

/ / /

/ / /

/ / /

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Defendants retained Edward Flosi ("Flosi") to serve as their police practices expert regarding the detaining and shooting of Benjamin Chin ("Decedent"). Flosi concluded in his Rule 26 expert report that the Defendant Deputies' seizure and force against the Decedent conformed with standard police practices.   Plaintiff argues that Flosi is offering legal opinions and opinions on ultimate issues of law, and that he should be precluded from doing so.  She further seeks to preclude Flosi from offering opinions concerning "force science."   Plaintiff also seeks to preclude Flosi from offering opinions that she alleges are outside his expertise.

As to Plaintiff's first ground, as supported by case law, Flosi is permitted to consider the officers' beliefs in developing his opinions in this matter.  One of the crucial aspects of this case, and what the jury will have to determine, is whether the Defendant Deputies' beliefs that the Decedent posed an imminent threat of death or serious bodily injury when the Defendant Deputies shot at the Decedent were objectively reasonable under the totality of the circumstances known to the Defendant Deputies at the time of the shooting.  The law is clear that an peace officer's beliefs are to be considered in determining whether the peace officer's actions were objectively reasonable as required under the Fourth Amendment.

With respect to Plaintiff's second ground, Flosi is not offering any legal opinions or conclusions on ultimate issues of law.  He is permitted, however, to set forth the applicable standard governing uses of force, and opine on whether the officers comported their conduct to those standards.  Further, as discussed below, and as Flosi will be able to establish via his trial testimony, Flosi is qualified to opine on "force science."

Accordingly, Defendants respectfully request that the Court deny Plaintiff's Motion entirely.

/ / /

2

## II.    **LEGAL STANDARD**

Plaintiff's Motion in Limine No. 2 ("Motion") seeks to exclude Defendants' expert, Flosi. Federal Rule of Evidence 702 states that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the Supreme Court rejected the former *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), test of "general acceptance" for scientific evidence and held that the dual standards of "relevance" and "reliability" would determine the admissibility of expert testimony.

In applying Federal Rule of Evidence 702, the trial court exercises broad discretion regarding the admissibility of expert-technical evidence by performing a "gatekeeping role...to all expert testimony...." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004); see *Daubert v. Merrell Dow Pharms., supra*, 509 U.S. 579 at 590-92. A Court properly exercises this gatekeeping role to exclude expert testimony only where the "factual basis, data, principles, methods, or their application [of the expert's testimony] are called sufficiently into question" by the moving party because the expert has not used "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field...." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

Factors to consider in evaluating the reliability of an expert opinion are: (1) whether the theory, reasoning, methodology or technique can be and has been tested based upon objective/empirical criteria; (2) whether the theory, reasoning, methodology or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the theory, reasoning, methodology or technique; and (4) whether the theory, reasoning, methodology or technique utilized enjoys widespread acceptance. *Daubert v. Merrell Dow Pharms., supra*, 509 U.S. 579 at

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

593-94. The focus of such evaluation is on determining scientific or technical validity - and thus admissibility - by examining the methodology rather than the conclusions. *Id*.

Further, the Ninth Circuit has held that, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565 (citation and quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d 960, 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969-70; *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014). Moreover, once the Court is satisfied that such evidence is admissible, "challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id*. at 814.

### A.    Flosi is Permitted to Discuss the Defendant Deputies' Beliefs

Plaintiff seeks to exclude Flosi from discussing whether it was reasonable for the deputies to believe Chin posed an immediate threat and was about to shoot. Dkt. #67, p. 6:2-4; Exhibit A. She argues that such opinions should be excluded because they are "legal conclusions regarding the ultimate issues in this case." *Id*., at 6:1-2. Contrary to this argument, Flosi is permitted to discuss the Defendant Deputies' beliefs.

California's Peace Officer Standards and Training ("POST") teaches peace officers about the factors regarding use of force (which are consistent with the

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

4

*Graham* factors) and consideration of their beliefs in deciding to use deadly force. Moreover, law enforcement experts have been allowed to express opinions that rely upon their own training and experience and knowledge of POST. *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005). Thus, defendants intend to ask Flosi what POST teaches sheriff's deputies with respect to the factors regarding use of force and the consideration of their beliefs during a use of deadly force.

Further, objective reasonableness is analyzed based on "the perspective of a reasonable police officer at the scene, rather than with the 20/20 vision of hindsight." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). In *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), a law enforcement officer's actions were reasonable because the police believed the driver of a van had run over another officer. *Id.* at 551. In *Tennessee v. Garner*, 471 U.S. 1 (1985), the court held where deadly force is used, the officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury." *Id.* at 3. In *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), the court held, "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with the probabilities and depends on the totality of the circumstances" and "the substance of all the definitions of probable cause is a reasonable ground for belief." *Id.* at 371. In *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002), the court held "that the 'reason to believe,' or reasonable belief standard . . . embodies the same standard of reasonableness inherent in probable cause." In *Terry v. Ohio*, 392 U.S. 1 (1968), the court also considered the officer's stated beliefs in determining whether the beliefs were reasonable and whether they formed the basis for reasonable suspicion to detain a suspect. *Id.* at 27-28. Case law makes no real distinction between "reasonable belief" and "probable cause." *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991). Thus, a law enforcement officer's beliefs are relevant to the inquiry of objective reasonableness.

To further explain, here, the jury will be determining whether the Defendant

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

5

1  Deputies' beliefs were reasonable based on the totality of circumstances known to

2  them at the time they encountered and fired at the Decedent.  The jury has to know

3  what the Defendant Deputies' beliefs were to assess whether they were objectively

4  reasonable under the circumstances.  Flosi should be allowed to tell the jury all of the

5  facts on which he bases his opinions, including the Defendant Deputies' beliefs in the

6  materials he reviewed.  Without being told what those facts are, the jury will not be

7  able to determine Flosi's credibility and whether they should believe his opinions.

8  Plaintiff's disagreement with Flosi's opinions does not warrant their exclusion.

9  Plaintiff is free to cross-examine Flosi and challenge the bases for his opinions.

10 Defendants expect that the Defendant Deputies will be allowed to explain to the jury

11 why they shot at the Decedent, including their beliefs at the time; otherwise, the jury

12 will not have a full understanding of the events that unfolded, and they will not be

13 able to determine whether the Defendant Deputies' beliefs were objectively

14 reasonable.  It would be impossible for a jury to determine whether a defendant's

15 beliefs were objectively reasonable if they are not told what those beliefs were.

16 Therefore, this is also not a proper reason to exclude any of Flosi's opinions.

17  **B.     Flosi Does Not Offer Legal Opinions of Opinions on Ultimate**

18          **Conclusions of Law**

19       In her Motion, Plaintiff points to multiple portions of Flosi's report, and argues

20 that Flosi is improperly offering legal opinions and opinions on ultimate issues of law.

21 The eight opinions Plaintiff concludes are ultimate issues of the law are found on Dkt.

22 #67, p. 4:25-28 – 5:1-21. The opinions proffered by Flosi are appropriate and conform

23 with Ninth Circuit law regarding an expert's ability to opine on ultimate conclusions

24 of law.

25       Viewing his report, Flosi bases these opinions on his application of the facts of

26 this case to the applicable use of force standard from POST.  Ed Flosi Report, p. 27 –

27 42; Exhibit B. Of course, it is wholly appropriate for Flosi to base his opinions on

28 POST.  In *Smith*, *supra*, 394 F.3d 689, the Ninth Circuit held that a police practices

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

6

expert can rely on POST in opining whether an officer's conduct was proper. There, in "[d]iscussing whether the officers' conduct comported with law enforcement standards, the [plaintiff's] expert relied upon [POST], which are applicable to all state police officers and are a part of Department policy." *Id.* at 703. The expert "concluded that the officers could and should have used control holds to complete the arrest rather than to sic [the K-9] on him once they had him restrained on the ground." *Id.* The Ninth Circuit held that "[a] rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable." *Id.*; *see also Molina v. City of Visalia*, 2016 WL 8730723, *6 (E.D. Cal. 2016) (police expert allowed to express opinion on whether officers' conduct was consistent with POST and constituted part of totality of circumstances that led to their use of deadly force); *Engman v. City of Ontario*, 2011 WL 2463178, *5 (C.D. Cal. 2011) (experts can rely on POST in forming opinions); *Lopez v. Chula Vista Police Dep't*, 2010 WL 685014, *5 (S.D. Cal. 2010) (same).

Finally, Plaintiff points to Flosi's statement, "[b]ased on the totality of the circumstances related to the perceived level of resistance by Barajas (*sic* – this is referring to the Decedent's perceived level of resistance, not Deputy Barajas'), it can only be concluded that the level of resistance was high and weighs heavily towards the need to use significant levels of appropriate force including deadly force to stop Chin's actions and escape," and other similar quotes regarding the Defendant Deputies' use of force. Dkt. #67 p. 4:25 – 5:21. Flosi's conclusion that there was a legitimate lawful purpose for the Defendant Deputies to use force is based on his application of the facts to the applicable POST standard. Ed Flosi Report, p. 27 – 42. It is unclear how this is a problematic conclusion. Plaintiff provides no substantive argument showing it specifically is improper.

Accordingly, Plaintiff has not shown that Flosi is improperly offering any legal opinions or opinions on ultimate issues of law. Therefore, the Court should deny this Motion in its entirety.

C.    **Flosi Should not be Precluded from Testifying as to "Force Science"**

Plaintiff argues that because Flosi has no formal education, training or experience in human factors analysis, he cannot opine on "force science."  Dkt. #67 p. 8:3-9:26. However, Flosi's opinions concerning perception reaction time are based not only on his training from the Force Science Institute, but also on his experience in law enforcement and his work with POST.

Expert testimony on police practices and use of deadly force routinely is admissible in cases involving allegations of excessive use of deadly force. *Smith*, 394 F.3d at 703; *Davis v. Mason County*, 927 F.2d 1473, 1484-85 (9th Cir. 1991); *Larez v. City of Los Angeles*, 946 F.2d 630, 635, 647 (9th Cir. 1991); *Lawson v. Trowbridge*, 153 F.3d 368, 376 (7th Cir. 1998) (knowledge about police training is a specialized body of knowledge).  Police practices experts are non-scientific, and admissibility of their testimony is analyzed based on the experience of the expert and not the *Daubert* factors of peer review, publications, error rate, etc.  "The *Daubert* factors (peer review, publications, potential error rate, etc.) simply are not applicable" because "reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).  While *Daubert's* reliability requirement is still applicable to police practices experts, "a trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.*  The *Daubert* reliability standard is liberal and the courts often look to the expert's experience to determine reliability. *See* Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  Police practices experts have been allowed to express opinions that rely upon their own training and experience and knowledge of POST. *See Smith*, 394 F.3d at 703.

Finally, motions *in limine* are "not the appropriate vehicle for weighing the

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE (213) 426-2000

1  sufficiency of the evidence." *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690

2  F.3d 1354, 1378 (Fed. Cir. 2012).  Plaintiffs are free to test Flosi's credibility on cross-

3  examination.  Therefore, the Court should deny this Motion *in Limine* on this ground.

## III.    <u>CONCLUSION</u>

5        Based on the foregoing, Defendants respectfully request that the Court deny

6  Plaintiff's Motion in Limine No. 2.

7  DATED:  January 12, 2026          HURRELL-LLP

8

9

10                            By:      */s/ Jerad J. Miller*
                                    THOMAS C. HURRELL
11                                  JOSEPH K. MILLER
                                    JERAD J. MILLER
12                                  Attorneys for Defendants, COUNTY OF
13                                  LOS ANGELES, MARISOL BARAJAS
                                    and HECTOR VAZQUEZ
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

## DECLARATION OF JERAD J. MILLER

I, Jerad J. Miller, declare:

1.    I am an attorney duly licensed to practice before this Court and am an associate with Hurrell-LLP, attorneys of record for MARISOL BARAJAS, HECTOR VAZQUEZ, and COUNTY OF LOS ANGELES herein.  The facts set forth herein are of my own personal knowledge and if sworn I could and would testify competently thereto.

2.    The parties met and conferred on December 22, 2025 to discuss Plaintiff's Motion in Limine No. 2. An agreement regarding Ed Flosi's testimony was not reached, and Plaintiff proceeded with the filing of the motion herein.

3.    This declaration is made in support of Defendants' Opposition to Plaintiff's Motion in Limine No. 2 to Exclude Testimony of Defense Expert Edward T. Flosi from Trial.

4.     A true and correct copy of Plaintiff's Motion in Limine No. 2 to Exclude Testimony of Defense Expert Edward T. Flosi from Trial is attached as Exhibit A.

5.    A true and correct copy of Ed Flosi's report is attached as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 12, 2026, at Los Angeles, California.

_/s/ Jerad J. Miller_
Jerad J. Miller

HURRELL-LLP
800 WEST 6TH STREET, SUITE 700
LOS ANGELES, CA 90017-2710
TELEPHONE  (213) 426-2000

# EXHIBIT "A"

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
E-mail: dalekgalipo@yahoo.com
Hang D. Le (SBN 293450)
E-mail: hlee@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333; Fax: (818) 347-4118

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JENNIE QUAN, individually and as
successor in interest to BENJAMIN
CHIN, deceased,

                  Plaintiffs,

vs.

COUNTY OF LOS ANGELES;
MARISOL BARAJAS; HECTOR
VAZQUEZ; and DOES 3-10, inclusive,

                  Defendants.

Case No. 2:24-cv-04805-MCS-KS

*Assigned to*:
Hon Mark C. Scarsi
Hon. Mag. Judge Karen L. Stevenson

**PLAINTIFF'S NOTICE OF MOTION
AND MOTION IN LIMINE NO. 2 TO
EXCLUDE TESTIMONY OF
DEFENSE EXPERT EDWARD T.
FLOSI FROM TRIAL**

Final Pretrial Conference:
Date:   January 26, 2026
Time:  2:00 p.m.
Crtrm: 7C

Trial:
Date:   February 10, 2026

PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE TESTIMONY OF
DEFENSE EXPERT EDWARD T. FLOSI FROM TRIAL

1 | **TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS**
2 | **OF RECORD:**

3 |     **PLEASE TAKE NOTICE THAT** that Plaintiff Jennie Quan hereby moves
4 | the Court, by way of this Motion in Limine No. 2, to exclude defense expert Edward
5 | T. Flosi, from offering certain opinions and testifying on certain topics at trial in this
6 | matter. Plaintiff makes this Motion under Federal Rules of Evidence 702, 703, 704.

7 |     **Statement of Local Rule 7-3 Compliance**: This motion is made following a
8 | conference of counsel during which no resolution could be reached.

9 |     This Motion is based on this Notice of Motion, the Memorandum of Points and
10 | Authorities, the records and files of this Court, and upon such other oral and
11 | documentary evidence as may be presented at the time of the hearing.

13 | DATED: January 5, 2026          LAW OFFICES OF DALE K. GALIPO

15 |                    By_____*/s/ Hang D. Le*_____
16 |                         Dale K. Galipo
17 |                         Hang D. Le
                             Attorneys for Plaintiff

PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT EDWARD T. FLOSI FROM TRIAL

1  generate[s]." *Daubert*, 509 U.S. at 594-95. Reliability is determined by assessing

2  "whether the reasoning or methodology underlying the testimony is scientifically

3  valid," whereas relevance depends upon "whether [that] reasoning or methodology

4  properly can be applied to the facts in issue." *Id.* at 592–593. "[A]ny step that renders

5  the analysis unreliable…renders the expert's testimony inadmissible." *In re Paoli*

6  *R.R. Yard PC Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994). Consequently, the Court may

7  exclude an expert's opinions based on obvious mistake in the expert's investigation

8  or reasoning process, *see* E.E.O.C. v. Freeman, 778 F.3d 463, 467 (4th Cir. 2015),

9  when there are analytical gaps between the data and the opinion, *Conde v. Velsicol*

10 *Chem. Corp.*, 24 F.3d 809 (6th Cir. 1994), or where the opinion is purely speculative,

11 *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001), among

12 other things.

13      Ultimately, Defendants have the burden for laying the proper foundation for

14 the admission of their police practices experts' opinions and must do so by a

15 preponderance of evidence. *Daubert*, 509 U.S. at 592. When objections are made, the

16 Court must make a preliminary determination regarding the admissibility of such

17 opinion and qualifications of the person attempting to officer such evidence. Fed.

18 Rule Evid. 104(a); Fed. Rule Evid. 702, Advisory Comm.

19 **III.   ARGUMENT**

20      **A. Mr. Flosi's Legal Conclusions Should Be Excluded**

21      Throughout his report, Mr. Flosi offers a number of impermissible legal

22 conclusions regarding the incident and the defendant deputies' conduct and uses of

23 force. The opinions Mr. Flosi offers that constitute improper legal conclusions are as

24 follows:

25      1. The Los Angeles County Sheriff's Department (LASD) deputies had a
           legitimate law enforcement purpose and reasonable suspicion – based on
26         current law enforcement training – to contact and detain Chin. (Ex. 3 to Le
           Decl., Flosi Report at 20, 22).
27      2. The LASD deputies had a legitimate law enforcement purpose and probable

28

cause – based on current law enforcement training – to arrest Chin. (Ex. 3 to Le Decl., Flosi Report at 22, 24). A reasonable officer could have an honest and strong belief that Chin's actions were in violation of California Penal Code §148(a)(1). (*Id.* at 24).

3. The deadly force responses by Vasquez (sic) and Barajas were appropriate and reasonable to prevent a perceived imminent and credible threat of serious bodily injury or death. (*Id.* at 27).

4. Based on the totality of the circumstances known and perceived by the deputies, it would be reasonable for an officer in the same situation to believe that Chin was moving closer to available targets in preparation to shoot at people stopped in the roadway. (*Id.* at 33).

5. Based on the totality of the circumstances related to the perceived level of resistance by Barajas, it can only be concluded that the level of resistance was high and weighs heavily towards to need to use significant levels of appropriate force including deadly force to immediately and quickly stop Chin's actions. (*Id.* at 34).

6. Barajas reasonably believed several serious and life-threatening crimes had been comitted, were about to be (imminently) committed or being committed at the time of the event and specifically at the time of the deadly force applications. These crimes included: California Penal Code § 245(b)…California Penal Code § 245(d)(2)…. California Penal Code § 187(a)….California Penal Code § 664. (*Id.* at 34-35).

7. Based on the totality of the circumstances related to the perceived level of resistance by Barajas, it can only be concluded that the level of resistance was high and weighs heavily towards to need to use significant levels of appropriate force including deadly force to immediately and quickly stop Chin's actions. (*Id.* at 35).

8. Taking into consideration the facts and circumstances observed and perceived by Vasquez (sic) and Barajas prior to and at the time of the deadly force responses…a resonable officer could conclude that…Chin was an imminent threat of serious bodily injury or death. (*Id.* at 35, 41).

An expert may not provide testimony that amounts to a "legal conclusion[] as to the ulitmate issues in the case." *Torres v. City of L.A.*, 548 F.3d 1197, 1214 n.11 (9th Cir. 2008). "[T]he jury," not an expert, "is best suited to determine the reasonableness of an officer's conduct in light of the factual context in which it takes place." Sloman v. Tadlock, 21 F.3d 1462, 1468 (9th Cir. 1994). "In determining what constitutes a legal conclusion, courts may pay special attention to whether the expert uses "legally specialized terms." *Fatai v. Ramos*, No. 19-CV-603-DKW-WRP, 2023

1    WL 2390573, at *4 (D. Haw. Mar. 7, 2023). <mark>The opinions listed above are legal</mark>

2    <mark>conclusions regarding the ultimate issues in this case, e.g., whether it was reasonable</mark>

3    <mark>for the deputies to use deadly force, whether it was reasonable for the deputies to</mark>

4    <mark>believe Chin posed an immediate threat and was about to shoot,</mark> the level of

5    resistance Chin posed and the appropriate amount of force to respond to such

6    reasistnace, and utilize specialized legal terms such as "legitimate law enforcement

7    purpose," "reasonable suspicion," "probable cause," and "totality of the

8    circumstances." Thus, Mr. Flosi should be precludef from offering such legal

9    conclusions at trial. *See Est. of Risher v. City of Los Angeles*, No. CV 17-00995-

10   MWF (DTBX), 2025 WL 869028, at *6 (C.D. Cal. Jan. 22, 2025) (excluding similar

11   legal conclusion opinions by Mr. Flosi at trial) *Zuniga v. City of Los Angeles*, No.

12   2:22-CV-03665-CBM-(ASX), 2024 WL 4744370, at *2–3 (C.D. Cal. Oct. 7, 2024)

13   (same); *Glover v. City of Los Angeles*, No. 2:21-CV-09915-FWS-AS, 2023 WL

14   8586386, at *4 (C.D. Cal. Oct. 26, 2023) (same).

15        **B. Mr. Flosi's Opinions That Are Not Helpful to the Trier of Fact Should**

16           **Be Excluded**

17        Throughout his report, Mr. Flosi also speculates as to the position of

18   Decedent's right hand as Decedent walked down Diamond Bar Boulevard. Mr. Flosi

19   speculates that "based on the video evidence, it appears to (sic) Chin had his right

20   hand holding the grip of the rifle near the trigger guard." (Ex. 3 to Le Decl., Flosi

21   Report at 33; *see id*. at 15, 27). This opinion is speculative, not based on any

22   scientific, technical, or specialized knowledge, and is not helpful to the trier of fact.

23   Mr. Flosi's opinion as to where he believes Decedent's right hand is based on his

24   viewing of the deputies' bodyworn camera videos does not require any specialized or

25   technical knowledge but is simply an interpretation of the video evidence, which the

26   jury is more than capable of performing without an expert's help. *See Est. of Risher v.*

27   *City of Los Angeles*, No. CV 17-00995-MWF (DTBX), 2025 WL 869028, at *6 (C.D.

28

### C. Mr. Flosi's Opinions That Are Outside the Scope of His Expertise Should Be Excluded

In his report, Mr. Flosi offers a reaction-perception opinion to attempt to justify the deputies' uses of deadly force despite there being no threatening or furtive movement by Decedent with the weapon prior to any of the volleys of shots by claiming that the deputies were facing a quickly paced even and were forced to make time-compressed decisions. (*See* Ex. 3 to Le Decl., Flosi Report at 36-40). However, Mr. Flosi is not a human factors or behavioral science expert and does not have any formal training regarding reaction-perception responses. Instead, he bases his opinions on an inapplicable "Tueller drill," wherein the experiment that formed the basis of the drill involved a person with an edged weapon attempting to sprint 21 feet while an officer unholsters his firearm and shoots[1], the inapplicable Learning Domain 19 (Emergency Vehicle Operations), and training and certification from the much-discredited Force Science Institute. *See Alves v. Riverside Cnty.*, No. EDCV192083JGBSHKX, 2023 WL 2983583, at *7-8 (C.D. Cal. Mar. 13, 2023) (collecting sources). As one district court found,

> The Force Science Institute is widely regarded as a purveyor of unreliable pseudoscientific analysis engineered to justify officers' use of force, and its studies, virtually all of which are non-peer reviewed and non of which have been published in reliable scientific journals, enjoy little to or no acceptions within the relevant scientific community.

*Alves*, 2023 WL 2983583, at *7.

Courts have routinely excluded police practices experts who have no educational background in science, neurology, kinesiology, biomechanics, or psychology but only training from the Force Science Institute from offering opinions

---

[1] Dennis Tueller, *How Close is Too Close?*, SWAT Magazine, March 1983, https://uapdi.com/my/docs/tueller.pdf.

regarding reaction-perception time because they are not qualified to offer such opinions under *Kumho Tire Co. See Tovar v. City of San Jose*, No. 5:21-CV-02497-EJD, 2024 WL 4280950, at *21–22 (N.D. Cal. Sept. 24, 2024) (precluding defense's police practices expert from offering opinions based on scientific principals or analyses, including opinions regarding perception-reaction time due to lack of education, experience, and reliable methodology, despite expert being accredited by Force Science Institute); *Alves*, 2023 WL 2983583, at *7 (precluding defense's former police officer expert from testifying on topics of behavioral science, including time compression, because his accreditation from the Force Science Institute did not meet the *Daubert* standard for admissibility); *Dominguez v. City of Los Angeles*, No. CV174557DMGPLAX, 2018 WL 6164278, at *7–8 (C.D. Cal. Oct. 9, 2018) (precluding Mr. Flosi from offering opinions on perception-reaction time and "reactionary gap" despite his claims that they are "well-known law enforcement principle(s)" because police academies and training organizations are not the "relevant scientific community" for such concepts under *Kumho Tire Co.*). Additionally, Mr. Flosi's point that the deputies were face with a quick-paced event and were forced to make time-compressed decisions is obvious and could easily be understood by a jury without an expert reiterating this fact. *See Sanchez v. Jiles*, No. CV1009384MMMOPX, 2012 WL 13005996, at *35 (C.D. Cal. June 14, 2012) (precluding defense's human factors expert from offering opinions regarding the fast-moving, dynamic situation and the difficulty in immediately responding to outside stimuli as something a jury could obviously appreciate from every day life situations). Accordingly, Mr. Flosi's opinions regarding perception-reaction times, reactionary gaps, and related concepts as well as opinions based on those concepts should be excluded as they are outside the area of his expertise and are unhelpful to the trier of fact.

//

PLAINTIFF'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE TESTIMONY OF DEFENSE EXPERT EDWARD T. FLOSI FROM TRIAL

1    **IV.    <u>CONCLUSION</u>**

2            For the foregoing reasons, Plaintiff respectfully requests the Court preclude

3    defense police practices expert Edward T. Flosi from offering the opinions discussed

4    herein.

5

6

7    Respectfully submitted,

8

9    DATED:  January 5, 2026              LAW OFFICES OF DALE K. GALIPO

10

11

12                                          By_____*/s/ Hang D. Le*_____

13                                              Dale K. Galipo
                                                Hang D. Le
14                                              Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "B"

**Edward T. Flosi, M.S.**
Law Enforcement Practices Expert
Law Enforcement Trainer
Justitia Consulting
1519 E Chapman Ave #34
Fullerton, CA 92831
Cell: (408) 315-0520
Email: ed.flosi@gmail.com

1       I have been retained by Hurrell Cantrall as an expert witness in the civil action of Quan v County
2 of Los Angeles, et al. I am therefore submitting the following information and report as required by Rule
3 26 of the Federal Rules of Civil Procedure.

4       The findings and opinions in this report are based upon my review of the documents as
5 presented to me by counsel and other evidence related to this incident. These findings are an overview
6 analysis based on the information currently available.

7       My findings and opinions are formed from: (1) the materials I have reviewed to date thus far
8 which provides me with information concerning the facts and circumstances as perceived by the officers
9 about what occurred during this incident, and (2) how a reasonable officer would have acted when
10 presented with similar circumstances, based upon his or her law enforcement and other related
11 professional training and experience.

12       As is my custom and practice, I reserve the right to amend, alter, enhance or delete findings and
13 opinions based upon my receipt and review of any subsequent new information pertaining to this case.

14       I have been retained by the Santa Clara County District Attorney's Office on thirteen occasions.
15 In each of these cases I was consulted on the officer's use of force regarding a case where a defendant
16 had resisted, delayed or obstructed the officer's arrest process. In each of these cases, I was not
17 consulted until after the Santa Clara County District Attorney's Office had already made the decision to
18 prosecute the case believing the elements had been satisfied. I had not been consulted on any cases
19 prior to the filing of the case.

20       A more detailed list of my consultations/retentions and testimony history can be found in the
21 attached Curriculum Vitae.

22       In 2007, I was contacted by the San Mateo County District Attorney's Office to provide
23 testimony in a case where a police officer was being prosecuted. I had agreed to provide testimony to
24 assist in the prosecution of the officer but was prohibited from doing so by the San Jose Police
25 Department Assistant Chief of Police.

26       I have been retained as the "person most knowledgeable" witness in civil proceedings by the
27 San Jose City Attorney's Office on six occasions and have given depositions in three of the cases. These
28 cases involved my testimony regarding the San Jose Police Department Use of Force Policy and Training.
29 In one case, I provided consultation that the officers had acted outside of policy and training.

30       I have been consulted three times by the San Jose Police Department Internal Affairs Unit
31 regarding a complaint of excessive force. In these consultations, I was asked several questions regarding

**Edward T. Flosi, M.S.**
Justitia Consulting

1    It is my professional opinion that the LASD deputies' pre-force tactics were consistent with
2   current law enforcement training and practices considering the totality of facts and circumstances
3   known/perceived by them at the time.

4   **4. The deadly force responses by Vasquez and Barajas were appropriate and reasonable to prevent a**
5   **perceived imminent and credible threat of serious bodily injury or death. The deadly force responses**
6   **were appropriate and consistent with current law enforcement training standards in consideration of**
7   **the "totality of circumstances" presented to Vasquez and Barajas at the moments force was used.**

8    The location where the deputy involved shooting incident occurred were the southbound lanes
9   of Diamond Bar Boulevard, just north of Crooked Creek Drive.

10    Chin was wearing a black nylon body armor plate carrier and was armed with a black and white
11   colored AR15 style rifle which contained a rifle magazine inside the weapons magazine well. It is noted
12   that he video evidence appears to show that Chin's right arm is bent at the elbow and appears to be in a
13   position that would be holding the grip of the rifle near the trigger guard while the left arm is hanging
14   freely as he walks. The rifle in this position could be simply lifted with the right arm/hand and fired
15   without the need to place the left hand onto the fore stock of the rifle.

16    Barajas was armed with a Smith & Wesson, Model M&P 2.0, 9mm semi-automatic pistol. During
17   the round count after the incident, it was revealed that Barajas had a 17 round magazine and had 12 left
18   in the magazine. This would tend to show that Barajas may have fired 5 rounds. Barajas noted that she
19   was not aware of how many rounds were in the magazine prior to the incident and believed at first that
20   she fired 2-3 rounds. The video evidence appears to show that she fired 3 rounds.

21    Vasquez fired two slug rounds from the Remington, 870 Police Magnum, Pump Action Shotgun.

22   Barajas BWV

23    The video evidence appears to capture the sound of 5 gunshots. If it is accepted that Vasquez
24   fire 2 rounds, then it can be concluded that Barajas fired 3 rounds. The video appears to show the
25   following sequence of fire:
26   • Barajas at approximately 11:45:05
27   • Vasquez
28   • Barajas
29   • Barajas – Chin bends at waist
30   • Vasquez at approximately 11:45:15

31    Police officers are trained that they are permitted to use reasonable force to effect an arrest,
32   prevent the escape or to overcome the resistance of a suspect:

33    Any peace officer who has reasonable cause to believe that the person to be arrested has
34    committed a public offense may use reasonable force to:
35    • effect the arrest,
36    • prevent escape, or
37    • overcome resistance.

38    A peace officer who makes or attempts to make an arrest:

27

**Edward T. Flosi, M.S.**
Justitia Consulting

1    • need not retreat or desist from his efforts by reason of the resistance or threatened
2    resistance of the person being arrested
3    • shall not be deemed an aggressor
4    • shall not lose his right to self-defense by the use of reasonable force to effect the arrest
5    or to prevent escape or to overcome resistance.[24]

6    Police Officers receive training that the United States Supreme Court established how force
7    must be judged from an objectively reasonable standard (Graham v. Connor, 490 U.S. 386, 109 S.Ct.
8    1865 (1989)).[25] The Court's analysis began by considering the subject's Fourth Amendment right to
9    remain free from any unreasonable seizure against the government's interest in maintaining order
10   through effective law enforcement.

11   When reviewing and analyzing an officer's use of force under a standard of "objective
12   reasonableness," officers are trained that the Graham decision gave an overarching guideline to those
13   that are charged with analyzing an officer's force response. Officers are told that the calculus of
14   reasonableness must embody allowance for the fact that police officers are often forced to make split-
15   second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount
16   of force that is necessary in a particular situation.[26]

17   The California POST Learning Domain 20 workbook states, "In some instances, peace officers
18   may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions
19   must be made."[27]

20   The California POST Learning Domain 20 workbook states:

21   The Court noted that determining the objective reasonableness for the use of force must be fact
22   specific, and established the following components for determining reasonableness:

23   The reasonableness of a particular use of force must be...
24   1. judged from the perspective of a reasonable officer.
25   2. examined through the eyes of an officer on the scene at the time the force was applied, not
26   the 20/20 vision of hindsight.
27   3. based on the facts and circumstances confronting the officer without regard to the officer's
28   underlying intent or motivation.[28]

29   A reasonable officer is defined as would another officer, facing a similar set of circumstances,
30   act in the same way or use similar judgement.[29]

---

[24] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[25] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[26] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[27] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[28] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[29] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1    In addition to the guideline listed above, other important factors to consider include, but are not
2    limited to; (1) the severity of the crime at issue, (2) whether the subject poses an immediate threat to
3    the safety of the officers or others, (3) and whether the subject is actively resisting.[30]  These factors are
4    described as "governmental interests" and weighed as a totality of the circumstances and balanced
5    against the quantum (or level) of force used by the officers.  The quantum of force is determined by the
6    type of force option used and the manner in which it was used.

7    Since the Graham decision, officers are trained that other courts have added to and rearranged
8    the factors listed. Officers within the 9th Circuit have been trained to recognize these factors listed in
9    "importance" as:
10       1.   The threat of the suspect to officer/others
11       2.   The resistance of the suspect
12       3.   The "Pace of the Event"
13       4.   The severity of the crime at issue
14       5.   The nature of the escape attempt

15    Other factors that have been identified and that officers have been trained to understand that
16    may or may not be applicable to the specific situation are:
17       1.   Number of Officers vs. Suspects
18       2.   Were cover officers enroute or on-scene?
19       3.   Access to Potential Weapons
20       4.   Age; Size; Relative Strength
21       5.   Special Knowledge or Skill Level
22       6.   Injury or Exhaustion
23       7.   Mental Illness or Drug Usage
24            a.   Higher pain tolerance
25            b.   Unable to understand commands
26       8.   Prior Contacts
27       9.   Environmental Factors
28            a.   Lighting, space limitations, footing, crowds, traffic
29       10. Availability of other reasonable force options
30       11. Was there an opportunity to warn and was there a warning given?
31       12. Was the subject able to cease resistance and/or comply with commands?

32    Officers are trained that there are three general categories of force options, including:
33       •    Non-Deadly Force: Force which creates a minimal risk of injury
34       •    Intermediate Non-Deadly Force: Force which has a significant risk of injury
35       •    Deadly Force: Force which has a substantial risk of serious bodily injury or death[31]

---

[30] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[31] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1    Understanding the importance of what an officer reasonably believed based on facts and
2    circumstances known or perceived is paramount to the analysis of any force response by an officer. As
3    previously stated, the force must be judged from the perspective of a reasonable officer and examined
4    through the eyes of an officer on the scene at the time the force was applied. To understand the
5    perspective, one must understand the perception of the officer on scene. While it is important to learn
6    the perception of other involved parties to better understand the incident in an overall sense, the
7    appropriateness of the force response must rely upon the perception of the officer responding with the
8    force option.

9    The evaluation must be made from the perspective of the officer. In simple terms, the officer
10   does not need to be correct for his/her actions to be objectively reasonable under the totality of the
11   facts and circumstances known and perceived by the officer.

12   Perception is the process of applying stored knowledge to sensory input (see, feel, hear, smell,
13   taste) and forming an interpretation and is truly key to evaluating the reasonableness of any force
14   application. It is important to also note that perception is individual to each officer based on the facts
15   and circumstances known to the officer and his training and experience. It is important to also
16   understand that sometimes an action outside the expected can raise a perceived threat level.

17   In evaluating the objective reasonableness of an officer's use of force, there must be a
18   reasonable balance between; (1) "why" the officer used the force option (governmental interests), and
19   (2) "what" type of force option was used and "how" it was used (level/quantum of force).

20   One way police officers are trained to determine the reasonable level/quantum of force is to
21   examine the reasonably likely injury expectation of the force option.  It is important to evaluate the
22   expectation based on what the officer knew and perceived rather than the actual outcome as they can
23   be drastically different in some cases.

24   Police officers are trained that they need not use lesser intrusive force options that may be
25   ineffective or not feasible before using a reasonable force option for the facts and circumstances.
26   Considering all possible options may be difficult and even impossible in high-risk environments due to
27   the time pressure, task complexity, and environmental uncertainty. In these types of situations officers
28   often must rely on intuitive decision making during potential use of force encounters.

29   In any incident, there are uncertainties and there are numerous option choices available to the
30   officer(s) throughout the incident as it unfolds. Many of them are not well defined. Much of what
31   officers do is based on; (1) experience, and (2) the totality of the facts and circumstances
32   known/perceived by the officer. Manuals and training simply cannot cover everything. Officers do not
33   have the ability to predict the future with 100% certainty.

**Edward T. Flosi, M.S.**
Justitia Consulting

1        Officers are trained that there is no legal requirement that an officer choose the "best" or
2  "most" reasonable force, but one that is objectively reasonable under the totality of the circumstances,
3  and conforms to agency policy, federal and state law.[32]

4        In the California POST Basic Academy, officers receive training regarding the use of force.  On
5  two occasions while still an active peace officer I participated directly in assisting California POST review
6  and update the Learning Domain 20 (Use of Force) workbook giving me a unique understanding of the
7  content of the workbook and I base my opinions on these writings.  In the 2015 update, I participated
8  remotely.

9        By definition, the use of a firearm is deadly force.  Police officers are taught that deadly force is
10  force that creates a substantial risk of causing death or serious bodily injury.[33]

11        Police officers are trained that they may use deadly force under certain circumstances.

12  <u>Deadly Force Training Standards: "Force on Force"</u>

13        "Force on Force" refers to a situation when an officer perceives that a subject is presenting an
14  imminent threat of serious bodily injury or death to the officer or to others based on the totality of the
15  facts and circumstances known/perceived by the officer at the time.

16        Officers are trained that imminent means, "a threat of death or serious injury is "imminent"
17  when, based upon the totality of the circumstances, a reasonable officer in the same situation would
18  believe that a person has the present ability, opportunity, and apparent intent to immediately cause
19  death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a
20  fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm,
21  but is one that, from appearances, must be instantly confronted and addressed."[34]

22        Officers are trained that they are not required to wait to until the subject actually points a gun
23  at them or fires at them prior to responding with deadly force. Officers may respond with deadly force if
24  there is an objectively reasonable belief that the subject is about to shoot at the officers, based on the
25  totality of facts and circumstances known/perceived by the officers, to prevent the subject from firing at
26  the officers.

27        In training, officers are given examples of what an imminent threat of serious bodily injury or
28  death may include:
29          &bull;   A subject is reaching for/drawing a firearm with the apparent intent to use the
30              object/weapon against the officer or others.
31          &bull;   A subject is moving the muzzle of a firearm in the direction of an officer or others with
32              the apparent intent to use the object/weapon against the officer or others.

---

[32] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[33] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[34] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1      •    A subject is armed with a object/weapon perceived to be able to cause serious bodily
2          injury or death, and his/her actions and behaviors demonstrate the ability and apparent
3          intent to use the object/weapon against the officer or others.

4      Examples of this would be a subject; (1) drawing/accessing a firearm in the presence of an
5 officer, (2) moving the muzzle of a firearm towards an officer or another, (3) shooting at an officer or
6 another person, and/or (4) moving towards an officer or another person, with a weapon that could
7 reasonably be believed to be able to create serious bodily injury or death while having the ability to use
8 that weapon against the officer or another.

9      This is taught as "to protect life" and reads in relevant part, "a peace officer is justified in using
10 deadly force upon another person only when the officer reasonably believes, based on the totality of the
11 circumstances, that such force is necessary to defend against an imminent threat of death or serious
12 bodily injury to the officer or to another person."[35]

13      Reverence for all life is the foundation on which the use of deadly force rests. This reverence is
14 not solely directed at the subject, it includes the life of the officer him/herself and of others.

15      One of the primary objectives in using deadly force is to immediately stop the subject from
16 continuing their actions. To this end, police officers are trained to shoot for center mass of the subject
17 in order to increase the likelihood of hitting the subject in a location that would stop the subject. It is
18 well known that under stress conditions marksmanship will decrease and that shooting at smaller
19 targets such as hands or limbs becomes extremely difficult. These targets also may not have the desired
20 effect of immediately stopping the subject's actions. Targeting these non-center mass areas commonly
21 leads to missing the target completely due to the size and the speed of movement of the limbs and
22 hands. With each miss the officer takes more risk that the subject will continue his/her actions to cause
23 serious bodily injury or death.

24      If the situation has risen to the level that the officer reasonably believes that officer's or other
25 person's life is in imminent danger of serious bodily injury or death, officers are trained to shoot until
26 the threat is stopped. If officers are justified in firing at a suspect in order to end a severe threat to
27 public safety, they need not stop shooting until the threat has ended. Officers are trained that there is
28 no specific time requirement to pause between shots to reassess the threat. Officers are taught to
29 continually assess the threat while shooting.

30      The limitations of sidearms being able to immediately stop the threat are well-known. In
31 research involving "deanimation," a threatening subject's cessation of movement after he or she has
32 been shot, most cardiologists agree with the five-second rule. When blood pressure drops suddenly to
33 near zero, most people will still remain animated for at least five more seconds before ceasing to be a
34 threat. Five seconds is considered the minimum. Some cardiologists insist the real figure is closer to 10
35 seconds or more.

---

[35] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1   Officers are trained that they may reasonably use deadly force when confronted by a perceived
2   armed suspect in close proximity whose actions indicate an intent to attack. An officer is not required to
3   wait in order to find out if the suspect will, in fact, injure or kill the officer.

4   Officers are trained that if they are justified in firing at a suspect in order to end a severe threat
5   to public safety, they need not stop shooting until they perceive the threat has ended. Officers are
6   trained to shoot until the threat is stopped.

7   Learning Domain 20 demonstrates that officers do not need to always exhaust all other means
8   of force applications if the situation dictates a deadly force application as a reasonable option.  In the
9   immediate case in question, it would not be an appropriate tactical decision to try lesser intrusive means
10  to stop Chin based on the immediacy of the perceived threat and the need to immediately stop his
11  actions.

12  Officers are trained that they need not wait until the gun is actually pointed at them or until a
13  gun is fired at them to respond with deadly force to prevent the attack from happening. Based on the
14  totality of the circumstances known and perceived by the deputies, it would be reasonable for an officer
15  in the same situation to believe that Chin was moving closer to available targets in preparation to shoot
16  at the people stopped in the roadway.

17  It is noted that based on the video evidence, it appears to Chin had his right hand holding the
18  grip of the rifle near the trigger guard. In that position with that grip, a person could likely raise the rifle
19  and fire quicker than; (1) another person could react and move to safety, and/or (2) an officer could
20  respond with deadly force to effectively stop that action.

21  It is also noted that this rifle could have been fired one-handed.

22  Chin displayed no indications of surrender or compliance with the commands of the deputies to
23  drop the rifle.

24  A reasonable officer could conclude that there would be no legitimate reason for Chin to
25  continue walking forward towards others when holding the grip of the rifle near the trigger guard other
26  than to get closer to available targets and/or compromise the cover of Barajas.

27  It must be clearly pointed out that it is the actions of Chin that was creating this life-threatening
28  situation and forced the deputies to react quickly and decisively.

29  <u>Barajas</u>

30  <u>The threat to the safety of the officer or others</u>: Barajas articulated that the perceived/known
31  threat posed by Chin at the time of the deadly force applications was high and life-threatening.

32  Based on the totality of the facts and circumstances perceived/known at the time, Barajas
33  believed that Chin was moving closer to the driver of the white Tesla and herself in order to shoot at
34  them.

33

**Edward T. Flosi, M.S.**
Justitia Consulting

1    <u>The level of resistance by the subject</u>: The level of Chin's perceived resistance was articulated by
2    the individual detectives at the time of the deadly force application in the incident as high. The amount
3    and type of control is dependent on the level of resistance offered by the subject. The California POST
4    workbook for Use of Force (Learning Domain 20) describes four levels of resistance and provides
5    possible force option solutions for each level. In this incident at the time of the deadly force
6    applications, Chin's perceived resistance by Barajas can be classified as "life-threatening resistance."
7    Life-threatening resistance is defined as:

8        "Any action likely to result in serious injury or possibly the death of the officer or another
9        person."[36]

10    The California POST workbook suggests possible force options when a subject is perceived to be
11    displaying life-threatening resistance as:

12        "Utilizing firearms or any other available weapon or action in defense of self and others."[37]

13    Based on the totality of the circumstances related to the perceived level of resistance by
14    Barajas, it can only be concluded that the level of resistance was high and weighs heavily towards the
15    need to use significant levels of appropriate force including deadly force to immediately and quickly stop
16    Chin's actions.

17    <u>Pace of the Event</u>: The pace of this event at the moments that Barajas responded with deadly
18    force can only be described as tense, uncertain and rapidly evolving. Barajas' life defending decisions
19    had to be made quickly and in a time compressed manner. Officers are trained on how the pace of the
20    event can be a factor in the overall reasonableness evaluation.[38] During the deadly force application,
21    Barajas was forced to make time compressed decisions that required split-second life-threatening
22    decision making.

23    <u>Severity of the Crimes at Issue</u>: Barajas reasonably believed several serious and life-threatening
24    crimes had been committed, were about to be (imminently) committed or being committed at the time
25    of the event and specifically at the time of the deadly force applications. These crimes included:

26    • California Penal Code §245(b): Any person who commits an assault upon the person of
27      another with a semiautomatic firearm.
28    • California Penal Code §245(d)(2): Any person who commits an assault upon the person
29      of a peace officer or firefighter with a semiautomatic firearm and who knows or
30      reasonably should know that the victim is a peace officer or firefighter engaged in the
31      performance of his or her duties, when the peace officer or firefighter is engaged in the
32      performance of his or her duties.

---

[36] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[37] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[38] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1     •   California Penal Code §187(a): Murder is the unlawful killing of a human being, or a
2         fetus, with malice aforethought.
3     •   California Penal Code §664: Every person who attempts to commit any crime, but fails,
4         or is prevented or intercepted in its perpetration.

5       <u>The nature of the escape attempt</u>: At the moments leading into the deadly force response, Chin
6 was not perceived to have been attempting escape.

7       Taking into consideration the facts and circumstances observed and perceived by Vasquez and
8 Barajas prior to and at the time of the deadly force responses (as detailed in the section titled, "Details
9 of the Incident"), and based on the factors listed above in this section, a reasonable officer could
10 conclude that a subject with a ballistic vest and carrying an AR type rifle in a residential and heavy traffic
11 area; (1) after firing multiple rounds from the rifle, (2) after harming a loved one, (3) after failing to drop
12 the rifle after being ordered to do so multiple times, (4) continuing to walk towards occupied vehicles
13 and other law enforcement personnel, that Chin was an imminent threat of serious bodily injury or
14 death.

15 <u>Vasquez</u>

16       <u>The threat to the safety of the officer or others</u>: Vasquez articulated that the perceived/known
17 threat posed by Chin at the time of the deadly force applications was high and life-threatening.

18       Based on the totality of the facts and circumstances perceived/known at the time, Vasquez
19 believed that Chin was moving closer to the driver of the white Tesla and Barajas in order to shoot at
20 them.

21       <u>The level of resistance by the subject</u>: The level of Chin's perceived resistance was articulated by
22 the individual detectives at the time of the deadly force application in the incident as high.  The amount
23 and type of control is dependent on the level of resistance offered by the subject.  The California POST
24 workbook for Use of Force (Learning Domain 20) describes four levels of resistance and provides
25 possible force option solutions for each level.  In this incident at the time of the deadly force
26 applications, Chin's perceived resistance by Barajas can be classified as "life-threatening resistance."
27 Life-threatening resistance is defined as:

28       "Any action likely to result in serious injury or possibly the death of the officer or another
29       person."[39]

30       The California POST workbook suggests possible force options when a subject is perceived to be
31 displaying life-threatening resistance as:

32       "Utilizing firearms or any other available weapon or action in defense of self and others."[40]

---

[39] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[40] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1    Based on the totality of the circumstances related to the perceived level of resistance by
2    Vasquez, it can only be concluded that the level of resistance was high and weighs heavily towards the
3    need to use significant levels of appropriate force including deadly force to immediately and quickly stop
4    Chin's actions.

5    <u>Pace of the Event</u>: The pace of this event at the moments that Vasquez responded with deadly
6    force can only be described as tense, uncertain and rapidly evolving. Vasquez's life defending decisions
7    had to be made quickly and in a time compressed manner. Officers are trained on how the pace of the
8    event can be a factor in the overall reasonableness evaluation.[41] During the deadly force application,
9    Vasquez was forced to make time compressed decisions that required split-second life-threatening
10   decision making.

11   There is a well-known training principle in law enforcement referred to as the reactionary gap.
12   This is the time that it takes a person to perceive a stimulus and then react to that stimulus. On the
13   average, it takes a person approximately 0.7-1.5 seconds to perceive and react to the stimulus. These
14   times may vary depending on certain factors, but one thing is consistent within the principle. The person
15   that creates the stimulus (actor) is always ahead of the person having to react to the stimulus (reactor).

16   This is the reality of human performance and response. Reactions to changes in stimuli do not
17   occur instantaneously. For every second an officer is forced to wait, the subject has a higher potential of
18   successfully completing the attack that had already been perceived by the officer as imminent. Thereby
19   placing the lives of others at unnecessary peril due to the actions and behaviors of the subject. The
20   subject may also move to a position that limits the officer's ability to respond with deadly force in
21   defense of life.

22   There are examples of this response time gap in other than police use of force scenarios. A
23   person is ending a phone call and are reaching for the end button when the other caller says, "Oh, one
24   more thing" but your finger hits the button, ending the call. You heard it, it registered in your brain at
25   some level, but your brain could not catch up to the motor program already being executed to stop it.
26   Another example is a basketball player going up on a layup, but the ball is rejected by a defender. The
27   shooter's hands still complete the motion of the shot, even though the ball is no longer in his or her
28   hands. It takes time to register the change in stimuli and generate a response.

29   It has been known for decades that reaction time will increase proportionally to the number of
30   possible responses until a point in which it maintains constant despite the increases in possible
31   responses. This is known as Hick's Law, named after William E. Hick, who discovered it in 1952.

32   Tueller drill published in 1983. It is the principle that an average person can sprint 21 feet in
33   roughly 1.5 seconds. That is about the same time it takes an officer perceive the threat and draw a
34   firearm and fire two unaimed shots. The drill has been replicated by other researchers.

35   I have received advanced training in the reactionary gap and have read various studies on this
36   topic. I have seen and experienced this reactionary gap in practice. I have personally witnessed this

---

[41] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**

Justitia Consulting

1  reactionary gap thousands of times in training scenarios that I conducted with in-service and recruit
2  officers.

3      I was a lead instructor for Use of Force – cognitive (California POST Learning Domain 20) at the
4  South Bay Regional Training Consortium and/or the San Jose Police Department Academy for
5  approximately nine years.  In my capacity as a Use of Force – cognitive instructor for the San Jose Police
6  Department, I commonly taught the legal aspects of an officer's use of force and policy concerns as they
7  relate to use of force. In total, I have taught law enforcement use of force for about 20 years. As a use of
8  force instructor, I commonly taught and trained officers on perception-reaction time and on the ways
9  officers could enhance their reaction time. In POST Learning Domain 20, officers are taught that "[s]elf-
10  control reflects one's confidence in their skills and abilities which can be improved through training,
11  practice, and experience; thereby enhancing decision-making and reaction time." In my teachings on
12  Learning Domain 20, I have used lecture-based learning to reinforce tactics and techniques to
13  mitigate/shorten reaction times based on my education on the topic and on my own personal
14  experiences. As an instructor, I used scenario-based training to observe human performance issues and
15  to create strategies to mitigate reaction time and stress factors. In these scenario training settings, I have
16  witnessed perception/reaction time gaps thousands of times and used those examples in the debriefing
17  of the officer taking the training, including possible tactics/techniques to mitigate the gap in future
18  encounters. I have also been directly involved as a California POST committee member in two prior
19  revisions of the Learning Domain 20 Workbook and participated remotely in the 2015 revision.

20      I am a POST certified Force Options Simulator instructor. In order to become a Force Options
21  Simulator instructor, I had to attend a 40-hour instructor level course.

22      I was the lead FOS instructor for the SJPD In-Service Training Unit. I trained thousands of officers
23  in Santa Clara County.

24      I was the POST "Train the Trainer" instructor for this block of instruction.

25      I was a Force Options Simulator instructor for the South Bay Regional Training Consortium. I
26  trained hundreds of officers in the bay area.

27      The Force Options Simulator (FOS) is a tool used to train the concepts of an objectively
28  reasonable force response based on current law enforcement training guidelines and principles. The
29  student officer will face different scenarios shown on a screen. The student officer will interact with the
30  subjects on the screen and evaluate the subject's actions and behaviors. Some scenarios will resolve with
31  no force response and others will require some type of force response to stop a threat including some
32  that will require a deadly force response to stop an imminent threat of serious bodily injury or death.

33      When the student officer responds with deadly force, the simulator would capture the amount
34  of time that it took from when the threat began to when the deadly force was applied. As an instructor, I
35  saw this happen thousands of times and found it consistent with the findings of previous reactionary gap
36  studies.

37      In addition, during the portion of the training where the simulator is used, and when an officer
38  would respond with deadly force, we would replay the video portion showing the "hits" that were
39  recorded by the simulator. On numerous occasions, the time of the "hit" would show a different body

37

**Edward T. Flosi, M.S.**

Justitia Consulting

1   position of the subject portrayed on the screen as described by the officer during the debriefing of the
2   scenario. I would take this opportunity to discuss the reactionary gap to describe why the "hit" appeared
3   after the perception of danger.

4        In my capacity as a FOS instructor for the San Jose Police Department, I commonly taught the
5   legal aspects of an officer's use of force and policy concerns as they related to use of force. I also taught
6   the principle of reactionary gaps at the end of force responses.

7        I was an active member of the California POST FOS committee from 2000 up until my retirement.
8   This committee met approximately every six months to discuss training trends and use of force issues
9   within the curriculum.  I have been directly involved in developing the past and present curriculum for
10  the California POST FOS program.  I was the supervisor for the San Jose Police Department FOS program
11  from March 2009 to December 2011.

12       I am a POST certified Learning Domain 33 (Arrest and Control)  instructor. In order to become a
13  Learning Domain 33 instructor, I had to attend a 80-hour instructor level course.

14       I was a lead instructor for the SJPD Basic Academy. I taught hundreds of recruits.

15       I was a lead instructor for the South Bay Regional Training Consortium Basic Academy. I taught
16  hundreds of recruits.

17       This domain included the defensive principles of time and distance in reference to the
18  reactionary gap.

19       At one point, I was involved in creating a blocking drill to mitigate the reactionary gap. This drill
20  was taught and a significant improvement was noted in the recruits' performance.

21       I am a POST certified Learning Domain 19 (Emergency Vehicle Operations) instructor. In order to
22  become a Learning Domain 19 instructor, I had to attend a two instructor level courses.

23       The concepts of "Perception - reaction time" are included in this learning domain as shown
24  below:

25       The average driver's perception time is .75 seconds and their reaction time (which includes the
26  decision making process) is another .75 seconds. It takes a total of 1.5 seconds to perceive and
27  react to a problem on the road. Depending on the speed of the vehicle, a significant distance can
28  be covered during the 1.5 second period.

29       For example, a vehicle traveling at 60 MPH will cover 132 feet in 1.5 seconds during an average
30  driver's perception-reaction time. The calculation for the distance covered during 1.5 seconds is:

31       Speed x 1.1 = distance traveled in .75 seconds (perception time)

32       Speed x 1.1 = distance traveled in .75 seconds (reaction time)

33       (60 x 1.1 = 66) + (60 x 1.1 = 66) = 132 feet

34       A safe minimum following distance is at least three seconds of time between

35       vehicles. This allows sufficient time for a driver to react to sudden hazards.

38

**Edward T. Flosi, M.S.**
Justitia Consulting

1     For example, a vehicle traveling at 60 MPH should be approximately 270 feet from the vehicle in
2     front.

3     Speed x 1.5 = feet per second (approximately)

4     (60 x 1.5 = 90) x 3 seconds = 270 feet

5     I am a POST certified Law Enforcement Driving Simulator instructor. In order to become a Law
6     Enforcement Driving Simulator instructor, I had to attend a 32-hour instructor level course.

7     The Law Enforcement Driving Simulator is a tool used to introduce/train the concepts of
8     emergency vehicle operations in a simulated environment. This includes introduction to driving in a
9     simulator, decision making processes, emergency response and pursuit. The concepts of perception-
10    reaction time and the reactionary gap were covered during the instructor course. The same driving
11    principles on the reactionary gap, as provided in Learning Domain 19, apply to the LEDS training as well. I
12    taught the LEDS program for approximately 5 years.

13    It is noted that reaction time is referenced in the California DMV Handbook. In several places,
14    the handbook references allowing enough time to react to hazards.

15    After I retired, I co-authored a POST approved 8-hour course, "Use of Force Liability Prevention
16    for Supervisors." This was an 8-hour course that I designed and taught as a POST approved course
17    through my company. The course included aspects of the reactionary gap to help instruct reviewing
18    supervisors to understand certain human performance concerns. To lead into the discussion, one of the
19    PowerPoint slides read, "The actions of the individual subject will determine the type of force applied by
20    peace officers…subject actions cause officer reactions."

21    In September of 2006, I attended an eight (8) hour training session from the Force Science
22    Institute (FSI) taught by Dr. Bill Lewinski. I also attended and successfully completed the certification
23    process of the forty (40) hour Force Science Institute Certification Course in June of 2009. The FSI is
24    comprised of three divisions, including the Force Science Research Center (FSRC). The FSRC conducts
25    scientific research designed to increase the understanding of officer and suspect behaviors in force
26    encounters.  While much of the research has focused on deadly force encounters, the same human
27    performance factors apply to events involving less or non-deadly encounters.

28    In my training from the Force Science Institute and in my experience and training, I have learned
29    how the reactionary gap can have an effect on where and when a subject is shot versus when the officer
30    had perceived the subject as an imminent threat of serious bodily injury or death and made the decision
31    to respond with deadly force. As a law enforcement practitioner, I have experienced the
32    perception/reaction time gap several hundreds of times in both driving situations and in situations
33    dealing with subjects involved in use of force investigations.

34    The FSI Certification Course covers the basics of anatomy and physiology of perception, including
35    how people acquire, retain and recall memories; the biomechanics of officer movements in relation to
36    suspect movements during force encounters; reaction time; and exploring why an officer's or witness'
37    account of an incident might be in conflict with physical evidence.  In addition to conducting a case study
38    and presentation within a work group, I had to pass a 60-question, multiple-choice exam to graduate
39    from the course as a certified "Force Analyst." Attendees who successfully complete the program are

**Edward T. Flosi, M.S.**

Justitia Consulting

1  certified in "Force Science Analysis."  This designation attests that the holder has been trained to
2  recognize and articulate important psychological, biological, and physiological factors that can influence
3  human behavior and memory in force encounters and pursuit situations.

4       Dr. Lewinski published his article, "Why is the suspect shot in the back" in December 2000.

5       It is noted that Dr. Lewinski's reactionary gap study published in National Criminal Justice
6  Reference Service Virtual Library. This is part of the US DOJ Office of Justice Programs.
7  https://www.ojp.gov/ncjrs/virtual-library/abstracts/force-science-reactionary-gap.

8       Based on my training and experience in the area of the reactionary gap, I know that an officer
9  can perceive facts and circumstances that combine to make the decision to respond with force, but there
10  is a gap in time between the perception of those facts and circumstances and the actual application of
11  force. It is therefore possible that the situation has changed at the very moment of the force application.

12       The reactionary gap as it applies to an OIS can be simply explained as the measurable time
13  between when an officer recognizes the threat and the time that the officer reacts to the threat. The
14  time would necessarily include; (1) the sensory perception of the subject's action(s) that have created an
15  imminent threat of serious bodily injury or death, (2) the decision to respond to the threat, (3) the motor
16  movements of bringing the firearm into a firing position and gaining a sight picture, and (4) the motor
17  movements to fire the gun.

18       At the time that an officer makes the decision to respond with a firearm, the officer would need
19  to change his/her focus onto his/her front sight. Without changing focus to the front sight, an officer
20  would not be able to be as accurate with his/her shooting and would; (1) create a danger to people in
21  the background that were not necessarily in the perceived line of fire, and (2) not be able to stop the
22  threat effectively by missing the target.

23       It is noted that this change in focus may cause the officer to lose some specific focus on the
24  subject, but the officer would still be able to see gross movements to help determine if the threat has
25  stopped. It is also noted that bringing the firearm up into the officer's line of sight would necessarily
26  create some visual obstruction as to what is happening below the officer's firearm and extended arm(s).

27       It must be noted that just as there is a reactionary gap at the beginning of an action (the time
28  between when an officer recognizes the threat and the time that the officer reacts to the threat), there is
29  a reactionary gap at the end of an action (the time that an officer is able to recognize that a threat has
30  stopped and the time that the officer is able to discontinue the force response). Simply put, an officer
31  that is in a perceived life-threatening situation must first perceive that the threat has stopped through
32  sensory input before he/she can physiologically react and stop firing. I have seen this reactionary gap at
33  the end of an action hundreds of times in Force Option Simulator training.

34       In previous cases that I was retained on involving an officer's force response, I have made this
35  observation in Rule 26 reports and have testified in federal court and state court on the effects of the
36  reactionary gap.

37       <u>Severity of the Crimes at Issue:</u> Vasquez reasonably believed several serious and life-threatening
38  crimes had been committed, were about to be (imminently) committed or being committed at the time
39  of the event and specifically at the time of the deadly force applications. These crimes included:

40

**Edward T. Flosi, M.S.**
Justitia Consulting

- California Penal Code §245(b): Any person who commits an assault upon the person of another with a semiautomatic firearm.
- California Penal Code §245(d)(2): Any person who commits an assault upon the person of a peace officer or firefighter with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties.
- California Penal Code §187(a): Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.
- California Penal Code §664: Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration.

The nature of the escape attempt: At the moments leading into the deadly force response, Chin was not perceived to have been attempting escape.

Taking into consideration the facts and circumstances observed and perceived by Vasquez and Barajas prior to and at the time of the deadly force responses (as detailed in the section titled, "Details of the Incident"), and based on the factors listed above in this section, a reasonable officer could conclude that a subject with a ballistic vest and carrying an AR type rifle in a residential and heavy traffic area; (1) after firing multiple rounds from the rifle, (2) after harming a loved one, (3) after failing to drop the rifle after being ordered to do so multiple times, (4) continuing to walk towards occupied vehicles and other law enforcement personnel, (5) taking ahold of the rifle in what appeared to be in preparation to fire it at the people stopped in the roadway first shot by Vasquez, and (6) then turning towards Vasquez while taking ahold of the rifle in what appeared to be in preparation to fire it – second shot by Vasquez, that Chin was an imminent threat of serious bodily injury or death.

Additional Commentary: Warning

The video evidence shows that Barajas told Chin to put the gun down approximately 7 times prior to her first shot over a time frame of approximately 19 seconds.

It is noted that the complaint alleges that the deputies failed to provide a warning prior to their deadly force response.

Officers are trained that the evaluation of whether their force response would be objectively reasonable may include whether there was an opportunity to warn about the use of force prior to force being used and, if so, was such a warning given.[42]

Officers are trained that they should give "some warning" prior to a deadly force response "where feasible." The training does not dictate any particular language that must be used.[43]

The warning may include – based on the time allowed by the subject's actions and behaviors – that the officer is a law enforcement officer and that deadly force may be used. In certain situations,

---

[42] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation
[43] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

**Edward T. Flosi, M.S.**
Justitia Consulting

1   officers are trained that they may not need to give a warning if the officer has objectively reasonable
2   grounds to believe the person is aware of those facts.[44]

3       The warning must take into consideration the pace of the event and the totality of facts and
4   circumstances at the time. In tense, uncertain and rapidly evolving situations when an officer reasonably
5   believes that he/she is facing a life-threatening imminent threat of serious  bodily injury or death, there
6   may not be enough time allowed by the subject's actions and behaviors to give any warning at all.

7       In these situations, officers must focus on immediately stopping the subject from continuing
8   their actions. Any delay in stopping the subject's actions by formulating and providing a verbal warning
9   may create an increased and unnecessary danger to the officer or others.

10      In other situations, there may only be time allowed by the subject's actions and behaviors to
11  give a short warning.

12      In some situations, where time and space allow and based on the subject's actions/behaviors, an
13  officer may be able to provide a warning that would include a command and a consequence (i.e., "Drop
14  the gun or I will shoot you!").

15      Taking into consideration the facts and circumstances observed and perceived by Vasquez and
16  Barajas prior to and at the time of the deadly force responses (as detailed in the section titled, "Details
17  of the Incident"), and based on the factors listed above in this section, it is my professional opinion that
18  the deadly force responses by the deputies were appropriate and reasonable to prevent a perceived
19  credible threat of injury created by Chin's actions and behaviors. The deadly force responses by Vasquez
20  and Barajas were appropriate and consistent with current law enforcement training standards in
21  consideration of the "totality of circumstances" presented to them at the moments non-deadly force
22  was used.

23  **5. There is no independent and objective evidence to support a claim that the LASD deputies denied**
24  **Chin of medical care. Indeed, this claim is demonstrably false.**

25      A simple review of the material and video evidence reveals that this claim is unsupported and
26  demonstrably false. The following is shown clearly in Barajas' BWV:
27  • The last shot was at approximately 11:45:15
28  • The approach to Chin began at approximately 11:47:07
29  • Contact with Chin at approximately 11:47:17
30  • Chin was handcuffed at approximately 11:47:40
31  • Placed on side while searching
32  • A deputy confirmed that the fire department personnel was responding at 11:47:58
33  • The unhandcuffing of Chin began to render medical aid at approximately 11:48:16
34  • Fire department personnel on scene at approximately 11:48:42
35      After being shot, Chin fell next to the rifle. There would be a legitimate tactical need to get a
36  shield and contact team formed with non-deadly and deadly force options prior to moving to where Chin

---

[44] California POST Basic Academy Workbook Learning Domain 20 – Use of Force/De-escalation

42

**Edward T. Flosi, M.S.**
Justitia Consulting

1    with writing various policies for the agency. Prior to these policies being enacted, they were reviewed by
2    the San Jose City Attorney's Office. In this assignment, I learned how to review and write agency policy
3    that was; (1) consistent with current law enforcement training and practices, and (2) consistent with
4    Constitutional standards.

5          It is my professional opinion that there is no objective and independent evidence that the LASD
6    maintains unconstitutional customs, practices and/or policies.

7          I would so testify to the aforementioned findings and opinions under penalty of perjury if called
8    upon in any subsequent civil proceedings. Signed under penalty of perjury in accordance with the laws
9    of California and of the United States on October 20, 2025, in Fullerton, California.

10   Respectfully submitted,

11

12   Edward T. Flosi, M.S.
13   Justitia Consulting, Inc.