# EXHIBIT "A"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE MARK SCARSI, U.S. DISTRICT JUDGE

JENNIE QUAN,

                    Plaintiffs,

        vs.                              Case No. 24-cv-4805

COUNTY OF LOS ANGELES, et al,

                    Defendants.
_____/

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 2
Wednesday, February 11, 2026
8:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

Q    And you did have some information that someone may have potentially been stabbed?

A    That's correct.

Q    But you did not know the severity of that; is that fair?

A    That's correct.

Q    When you spoke to Mr. Chin's mother, did you have the impression that she may be the victim of the stabbing?

A    I did.

Q    Did you ask her where she was stabbed?

A    No, I didn't.

Q    Did you ask her if she needed medical attention?

A    No, I didn't, because unfortunately, at that time we got to the scene where Mr. Chin was, and because there was an active threat, unfortunately, we had to focus our attention to the threat to make sure no more people would get hurt, try to prevent that, yes.

Q    Okay.  Up to that point in time, the only person you had information that had been injured in any way would have been Mr. Chin's mother?

A    That's correct.

Q    And your understanding is that she was not shot, but she may have been stabbed?

A    That's correct.

Q    And when you saw her, was she standing upright?

A    Yes.

**UNITED STATES DISTRICT COURT**

12

Q    Was she able to walk, based on your observations?

A    It appears she was, yes.

Q    Was she able to talk?

A    Yes.

Q    And up to that point in time, was it your understanding that she was the only known victim to you?

A    Yes.

Q    And the only known victim being Mr. Chin's mother, is the one that asked you or pled with you not to shoot him -- not to hurt him; is that fair?

A    Yes.

Q    And then some seconds later, you shot and killed her son; is that also fair?

A    Yes.

Q    Were you aware that there were other deputies on scene besides yourself and Deputy De La Torres?

A    Yes.

Q    And did you understand some of them were more north of you?

A    At some point, I heard a radio transmission from who I now know was Deputy Barajas, who said she was detained at gunpoint.

Q    Okay.  Then I think we looked at some exhibits yesterday where we saw, I think, the white Tesla and Deputy Barajas's vehicle?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    And then we saw another vehicle next to Deputy Barajas, but you understood was an unmarked vehicle?

A    Yes.  After the fact, I realized that it was an unmarked police vehicle.  I didn't realize it was a police vehicle at the time of everything was unfolding.

Q    Your understanding now is there were two deputies associated with that vehicle?

A    Correct.

Q    I think you gave us the names yesterday, one of them was Deputy Holland?

A    Yes.

Q    The other again?

A    Deputy Toves.

Q    To your knowledge, did either of those deputies use deadly force?

A    No, I believe not.

Q    At some point you decided to leave the cover of Deputy Brodwicki's vehicle; is that correct?

A    Yes.

Q    And when you left cover, you would have had the shotgun with you?

A    Correct.

Q    Loaded with the two slugs?

A    Yes.

Q    One of your concerns or thoughts at the time was cross

**UNITED STATES DISTRICT COURT**

fire?

A    Yes.

Q    You did not want to be shooting in a direction where other deputies or civilians were in the background?

A    Correct.

Q    At some point, as you were on the sidewalk, you felt you had a good background with respect to Mr. Chin?

A    Yeah, I believe there was a safe backdrop.

Q    Right.  And once you saw that safe background, it was shortly after that that you fired your shot; isn't that true?

A    Yes.  Shortly after I saw Mr. Chin's arm take that position, where it appeared to me he was gripping the firearm stock.

Q    We're going to get to that in a second.

But you fired very soon after you saw what you thought was a clear background or backdrop?

A    I fired when I saw his hand go to the stock, sir.

Q    Was the fact that you had a clear background or backdrop a factor in your decision to fire?

A    No.

Q    When you heard the first shot, were you expecting it at that point?

A    I wasn't expecting anything.

Q    And when you heard the first shot, you observed Mr. Chin at that time?

**UNITED STATES DISTRICT COURT**

Are you able to see this image on your screen?

A    Yes, sir.

Q    And in this image, would you agree that Mr. Chin is more upright as opposed to the image we just saw with him bent over forward?

A    It appears that way, yes, sir.

Q    Would you also agree he's not facing you in this image?

A    Yes, it appears that way.

Q    Would you agree that his upper body is generally facing straight ahead or north?

A    It appears that way, sir.

Q    And again, in this image, sir, do we see what appears to be one of your casings?

A    Yes, sir.

Q    From looking at this image, would you agree that Mr. Chin is not turned toward you?

A    Yes, sir.

Q    Would you agree that he's not pointing the weapon at anyone?

A    To me it appears, sir, that he, again, to be focusing on -- that just disappeared.

            MR. GALIPO:  We will get that back up.

BY MR. GALIPO:

Q    Go ahead, Deputy.

A    If you focus on Mr. Chin, you will see his right arm how

**UNITED STATES DISTRICT COURT**

the upper part of his arm extends back, his elbows 40 at 90 and his forearm goes in.   It appears to me at that point he is grabbing the grip of the handgun.

At that point with that grip, he can shoot.

Q    Okay.   So are you saying, sir, that this was his approximate position when you fired your shot?

A    Yes, sir.

Q    So I want to just break down what you are saying about his right arm and elbow.

It appears to be bent?

A    Yes, sir.

Q    Would you agree that when looking at the video, and based on your recollection, at the time if you look at Mr. Chin's right arm, it essentially is in the same position the entire time he's walking?

A    As I testified yesterday, sir, that might be the case, but when I fired my round is when I became aware of it.

Q    Can you see the rifle in this image?

A    Not clearly, sir.

Q    You agree you could not see Mr. Chin's right hand, is that fair?

A    Yes.

Q    So when you say you thought his right hand was grabbing the rifle, you would believe you could not see his right hand; is that a fair statement?

**UNITED STATES DISTRICT COURT**

Q    We see a patrol vehicle and the white Tesla?

A    Correct.

Q    And then do you recall Mr. Chin being in this area on the roadway in this general position at some point before you fire?

A    Yes.

Q    And then if we could look, please, at Exhibit 48-3.

Again, similar photo; in this photo, we can see the patrol vehicle and the other vehicle next to the curb that we were referencing earlier?

A    Yes, sir.

Q    And again, would you agree at this point, Mr. Chin is not pointing the rifle at anyone?

A    Again, it appears his hand is bent, but no, it doesn't look -- I can't see the rifle.

Q    You can't see the rifle, let alone seeing him pointing it at anyone; is that a fair statement?

A    I think a fair statement would be, I can't see the rifle on this photo.

Q    Well, let's be very clear.

Did you at any time, before you fired your first shot, see Mr. Chin pointing the rifle at anyone?

A    I could see the rifle slung over his shoulder on his right side, carried, like, a ready position.

Q    Let me try the question again.

Did you see at any time before you fired your first

UNITED STATES DISTRICT COURT

Q    Are you saying when you say he came up, are you saying you saw him coming up with the rifle before your -- let's take the first shot, first of all.

Did you see him coming up with the rifle before your first shot?

A    I fired my first shot when I saw his arm bent and gripped the stock.

Q    Well, are you saying you did not see the rifle come up at the time of your first shot?

A    I'm saying, yes, that I saw him grip the stock when I fired my first shot, sir.

Q    But just so we're clear, you did not see the rifle coming up; is that correct?

A    Correct, sir.

Q    And then you say you saw his hand gripping somebody but you already told us you couldn't see his hand; is that correct?

A    I couldn't see his hand, his arm was in the position for me to believe he had gripped that weapon.

Q    Now, the second shot, which you are telling us you can't tell from looking at this, 49-7, whether it's your first shot or second shot.

Is that what you are saying?

A    I don't know which one this is, sir.

Q    Are you saying, sir, you saw the rifle coming up before your second shot?

UNITED STATES DISTRICT COURT

A    I'm saying it started, yes, sir.

Q    Did you actually see it coming up before you fired your second shot?

A    Sir, it was one fluid rapidly evolving scene, and if you play the video, as I mentioned, you guys will see that the rifle comes up, all the way up, and around up over his head and he tosses it above his head.

Q    Sir, the rifle on the video, comes up and over his head after you struck him in the back with your second shot, true?

A    You might perceive it that way, but that is not what I perceived at the time of the incident.

Q    But you are telling me what the video shows, I thought you were saying what the video shows?

A    I never mentioned anything about video, sir.

Q    I thought you said you could see on the video?

A    Sorry, can you clarify, because you are confusing me a little bit.

Q    And are you also still saying that he was turning towards you and the rifle was coming in your direction when you fired the second shot?

Is that your testimony?

A    I did perceive that, yes, sir.

Q    You are saying you fired the second shot to protect yourself, because you thought he was going to shoot you?

A    I thought he was going to shoot me or shoot someone in

**UNITED STATES DISTRICT COURT**

front of him.  He had the opportunity to do both.

Q    Right, but would you at least agree with me, sir, that to fire that weapon, you, at least, have to have a hand on the trigger?

A    Absolutely, you have to pull the trigger, yes, sir.

Q    Would you agree if you are going to shoot someone, you would have to point the rifle at someone?

A    Not necessarily.

MR. GALIPO:  Now, I'm going to show you some other exhibits, Your Honor.

We have an agreement with some parts of Exhibit 13, Your Honor.  And I could give the Court and the clerk the numbers.

So we have -- hold on.  It's actually Exhibit 48, I apologize.

So we have, by agreement, 48-5, 48-6, 48-7, 48-10, 48-11, 48-13, and 48-4.

I would move to admit these by agreement.

THE COURT:  Any objection to those pages coming into evidence?

MR. HURRELL:  No, Your Honor.

THE COURT:  Okay.  48-5, 48-6, 48-7, 48-10, 48-11, 48-13, and 48-4 are in.  You can publish them.

(Exhibits 48-5, 48-6, 48-7, 48-10, 48-ll, 48-13, and 484 received into evidence.)

BY MR. GALIPO:

Q    We will start with, please, 48-4.

    By the way would you agree based on your training, if Mr. Chin never raised the rifle or turned towards anyone that it would be in appropriate to shoot him?

A    Mr. Chin never -- can you repeat that?

Q    Sure.  Would you agree if Mr. Chin never raised the rifle or turned towards anyone with the rifle, based on your training, it would be inappropriate to shoot him?

A    That's incorrect, sir.

Q    Did you say correct or incorrect?

A    Incorrect, sir.

Q    Do you recall testifying in your deposition under oath that if he never raised the rifle or turned towards anyone, it would be inappropriate to shoot him?

    MR. HURRELL:  Objection.  That is inappropriate in the deposition.

    THE COURT:  Counsel, do you want to use the deposition to try to impeach the witness?

    MR. GALIPO:  That would be fine, Your Honor.

    May I have one moment, Your Honor?

    THE COURT:  Sure.

    MR. GALIPO:  I would like to refer the Court and counsel to the deposition of Deputy Vazquez, page 45, Line 15, to 46, Line 4, and offer to read, please.

    Again, yeah, I could start at Line 15 to page 46 Line 4.

he never raised it towards anyone, what did you have in mind, what steps did you have in mind to deescalate the situation further and let it play out?

A    In that situation, it would have been a very difficult thing to do, but my major concern would be to evacuate civilians out of the line of fire and danger, sir, that would be my main concern.

Q    Are you trained on -- oh here, we're seeing, I guess Exhibit 48-4, and does this appear to be an image from Deputy Barajas's body-worn camera?

A    It does.

Q    And can you see what appears to be two arms holding a handgun over the door?

A    Yes.

Q    And can you see Mr. Chin, from this perspective, in this image?

A    His upper body, yes.

Q    Before I forget, do you have training on the 40 millimeter?

A    I do.

Q    Is that a less lethal option you are trained on?

A    It is.

Q    That can be fired from a distance?

A    Yes.  It's a less lethal weapon that fires rubber batons, which are meant to inflict some type of pain to try to gain

**UNITED STATES DISTRICT COURT**

cooperation.

It wasn't something that was considered at this time because this was a lethal situation.

We couldn't address that with a baton when he was holding a rifle.

And in addition to that, the fact that this man was wearing a bulletproof vest that is meant to stop bullets, a baton would not cause the same effect over that heavy armor.

Q    Deputy Vazquez, I was only asking you if you had training on that?

A    I thought I had to address the jury and explain what that was, sir, I apologize.

Q    When you are talking about whether it was considered or not, whether he had a vest, I just want to know if you had training on it?

A    I have.

Q    And that is a less lethal option, correct?

A    Correct.

Q    And that could be fired from a distance?

A    Correct.

Q    The idea is it causes pain, sometimes serious injury to try to gain compliance without having to use lethal force?

A    It can, yes.

Q    Is that shot from a rifle?

A    Yeah.  I would call it a rifle.

MR. GALIPO:  May I confer with Ms. Le, for a moment?

THE COURT:  With the video clips, the reason why I'm being specific about it, is you won't have the ability to watch the video clips back in the jury deliberation room.  If you see something, and you want to see it again, let's say during deliberations, you want to see this video 1-1, you can come back and we can play it.

If the whole video is admitted, which could be several minutes, then it's not clear what you would want for see, so that's why I'm making sure we identify each segment that is played to you with a separate number.

So if you wanted to see that number, we can come back to it.

(Exhibit 1-1 received into evidence.).

MR. GALIPO:  Thank you, Your Honor.  This is from Exhibit 1, we will mark it 1-1.

THE COURT:  Yes.

MR. GALIPO:  We're going to play from 11:41:51, which is the time on the actual Exhibit 11:41:51.

(Audio/video played in open court.)

MR. GALIPO:  Could we just have one moment, Your Honor, to fix that?

(Audio/video played in open court.)

MR. GALIPO:  If we could stop it now, we stopped it at 11:45:7, Your Honor.

UNITED STATES DISTRICT COURT

We're going to play now a portion of Exhibit 2, which is from the body-worn camera footage of Deputy Barajas.

THE COURT:  Can we call this 2-1?

MR. GALIPO:  2-1.  That would be great.

THE COURT:  Any objection?

MR. HURRELL:  No, Your Honor.

(Exhibit 2-1 received into evidence.)

MR. GALIPO:  We're going to start Exhibit 2-1.  We will start at 11:44:08, that is the time listed on the exhibit in the upper right.

(Audio/video played in open court.)

MR. GALIPO:  We can stop it again at 11:45:46, Your Honor.

Next, we would like to play Exhibit 3, by agreement, which is the two videos we just saw synced at the time frame of the shooting.

THE COURT:  Okay.  Any objection to that?

MR. HURRELL:  None, Your Honor.

THE COURT:  Exhibit 3 is in evidence.

(Exhibit 3 received into evidence.)

(Audio/video played in open court.)

MR. GALIPO:  Stop it right there.

BY MR. GALIPO:

Q    Did you hear any shots fired after your last shot?

A    No.

UNITED STATES DISTRICT COURT

calls for service or arrest someone for a crime, it is my duty to further investigate those cases.

If a person was arrested, it's my job to take those cases to the District Attorney's Office, and work with them and try to levy charges against these people.

If someone wasn't arrested, it's my duty to try to investigate and identify a person responsible for whatever crime was committed.

Q    Detective Vasquez, I want to take you to June 19th, 2023, the day of this incident, okay?

A    Yes, sir.

Q    Did you receive a radio call concerning what we have been talking about here in court?

A    Yes, sir.

MR. HURRELL:  I would like to move for admission Exhibit 134-1, which is the dispatch audio.

THE COURT:  Any objection?

MR. GALIPO:  No objection.

THE COURT:  134-1 is in evidence and can be published.

(Exhibit 134-1 received into evidence.)

BY MR. HURRELL:

Q    Detective Vasquez, I would like to play for you the audio transmission, if you could listen to it, please?

(Audio played in open court.)

UNITED STATES DISTRICT COURT

MR. GALIPO:  Your Honor, may I have one moment to confer with counsel?  I think we have the wrong exhibit number.

THE COURT:  Please stop it.  I'm sorry.

MR. GALIPO:  May I confer with counsel?

MR. HURRELL:  I'm playing the wrong one.

MR. GALIPO:  I wanted to make sure the record was clear.

MR. HURRELL:  Got you, thank you.

(Audio played in open court.)

MR. HURRELL:  I will stop it at 1:58.

BY MR. HURRELL:

Q    Do you recall the radio transmissions that day?

A    Yes, sir.

Q    Can you tell us what information did you receive?

A    So the dispatcher broadcasts the call asking for units to respond Code 3, which means in emergency style with lights and sirens.

He mentioned there was a 417, which is a radio code for us, stating there was a person with a gun.

Added to that, there was a 246, which was an additional radio code, which meant this person was negligently discharging this firearm.

And that is pretty much what he said, sir.

Q    Did you receive an update to the call concerning the stabbing?

UNITED STATES DISTRICT COURT

A    Yes.  As we were responding, there was actually several updates that kept getting put out over the radio, saying multiple people were calling, multiple people were confirming that this person was walking down street with a rifle firing it off, wearing a bulletproof vest, and it was Deputy De La Torres who actually broadcast that there was a stabbing victim.

Q    So going back to that date, when you received this -- these video broadcasts, what does this tell you about what you were going to encounter, potentially?

A    As the multiple updates starting coming out, I formed the opinion that this was an actual serious and legitimate call.  I mean it is known that a lot of times calls are placed and we find nothing.

But the fact that our desk was broadcasting several updates from multiple different people, it immediately raised my awareness to know it was serious.

Q    And now, we saw -- I won't play it again, but we saw the video where you encountered Ms. Quan, correct?

A    Yes.

Q    And then we saw in the video you were doing something with your rifle and shells were being ejected?

Tell us what was going on there?

A    So once I observed Mr. Chin was wearing a bulletproof vest and carrying an assault-style rifle, I decided that my shotgun with the current ammunition, which was the double ot buck was

42

not going to be something adequate for the situation.

So I proceeded to empty out the rounds that were inside of it, and loaded it up with the slug rounds.

Q    We saw you going up the street there, were you giving any commands to Mr. Chin?

A    I was.  I told him multiple times to drop the gun, to stop, drop the gun.

Q    And had he not had a gun, so would the event be over?

A    I wish he would have, absolutely.

Q    Now going to the point in time he's up on Diamond Bar Boulevard, do you have experience using a rifle?

A    I have been trained before in the department with the use of a rifle.

Q    And, Mr. Chin, as he's walking northbound on Diamond Bar Boulevard, can you describe the position of the rifle before your first shot?

A    It was slung over his neck with a sling.  It was towards his right side.

It appeared to be in a downward-ready position which is like a 45-degree angle, almost where it's pointing downward, but basically it's downward-ready, because at that position, you can elevate the gun and make it operable in a split second.

Q    I was going to ask you that question, actually, based upon your use of a rifle, how long would it take to bring the rifle up into a position where he could potentially be pointing it at

UNITED STATES DISTRICT COURT

an individual?

A    I mean, it could be done, honestly, before you can even react.

As law enforcement, we're in a reactive-type scenario, we are in position at a time it would take a human eye to capture that, and for us to react to him doing it, it would be too late.

If that rifle comes up by the time I react, he's able to fire a round or more.

Q    Now, counsel asked you a number of questions concerning a hypothetical about what if Mr. Chin was just walking on Diamond Bar Boulevard with his rifle pointed down.

Do you recall those questions?

A    Yes.

Q    Was this a situation where you were going to let that happen?

A    No.  Again, I think counsel mentioned "hypothetical," so I went along with his hypothetical, but that wasn't the case here.

This man wasn't just the person who was walking down the street with a rifle, it's a person who had stabbed someone who was a relative or a friend of his, someone who had taken the time to put on a bulletproof vest and take this rifle out to a populated area.

In my eyes, someone doesn't do that, unless they are

prepared to hurt people.

Q    Do you need some water?

Detective Vasquez, was this a situation where it would have been appropriate, from your perspective there at the scene, to use less lethal weapons such as a 40-millimeter?

A    No, it wasn't, sir.

Q    Why not?

A    Well, I mean, the example is apparently there were several rounds that were fired, and it's -- I think counsel mentioned it was four or five shots, I'm not sure, but those were actual bullets that hit him, and he remained up until the last shot.

The less lethal option would not have the same effect as a less lethal option would, so that vest, if it absorbed those impacts from those actual bullets being fired at him and he remained up, a less lethal option would not have any effect.

The taser prongs wouldn't penetrate that vest, the impact batons, would strike him, but it wouldn't create enough pain on him to comply, if a bullet itself that striking him wasn't creating pain enough for him to drop.

So it wouldn't be smart to bring less lethal, when we are facing a man with an assault weapon and a vest, sir.

Q    When we were listening to the video, we heard a number of individuals asking Mr. Chin to drop the gun.

Is that correct?

A    Yes, sir.

**UNITED STATES DISTRICT COURT**

Q    Did you ever see Mr. Chin respond to any of those warnings?

A    No, he just continued on his way.

Q    Now, after Mr. Chin was shot and lying on the ground, what happened, then?

A    What I did after that, is I continued my trajectory towards where my partner was.

At that time, I discovered that the gray vehicle was actually a police vehicle as well.

I met up with them to all get basically on the same side, and we formulated a plan to basically safely approach him and take him into custody, and begin providing medical aid to him, as needed.

Q    And was medical aid provided by sheriff's personnel?

A    It was.

MR. HURRELL:  That's all I have.

THE COURT:  Any redirect?

MR. GALIPO:  Yes, thank you.

THE COURT:  Please proceed.

REDIRECT EXAMINATION

BY MR. GALIPO:

Q    Detective Vasquez, you said at some point you were a field training officer?

A    I was.

Q    So you would have to train younger deputies?

Q    And did you say something to the effect you couldn't let him just walk down the street like that?

A    I don't recall that.

Q    Are you saying that it was your intent, once you left cover, to shoot him?

A    My intent was to line up with my partners to protect them and protect the civilian population.

Q    What I'm asking you, is when you left cover, and started running out in the open, was your mind frame, you are going to shoot him?

A    I think I just answered that.  My mind frame was to rally with my partners to protect them and to protect civilians.

Q    I'm not sure what rally with your partners means.  Does that mean you were going to shoot him or does mean something else?

A    That means, sir, I was traveling diagonally to meet up with my partners to line up with them and offer them some support.

Q    So, you weren't thinking you were going to shoot him, you are saying you were running to rally up with your partners?

A    Correct, sir.

Q    And in terms of the position of the rifle, would you agree that in between each shot, so, up to the first shot, he doesn't raise the rifle, and in between the first shot and the second shot, would you agree he doesn't raise it?

lockup, that would have been about seven years, approximately?

A     Yes.

Q     So you would have been assigned to patrol at some point after that?

A     Yes.

Q     And did you have some field training?

A     Yes, sir.

Q     How long was that, approximately?

A     Seven months.

Q     When did you complete field training for patrol, approximately?

A     In February of 2022.

Q     So you would have been out of field training for patrol a little bit over a year when this incident happened.

      Does that sound correct?

A     About a year, sir.

Q     At some point, you heard over the police radio comments on this call that eventually involved Mr. Chin?

A     Yes.

Q     You understand my question.

      In other words, you heard radio traffic at some point before getting to the scene about this call?

A     Yes, sir.

Q     You were in uniform?

A     Yes.

**UNITED STATES DISTRICT COURT**

Q    In a marked vehicle?

A    Yes.

Q    Were you by yourself?

A    Yes.

Q    And you had information about this being somewhere in the area of Crooked Creek and Diamond Bar Boulevard?

A    Initially, it was an address in Crooked Creek.

Q    And you were trying your best to go in that area; is that correct?

A    Correct.

Q    And have you reviewed your -- you gave an interview also in this case; is that right?  A statement?

A    Yes.

Q    And was that two or three weeks after the incident?

A    Yes, with homicide.

Q    Then you also gave a deposition at some point?

A    Yes.

Q    And I took your deposition.  Do you remember that?

A    Yes.

Q    In preparation for the trial, have you had a chance to review your statement?

A    Yes, sir.

Q    And have you had an opportunity to review your deposition?

A    Yes.

Q    You also had a body-worn camera on your person at the

**UNITED STATES DISTRICT COURT**

time?

A    Yes.

Q    And at some point, you activated it?

A    Yes.

Q    Have you had an opportunity to look at your body-worn camera footage?

A    Yes.

Q    Were you aware, after your deposition was taken, you had the right or an opportunity to make changes to your answers if you thought you needed to?

A    Yes.

Q    Did you make any changes?

A    No.

Q    And you understood at the time of your deposition you were testifying under oath under penalty of perjury like you are now?

A    Yes.

Q    Where was Mr. Chin when you first saw him?

A    He was in the southbound lane on Diamond Bar Boulevard while walking northbound.

Q    And where were you when you first saw him?

A    About 15 feet from Mr. Chin.

Q    Were you in your vehicle or out of your vehicle?

A    In my vehicle.

Q    And then you got out, shortly thereafter?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    And you stood in the open V of your vehicle?

A    Yes.

Q    And you have some training that that's a position of cover or partial cover?

A    Correct.

Q    And is that why you stood there?

A    Yes.

Q    At some point, did you hear an update on the radio about someone being stabbed?

A    Yes.

Q    Did you know who had been stabbed?

A    No.

Q    Did you know the severity of the stabbing?

A    No.

Q    When you first saw Mr. Chin, was he stationary or moving?

A    Moving, then stationary.

Q    Okay.   And would you describe him as walking slowly or in some other way?

A    Walking at, I guess, a normal pace.

Q    What street was he on when you first saw him?

A    Diamond Bar Boulevard.

Q    And which direction was he walking, if you know?

A    He was going northbound.

Q    Could we possibly, Ms. Le, put up Exhibit 48-2?

**UNITED STATES DISTRICT COURT**

Q    While we get that up, did you notice when you saw Mr. Chin that he appeared to have some type of a rifle on a sling?

A    Yes.

Q    At some point, did you notice that there was a white Tesla to your left or on the driver's side of your vehicle?

A    Yes.

Q    Did you ever say anything to the person in the white Tesla to back up or move or anything like that?

A    I recall that I did, but then there was vehicles behind it.

Q    I'm sorry, can you repeat your answer.  I didn't quite understand it?

A    I did, I motioned also with my hand.

Q    You motioned for the Tesla to back up?

A    Or just to stop.

Q    To stop?  So what type of motion did you make, if you remember?

A    From the body-worn camera you observed, you see me motioning from the driver's side of my patrol car.

Q    I'm just wondering if you can show us the motion you made or explain what you were trying to do?

A    Well, I was just making a hand gesture with my hand.  I don't exactly know the exact motions I was making, sir.

Q    Okay, what were you trying to accomplish by that motion?

A     If feasible for the vehicle to back up, sir, but it was not able to.

Q     Okay.  Are you able to see this Exhibit 48-2 on your screen?

A     Yes, sir.

Q     And do you see the white Tesla in this vehicle -- this image?

A     I do.

Q     Do you see if there is any car behind the white Tesla in this image?

A     No, sir.  My patrol car is within blocking.

Q     Okay.  Your patrol car is on the side of the white Tesla, isn't it?

A     Yes, but I can't see anything behind that.

Q     I thought you said the Tesla couldn't back up, because there was a car behind it.  Maybe I misunderstood you?

A     But that is not depicted on this still.

Q     I see.  In any event, do you see Mr. Chin in this exhibit?

A     I do.

Q     And you saw him in that area of the roadway at some point?

A     Yes.

Q     So the front of your vehicle would have been facing southbound; is that right?

A     That's correct.

Q     And Mr. Chin was generally walking northbound?

UNITED STATES DISTRICT COURT

A      Yes.

Q      Did you ever have any communications with any other officers on scene, either before you got there or upon arriving about how the tactics were going to be approached?

A      No, sir.   It was just updated as far as the injured person and the attempt to secure the location.

But by that point, I was already within feet.

Q      Did you hear over your police radio, for example, any discussion about who would be assigned less lethal?

A      No, sir.

Q      Any discussion about setting up a containment or perimeter?

A      There was a point in which, as I stated, somebody wanted to block off the street, but that was within seconds of my arrival with Mr. Chin.

Q      Okay.  Did you hear that?

A      Yes, sir.

Q      You, yourself, at some point thought about the 40-millimeter; is that right?

A      Yes.  But based on my distance with Mr. Chin, I would have to boost my visual on him to obtain my 40, which was in the back of my patrol car.

Q      You, yourself, thought about the taser at some point.  Is that also accurate?

A      Yes, but I would have to secure my weapon to obtain the

**UNITED STATES DISTRICT COURT**

A     Yes.

Q     Was he stopped when you first saw him?

A     Yes, sir.

Q     I think you have indicated that he was about -- was it 15 or 20 feet from you at that point?

A     Yes, sir.

Q     And when you first saw him, was he pointing the rifle at anyone?

A     No, sir.

Q     Was he raising the rifle at anyone when you first saw him?

A     No, sir.   It was slung across his body.

Q     Did you ever hear him verbally to threaten anyone?

A     I did not.

Q     Did you ever hear him say anything?

A     No.

Q     Did you feel, when you first heard the nature of the crime, you were starting to panic before you got to the scene?

A     I was scared, yes.

Q     Do you recall in your statement words to the effect you started to panic before you even saw Mr. Chin, based on the nature of the call?

A     Yes, I did say that I panicked after I heard the radio traffic and update, I did panic.

Q     And then would you agree after you saw Mr. Chin and he started walking in your direction, you indicated in your

statement, you started to panic more?

A     Well, my level of fear did grow, yes.

Q     You recall using the word "panic", you started to panic more, or words to that effect?

A     I did agree, and I did say, "I panicked."  I feel it's normal nature for somebody to be scared in that situation.

Q     Right, but you, yourself, would agree that multiple times in your statement in describing your actions, you used the word "you panicked"?

A     Yes.  You also brought it up, and I concurred.

Q     Okay.  But you would agree when I took your deposition that was way after you had given your statement and mentioned the panicking?

A     Yes, that was mentioned to homicide, yes.

Q     Now, you gave a multiple commands to drop the gun or words to that effect?

A     I did.

Q     And when you did that, were you in the V of your door, the open V of your door?

A     Yes.

Q     And you noted that he was continuing to walk north on Diamond Bar Boulevard?

A     Yes.

Q     And at some point you fired your first shot?

A     Yes.

**UNITED STATES DISTRICT COURT**

Q    And did you hear any other shots being fired before you fired your first shot?

A    No.

Q    Did you give any verbal warning you were going to shoot?

A    No, but I was showing him my handgun, and I did tell him to put the gun down several times.

Q    Are you trained to give a verbal warning that you are going to use deadly force when feasible?

A    When feasible.

Q    And after you fired your first shot, did you at some point hear another shot?

A    Yes.

Q    And could you tell where that was coming from, from your perspective?

A    I did not see it but I heard -- it was approximately somewhere to the right of me.

Q    Okay.  At that point, did it sound to you like possibly from a shotgun?

A    Yes.

Q    And then after your shot, and after hearing another shot, did you fire any additional shots?

A    Yes.  I gave more additional verbal commands and then I gave two shots.

Q    Two additional shots?

A    Yes, sir.

Q    So would it be correct to say that altogether you fired three shots?

A    Yes.

Q    And after your last shot, did you hear any other shots?

A    Yes.

Q    How many shots did you hear after your last shot?

A    One, sir.

Q    So, do I have it right that there were a total of five shots?

A    Yes.

Q    And do you know how much time past from your first shot to your second shot?

A    A few seconds.

Q    Can you give us an estimate please?  What would be your best estimate as to how many seconds past from your first shot to your second shot?

A    Maybe 12, 15.

Q    What would be your estimate as to how many seconds past from your second shot to your third shot?

A    Maybe five.  I can't recall the exact.

Q    These are just your best estimates?

A    Correct.

Q    Then what would be your estimate as to how many seconds past from your last shot to hearing that final shot?

A    That, I cannot -- it was just like after but I don't know

UNITED STATES DISTRICT COURT

70

Q    And you had a 9mm; is that right?

A    Yes.

Q    It's a semiautomatic firearm?

A    Yes.

Q    And you have to press the trigger for each shot?

A    Yes.

Q    And it sounds like you pressed the trigger three times?

A    Yes.

Q    At the time of your statement, you weren't sure whether you fired a fourth shot or not; is that fair?

A    That is fair.

Q    In this image, can you see a portion of Mr. Chin?

A    His upper body.

Q    And were you able to see his upper body as he progressed towards you?

A    Yes.

Q    I take it, your eyes would have been a little higher than the body-worn camera position on your body?

A    Yes.

Q    So, from where you were standing, could you see Mr. Chin's entire body?

A    Yes.

Q    And can we look, please, at 48-5.

    Can you see that on your screen?

A    Yes.

UNITED STATES DISTRICT COURT

Q      Okay.  So you glance for --

A      Yes.

Q      -- a split second?

A      Yes.

Q      But would you agree that the majority -- the vast majority of the time, you were focused on Mr. Chin?

A      Yes.

Q      Was anything, when you were looking at him, obstructing your view?

A      No.

Q      I take it being a young person, especially relative to me, your eyesight was good at the time, as far as you know?

A      Yes.

Q      And obviously, it was daylight out, correct?

A      Yes.

Q      And you mentioned earlier you saw the rifle slung over his shoulder in some fashion?

A      Yes.

Q      Did you ever see Mr. Chin point the rifle at anyone?

A      No.

Q      Did you ever see Mr. Chin raise the rifle towards anyone?

A      No, just slung across his upper body.

Q      Did you ever see Mr. Chin holding the rifle in two hands?

A      No.

Q      Did you ever see Mr. Chin manipulating the rifle?

**UNITED STATES DISTRICT COURT**

A    No.

Q    Did you, yourself, ever see Mr. Chin actually touching or holding the rifle with either one of his hands?

A    No.

Q    And during the entirety of your observations of Mr. Chin, up to the time of the last shot, was the barrel of the rifle pointed down?

A    I'm sorry, repeat?

Q    Sure.

During your observations of Mr. Chin, up until the time you heard the last shot, was the barrel of the rifle pointed down?

A    Yes.    It was -- since it was slung over, it wasn't all the way down, but it was down.

Q    And obviously, some of these questions that I just asked you about whether he pointed it, or raised it, or manipulated it, or held it, some of these questions you were asked in your initial interview by the detectives.

Is that fair?

A    Yes.

Q    And then I asked you some of the same questions or similar questions at the time of your deposition?

A    Yes.

Q    Now, you would have had some training with respect to the use of deadly force, correct?

UNITED STATES DISTRICT COURT

A     Yes.

Q     And were you essentially trained that deadly force should only be used if there is an imminent threat of death or serious bodily injury?

A     Yes.

Q     And were you generally trained a verbal warning should be given, when feasible, before using deadly force?

A     If feasible.

Q     Were you generally trained the deadly force should only be used when there are no other reasonable options?

A     Yes.  In a lethal situation, we always, usually match.

Q     Were you trained that in order for there to be an imminent threat of death or serious bodily injury, there has to be the ability, opportunity, and intent to immediately cause death or serious bodily injury?

A     Yes.

Q     As Mr. Chin was walking northbound on Diamond Bar Boulevard, did he ever look directly at you?

A     Yes.

Q     You thought he looked like he had a blank stare on his face; is that fair?

A     Well, he was looking forward.

Q     Did it look to you like he had a blank stare on his face?

A     Yes.

Q     You were trained that you are responsible for every shot?

or words to that effect, correct?

A    Correct.

Q    Did you ever see him reaching for the rifle after he went down to the ground?

A    No, but it's for common practice for us to tell them not to, just like put the gun down.

Q    Okay.  You were aware, when you told him to put the gun down, that the gun was slung over his shoulder?

A    Yes.

Q    So, in order to put the gun down, you understood that he had to somehow get the sling off and either with one hand or two hands, take the sling and the gun and put it on the ground?

A    Yes.  But after several commands, he did not.

Q    So, you are saying he would have had to grab or touch the gun to put it on the ground?

A    The sling.

Q    But he never did that?

A    He did not comply.

Q    And I think you have already said this, but you never saw Mr. Chin holding the rifle with both hands; is that correct?

A    I did not.

MR. GALIPO:  May I have one more moment, Your Honor.

THE COURT:  Yes.

MR. GALIPO:  May I consult with Ms. Lee, for one moment?

**UNITED STATES DISTRICT COURT**

THE COURT:  Sure.

MR. GALIPO:  Thank you, Your Honor.  I have no further questions at this time.

THE COURT:  Any cross-examination?

MR. HURRELL:  Yes, Your Honor.

THE COURT:  Please, proceed.

CROSS-EXAMINATION

BY MR. HURRELL:

Q     Good morning.

A     Good morning.

Q     I know when Mr. Galipo was asking questions about your position with the department, you gave that, but where are you now, are you still at Walnut Station?

A     Yes, I'm still assigned to patrol.

Q     Now, going to the date of this incident in June of 2023, you received a radio call?

A     Yes, sir.

Q     I think there were more than one broadcast concerning this incident, correct?

A     There were several updates.

Q     What did you learn?

A     That there were shots fired, and a stabbing victim.

Q     Did you learn that Mr. -- you didn't know the name of the individual, but did you learn Mr. Chin was walking with an assault rifle on Diamond Bar?

UNITED STATES DISTRICT COURT

A    Yes, sir.

Q    You mentioned when counsel was asking questions, you started to panic a bit, when you heard about this, correct?

A    Yes.

Q    Why?

A    Because I was scared, I feel like it's normal.

Q    What was going through your head?

A    Based on the fact I heard shots fired, I assumed there was other casualties.

Q    Now, you had a 9mm revolver, correct?

A    No.  Not a revolver, sir.

Q    Can you describe your weapon?

A    It's a Smith and Weston, 9mm.

Q    Did you hear on the broadcast that Mr. Chin was -- had an assault rifle?

A    Yes, I did.

Q    How do you compare the two weapons, is one more potentially harmful than the other?

A    Yes.  Based on me having a 9mm and him wearing a ballistic vest, there is obviously a possibility that it would not affect the vest at all.

     Also, the assault rifle could pierce through my vehicle and through my armor.

Q    Was that going through your head when you heard about this call?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       I would like to play for you -- I have Exhibit 119, but it's Exhibit 2 in evidence.

THE COURT:  The same exhibit you put in before the audio?

MR. HURRELL:  This is the body-worn video of the deputy.

THE COURT:  Okay.

(Audio/video played in open court.)

BY MR. HURRELL:

Q       Is that your first shot?

A       Yes.

Q       And describe what is going on there.

Is Mr. Chin walking towards you?

A       He is still walking forward.

Q       Now?

THE COURT:  Counsel, this is Exhibit 119?

MR. HURRELL:  It's Exhibit 2.  It's the same exhibit as Exhibit 2.

THE COURT:  I see, so 2-1.  So, we put a clip of Exhibit 2 in evidence from the 11:44:08 mark, to 11:45:56.

Is that what this is?

MR. HURRELL:  That's what I'm playing is that portion of the clip.

THE COURT:  Thank you.

**UNITED STATES DISTRICT COURT**

BY MR. HURRELL:

Q    Were you concerned about the civilian in the Tesla to your left?

A    Yes.

Q    You mentioned you tried to motion for him to get out of there?

A    Yes.

Q    And what prevented him from doing that?  Were there cars parked in back of him?

A    There was traffic.

Q    Let's play a little more here.

            (Audio/video played in open court.)

BY MR. HURRELL:

Q    Now, you mentioned when counsel was asking you questions that the rifle was pointed in a downward direction, correct?

A    Yes, sir.

Q    Did you have a concern that Mr. Chin could raise the rifle from that position?

A    Of course, it doesn't take very long to manipulate it with one hand.

Q    Have you used a rifle before?

A    Yes.

Q    How long would it typically take to raise the rifle from a downward position into a pointed position at an individual?

A    Just a few seconds if you are not -- you don't necessarily

**UNITED STATES DISTRICT COURT**

need to align your sites with a rifle.

Q     Can you explain what you mean by that?

A     Versus like me utilizing the 9mm, I actually have to align my sites to make sure it's hitting the correct target, versus if it's an actual, like, AR, you don't necessarily need to align your sites.

Q     Can you shoot a rifle in a position without raising it to your eyes?

A     Yes.

Q     And your 9mm, when you say are looking for the sites, are you looking through the top of the gun?

A     Yes.  It's like the two dots, if you can see them in between that.

Q     Can you draw a circle around what you are pointing at? You can draw it on the screen.

A     Oh.

Q     Okay.  Those are the sites you are looking through?

A     Yes.

Q     Counsel asked you some questions about whether you thought about less lethal options.

        Do you recall that?

A     Yes.

Q     Were less lethal options, would they have been appropriate for the situation?

A     No.

Q    Why not?

A    I would have to lose my visual on the person as he's in front of me, just between me, like a few feet away, and then I would have to go all the way to my trunk, grab my 40, and then regain my sites, depending wherever he might be, resulting on Mr. Chin essentially harming the person in the white sedan.

Q    And given that he was wearing a Kevlar or bulletproof vest, would a 40mm projectile have any impact?

        MR. GALIPO:  Objection.  Lacks foundation, and depends on where he was struck.

        THE COURT:  Yeah, you can ask based on her experience and training.

        THE WITNESS:  That is correct.  It might have been ineffective, based on the ballistic vest.

BY MR. HURRELL:

Q    When you were out there that day, did you hear other individuals shouting at Mr. Chin to drop his weapon?

A    I did recall somebody shouting, I just don't know who.

Q    Had he done so, put his weapon down on the ground, would the event be over?

A    Yes.

        MR. HURRELL:  That's all I have, thank you.

        THE COURT:  Any followup, counsel?

        MR. GALIPO:  Yes, briefly.

                REDIRECT EXAMINATION

                UNITED STATES DISTRICT COURT

Q    And you are saying that the second shot you heard and the last shot, sounded like it came from a shotgun?

A    Yes.

Q    Now, you were briefly asked about the panicking, and would you agree that in your statement in deposition, you said you started to panic when you heard the call?

A    Yes, I said that in my deposition.

Q    And then in your statement in deposition, you said you started panicking more when you saw Mr. Chin?

A    That is correct.

Q    And then in your statement in deposition, you said you started panicking more when he started walking towards you?

A    Of course, yes.

Q    And you stated you were extremely nervous and started to panic even after all of the shots were fired?

        MR. HURRELL:  Objection, Your Honor.  This is cumulative.

        THE COURT:  You can answer.

        THE WITNESS:  Yes, it's still an ongoing incident.

BY MR. GALIPO:

Q    You mentioned a few times, the white Tesla.

        And I'm wondering, from your perspective, and based on your training, if hypothetically the white Tesla wasn't there, would you have fired?

        MR. HURRELL:  Objection.  Relevance, Your Honor.

UNITED STATES DISTRICT COURT

THE COURT: Objection overruled. You can answer.

THE WITNESS: There would have still be additional vehicles if the Tesla wasn't there.

BY MR. GALIPO:

Q    So, you are saying you would have fired even if the white Tesla was not there?

A    If he continued to engage forward, yes.

Q    You were asked questions about how long it would take to raise the rifle.

Do you remember those questions?

A    Yes.

Q    I think you said, based on your experience, it would take a relatively short period of time, maybe a second or a few seconds or words to that effect?

A    Correct.

Q    And in terms of raising the rifle, when you initially saw Mr. Chin before he started walking towards you, did you see him raise it?

A    No.

Q    During the time frame he was walking towards you, did you see him raise it?

A    No.  It was still across his body, to his right.

Q    At any time before the first shot, did you see him raise it?

A    No.

UNITED STATES DISTRICT COURT

Q    And after your first shot, did you see him raise it?

A    No, he just continued going forward.

Q    After the second shot, did you see him raise it?

A    No.

Q    The third shot?

A    No, sir.

Q    The fourth?

After your last shot did you see him raise it before the last shot?

A    No.  It was slightly up, but no.

Q    Did you see him ever turn away from you at any time during the shooting?

A    No.

Q    You talked about whether you have to use sites for that weapon.

Would you at least admit the barrel has to be pointed towards the target to strike it?

A    It doesn't have to be pointed exactly at the target, just at the direction.

Q    In this case, you would agree you never saw the barrel pointed at any targets, true, or in the direction of any targets?

A    Yes.

Q    And in terms of less lethal options, were you trained that when there is multiple deputies on scene, some other deputies

could be assigned less lethal.

It doesn't have to be you, it could be someone else who uses the less lethal, see if that works, and if not, there is lethal coverages.

A    If feasible.

Q    You were trained on the concept of contact cover officer?

A    Yes.

Q    And I think you told us that you were aware at some point that there were multiple deputies on scene?

A    At the residential, yes, but at Diamond Bar Boulevard, I was by myself.

Q    I thought you said you looked over to your right and you saw two other people from the department there?

A    Not immediately.

Q    At some point?

A    Yes.

Q    I thought I asked you, were you looking at Mr. Chin the entire time, and you said, well, I glanced away for a moment, when I noticed two other people on your right?

A    Yes.  But when I looked, to my back, that's when I saw the other vehicles, not the unmarked vehicle.

Q    I see.

A    Uh-huh.

Q    Did you hear anybody giving him any other command, other than drop the weapon?

**UNITED STATES DISTRICT COURT**

A    No, I just heard "drop the weapon" several times.

Q    And according to you, based on your observations you never saw him holding the weapon with his hands, correct?

A    Not during my time period, no, sir.

MR. GALIPO:  Thank you, that is all I have, Your Honor.

THE COURT:  Any followup, counsel?

MR. HURRELL:  No, Your Honor.

THE COURT:  The witness is excused.

Please call your next witness.

MR. GALIPO:  Can we approach, Your Honor?

Thank you.

(Sidebar begins.)

MR. GALIPO:  We're going a little faster than we expected.  We have two witnesses lined up for this afternoon. One is Deputy Holland, which is going to be here at noon.  Then I have my police practice expert.  I am wondering if it makes sense to break a little earlier today for lunch.

THE COURT:  We can come back at 12:45?

MR. GALIPO:  I'm available, if that is good for Your Honor and the jury.

Do you think Deputy Holland will be here by then.

MR. HURRELL:  I'm sure he will.

THE COURT:  We're going to take our lunch break a little bit early.  We will kick off now and come back at 12:45.

UNITED STATES DISTRICT COURT

binders.

In the microphone, will you please state and spell your full name for the record?

THE WITNESS:  First name is Chad, C-H-A-D.  Last name is Holland, H-O-L-L-A-N-D.

CHAD HOLLAND,

having been duly sworn,

testified as follows:

THE COURT:  Counsel, you can proceed.

DIRECT EXAMINATION

BY MR. GALIPO:

Q    Good afternoon, Deputy Holland.

A    Good afternoon.

Q    Who do you currently work for?

A    LA County Sheriff's Department.

Q    How long have you worked for them?

A    Close to 20 years.

Q    What is your current assignment?

A    Walnut Sheriff's Station.

Q    Was that also your assignment on June 19, 2023?

A    Yes.

Q    At some point, did you respond to some radio traffic you heard regarding a call on Crooked Creek or Diamond Bar Boulevard?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    And do you recall what type of vehicle you were in that day?

A    Yes.

Q    What type of vehicle?

A    I was in a gray Ford Explorer.

Q    And were you with anyone else in your vehicle?

A    Yes.

Q    Who were you with?

A    I was with Deputy Toves, as my partner.

Q    Do you recall who was driving the vehicle?

A    Yes.

Q    Who was driving?

A    Myself.

Q    At some point after this incident, you gave a statement; is that correct?

A    Yes.

Q    Have you had a chance to review your statement in preparation for today?

A    Yes.

Q    Did that help refresh your recollection about some of the details?

A    Yes, some.

         MR. GALIPO:  Okay.  I want to try to put up Exhibit 48-3, which has previously been admitted, Your Honor.

         THE COURT:  Yes.

**UNITED STATES DISTRICT COURT**

Did you see who we now know to be Mr. Chin?

A    Yes.

Q    Where was he when you first saw him?

A    He was walking down the street back towards, I guess, you could say southbound.

Q    Was it southbound or northbound, if you recall?

A    I don't recall, I believe it's southbound.

Q    That's okay.  Just when I thought I had my directions figured out, you are going to confuse me.

But, in any event, he was walking down the street?

A    Yes.

Q    Was he walking generally in your direction?

A    Yes.

Q    And this would be after you got out of your vehicle, the vehicle that we see parked close to the curb?

A    Are you saying this frame would be after I got out of the car?

Q    I'm asking you, if you first saw Mr. Chin after you got out of your car, not necessarily this frame.

A    Yes.

Q    Okay.  And when you got out of your car, where did you position yourself initially?

A    Between right out of my driver's seat out of my car, right out of my driver door.

Q    Did you have an open driver's door?

**UNITED STATES DISTRICT COURT**

95

A      Well, I opened it, yes.

Q      Were you kind of in the V of the door or just near it?

A      The V.

Q      In the V?

A      Pillar of the door.

Q      Is that part of your training to be in the open V, when you can, for some cover?

A      Yes.

Q      And did you at some point draw your firearm?

A      Yes.

Q      And what type of firearm did you have at that time?

A      Beretta 92FS.

Q      And is that a 9mm or something else?

A      9mm.

Q      At some point, did you point your firearm in the direction of Mr. Chin?

A      Yes.

Q      And you saw what appeared to be -- was it a black and white assault rifle?  Was that the colors it appeared to be?

A      Yes.

Q      And did you see it shouldered, kind of over one of his shoulders?

A      Yes.

Q      And your recollection is that the barrel was down; is that fair?

UNITED STATES DISTRICT COURT

A    Yes.

Q    How far was Mr. Chin from you when you first saw him?

A    I don't exactly recall, but I believe maybe ten or 15 feet, but I would have to refer to my statement for the exact distance.

Q    And when you observed him, was he just essentially walking forward on the street?

A    Yes.  He was walking forward on the street with his rifle shouldered over his shoulder, with body armor on too, I believe.

Q    Did you, at some point, reverse your vehicle slightly?

A    Yes.

Q    And how far did do you believe you reversed your vehicle, approximately?

A    That, I do not recall.

Q    You heard some commands given at some point?

A    Yes.

Q    Do you know who was giving them?

A    I do not.

Q    Did you know at any time before you heard shots that there was a female deputy on the driver's side of the patrol car?

A    No, I did not.

Q    Were you aware that that patrol car was at least there?

A    Yes.

Q    And you told us earlier you had a partner on that shift?

UNITED STATES DISTRICT COURT

have, Your Honor.

THE COURT:  Thank you, any cross-examination?

MR. HURRELL:  Just brief.

CROSS-EXAMINATION

BY MR. HURRELL:

Q    Good afternoon.

A    Good afternoon.

Q    You had body-worn -- a body-worn camera on your chest?

A    Yes.

MR. HURRELL:  Your Honor, I would like to move for admission of Exhibit 122, it will be a one-minute portion of the video.  It starts at 2:45.

THE COURT:  Okay.  Any objection to that?

MR. GALIPO:  No objection.

THE COURT:  Okay.

So you are playing a clip -- is 122 a longer video.

MR. HURRELL:  Yeah, it would be 122-1.

THE COURT:  Thank you.

(Exhibit 122-1 received into evidence.)

(Audio/video played in open court.)

BY MR. HURRELL:

Q    If I could ask you to watch this and if you can tell us, does this depict you?

A    Okay, yes.

Q    Are you the male voice?

**UNITED STATES DISTRICT COURT**

A     Yes.

(Audio/video played in open court.)

BY MR. HURRELL:

Q     As you were getting out of your vehicle, is that when you first heard shots?

A     Yes.

Q     Had you had a chance to assess the situation there at all?

A     No.

Q     What did you observe in terms of Mr. Chin?

A     I observed him just walking still northbound on Diamond Bar Boulevard or southbound, yeah.

Q     And did you perceive him to be a potential threat?

A     Yes.

Q     Lethal threat?

A     Yes.

MR. HURRELL:  Thank you very much.

THE COURT:  Anything else, counsel?

MR. GALIPO:  Yes.  Thank you.

Are we able to play that again from the beginning?  I don't know if that is possible.

But I just want to make sure we have a document start time.

THE COURT:  It was at 2:45 in the video clip?

MR. HURRELL:  Is that okay?

MR. GALIPO:  All right.  Thank you.

**UNITED STATES DISTRICT COURT**

REDIRECT EXAMINATION

BY MR. GALIPO:

Q    So, before we start, I take it that without going into all of the specifics, you had some information related to the call over the police radio before you got there?

A    Yes.

Q    And then before you got out of your car, I'm assuming you were at least looking at your front windshield?

A    Yes.

Q    You may have seen Mr. Chin before you got out, that was the reason maybe you reversed?

A    Yes.

Q    So, you made observations of Mr. Chin before you got out of your car.

     Is that a fair statement?

A    Yes.

Q    And let's play -- we're starting, it looks like the time on the top right is 11:44:57.  Just play it, I will ask you to stop it in a moment.

            (Audio/video played in open court.)

        MR. GALIPO:  Stop right there.

     Now you are -- we stopped at, for the record, at 11:45:03, Your Honor.

BY MR. GALIPO:

Q    You are out of your vehicle at this point, correct?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    And you have a firearm in your hands at this point; is that also correct?

A    Yes.

Q    And you are pointing it in the direction of Mr. Chin?

A    Yes.

Q    Now, counsel asked you whether he was a potential threat, and you said yes?

A    Yes.

Q    You would agree, based on your training, you can't shoot someone just because they are a potential threat; is that fair?

A    Yes.

Q    Then he asked you if he was a lethal threat and you said yes, correct?

A    Yes.

Q    But again, you would agree, based on your training, you can't shoot someone just because you think they are potentially a threat?

A    Yes.

Q    And your gun at this point, as you are looking at Mr. Chin is essentially pointed in his direction; is that right?

A    Yes.

Q    And you gave, it sounds like, a command to drop the gun.

A    Yes.

Q    Okay.  And he -- the gun was not dropped to the ground at

**UNITED STATES DISTRICT COURT**

that point, correct?

A    No.

Q    Is that correct?

A    Yes.

Q    But given the fact that you gave him a command to drop the gun, he didn't, you did not shoot; is that true?

A    Yes.

Q    Okay.

        MR. GALIPO:  Let's play a little bit more, please.

            (Audio/video played in open court.)

        MR. GALIPO:  Stop.  So now you have heard one shot so far, right?

            THE WITNESS:  Yes.

BY MR. GALIPO:

Q    You are still in the open door area of your vehicle as we can see here?

A    Yes.

Q    Is your gun still pointing in the direction of Mr. Chin?

A    At that moment, I don't recall, because I don't see my gun pointed down at the moment.

        MR. GALIPO:  Okay.  And then we stopped at 11:45:07. Can you play a little bit more, please?

            (Audio/video played in open court.)

        MR. GALIPO:  Stop.  You heard two more shots, right?

            THE WITNESS:  Yes.

**UNITED STATES DISTRICT COURT**

Q     So, in this case, Mr. Noble, were you provided with some documents to review?

A     Yes.

Q     And without getting into all of them, did that include the statements of the two shooting officers?

A     Yes.

Q     Were you also provided with their deposition testimony?

A     I was.

Q     And were you provided with video to watch from body-worn cameras of the event from different perspectives?

A     Yes.

Q     At some point, did you prepare an expert report in this case?

A     I did.

Q     In your report, did you indicate your opinions and the reasons for your opinions?

A     Yes.

Q     And at some point, did the attorneys on the defense take your deposition in this case?

A     They did.

Q     So, I'd like to talk a little bit about the basic background of this case.

As you understand it, there is a call for service, and in the call, there is information about someone having an assault rifle, a bulletproof vest, shots fired in the air.

**UNITED STATES DISTRICT COURT**

Is that part of your understanding of the nature of the call?

A    Yes.

Q    And then at some point, as officers are arriving on scene, is it your understanding that one of the deputy's updates, the call that says that there is a victim of, you know, a knife cut or stabbing?

A    Yes.

Q    So, going into a call like this, what are some of the general tactical considerations you would hope officers would be thinking about or communicating to each other?

A    So, when you are approaching a call like this, you want to think containment, you want to locate the individual.

You want to communicate with your fellow deputies to coordinate how you are responding to the scene and what directions or what roadways you are taking.

And you may want to coordinate, depending on the number of officers responding, you know, that somebody would be taking, you know, a less lethal option in order to ensure that is covered.

Q    Why is that important, in your opinion, to have some less lethal options available?

A    It's always important.  You know, whether that option is something you can use, you have to determine that after you arrive, obviously.

**UNITED STATES DISTRICT COURT**

shooting at you -- can be in a -- for example, behind a engine block of a vehicle where the bullet is less likely to be able to penetrate.

Q    Are sometimes officers trained that they can take cover or partial cover in the open Vs of their vehicles?

A    That is the primary location that we teach.

Q    So, I'm going to ask you in a moment about the training and standards that officers are taught regarding the use of deadly force.

But in connection with all uses of force, including deadly force, is there training that officers get on controlling their fear?

A    Yes.

Q    And not panicking?

A    Yes.

Q    Can you explain to the jury that training, please?

A    I mean, police officers are human beings, we can't train somebody not to have any fear.

Of course, you are responding to certain types of calls, you are going to have, you know, some level of fear is going to come up in you, that is a healthy response, and that's why we train tactics to take positions to minimize the threat to the officers, to offer the officers a level of protection while they can still proceed with what their responsibilities are.

So, while we train them in tactics and train them in use

of force, we try to minimize their fearful response by giving them confidence that tactics work.

But we also train them that you can't use force just because you are fearful.

You actually, you have to be confronted with an imminent threat in order to use force.

So, just because you feel a sense of fear, something might happen in the future, no matter how great that harm may be that you are afraid of, you can't use force, based on fear.

You can only use force, based on threat.

Q    And when you -- I think you indicated earlier you reviewed the statement of Deputy Barajas?

A    Yes.

Q    And also her deposition testimony?

A    I did.

Q    And did you note in your review of her indicating that she had panicked at various points in time throughout the encounter?

A    Yes.

Q    Was that important to you in your review?

A    Yes.

Q    Can you explain to the jury why.

A    Because what she was explaining is that, you know, it sounded like was that she used force because of her level of fear.

So, the fact her statements that she panicked combined with her statements of what she actually observed, was what was concerning to me.

MR. HURRELL:  Objection, Your Honor.  Motion to strike.  The witnesses drawing a conclusion.

THE COURT:  I will grant that motion.

I think that the witness can give his opinion but a conclusion of the -- of that sort, I think is not proper.

Go ahead, counsel.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q    All right.  You indicated -- you noted her mentioning multiple times that she panicked?

A    Yes.

Q    And then you indicated you compared that with based on what she observed of Mr. Chin?

A    Yes.

Q    What specifically, based on her statements and testimony, about what she observed Mr. Chin doing relative to the rifle were important to you?

A    The fact that he never manipulated the rifle.  He never raised the rifle, he never pointed the rifle, and he never touched the rifle.

Q    This, again, would be from her statements and testimony?

A    Yes.

UNITED STATES DISTRICT COURT

Q    So, I want to ask you next about the principles that apply to deadly force and then see if we can apply these standards to your opinions in this case.

Are there special rules or standards that officers are trained to apply to the use of deadly force as opposed to other types of force?

A    Yes.

Q    And, generally speaking, when can an officer use deadly force, based on the training?

A    When there is an imminent threat of death or serious bodily injury to the officer or someone else.

Q    So, let me ask you a few questions about that.

POST, stands for what?

A    Peace Officers Standards and Training.

Q    And are there something called Learning Domains that POST has?

A    Yes.

Q    And do officers -- are they tasked with learning the learning domains during the police academy?

A    Yes.  So learning domains are the minimum training standards for every police academy in the state of California.

Q    Is one of the learning domains focused on the use of force?

A    Learning Domain 20.

Q    Does that learning domain have a specific chapter on the

use of deadly force?

A    Yes.

Q    And in that POST learning domain, does it define when, based on the training, there is an imminent threat of death or serious bodily injury?

A    Yes.

Q    What is the training in that regard?

A    That the person demonstrates the ability, the opportunity, and the apparent intent to cause death or serious bodily injury.

Q    Does it have to be to immediately cause death or serious bodily injury?

A    Yes.

Q    Now, does chapter 20, the POST learning domain on use of force, have a table in it that categorizes suspect's behavior, versus what type of force you can use?

A    Yes.

Q    And what are the categories of the suspect's behavior. Can you explain that to the jury?

     In other words, is there one that is resistive?

A    There is resistive, there is active resistance, and there is deadly threat.

Q    Okay.  So, if someone is resistant, let's say they are not obeying commands, is that enough, according to the training, enough to shoot them?

UNITED STATES DISTRICT COURT

A     No.

Q     Is there another category of assaultive, but short of life- threatening?

A     Yes.

Q     If someone is assaultive, but not immediately life threatening, is that enough, based on the training and standards, to shoot them?

A     No.  You wouldn't be able to use deadly force.  You may be able to use a different use of force.

Q     How about, as we have in this case, the officers have information that shots have been fired in the air, someone has an assault rifle, wearing what appears to be a bulletproof vest.  There is some evidence that someone may have been stabbed.

Is the training that you can just shoot someone onsite just walking down the street with a body armor and a rifle?

A     No.

Q     Why not?

A     Because to have used deadly force, they have to be an imminent threat, something happens to be happening right then to someone else, in order to use that level of force.

Q     Well, what if the officers say, I was afraid -- even though he wasn't doing anything, I was afraid he was going to do something.  He was walking towards a car.

Is that enough, based on the training and standards?

A     Yes.  Again, no, you can't use deadly force based on a possible future harm or future risk.

Q     Does part of the POST training talk about fear of future harm and whether that is sufficient to use deadly force?

A     Yes.

Q     Can you explain that to the jury, please?

A     Yeah.  Again, you can't use force based because you think something might happen in the future, because, you know, if that were true, officers would be using deadly force all of the time, because somebody might use something in the future.

Q     Subjective fear.  If the officer said, I was in fear of my life or I thought he was going to raise the gun and start shooting people.

      Is that enough to use deadly force?

A     No.  Again, you have to look at reasonably objective factors to cause a reasonable police officer to believe that the person is about to use deadly force.

Q     Is there a difference in the training between a potentially lethal threat and actually an imminent threat of death or serious bodily injury?

A     Well, if it's an imminent threat, then you can use deadly force.

      If something is potential, then that's when we rely on tactics.  We seek cover --

            THE COURT:  I think the question was, what is the

UNITED STATES DISTRICT COURT

difference between imminent and potential?

In other words, if somebody pointing a gun at someone, you would say that was imminent?

THE WITNESS:  Yes, sir.

THE COURT:  So, if somebody, I guess, you would say if somebody had the gun down by their side, it's potential?

THE WITNESS:  Yes, sir.

THE COURT:  So, at some point when I pull my arm up, when does it become imminent?

When in that time, from the side to the pointing, does it become imminent?

I think that is the question that the jury is going to have to answer, and I mean, obviously, what is your opinion on that?

THE WITNESS:  So, you have to look at the totality of the circumstances, but, you know, if the person is making some kind of motion, as though they are raising the gun, then it becomes imminent.

You don't have to wait until it's actually pointed at you.

If there is some sort of motion, if they are grasping the gun, and beginning to raise it, that is enough.

THE COURT:  Thank you.  Sorry to interrupt.

MR. GALIPO:  Thank you, Your Honor.  That is a good clarification.

UNITED STATES DISTRICT COURT

BY MR. GALIPO:

Q    You looked at the video in this case, correct?

A    Yes.

Q    And I think you told us already, you reviewed Deputy Barajas's statements in deposition?

A    Yes.

Q    So, were you, in reviewing her deposition and the video, looking to see if Mr. Chin grabbed the weapon in two hands and raised it, or starting to raise it to point it at somebody?

A    Yes, I looked for that.

Q    What was important to you in that review?

MR. HURRELL:  Well, Your Honor, the video speaks for itself.

THE COURT:  I think that is right.  I think --

MR. GALIPO:  I will do it another way.  That is fine.

THE COURT:  Thank you.

BY MR. GALIPO:

Q    If hypothetically, under these facts, and let's just take Deputy Barajas's testimony as true, that Mr. Chin was walking forward, getting closer to her and the white Tesla, but she did not see him touching the rifle, she did not see him holding it at any time with two hands, she did not see him manipulating it, she never saw him start to raise it, it was pointed down.

Are you with me in terms of my hypothetical?

**UNITED STATES DISTRICT COURT**

A      Yes, sir.

Q      Assuming that is true, do you have an opinion as to whether the use of deadly force would be appropriate?

            MR. HURRELL:  Objection.  That calls for conclusion.

            THE COURT:  I think he can answer that.  I think you can give your opinion on that.

            THE WITNESS:  Yes, I have an opinion.

BY MR. GALIPO:

Q      What is it?

A      That the use of deadly force would not be reasonable or consistent with generally-accepted police practices.

Q      Why not?

A      Because the weapon is pointed at the ground.  He's not touching it, he's not raising it, he's not making some kind of motion as if he is about to raise it.

Q      What if -- to go on in a hypothetical, what if the officer says, well, he never raised it, but I was afraid he could, and I think he could have raised it quickly, so I wanted to shoot him first?

A      So again, that falls back in the discussion we had earlier about having a fear.

      So, you know, you can raise a gun quickly, but you have to grab it first, and you have to begin with some kind of motion, and that's why we train officers to use cover, so they can respond, and, you know, the officer already has their

firearms drawn and pointed, so they can respond to that threat when it manifests.

THE COURT: So, it's your opinion then the officers have to wait for the person to touch the gun and move it, before they can perceive the situation as imminent?

So, they have to wait until there is some movement of the gun by the individual before they can -- before they can form a perception it's imminent.

Is that your opinion, that's where you would draw the line?

THE WITNESS: Yes.

THE COURT: Thank you.

BY MR. GALIPO:

Q    So, it sounds like you are saying, Mr. Noble, there has to be some furtive movement of grabbing and starting to move or raise the weapon towards the officers or others?

A    Yes, there needs to be something.

THE COURT: I'm sorry. You said there has got to be furtive movement, you said there needs to be something.

Is your answer, there has got to be some furtive movement?

THE WITNESS: Yes.

BY MR. GALIPO:

Q    Now, under these facts, it's the middle of the day, there are some cars outside, I mean, someone is walking down the

He couldn't do anything if Mr. Chin suddenly turned on him.

So, he's putting himself at risk.

Q    Is there training with respect to leaving cover sometimes could be a scenario where a police officer overreacts?

A    It's what we call a state-created danger.  You are putting yourself in a position where you may have to use your force to extricate yourself from a bad position you put yourself into.

Q    When you reviewed Deputy Vazquez's deposition, did you review a portion, where you talked about you can't shoot Mr. Chin for walking down a street or a fleeing felon?

A    Yes.

Q    Did you agree with that?

A    I did.

Q    And does that relate to the opinion you explained, that there has to be some furtive movement of grabbing and raising the firearm?

A    Yes.

Q    How about warnings?

Is it your understanding that there were multiple commands to drop the gun, but no verbal warning that deadly force was going to be used?

A    Yes.

Q    What's the training, again, on giving a verbal warning?

A    So, police officer is trained, if feasible, if it's

them to grab the gun, to pull it off and put your hands on the gun.

Q    How could that create a potential problem?

A    Now they're grabbing ahold of the gun, and there would maybe be some movement that would cause some officer to think they are raising it, and may cause a shooting.

Q    Would there -- other than the command to drop the gun, in your opinion, were there other commands that may have been appropriate?

MR. HURRELL:  Objection.  That calls for speculation.

THE COURT:  You can answer that.  Go ahead.

THE WITNESS:  Yes.  Things like get on the ground or I will shoot, stop or I will shoot.

BY MR. GALIPO:

Q    Is it your understanding there were multiple deputies on scene at the time of the shooting?

A    Yes.

Q    And that just the two deputies fired?

A    Yes.

Q    Assuming hypothetically, that Mr. Chin never grabbed the rifle and raised it in the direction of the officers or the person in the Tesla, given all of the same facts we have in this case, do you have an opinion as to whether the use of deadly force by Deputy Barajas was appropriate?

MR. HURRELL:  Objection.  That calls for a conclusion.

THE COURT:  I think that is ultimately the question the jury is going to answer.

BY MR. GALIPO:

Q    Do you have an opinion as to assuming that hypothetical, that the use of deadly force would be inconsistent with the training you described?

A    Yes.

Q    What is your opinion?

A    That it would be inconsistent with the training.

Q    And same question with Deputy Vazquez, assuming hypothetically, that Mr. Chin did not raise the rifle towards Deputy Barajas or assuming he never turned towards Deputy Vazquez and raised the rifle to him, do you have an opinion as to whether the use of deadly force by Deputy Vazquez was consistent or inconsistent with the training?

A    Yes.

Q    What is your opinion?

A    It is inconsistent with the training.

Q    And I think you touched on most of the points, but can you explain again why to the jury?

A    There was no imminent threat of death of serious bodily injury.

Q    Even if the officers said that they were afraid, and they

thought he could raise the rifle, and they were concerned for the person in the Tesla?

A     It would still be inconsistent.

Q     And what other options, in your opinion, did the officers have?

Did you note in part of your review of Deputy Vazquez's deposition that if he didn't raise the rifle or turn towards the people, they could let it play out and try to further deescalate?

A     Yes.  That is exactly the goal, is that you try to set a containment, you try to engage in deescalation, you try to maintain positions of cover, you have somebody assigned to a less lethal tool like a 40mm bean bag or a taser, you try to use less lethal level of force if you can.

Q     Why is all of this important based on the training when we get back to the concept of reverence for human life?

A     Because the goal is the safety of everybody.  You know, it's not the safety of the police officers or the community, it's safety of suspect too.  Our goal is to take people in custody safely, if possible.

MR. GALIPO:  Thank you.  That is all I have.

THE COURT:  Counsel, any cross-examination?

MR. HURRELL:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. HURRELL:

Q      Good afternoon, Mr. Noble.  Nice to see you.

A      Good afternoon.

Q      I understand that you are -- the bulk of your law enforcement background was spent in Irvine in Orange County?

A      Yes, sir.

Q      Is it true that in your entire career, you were only involved in one lethal shooting?

A      That's true.

Q      Now, you were describing some of the POST standards, and in terms of deciding whether a threat is imminent or not, you need to consider the opportunity and ability of the individual to cause death, correct?

A      There are three factors.  The ability, the opportunity, and apparent intent.

Q      In this case, you found it significant that Mr. Chin never pointed his rifle or raised it, correct?

A      That is one factor, yes.

Q      Now, you do know that the deputies that responded were informed that Mr. Chin had been shooting his rifle?

A      Into the air, yes.

Q      That he was wearing --

          THE COURT:  Counsel.  Can I stop a second?

     You were under the impression that the deputies were informed that Mr. Chin was shooting his rifle in the air and not at people?

THE WITNESS:  Yes.  That is my recollection, yes.

THE COURT:  You think that's what the deputies heard, that he was shooting his gun in the air, and not at people?

THE WITNESS:  That is what I recall, yes.

THE COURT:  That's what you based your opinion on?

THE WITNESS:  Yes.  That's what I recall.

THE COURT:  Sorry.

BY MR. HURRELL:

Q     Mr. Chin was wearing a bulletproof vest, correct?

A     Yes.

Q     The deputies could plainly see that, would you agree?

A     Yes.

Q     And an individual holding an assault style rifle, wearing a bulletproof vest creates a rather bleak scenario, wouldn't you agree?

MR. GALIPO:  Objection.  Vague, ambiguous as phrased.

THE COURT:  You can answer.  Go ahead.

THE WITNESS:  I think any reasonable officer would be very concerned, yes.

BY MR. HURRELL:

Q     Would he be concerned that this individual would have the opportunity and ability to cause death very quickly?

A     I believe the opportunity and ability, yes.

UNITED STATES DISTRICT COURT

140

Q    The deputies were aware that Mr. Chin had stabbed an individual, correct?

A    Yes.

Q    Wouldn't that lead to a greater heightened awareness that this individual has the intent and ability and opportunity to cause physical harm to another person?

A    I don't think it shows he has the intent.  I think it shows he has the ability and opportunity.

Q    And when Mr. Chin is shot, he is literally seven to eight feet from the driver of the white Tesla, wouldn't you agree?

A    Less than ten feet, yes.

Q    And it's your opinion that the deputies that shot Mr. Chin, needed to wait until Mr. Chin raised his gun up?

A    Until he made some kind of motion as though he were about to raise the gun, yes.

Q    And is it your opinion, that they need to wait until it would be too late to save somebody's life?

        MR. GALIPO:  Objection.  Vague and ambiguous as phrased.

        THE COURT:  You can answer the question.

        THE WITNESS:  No.  As I said before, you don't need to wait until the gun is actually pointed, but you have to wait until there is some indication that shows his intent.

BY MR. HURRELL:

**UNITED STATES DISTRICT COURT**

Q    But you would agree, I think you already stated, that Mr. Chin could have raised that rifle into a position that he could fire it within a second or two?

A    Yes.

Q    That is calling it pretty close, wouldn't you agree?

A    Again, you need to wait until there is some kind of movement.

You don't have to wait for him to raise it.  It is a rifle, it's time to get that barrel up.

Q    There is an individual wearing a bullet vest, has an assault style rifle, has already stabbed his mother that day, and he has been shooting the rifle.

You have to wait until he raises the rifle, which could last a second or two, until he takes care of that situation?

A    You have to wait until he makes some kind of movement as if he's about to raise the rifle, yes.

THE COURT:  Excuse me, is it about to raise the rifle, or is it raise the rifle, where are you drawing that line.

Before I thought you said, you have got to make some motion with the rifle.

THE WITNESS:  Yes.

THE COURT:  So your line is, you have to wait until you see him move the rifle; is that the line?

THE WITNESS:  Yes.

**UNITED STATES DISTRICT COURT**

THE COURT:  Then one more question before I give it to you back.

You said the fact that the officers -- the fact he stabbed somebody, you don't think it shows he has intent to harm another individual; is that right?

THE WITNESS:  For the analysis of ability, opportunity and intent, it doesn't apply to that portion of apparent intent, whether he's an imminent threat at the moment the force was used.

THE COURT:  Well, help me understand that, so he has just stabbed somebody, he has got an assault rifle, your view is that there is -- the officers shouldn't assume he has an intent to harm another individual?

THE WITNESS:  Right.  Because somebody could harm somebody else and then give up.

In order to use deadly force, there has to be an imminent threat, something has to be happening right now, not something in the past.  Something is happening now.

THE COURT:  So, the fact he just stabbed somebody has no part of your analysis at all?

I mean, it doesn't matter?

THE WITNESS:  It matters, in the sense it's part the totality of the circumstances.

It matters in the sense that --

THE COURT:  Well, if it matters, what does it matter

UNITED STATES DISTRICT COURT

towards?

If it doesn't matter towards intent, what does it matters towards?

THE WITNESS:  It tells the officers they are dealing with a dangerous individual.

It tells the officers that's they need to use cover.

It tells the officers that they need to engage inappropriate tactics to deal with the situation.

It gives a lot of information to the officers.

THE COURT:  Sorry, counsel.

BY MR. HURRELL:

Q    So, sir, would this entire scenario that we have discussed the stabbing, the shooting of the rifle that day, the Kevlar bulletproof vest, and he is seven to eight feet from the Tesla driver, it's your opinion that the deputies have to wait until he moves his rifle before they shoot?

A    Yes.

Q    Even if it places the Tesla driver's life at risk; is that your opinion?

A    Yes.  Even though it places his life at risk, that there is no imminent threat at that point.

Q    And if we're talking a split second, if you would agree that if the deputies perceive and react longer than it takes Mr. Chin to raise his rifle, the Tesla driver could lose his life?

A    No.  Well, I disagree with a couple things.

First, it doesn't take a split second, it's going to take couple of seconds for him to actually grab the rifle and begin to move it.

The officers have their guns out and pointed at him, so I believe there is time.

Q    Well, let me ask you this:  You have said that Mr. Chin was not holding the rifle, correct?

A    Yes.

Q    But you don't know that; isn't that true?

A    I don't see him touching the rifle on a video and based on Deputy Barajas's statements.

Q    Well, you can't see his right hand, sir.

A    That's what I said.  I can't see it on this video.

Q    Neither can Deputy Vazquez or Barajas?

MR. GALIPO:  Calls for speculation, it's what they could see.

THE COURT:  I think that the -- I will sustain the objection.

I don't think the witness can testify to the facts.

BY MR. HURRELL:

Q    Let me ask you about your opinion on the warning that the deputies, Deputy Vazquez and Deputy Barajas, should have given him as a warning.

So you have deputies in uniform, correct?

UNITED STATES DISTRICT COURT

A      Yes.

Q      They are telling Mr. Chin to drop his weapon, correct?

A      Yes.

Q      Mr. Chin can easily see that the deputies have their weapons pointed directly at him, correct?

          MR. GALIPO:   Objection.   Calls for speculation, as to what Mr. Chin could see.

          THE COURT:   I think that is fair.   Objection sustained.

BY MR. HURRELL:

Q      Isn't the fact that they are their uniform, shouting commands to drop the weapon, and they are pointing their guns, a warning enough?

A      Police officers are trained that if you are going to use deadly force, and if you have time, I believe they had the time in this situation, that they should give a warning because it tells the person what their intention is, that they are going to use deadly force, if they don't comply.

Q      You indicated that Mr. Chin would have had to grab his weapon or drop it?

A      The weapon with a sling, you have to pull it off, you would have to handle the weapon in some way.

Q      The sling was on his right shoulder?

A      Yes.

Q      Doesn't he have to go like this?

**UNITED STATES DISTRICT COURT**

THE COURT:  Let the record reflect that counsel is brushing the top of his shoulder.

THE WITNESS:  Well, he could, but he wasn't told to go like that.  He was told to drop the weapon.

BY MR. HURRELL:

Q    You don't think Mr. Chin would understand he needed to get rid of the weapon?

MR. GALIPO:  Calls for speculation.

THE COURT:  Objection sustained.

MR. HURRELL:  That is all I have.  Thank you.

THE COURT:  Any redirect?

MR. GALIPO:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. GALIPO:

Q    You were asked about shots in the air, that the rounds were fired in the air.

Do you remember that inquiry?

A    Yes.

Q    And I think there is an exhibit book in front of you, or to your side that has Plaintiffs Exhibits 1 through 49.

I don't know if you see that or not.

If you could turn please to Tab 26, which I believe is Officer Vazquez's statement.

A    Yes.

Q    If you could turn to Page 4 of 19, and look at Lines 18

UNITED STATES DISTRICT COURT

through 21.

Is that part of what you reviewed in this case?

A    Yes.

Q    Is that where you got information, that according to Deputy Vazquez, the information about the shots were firing rounds in the air?

A    Yes.

Q    Did you also see that reference in Deputy Vazquez's deposition?

A    I believe so, yes.

Q    In terms of the movement of the rifle, and the Judge asked some clarifying questions on that issue, are you saying that the movement of the rifle has to be such that it appears he's in the process of or getting ready to fire at someone?

A    Yes.

Q    And is that why you were talking about whether he touched it, had it in one hand or two hands, et cetera?

A    Yes.

Q    You were asked about the distance with the white Tesla.

Does it meet, or is it consistent in your opinion with the training standard on apparent intent to immediately cause death for Mr. Chin to be walking with the rifle pointed down, not holding it, slowly towards the Tesla?

A    No.

Q    Is it enough for someone to say, well he was close to the

**UNITED STATES DISTRICT COURT**

Tesla, so let's shoot and kill him?

A    No.

Q    And with respect to the verbal warning, what is the training on why you should give another human being a verbal warning you are going to shoot them, or use deadly force against them, if it's feasible to do so?

A    You want them to comply.  You don't want to use deadly force, the goal is to get them to comply.

Q    Well, why give a warning if they haven't complied so far, what is the purpose?

A    It's one final opportunity.

Q    And how about this failure to comply with this command to drop the gun, under the scenario of this case, based on the training and standards, is that enough to rise to the level of lethal force?

A    No.

Q    Well, what if someone on the other side says, well, he had a chance, he didn't drop it, so it was okay to shoot.

What would your response be to that?

A    It would be inconsistent with how we train police officers.

MR. GALIPO:  Thank you.  That is all I have.

THE COURT:  Anything else, counsel?

MR. HURRELL:  No, Your Honor.

THE COURT:  I might have a question to this.  The

shooting the gun in the air, would that -- did that make it more likely or less likely that there was imminent threat?

THE WITNESS:  So the shooting the rifle in the air tells the officers to engage in a certain level of tactics as they respond.

THE COURT:  Does it make it more likely or less likely, because shooting the rifle in the air, you would agree with me, wouldn't you, that it shows that the rifle has got ammunition in it, right?

THE WITNESS:  Yes.

THE COURT:  It shows that the decedent knows how to use it?

THE WITNESS:  Yes.

THE COURT:  At some point the decedent had the rifle in position to fire it, correct?

THE WITNESS:  Well, that he was able to fire it when he fired it into the air, yes.

THE COURT:  But still you don't think that the fact that they knew he was firing the rifle, makes it more likely -- makes the situation more imminent?  That is your opinion?

THE WITNESS:  It's my opinion, a reasonable officer would believe there is a risk, but there is no imminent threat.

THE COURT:  Anything else?

MR. GALIPO:  No, thank you, Your Honor.

MR. HURRELL:  Nothing further.

UNITED STATES DISTRICT COURT

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


            I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date: 2nd day of April, 2026.


                          /s/ TERRI A. HOURIGAN
                   _____
                        TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                               Federal Court Reporter


**UNITED STATES DISTRICT COURT**