# EXHIBIT "B"



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE MARK SCARSI, U.S. DISTRICT JUDGE

JENNIE QUAN,

                Plaintiffs,

     vs.                   Case No. 24-cv-4805

COUNTY OF LOS ANGELES, et al,

                Defendants.
_____/

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 3
Thursday, February 12, 2026
8:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

MR. GALIPO:  That will be fine, thank you.

(Sidebar ends.)

MR. HURRELL:  As our first witness, we would like to call Mr. Brandon Wiseman.

THE COURTROOM DEPUTY:  Sir, if you will stand here for me.

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before the Court, shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  Yes.  I do.

THE COURTROOM DEPUTY:  Please be seated.  In the microphone, will you please state and spell your full name for the record?

THE WITNESS:  My name is Brandon Wiseman. W-i-s-e-m-a-n.

BRANDON WISEMAN,

having been duly sworn,

testified as follows:

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. HURRELL:

Q    Good morning, Mr. Wiseman.

I want to take you back to June 19th of 2023.

**UNITED STATES DISTRICT COURT**

Do you recall driving on Diamond Bar Boulevard that day.

A    Yes.

Q    What direction were you going?

A    I was going, I believe, south, towards the Brea Mall, south on Diamond Bar.

Q    Was that going to be your destination?

A    A restaurant around there.

Q    What kind of car were you driving that day?

A    I was driving a white Tesla, 2019 -- or '21.

Q    And as you were driving southbound on Diamond Bar Boulevard, did something happen that caused to you stop your car?

A    Yes.

Q    What was that?

A    There was a guy in the middle of the road with a gun.

Q    I would like to show you a small portion of Exhibit 1, in this case, sir, which is admitted into evidence.

          (Audio/video played in open court.)

          MR. HURRELL:  I'm going to show you, and I will ask you some questions.

          THE WITNESS:  All right.

BY MR. HURRELL:

Q    If you look at the image.  I stopped us at 2:55.

          Do we see your car in this image?

A    Yes.

**UNITED STATES DISTRICT COURT**

Q    Is the white car out near the center lane?

A    Yes.

Q    And you were inside the car?

A    Yes.

Q    And do you see the man standing in front of your car?

A    Yes.

Q    Is he the man you saw with a gun?

A    Yes.

Q    And when you looked at him and the gun, could you see whether or not he had his -- either one of his hands-on the gun?

A    Yes.

Q    Can you describe what you saw?

A    He had both hands on the gun and it was positioned like this.  (Witness indicating.)

        THE COURT:  Can you describe what you are doing when you are doing that?

        THE WITNESS:  So the gun, was kind of like this, one hand was under it, and the other one was kind of like on top of the bottom part.

BY MR. HURRELL:

Q    So you are holding your hands as if the gun were kind of on a diagonal?

A    Yes.

Q    In front of him?

**UNITED STATES DISTRICT COURT**

67

Q      So you just kind of stayed there?

A      Yes.

Q      Do you recall in your statement saying you thought the person with the gun had facial hair?

A      I don't recall that, no.

Q      Do you recall now if he had facial hair or was anything on his face?

A      No.  I was mostly focused on this part.

Q      This part, meaning the gun?

A      Yes, correct.

Q      I just want to make sure I'm understanding you.

You are saying you saw him holding the gun in both hands?

A      Correct.

Q      And are you aware you never said in your initial statement that you saw him holding the gun in both hands?

                MR. HURRELL:  Objection, Your Honor.  Assumes facts.

                THE COURT:  Objection sustained.

BY MR. GALIPO:

Q      Did you say in your original statement that you saw him holding the gun with both hands?

A      From what I recall, I do believe so.

Q      How about in your second statement, do you believe you said you saw him holding the gun in two hands?

A      Yes, I do believe that.

**UNITED STATES DISTRICT COURT**

Q     Okay.  So you then -- you seen the person, and then you look to your right, and that's when you noticed the patrol car?

A     Correct.

Q     So the time frame you are seeing the person would be about the same time frame that the patrol car was to your right?

A     I'm not too sure when the police officer was there.  I just looked to my right and they were there.

Q     Okay.

            THE COURT:  Just to be clear, you saw the person in the street first, before you saw the police car?

            THE WITNESS:  Correct.

BY MR. GALIPO:

Q     When you leaned back in your car, did you go back as far as you could?

A     Yes.

Q     When you leaned back, were you looking at this person any longer?

A     I don't recall fully, no.

Q     At some point, did you hear shots?

A     Yes.

Q     How many shots did you hear?

A     About two or three.

Q     And were you leaned back, when you heard the shots?

A     I can't recall entirely, but I do believe I was all the way reclined at that time, yes.

**UNITED STATES DISTRICT COURT**

A    Yes, I have.

Q    How many?

A    Approximately 29, I think.

Q    Can you tell us about your professional experience after you obtained your Ph.D?

A    Sure.  I first worked at the Federal Aviation Administration as a human factors specialist, where I investigated pilot decision-making.

Following that, I completed a post-doctorate, education at a university in Canada, where I focused on understanding the perceptual aspects of CCTV operators, who are setting in control room monitoring many screens.

After that, I moved back to the United States to a university in Kansas, where I was an assistant professor in the psychology department.

I eventually got tenure there and became an associate professor.

I then decided I had the opportunity to move to Canada to pursue a position with a police department there, the Calgary Police Service, where I was a human performance researcher, and I just, in the last couple of weeks, just left there, returned to Australia where I'm from originally and I will be starting a very similar position with a police force in Australia, focused on police training.

Q    On that note about law enforcement, have you utilized your

expertise as a human factors expert in the area of law enforcement?

A     Yes, I have.

Q     Can you tell us about that, please?

A     Yes.  Most of my research has been focused on human performance in law enforcement.

Mainly focused on just officer decision-making in critical incidents and shooting performance and cognitive aspects of decision-making.

Q     Have you authored publications in that area?

A     Yes, I have.

Q     Now, in the area of human factors, is there a concept known as perception and reaction time?

A     Yes.  Perception/reaction time.

Q     Can you explain to us what is that?

A     Sure.  So, it's really getting at the idea that when people respond to some kind of stimulus, they don't do so instantaneously.

So, the best example I can give that I think a lot of people can relate to is driving.  So imagine that you are driving a car, there is another car in front of you, for some reason that car in front of you slams on the brakes, the brake lights come on, and you have to stop all of a sudden.

So, that doesn't happen just in an instant.  You have to perceive that that car is slowing down or stopping.

**UNITED STATES DISTRICT COURT**

And while that is happening, your car is still moving and then once you have perceived what is happening, and understood it then, you have to make the decision, you need to stop and slow down.  That takes time.

Your car is still moving, and then to actually stop your vehicle, you have to move your foot from wherever it is, on to the brake, press the brake pedal, until the car comes to a stop.  That also takes time.

And while that is happening, your car is still moving, and as you might be aware, sometimes people aren't able to stop, and they might hit the other car and rear-end it, and that's an example of perception/reaction time that it takes time to perceive what is happening, before you can start a response.

So, kind of, it can put you behind the time code, so to speak.

Q    Have you analyzed this case from your perspective as a human factors expert?

A    Yes, I have.

Q    And doing so, can you tell us what type of materials you looked at and reviewed?

A    Yes.  I reviewed the deputies' interview transcripts -- interviews and the depositions.  I have also looked at the body-worn camera footage from the deputies.

Q    Now, in terms of, we have all seen in court before you got

**UNITED STATES DISTRICT COURT**

here a little of the body-worn video?

Do you recall seeing body-worn video depicting Mr. Chin, the individual with a gun, standing in front of the white Tesla?

A    Yes.

Q    And I want you to assume for some questions I'm going to ask you, that he's holding the gun in a downward position.

Can you assume that?

A    Yes.

Q    Now, I want you to assume that when Mr. Chin is standing in front of the Tesla, there is a Detective Vazquez onsite. You were aware of that, correct?

A    Yes.

Q    Also, Deputy Barajas, correct?

A    Yes.

Q    They have their guns drawn.

Do you see those images?

A    Yes.

Q    I want you to assume that Mr. Chin starts to raise his rifle in a more upright position.

Can you assume that?

A    Yes.  I just want to clarify, that I didn't see him doing that in the video, but you are asking me to assume as a hypothetical, that he is doing that?

Q    Yes.

A    Sure.

Q    And assuming that that is occurring, can you apply your expertise in terms of the human factors aspect of this case, to what would be going on in terms of a deputy response to that?

A    Sure.

MR. GALIPO:  I apologize.  I'm going to object as it's vague and ambiguous as phrased, and assumes facts not in evidence, in this case, and it's an incomplete hypothetical.

THE COURT:  I think -- in order to get away from testifying as to what these deputies were thinking, I wonder if you can couch the question as to, in his experience in human factors, what is the likely reaction to that?

Does that make sense?

MR. HURRELL:  Yes.

BY MR. HURRELL:

Q    So, assuming that the Deputy Barajas and Detective Vasquez saw Mr. Chin raising his gun up, what would be the likely reaction of those individuals to the situation from a human factors perspective?

MR. GALIPO:  Again, Your Honor, I'm going to object, because it assumes facts not in evidence, based on his own testimony, and we're using the deputies' names.

THE COURT:  I will overrule the objection.  You can answer that.

THE WITNESS:  Okay.  So, from a human factors

perspective, if the decedent was raising his rifle and beginning to point at someone from where it was in a down position, so the officers need to perceive that is happening, and that's maybe not as clear as a brake light going on in a car.

So, a brake light goes in a car, it's a very salient stimulus you can spot that straight away.

So the officers have to be able to determine at what point is it really coming up.

They may not be focusing on that at that time.  They may be focusing on some other aspect of the situation or of the person.

So, it may take them time to cue on to that, that that is happening.

And then they have to coordinate their response, they have to make a decision, is this a threat, does this represent a threat, do I need to respond to it?

So, that takes time.

While that is happening, I'm going to assume that the rifle is still coming up, still moving up and posing maybe more of a threat, or being aimed at someone.

Then the officers would have to aim their own weapons, so acquire their sites, so they can do their best to hit what they are aiming at.

Then they have to pull the trigger.

So, while they are doing all of those things, I assume, in the situation that you have posed, that the muzzle is coming up all of the time, and so from research that has been done related to that kind of situation where an officer has a weapon in their hand, and there is a suspect who has a weapon and the suspect is told to make a move, and the officer is told to respond to that, as I recall, from that study, approximately --

MR. GALIPO:  I apologize, I think the study would call for hearsay.

THE COURT:  Your response?

MR. HURRELL:  He relied on the studies to formulate his opinions, Your Honor.

THE COURT:  So, he can discuss the study, but the study is not in evidence, so, what the study said can't take to be true, but you can use his description of the study to allow you to have an understanding as for how he forms his opinions in the case.

Go ahead.

THE WITNESS:  In that study, approximately 60 percent of the time, officers were not the first to shoot. So approximately 60 percent of time, the suspect was able to fire before the officers fired.

That is in the best case scenario of the officer waiting and expecting the person to do something.

BY MR. HURRELL:

Q   Now, you mentioned, as part of this process, this reaction to the situation by the two officers that they need to acquire their sites and aim the weapons, correct?

A   Yes.

Q   It takes time?

A   Yes, so from to the best of my understanding, from police training, and I'm not a police practice expert, but officers are trained to aim and aiming takes time, compared to just raising a weapon and firing it without a specific point of aim.

Q   Is that same analysis, does that apply to the individual holding the rifle?

A   So, I can apply it to the person holding the rifle, because arguably, they don't have to aim to pose a threat, they just have to raise a rifle in the general direction of someone, and they could fire, and pose a threat, but they don't necessarily need to aim to do that.

Whereas, I think, the officers are obliged to aim before they fire.

Q   Is that one of the time differences between the reaction of the individual holding the rifle versus the reaction of the officers?

A   I think that that is a factor that plays into that, yes.

Q   Now, just to a little bit different topic but still dealing with the concept of perception and reaction, you have seen Mr. Chin in images where he is slightly bent over?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    The last shot, you understand was Deputy Vazquez?

A    Yes.

Q    And did you have an understanding from reviewing the materials whether Mr. Chin had been struck by any of the first four shots before he bent over for that last shot?

A    It's my understanding that he had been struck by at least one of them.

Q    And as a human factors expert, do you think him bending over, as we see in the video, is related to him being struck by a shot, or can you say?

A    I assume from the way that he bent forward that it was in response to a shot.

Q    Okay.  And you talked about this perception/reaction time and different things take time.

Obviously, if the officer's gun was in the holster, for example, it might take time to get it out of the holster?

A    Yes.

Q    It might take time to bring it up towards the target?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    But if the gun is already pointed out of the holster and pointed at the target, that would save part of that reaction time?

**UNITED STATES DISTRICT COURT**

A    Yes.  It would reduce it, but it wouldn't cancel it out.

Q    Right.  I'm not saying it canceled it, but at least those time components would not be there because the gun was already pointed, that would take -- the time element of bringing it up on target at least would be eliminated?

A    Yes, but in my mind, there is just because a deputy has the gun oriented towards the target, doesn't mean that there is not time needed to bring it -- to aim it at wherever they are trying to hit.

So just because it's out already, there is still aspects -- there is still movement in time that needs to be taken before a shot can be made.

Q    Do you have a round estimate as to how many hours you have worked on this case?

A    Yes.  Approximately, 35 to 40.

Q    What do you charge per hour for your work on this?

A    $400 an hour.

MR. GALIPO:  Thank you very much.  That's all I have, Your Honor.

THE COURT:  I have a question.  And I guess, so one of the things I'm wondering about, I don't know whether you have the expertise to form -- to have an opinion on this or not.

So first, I want to know whether or not you feel like you got expertise to answer the question, and then I will ask

UNITED STATES DISTRICT COURT

it, if you do, to answer the question.

But so if the decedent has a rifle slung over his arm, how long would it take the decedent to go from that position having the rifle on his arm to a position where it was pointed in a way that could damage someone.

Is that within the time analysis, you have done in the past?

A       I think it's within my expertise.

THE COURT:   Tell me about your expertise, so I can --

THE WITNESS:   So, with respect to the question you asked, I can't draw on any research that I have done or that I'm aware of -- and I have looked further research that would answer that kind of question -- so, I'm relying on my experience, myself, when I was in the military and I carried a rifle like that and carried it slung, and observed many people firing from different positions.

I'm quite confident in saying a person could --

MR. GALIPO:   Before he gets to that, I feel very awkward objecting to Your Honor's question.

THE COURT:   I set it up to invite the objection.

MR. GALIPO:   I think it lacks foundation, if there is no studies he looked at on the issue.

THE COURT:   Does defense counsel have a different view?

MR. HURRELL:  Yes, Your Honor.  The jury can weigh his qualifications in terms of this testimony, but he says he has experience.

THE COURT:  I'm going to allow it as a lay opinion, so, you can go ahead and give us your opinion on that.

THE WITNESS:  So, I'm confident that a person could, from that position, raise the rifle and shoot in less than a second, quite easily in less than a second.

And I think it's also important to realize that while a person could use two hands to do that, if it's slung, they don't need two hands to do that, they could hold it in the way that Mr. Chin was holding it, or had it slung on his body.

You could use your right hand by itself and the sling to raise it and move the safety to the fire position if that was needed to pull the trigger in less than a second.

THE COURT:  Okay.  Thank you.  Anybody want to do any follow up to that?

MR. GALIPO:  Yes.

CROSS-EXAMINATION

BY MR. GALIPO:

Q    I think you would agree, and you indicated in your report that traditionally a rifle is fired with two hands?

A    Yes.

Q    And in terms of him, Mr. Chin, or anyone else being able to lift up a rifle and shoot it?

**UNITED STATES DISTRICT COURT**

A    I have.

MR. GALIPO:  I apologize, Your Honor, I thought we were just going to talk about whether it was consistent or not with the training standards.

THE COURT:  So, the distinction we're making here is that it's going to be up to the jury to decide whether the deputies met the legal standard, and what the expert witnesses can testify to is whether they believe the deputies acted in accordance with police training and procedures.

You heard POST, and those things.

But if we could couch the question like that, that would probably be more appropriate.

We don't want to take the decision away from the jury.

BY MR. HURRELL:

Q    Mr. Flosi, have you formed an opinion about whether Deputy Barajas use of force was consistent with current law enforcement training and practices?

A    I have.

Q    What is your opinion?

A    It is my opinion that her deadly force responses were consistent with current law enforcement training and practices.

Q    How so?

A    The threat, there are several things that officers are trained on as far as a force response.

The first thing that they are trained on in Learning

I want to ask you the same questions about his conduct in utilizing deadly force.

Have you formulated an opinion as to whether Detective Vasquez utilized deadly force in a way consistent with current law enforcement training and practices?

A     I have.

Q     Tell us your opinion?

A     That his deadly force responses were appropriate and consistent with current law enforcement training and practices.

Q     And would the same analysis that you utilized for Deputy Barajas, apply to him?

A     Absolutely.

Q     Same question, Mr. Chin, from Deputy Vazquez's perspective is actually walking away from Deputy Vazquez, correct?

A     He was in front of Deputy Vazquez, yes.

Q     Would you fault him from shooting him from behind?

A     No.

Q     Why not?

A     Because at the moment, if you have a reasonable belief that the person is an imminent danger of serious bodily injury or death, based on the totally and facts and circumstances known to you or perceived to you at the time, that an officer is allowed to respond with deadly force, with the target that is available.

You don't have to run, so that you get a frontal shot at

147

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES     )
                          )
STATE OF CALIFORNIA       )


             I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date: 2nd day of April, 2026.



                              /s/ TERRI A. HOURIGAN
          _____
                    TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                          Federal Court Reporter


**UNITED STATES DISTRICT COURT**