# Exhibit 2



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

JENNIE QUAN,

                    Plaintiffs,

         vs.                              Case No. 24-cv-4805

COUNTY OF LOS ANGELES, et al,

                    Defendants.
_____/

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 1
Tuesday, February 10, 2026
8:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

A    I believe there was an actual address given on Crooked Creek.

Q    And Crooked Creek runs into Diamond Bar Boulevard?

A    It runs parallel at some point, and then curves and runs into Diamond Bar, yes.

Q    Is that in the City of Diamond Bar, if you know?

A    Yes.

Q    So, some of the information you received was that somebody had something that looked like an AR-style rifle, or words to that effect?

     Was that part of the information you had?

A    Yes.  There was a lot of radio communication that came out saying several people were calling that this person had stabbed an individual, and was firing rounds, and was wearing a bulletproof vest and working his way from that Crooked Creek address towards Diamond Bar Boulevard, which is a major thoroughfare in the city.

Q    Okay.  Now, you gave a statement at some point after the shooting; is that true?

A    Correct.

Q    When did you give your statement following the shooting, approximately?

A    I don't remember the exact date, but it was maybe a couple of weeks after.

Q    A couple of weeks after?

**UNITED STATES DISTRICT COURT**

184

BY MR. GALIPO:

Q     Do you know why your interview was taken 18 days later?

A     I don't.

Q     And would you agree that in your original interview, you indicated that with respect to the shots fired, you had information they were fired in the air?

A     Yes.

Q     You were in uniform at that time; is that correct?

A     Yes.

Q     And you were in a marked vehicle?

A     Yes.

Q     Were you alone in your car or with someone else?

A     Alone.

Q     I take it you have a handgun on your person?

A     I do.

Q     Are you right-handed or left-handed?

A     Right-handed.

Q     And you also carry pepper spray, a taser, police baton?

A     Correct.

Q     And you responded to the scene as we heard in the opening, code 3?

A     Correct.

Q     Code 3 essentially means lights and sirens?

A     Yes.

Q     You mean your goal is to get there as quickly as possible,

**UNITED STATES DISTRICT COURT**

188

MR. HURRELL:  Objection.  Relevance, Your Honor.

THE COURT:  You can answer.

THE WITNESS:  I'm not sure.

BY MR. GALIPO:

Q    You, yourself, weren't sure if she was a victim of a stabbing or not, at the time; is that fair?

A    I knew she had been stabbed.

Q    You recall testifying earlier you weren't sure if she had been stabbed or not.  You only saw blood on her hand?

A    I saw blood on her hands, and my partner had said on the radio, he had a stabbed victim, so in my head, I kind of knew it was her.

Q    Did you know the severity of the stab?

A    I did not.

Q    But you recall her walking around and having a conversation with her?

A    Yes.

Q    And do you recall what you said in response to her telling you not to shoot him, don't hurt him?

A    I acknowledged her, I said, okay.  I asked her several times to get out of the way.

Q    Okay.  You acknowledged her and said, okay?

A    Yes.

Q    Did you ask her any questions about how she was doing, the extent of her injury, where her son was at, anything like that?

UNITED STATES DISTRICT COURT

from you, when you first saw him, approximately?

A    Approximately, maybe two.  Two times that distance.

Q    Two or three times?

A    Two or three, yeah.

Q    When you first saw him, did you have anything in your hands?

A    I had the shotgun in my hands.

Q    You had already loaded the slugs in it?

A    No.

Q    Not yet?

A    Not yet.

Q    Okay.  And what was Benjamin Chin doing when you first saw him?

A    When I first saw him he was standing still on the sidewalk facing the residences.

Q    Did you think, based on your training it was appropriate to shoot him when you first saw him?

A    When I first saw him, I immediately noticed he was wearing the bulletproof vest, I noticed he had rifle, but he was just standing still.  I didn't see any people around him at that time, so I began to yell at him multiple times, to drop the gun.

Q    Was it your understanding that you did not think it was appropriate to shoot him when you first saw him?

A    At that point, correct.

UNITED STATES DISTRICT COURT

to turn the other way and start walking towards Diamond Bar Boulevard.

The reason I requested a car was, in my mind, was I don't want him to get to Diamond Bar Boulevard, because again it's a major thoroughfare. There is a lot of people at 11:00 in the morning are driving through there, and he's walking towards them with an assault weapon.

I wanted a ride from my partner, one, because I think we could close the distance faster; but two, because yes, it would provide some type of cover in that thoroughfare where at any moment he can turn around and fire with that rifle and hit us from anywhere, really.

Q    Right.  But you would agree he never turned around and fired the rifle.  Would you agree with that, at least?

A    Correct.

Q    And when he -- you say looked in your direction, what would you estimate the distance to be between you and him at that point?

A    It was the same.  He hadn't moved.  He was standing still in front of the houses, and then he turned, and it wasn't until he turned to look at us that he turned the opposite way and started making his way towards Diamond Bar.

Q    Did you ever hear him make any verbal threats against anyone?

A    No.

**UNITED STATES DISTRICT COURT**

Q      Did you ever hear him say anything?

A      I did not.

Q      You said you gave him a command or multiple commands to drop the gun?

A      Yes.

Q      And that's after you saw the gun slung over his shoulder?

A      Yes.

Q      Did you hear yourself in listening to your body-worn camera audio, giving him any other commands, other than drop the gun?

A      All I remember saying is drop the gun.

Q      For example, did you say stop or get down on the ground or anything like that?

A      I don't recall if I said those things.

Q      Did you give any verbal warning that you were going to shoot?

A      I did not.

Q      So you get in the passenger -- front passenger seat of Bronowicki's vehicle, correct?

A      Correct.

Q      He drives some distance to get closer to Mr. Chin?

A      Correct.

Q      Obviously, you didn't know Mr. Chin's name at the time, correct?

A      I did not.

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date: 16th day of April 2026.

                              /s/ TERRI A. HOURIGAN
_____
        TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                Federal Court Reporter

**UNITED STATES DISTRICT COURT**