# Exhibit 3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE MARK SCARSI, U.S. DISTRICT JUDGE

JENNIE QUAN,

                 Plaintiffs,

     vs.                  Case No. 24-cv-4805

COUNTY OF LOS ANGELES, et al,

                 Defendants.
_____/

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 2
Wednesday, February 11, 2026
8:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

Q    And you did have some information that someone may have potentially been stabbed?

A    That's correct.

Q    But you did not know the severity of that; is that fair?

A    That's correct.

Q    When you spoke to Mr. Chin's mother, did you have the impression that she may be the victim of the stabbing?

A    I did.

Q    Did you ask her where she was stabbed?

A    No, I didn't.

Q    Did you ask her if she needed medical attention?

A    No, I didn't, because unfortunately, at that time we got to the scene where Mr. Chin was, and because there was an active threat, unfortunately, we had to focus our attention to the threat to make sure no more people would get hurt, try to prevent that, yes.

Q    Okay.  Up to that point in time, the only person you had information that had been injured in any way would have been Mr. Chin's mother?

A    That's correct.

Q    And your understanding is that she was not shot, but she may have been stabbed?

A    That's correct.

Q    And when you saw her, was she standing upright?

A    Yes.

UNITED STATES DISTRICT COURT

Q    Was she able to walk, based on your observations?

A    It appears she was, yes.

Q    Was she able to talk?

A    Yes.

Q    And up to that point in time, was it your understanding that she was the only known victim to you?

A    Yes.

Q    And the only known victim being Mr. Chin's mother, is the one that asked you or pled with you not to shoot him -- not to hurt him; is that fair?

A    Yes.

Q    And then some seconds later, you shot and killed her son; is that also fair?

A    Yes.

Q    Were you aware that there were other deputies on scene besides yourself and Deputy De La Torres?

A    Yes.

Q    And did you understand some of them were more north of you?

A    At some point, I heard a radio transmission from who I now know was Deputy Barajas, who said she was detained at gunpoint.

Q    Okay.  Then I think we looked at some exhibits yesterday where we saw, I think, the white Tesla and Deputy Barajas's vehicle?

A    Yes.

**UNITED STATES DISTRICT COURT**

fire?

A     Yes.

Q     You did not want to be shooting in a direction where other deputies or civilians were in the background?

A     Correct.

Q     At some point, as you were on the sidewalk, you felt you had a good background with respect to Mr. Chin?

A     Yeah, I believe there was a safe backdrop.

Q     Right.  And once you saw that safe background, it was shortly after that that you fired your shot; isn't that true?

A     Yes.  Shortly after I saw Mr. Chin's arm take that position, where it appeared to me he was gripping the firearm stock.

Q     We're going to get to that in a second.

      But you fired very soon after you saw what you thought was a clear background or backdrop?

A     I fired when I saw his hand go to the stock, sir.

Q     Was the fact that you had a clear background or backdrop a factor in your decision to fire?

A     No.

Q     When you heard the first shot, were you expecting it at that point?

A     I wasn't expecting anything.

Q     And when you heard the first shot, you observed Mr. Chin at that time?

UNITED STATES DISTRICT COURT

Are you able to see this image on your screen?

A    Yes, sir.

Q    And in this image, would you agree that Mr. Chin is more upright as opposed to the image we just saw with him bent over forward?

A    It appears that way, yes, sir.

Q    Would you also agree he's not facing you in this image?

A    Yes, it appears that way.

Q    Would you agree that his upper body is generally facing straight ahead or north?

A    It appears that way, sir.

Q    And again, in this image, sir, do we see what appears to be one of your casings?

A    Yes, sir.

Q    From looking at this image, would you agree that Mr. Chin is not turned toward you?

A    Yes, sir.

Q    Would you agree that he's not pointing the weapon at anyone?

A    To me it appears, sir, that he, again, to be focusing on -- that just disappeared.

        MR. GALIPO:  We will get that back up.

BY MR. GALIPO:

Q    Go ahead, Deputy.

A    If you focus on Mr. Chin, you will see his right arm how

UNITED STATES DISTRICT COURT

the upper part of his arm extends back, his elbows 40 at 90 and his forearm goes in.  It appears to me at that point he is grabbing the grip of the handgun.

At that point with that grip, he can shoot.

Q      Okay.  So are you saying, sir, that this was his approximate position when you fired your shot?

A      Yes, sir.

Q      So I want to just break down what you are saying about his right arm and elbow.

It appears to be bent?

A      Yes, sir.

Q      Would you agree that when looking at the video, and based on your recollection, at the time if you look at Mr. Chin's right arm, it essentially is in the same position the entire time he's walking?

A      As I testified yesterday, sir, that might be the case, but when I fired my round is when I became aware of it.

Q      Can you see the rifle in this image?

A      Not clearly, sir.

Q      You agree you could not see Mr. Chin's right hand, is that fair?

A      Yes.

Q      So when you say you thought his right hand was grabbing the rifle, you would believe you could not see his right hand; is that a fair statement?

A    I could not see his actual hand, no.

Q    You could not see the rifle either; isn't that true?

A    I can't see the rifle here, sir.

Q    And you told us, I think, you gave no warning to Mr. Chin before your first shot or in between your two shots; is that correct?

A    Yes, sir.

Q    We had two other exhibits we discussed yesterday, Exhibit 48-2, and 48-3.

I believe, Your Honor, those are both in?

THE COURT:  48-2 and 48-3 are in.

MR. GALIPO:  May we publish?

THE COURT:  Uh-huh.  48, we will start with 48-2, please.

BY MR. GALIPO:

Q    This again, would be -- oh, can you see this on your screen?

A    Yes, sir.

Q    Okay.  This again, would be from your body-worn camera?

A    Yes.

Q    And we see Mr. Chin in this image, correct?

A    Yes.

Q    And we see -- I think we talked yesterday, part of your weapon at the top?

A    Yes, sir.

**UNITED STATES DISTRICT COURT**

Q    We see a patrol vehicle and the white Tesla?

A    Correct.

Q    And then do you recall Mr. Chin being in this area on the roadway in this general position at some point before you fire?

A    Yes.

Q    And then if we could look, please, at Exhibit 48-3.

Again, similar photo; in this photo, we can see the patrol vehicle and the other vehicle next to the curb that we were referencing earlier?

A    Yes, sir.

Q    And again, would you agree at this point, Mr. Chin is not pointing the rifle at anyone?

A    Again, it appears his hand is bent, but no, it doesn't look -- I can't see the rifle.

Q    You can't see the rifle, let alone seeing him pointing it at anyone; is that a fair statement?

A    I think a fair statement would be, I can't see the rifle on this photo.

Q    Well, let's be very clear.

Did you at any time, before you fired your first shot, see Mr. Chin pointing the rifle at anyone?

A    I could see the rifle slung over his shoulder on his right side, carried, like, a ready position.

Q    Let me try the question again.

Did you see at any time before you fired your first

UNITED STATES DISTRICT COURT

shot, Mr. Chin pointing the rifle at anyone?

A    No, sir.

Q    Did you see at any time before you fired your second shot, Mr. Chin pointing the rifle at anyone?

A    I did, sir.

Q    Who was he pointing the rifle at, when you fired your second shot?

A    After firing the second shot, that rifle began to come up as a result of him gripping.

If you see in that video, the rifle comes all the way up, faces all of the people in front of him, and turns over and around the top of his head.

Q    Can we go back, please, to Exhibit 49-7?

Do you remember we spoke about this exhibit earlier?

A    Yes, sir.

Q    And you told me this was his position at about the time of one of your shots, because we see the casing, correct?

A    Correct.

Q    I want to be very clear here.  Before you fired your second shot, not afterwards, before you fired your second shot, did you see Mr. Chin pointing the rifle at anyone?

A    Like I explained, sir, it was a fluid motion.

So here, it appears he's bent over.  I don't know whether this is my first or second shot, but he did come up, sir.

UNITED STATES DISTRICT COURT

Q     Are you saying when you say he came up, are you saying you saw him coming up with the rifle before your -- let's take the first shot, first of all.

Did you see him coming up with the rifle before your first shot?

A     I fired my first shot when I saw his arm bent and gripped the stock.

Q     Well, are you saying you did not see the rifle come up at the time of your first shot?

A     I'm saying, yes, that I saw him grip the stock when I fired my first shot, sir.

Q     But just so we're clear, you did not see the rifle coming up; is that correct?

A     Correct, sir.

Q     And then you say you saw his hand gripping somebody but you already told us you couldn't see his hand; is that correct?

A     I couldn't see his hand, his arm was in the position for me to believe he had gripped that weapon.

Q     Now, the second shot, which you are telling us you can't tell from looking at this, 49-7, whether it's your first shot or second shot.

Is that what you are saying?

A     I don't know which one this is, sir.

Q     Are you saying, sir, you saw the rifle coming up before your second shot?

UNITED STATES DISTRICT COURT

A       I'm saying it started, yes, sir.

Q       Did you actually see it coming up before you fired your second shot?

A       Sir, it was one fluid rapidly evolving scene, and if you play the video, as I mentioned, you guys will see that the rifle comes up, all the way up, and around up over his head and he tosses it above his head.

Q       Sir, the rifle on the video, comes up and over his head after you struck him in the back with your second shot, true?

A       You might perceive it that way, but that is not what I perceived at the time of the incident.

Q       But you are telling me what the video shows, I thought you were saying what the video shows?

A       I never mentioned anything about video, sir.

Q       I thought you said you could see on the video?

A       Sorry, can you clarify, because you are confusing me a little bit.

Q       And are you also still saying that he was turning towards you and the rifle was coming in your direction when you fired the second shot?

        Is that your testimony?

A       I did perceive that, yes, sir.

Q       You are saying you fired the second shot to protect yourself, because you thought he was going to shoot you?

A       I thought he was going to shoot me or shoot someone in

**UNITED STATES DISTRICT COURT**

Q     We will start with, please, 48-4.

By the way would you agree based on your training, if Mr. Chin never raised the rifle or turned towards anyone that it would be in appropriate to shoot him?

A     Mr. Chin never -- can you repeat that?

Q     Sure.  Would you agree if Mr. Chin never raised the rifle or turned towards anyone with the rifle, based on your training, it would be inappropriate to shoot him?

A     That's incorrect, sir.

Q     Did you say correct or incorrect?

A     Incorrect, sir.

Q     Do you recall testifying in your deposition under oath that if he never raised the rifle or turned towards anyone, it would be inappropriate to shoot him?

MR. HURRELL:  Objection.  That is inappropriate in the deposition.

THE COURT:  Counsel, do you want to use the deposition to try to impeach the witness?

MR. GALIPO:  That would be fine, Your Honor.

May I have one moment, Your Honor?

THE COURT:  Sure.

MR. GALIPO:  I would like to refer the Court and counsel to the deposition of Deputy Vazquez, page 45, Line 15, to 46, Line 4, and offer to read, please.

Again, yeah, I could start at Line 15 to page 46 Line 4.

UNITED STATES DISTRICT COURT

MR. HURRELL:  No objection.

THE COURT:  You can go ahead and read it.

MR. GALIPO:

"QUESTION:  But if, hypothetically, this is my hypothetical, if he had just been walking northbound and not turned towards you, not grabbed the rifle, not raised the rifle, but the rifle had just continued to be slung, you know, around his neck pointed down.  Are you with me in my hypothetical?

"ANSWER:  Yes.

"QUESTION:  If that happened, and he never raised it, grabbed it, or turned towards anyone, would you agree that based on your training, it would be inappropriate to shoot him?

"ANSWER:  I think that if he made no movements towards grabbing the rifle and was just walking, yes, we would let it play out and try to deescalate the situation further.

BY MR. GALIPO:

Q     Do you recall that question and answer in your deposition?

A     Yes, I do.  I think the key to that, though, is that when you asked that question in that deposition, you mentioned, "hypothetically."

Right now, you didn't and there are many variables to that.  So when you say hypothetically, I will follow along with your scenario.

Q     When you say you would try to deescalate the situation, if

UNITED STATES DISTRICT COURT

MR. GALIPO:  48-5, thank you.

BY MR. GALIPO:

Q     All right.  Can you see Mr. Chin in this image, sir?

A     Yes.

Q     Do you recall him being in this area of the street at some point?

A     Not from this angle, that wasn't when I was standing, but yes, I mean, obviously that area.

Q     Okay.  You would agree he's not pointing a firearm at anyone in this image?

A     It doesn't appear that way.

Q     All right.  Let's look at 48-6, please.

You talked about Mr. Chin leaning forward at some point?

A     Yes.

Q     Does he appear to be bending forward to some extent in this image?

A     Yes.

Q     Would you, at least, agree the rifle appears to be pointing down?

A     That's what it looks like, sir.

Q     Showing you 48-7, please.

Again, you could see Mr. Chin canted forward with a rifle pointed down?  Would you agree?

A     Yes.

Q     48-10, please.

UNITED STATES DISTRICT COURT

Again, we could see Mr. Chin canted forward with a rifle pointed down?

A      Yes.

Q      Would you agree in this image he doesn't appear to be turned towards you, who would be behind him to his left?

A      Yes, sir.

Q      You would agree he doesn't appear to be pointing the rifle at anyone.  Would you agree?

A      It appears that way, yes.

Q      Would you agree that he doesn't even appear to be looking in the direction from Deputy Barajas's body-worn camera?

A      It appears he might be facing the Tesla direction.

Q      48-11, please.

Again, he appears to be bent forward with the rifle pointed down; is that correct?

A      Yes.

Q      And finally, 48-13?

Again, you would agree he has bent a little bit more in this image.

A      It appears this way.

Q      You would agree he's not turned toward you in this image?

A      No, it doesn't look like that.

Q      You agree he is not raising or pointing a rifle in this image?

A      It doesn't look like that way.

**UNITED STATES DISTRICT COURT**

A    Yes, sir.

Q    Did you train them on the concept of cover?

A    I did, sir.

Q    Did you train them on the concept of less lethal options?

A    I did, sir.

Q    Did you train them on the concept of when you can use deadly force?

A    Yes, sir.

Q    And did you train them you can only use deadly force if there is an imminent threat of death or serious bodily injury?

A    Yes, sir.

Q    Did you train them that that means that it has to be the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?

          MR. HURRELL:  Objection, this is out of the scope.

          THE COURT:  You can answer.

          THE WITNESS:  Yes, sir.

BY MR. GALIPO:

Q    And you trained them to give a warning, when feasible?

A    If feasible, safely.

Q    Finally, you trained them they are responsible to justify every shot?

A    I did.

Q    Did you say that it appeared this rifle was on a sling?

A    It appeared to.

**UNITED STATES DISTRICT COURT**

Q    And did you say something to the effect you couldn't let him just walk down the street like that?

A    I don't recall that.

Q    Are you saying that it was your intent, once you left cover, to shoot him?

A    My intent was to line up with my partners to protect them and protect the civilian population.

Q    What I'm asking you, is when you left cover, and started running out in the open, was your mind frame, you are going to shoot him?

A    I think I just answered that.  My mind frame was to rally with my partners to protect them and to protect civilians.

Q    I'm not sure what rally with your partners means.  Does that mean you were going to shoot him or does mean something else?

A    That means, sir, I was traveling diagonally to meet up with my partners to line up with them and offer them some support.

Q    So, you weren't thinking you were going to shoot him, you are saying you were running to rally up with your partners?

A    Correct, sir.

Q    And in terms of the position of the rifle, would you agree that in between each shot, so, up to the first shot, he doesn't raise the rifle, and in between the first shot and the second shot, would you agree he doesn't raise it?

**UNITED STATES DISTRICT COURT**

time?

A    Yes.

Q    And at some point, you activated it?

A    Yes.

Q    Have you had an opportunity to look at your body-worn camera footage?

A    Yes.

Q    Were you aware, after your deposition was taken, you had the right or an opportunity to make changes to your answers if you thought you needed to?

A    Yes.

Q    Did you make any changes?

A    No.

Q    And you understood at the time of your deposition you were testifying under oath under penalty of perjury like you are now?

A    Yes.

Q    Where was Mr. Chin when you first saw him?

A    He was in the southbound lane on Diamond Bar Boulevard while walking northbound.

Q    And where were you when you first saw him?

A    About 15 feet from Mr. Chin.

Q    Were you in your vehicle or out of your vehicle?

A    In my vehicle.

Q    And then you got out, shortly thereafter?

**UNITED STATES DISTRICT COURT**

A     Yes.

Q     And you stood in the open V of your vehicle?

A     Yes.

Q     And you have some training that that's a position of cover or partial cover?

A     Correct.

Q     And is that why you stood there?

A     Yes.

Q     At some point, did you hear an update on the radio about someone being stabbed?

A     Yes.

Q     Did you know who had been stabbed?

A     No.

Q     Did you know the severity of the stabbing?

A     No.

Q     When you first saw Mr. Chin, was he stationary or moving?

A     Moving, then stationary.

Q     Okay.  And would you describe him as walking slowly or in some other way?

A     Walking at, I guess, a normal pace.

Q     What street was he on when you first saw him?

A     Diamond Bar Boulevard.

Q     And which direction was he walking, if you know?

A     He was going northbound.

Q     Could we possibly, Ms. Le, put up Exhibit 48-2?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       Was he stopped when you first saw him?

A       Yes, sir.

Q       I think you have indicated that he was about -- was it 15 or 20 feet from you at that point?

A       Yes, sir.

Q       And when you first saw him, was he pointing the rifle at anyone?

A       No, sir.

Q       Was he raising the rifle at anyone when you first saw him?

A       No, sir.  It was slung across his body.

Q       Did you ever hear him verbally to threaten anyone?

A       I did not.

Q       Did you ever hear him say anything?

A       No.

Q       Did you feel, when you first heard the nature of the crime, you were starting to panic before you got to the scene?

A       I was scared, yes.

Q       Do you recall in your statement words to the effect you started to panic before you even saw Mr. Chin, based on the nature of the call?

A       Yes, I did say that I panicked after I heard the radio traffic and update, I did panic.

Q       And then would you agree after you saw Mr. Chin and he started walking in your direction, you indicated in your

statement, you started to panic more?

A       Well, my level of fear did grow, yes.

Q       You recall using the word "panic", you started to panic more, or words to that effect?

A       I did agree, and I did say, "I panicked."  I feel it's normal nature for somebody to be scared in that situation.

Q       Right, but you, yourself, would agree that multiple times in your statement in describing your actions, you used the word "you panicked"?

A       Yes.  You also brought it up, and I concurred.

Q       Okay.  But you would agree when I took your deposition that was way after you had given your statement and mentioned the panicking?

A       Yes, that was mentioned to homicide, yes.

Q       Now, you gave a multiple commands to drop the gun or words to that effect?

A       I did.

Q       And when you did that, were you in the V of your door, the open V of your door?

A       Yes.

Q       And you noted that he was continuing to walk north on Diamond Bar Boulevard?

A       Yes.

Q       And at some point you fired your first shot?

A       Yes.

**UNITED STATES DISTRICT COURT**

Q    And you had a 9mm; is that right?

A    Yes.

Q    It's a semiautomatic firearm?

A    Yes.

Q    And you have to press the trigger for each shot?

A    Yes.

Q    And it sounds like you pressed the trigger three times?

A    Yes.

Q    At the time of your statement, you weren't sure whether you fired a fourth shot or not; is that fair?

A    That is fair.

Q    In this image, can you see a portion of Mr. Chin?

A    His upper body.

Q    And were you able to see his upper body as he progressed towards you?

A    Yes.

Q    I take it, your eyes would have been a little higher than the body-worn camera position on your body?

A    Yes.

Q    So, from where you were standing, could you see Mr. Chin's entire body?

A    Yes.

Q    And can we look, please, at 48-5.

     Can you see that on your screen?

A    Yes.

UNITED STATES DISTRICT COURT

Q    Okay.  So you glance for --

A    Yes.

Q    -- a split second?

A    Yes.

Q    But would you agree that the majority -- the vast majority of the time, you were focused on Mr. Chin?

A    Yes.

Q    Was anything, when you were looking at him, obstructing your view?

A    No.

Q    I take it being a young person, especially relative to me, your eyesight was good at the time, as far as you know?

A    Yes.

Q    And obviously, it was daylight out, correct?

A    Yes.

Q    And you mentioned earlier you saw the rifle slung over his shoulder in some fashion?

A    Yes.

Q    Did you ever see Mr. Chin point the rifle at anyone?

A    No.

Q    Did you ever see Mr. Chin raise the rifle towards anyone?

A    No, just slung across his upper body.

Q    Did you ever see Mr. Chin holding the rifle in two hands?

A    No.

Q    Did you ever see Mr. Chin manipulating the rifle?

A    No.

Q    Did you, yourself, ever see Mr. Chin actually touching or holding the rifle with either one of his hands?

A    No.

Q    And during the entirety of your observations of Mr. Chin, up to the time of the last shot, was the barrel of the rifle pointed down?

A    I'm sorry, repeat?

Q    Sure.

During your observations of Mr. Chin, up until the time you heard the last shot, was the barrel of the rifle pointed down?

A    Yes.  It was -- since it was slung over, it wasn't all the way down, but it was down.

Q    And obviously, some of these questions that I just asked you about whether he pointed it, or raised it, or manipulated it, or held it, some of these questions you were asked in your initial interview by the detectives.

Is that fair?

A    Yes.

Q    And then I asked you some of the same questions or similar questions at the time of your deposition?

A    Yes.

Q    Now, you would have had some training with respect to the use of deadly force, correct?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    And were you essentially trained that deadly force should only be used if there is an imminent threat of death or serious bodily injury?

A    Yes.

Q    And were you generally trained a verbal warning should be given, when feasible, before using deadly force?

A    If feasible.

Q    Were you generally trained the deadly force should only be used when there are no other reasonable options?

A    Yes.  In a lethal situation, we always, usually match.

Q    Were you trained that in order for there to be an imminent threat of death or serious bodily injury, there has to be the ability, opportunity, and intent to immediately cause death or serious bodily injury?

A    Yes.

Q    As Mr. Chin was walking northbound on Diamond Bar Boulevard, did he ever look directly at you?

A    Yes.

Q    You thought he looked like he had a blank stare on his face; is that fair?

A    Well, he was looking forward.

Q    Did it look to you like he had a blank stare on his face?

A    Yes.

Q    You were trained that you are responsible for every shot?

A      Yes.

Q      Were you trained to control your fear and not panic?

A      As humanly possible.

Q      You were trained on the concept of deescalation?

A      Yes.

Q      You were trained on the concept of reverence for human life?

A      Yes.

Q      You also, from your perspective, even after your last shot, you still felt panicked; is that right?

A      Yes, I was still scared.

Q      You used the term panic, though, in your statement, didn't you?

A      I used panic in my statement.

Q      In fact, in your statement, you said you were panicked when you got the call, panicked when you saw him, panicked when he started walking toward, panicked after your first shot, and even panicked after all of the shots had been fired?

A      Yes.  I used the word panic.

          MR. GALIPO:  May I have a moment to look at my notes, Your Honor.

          THE COURT:  Yes.

BY MR. GALIPO:

Q      Now, when you were aiming your first shot, you were trying to aim below slightly below the vest he was wearing, correct?

A      Yes.

Q      Because you wanted your bullet to strike him, not the vest, is that fair?

A      That's fair.

Q      So from your perspective, you would have been aiming -- would it be his left front below the vest towards the waste line?

A      Just below vest.

Q      You were aiming below the vest and below the vest would that be in the area of Mr. Chin's waistline?

A      Yes.

Q      When you saw Mr. Chin bent forward, as we have seen in some of the images, your impression was that he had been struck by at least one of the shots; is that fair?

A      That's fair.

Q      And when you heard the last shot, is it also correct, that not your shot but the final shot you heard from the shotgun, isn't it correct, that Mr. Chin was already bent forward?

A      I recall he was bent to a degree and then I heard the shot but I did not recall the exact incident after my shot.

Q      Okay.  But you do recall him being bent forward and then hearing the last shot?

A      Yes.

Q      And then, after the last shot, and Mr. Chin going to the ground, you were yelling or screaming at him not to reach for,

THE COURT:  Sure.

MR. GALIPO:  Thank you, Your Honor.  I have no further questions at this time.

THE COURT:  Any cross-examination?

MR. HURRELL:  Yes, Your Honor.

THE COURT:  Please, proceed.

CROSS-EXAMINATION

BY MR. HURRELL:

Q    Good morning.

A    Good morning.

Q    I know when Mr. Galipo was asking questions about your position with the department, you gave that, but where are you now, are you still at Walnut Station?

A    Yes, I'm still assigned to patrol.

Q    Now, going to the date of this incident in June of 2023, you received a radio call?

A    Yes, sir.

Q    I think there were more than one broadcast concerning this incident, correct?

A    There were several updates.

Q    What did you learn?

A    That there were shots fired, and a stabbing victim.

Q    Did you learn that Mr. -- you didn't know the name of the individual, but did you learn Mr. Chin was walking with an assault rifle on Diamond Bar?

UNITED STATES DISTRICT COURT

A       Yes, sir.

Q       You mentioned when counsel was asking questions, you started to panic a bit, when you heard about this, correct?

A       Yes.

Q       Why?

A       Because I was scared, I feel like it's normal.

Q       What was going through your head?

A       Based on the fact I heard shots fired, I assumed there was other casualties.

Q       Now, you had a 9mm revolver, correct?

A       No.  Not a revolver, sir.

Q       Can you describe your weapon?

A       It's a Smith and Weston, 9mm.

Q       Did you hear on the broadcast that Mr. Chin was -- had an assault rifle?

A       Yes, I did.

Q       How do you compare the two weapons, is one more potentially harmful than the other?

A       Yes.  Based on me having a 9mm and him wearing a ballistic vest, there is obviously a possibility that it would not affect the vest at all.

        Also, the assault rifle could pierce through my vehicle and through my armor.

Q       Was that going through your head when you heard about this call?

BY MR. HURRELL:

Q     Were you concerned about the civilian in the Tesla to your left?

A     Yes.

Q     You mentioned you tried to motion for him to get out of there?

A     Yes.

Q     And what prevented him from doing that?  Were there cars parked in back of him?

A     There was traffic.

Q     Let's play a little more here.

        (Audio/video played in open court.)

BY MR. HURRELL:

Q     Now, you mentioned when counsel was asking you questions that the rifle was pointed in a downward direction, correct?

A     Yes, sir.

Q     Did you have a concern that Mr. Chin could raise the rifle from that position?

A     Of course, it doesn't take very long to manipulate it with one hand.

Q     Have you used a rifle before?

A     Yes.

Q     How long would it typically take to raise the rifle from a downward position into a pointed position at an individual?

A     Just a few seconds if you are not -- you don't necessarily

**UNITED STATES DISTRICT COURT**

Q    And you are saying that the second shot you heard and the last shot, sounded like it came from a shotgun?

A    Yes.

Q    Now, you were briefly asked about the panicking, and would you agree that in your statement in deposition, you said you started to panic when you heard the call?

A    Yes, I said that in my deposition.

Q    And then in your statement in deposition, you said you started panicking more when you saw Mr. Chin?

A    That is correct.

Q    And then in your statement in deposition, you said you started panicking more when he started walking towards you?

A    Of course, yes.

Q    And you stated you were extremely nervous and started to panic even after all of the shots were fired?

        MR. HURRELL:  Objection, Your Honor.  This is cumulative.

        THE COURT:  You can answer.

        THE WITNESS:  Yes, it's still an ongoing incident.

BY MR. GALIPO:

Q    You mentioned a few times, the white Tesla.

     And I'm wondering, from your perspective, and based on your training, if hypothetically the white Tesla wasn't there, would you have fired?

        MR. HURRELL:  Objection.  Relevance, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  Objection overruled.  You can answer.

THE WITNESS:  There would have still be additional vehicles if the Tesla wasn't there.

BY MR. GALIPO:

Q    So, you are saying you would have fired even if the white Tesla was not there?

A    If he continued to engage forward, yes.

Q    You were asked questions about how long it would take to raise the rifle.

Do you remember those questions?

A    Yes.

Q    I think you said, based on your experience, it would take a relatively short period of time, maybe a second or a few seconds or words to that effect?

A    Correct.

Q    And in terms of raising the rifle, when you initially saw Mr. Chin before he started walking towards you, did you see him raise it?

A    No.

Q    During the time frame he was walking towards you, did you see him raise it?

A    No.  It was still across his body, to his right.

Q    At any time before the first shot, did you see him raise it?

A    No.

Q    And after your first shot, did you see him raise it?

A    No, he just continued going forward.

Q    After the second shot, did you see him raise it?

A    No.

Q    The third shot?

A    No, sir.

Q    The fourth?

     After your last shot did you see him raise it before the last shot?

A    No.  It was slightly up, but no.

Q    Did you see him ever turn away from you at any time during the shooting?

A    No.

Q    You talked about whether you have to use sites for that weapon.

     Would you at least admit the barrel has to be pointed towards the target to strike it?

A    It doesn't have to be pointed exactly at the target, just at the direction.

Q    In this case, you would agree you never saw the barrel pointed at any targets, true, or in the direction of any targets?

A    Yes.

Q    And in terms of less lethal options, were you trained that when there is multiple deputies on scene, some other deputies

**UNITED STATES DISTRICT COURT**

could be assigned less lethal.

It doesn't have to be you, it could be someone else who uses the less lethal, see if that works, and if not, there is lethal coverages.

A    If feasible.

Q    You were trained on the concept of contact cover officer?

A    Yes.

Q    And I think you told us that you were aware at some point that there were multiple deputies on scene?

A    At the residential, yes, but at Diamond Bar Boulevard, I was by myself.

Q    I thought you said you looked over to your right and you saw two other people from the department there?

A    Not immediately.

Q    At some point?

A    Yes.

Q    I thought I asked you, were you looking at Mr. Chin the entire time, and you said, well, I glanced away for a moment, when I noticed two other people on your right?

A    Yes.  But when I looked, to my back, that's when I saw the other vehicles, not the unmarked vehicle.

Q    I see.

A    Uh-huh.

Q    Did you hear anybody giving him any other command, other than drop the weapon?

A        No, I just heard "drop the weapon" several times.

Q        And according to you, based on your observations you never saw him holding the weapon with his hands, correct?

A        Not during my time period, no, sir.

MR. GALIPO:  Thank you, that is all I have, Your Honor.

THE COURT:  Any followup, counsel?

MR. HURRELL:  No, Your Honor.

THE COURT:  The witness is excused.

Please call your next witness.

MR. GALIPO:  Can we approach, Your Honor?

Thank you.

(Sidebar begins.)

MR. GALIPO:  We're going a little faster than we expected.  We have two witnesses lined up for this afternoon.  One is Deputy Holland, which is going to be here at noon.  Then I have my police practice expert.  I am wondering if it makes sense to break a little earlier today for lunch.

THE COURT:  We can come back at 12:45?

MR. GALIPO:  I'm available, if that is good for Your Honor and the jury.

Do you think Deputy Holland will be here by then.

MR. HURRELL:  I'm sure he will.

THE COURT:  We're going to take our lunch break a little bit early.  We will kick off now and come back at 12:45.

**UNITED STATES DISTRICT COURT**

A     Well, I opened it, yes.

Q     Were you kind of in the V of the door or just near it?

A     The V.

Q     In the V?

A     Pillar of the door.

Q     Is that part of your training to be in the open V, when you can, for some cover?

A     Yes.

Q     And did you at some point draw your firearm?

A     Yes.

Q     And what type of firearm did you have at that time?

A     Beretta 92FS.

Q     And is that a 9mm or something else?

A     9mm.

Q     At some point, did you point your firearm in the direction of Mr. Chin?

A     Yes.

Q     And you saw what appeared to be -- was it a black and white assault rifle?  Was that the colors it appeared to be?

A     Yes.

Q     And did you see it shouldered, kind of over one of his shoulders?

A     Yes.

Q     And your recollection is that the barrel was down; is that fair?

UNITED STATES DISTRICT COURT

A       Yes.

Q       How far was Mr. Chin from you when you first saw him?

A       I don't exactly recall, but I believe maybe ten or 15 feet, but I would have to refer to my statement for the exact distance.

Q       And when you observed him, was he just essentially walking forward on the street?

A       Yes.  He was walking forward on the street with his rifle shouldered over his shoulder, with body armor on too, I believe.

Q       Did you, at some point, reverse your vehicle slightly?

A       Yes.

Q       And how far did do you believe you reversed your vehicle, approximately?

A       That, I do not recall.

Q       You heard some commands given at some point?

A       Yes.

Q       Do you know who was giving them?

A       I do not.

Q       Did you know at any time before you heard shots that there was a female deputy on the driver's side of the patrol car?

A       No, I did not.

Q       Were you aware that that patrol car was at least there?

A       Yes.

Q       And you told us earlier you had a partner on that shift?

**UNITED STATES DISTRICT COURT**

Q     And is it your understanding, now, from the first shot to the last shot, was about 11 seconds?

A     I don't know the time.  I haven't sat down to time it.

Q     Did you, Deputy Holland, ever fire any shots?

A     No.

Q     To your knowledge, did your partner fire any shots?

A     No.

Q     How many shots altogether did you hear?

A     I believe I stated three to five, but that's what I believe I said.

Q     And would you at least agree with me you never saw Mr. Chin pointing the firearm at anyone?

A     Yes.

Q     After the shots, did you see Mr. Chin go to the ground?

A     I believe I saw him kind of cant to his left, which would be towards the brick wall of Diamond Bar Boulevard, but yes, he eventually went to the ground, yes.

Q     Do you recall if the rifle ended up on the ground somewhere?

A     After he went to the ground, yes.  It did go to the ground.

Q     Did you ever see him reaching for the rifle after he went to the ground?

A     No, because I stood directly over it when we went in to secure the firearm.

**UNITED STATES DISTRICT COURT**

REDIRECT EXAMINATION

BY MR. GALIPO:

Q    So, before we start, I take it that without going into all of the specifics, you had some information related to the call over the police radio before you got there?

A    Yes.

Q    And then before you got out of your car, I'm assuming you were at least looking at your front windshield?

A    Yes.

Q    You may have seen Mr. Chin before you got out, that was the reason maybe you reversed?

A    Yes.

Q    So, you made observations of Mr. Chin before you got out of your car.

     Is that a fair statement?

A    Yes.

Q    And let's play -- we're starting, it looks like the time on the top right is 11:44:57.  Just play it, I will ask you to stop it in a moment.

          (Audio/video played in open court.)

          MR. GALIPO:  Stop right there.

          Now you are -- we stopped at, for the record, at 11:45:03, Your Honor.

BY MR. GALIPO:

Q    You are out of your vehicle at this point, correct?

**UNITED STATES DISTRICT COURT**

A       Yes.

Q       And you have a firearm in your hands at this point; is that also correct?

A       Yes.

Q       And you are pointing it in the direction of Mr. Chin?

A       Yes.

Q       Now, counsel asked you whether he was a potential threat, and you said yes?

A       Yes.

Q       You would agree, based on your training, you can't shoot someone just because they are a potential threat; is that fair?

A       Yes.

Q       Then he asked you if he was a lethal threat and you said yes, correct?

A       Yes.

Q       But again, you would agree, based on your training, you can't shoot someone just because you think they are potentially a threat?

A       Yes.

Q       And your gun at this point, as you are looking at Mr. Chin is essentially pointed in his direction; is that right?

A       Yes.

Q       And you gave, it sounds like, a command to drop the gun.

A       Yes.

Q       Okay.  And he -- the gun was not dropped to the ground at

that point, correct?

A      No.

Q      Is that correct?

A      Yes.

Q      But given the fact that you gave him a command to drop the gun, he didn't, you did not shoot; is that true?

A      Yes.

Q      Okay.

            MR. GALIPO:  Let's play a little bit more, please.

                  (Audio/video played in open court.)

            MR. GALIPO:  Stop.  So now you have heard one shot so far, right?

            THE WITNESS:  Yes.

BY MR. GALIPO:

Q     You are still in the open door area of your vehicle as we can see here?

A     Yes.

Q     Is your gun still pointing in the direction of Mr. Chin?

A     At that moment, I don't recall, because I don't see my gun pointed down at the moment.

            MR. GALIPO:  Okay.  And then we stopped at 11:45:07. Can you play a little bit more, please?

                  (Audio/video played in open court.)

            MR. GALIPO:  Stop.  You heard two more shots, right?

            THE WITNESS:  Yes.

            UNITED STATES DISTRICT COURT

MR. GALIPO:  And you are still in this area as we can see on the driver's side of your car, the passenger's side of the patrol car?

THE WITNESS:  Yes.

BY MR. GALIPO:

Q    So you are at least in this area for the first three shots?

A    Yes.

MR. GALIPO:  And we stopped at 11:45:12, can we play a little bit more, please?

(Audio/video played in open court.)

MR. GALIPO:  Stop that, please.

BY MR. GALIPO:

Q    We heard 998, did you hear that?

A    Yes.

Q    Is that the police lingo for officer-involved shooting or shots fired?

A    Yes.

Q    Then it appears you reposition yourself from where you were, and you went behind your car towards the passenger's side?

A    Yes.

Q    And here, we stopped at 11:45:20, who is this -- I'm assuming this is your partner on the passenger side?

A    Yes.

UNITED STATES DISTRICT COURT

use of deadly force?

A    Yes.

Q    And in that POST learning domain, does it define when, based on the training, there is an imminent threat of death or serious bodily injury?

A    Yes.

Q    What is the training in that regard?

A    That the person demonstrates the ability, the opportunity, and the apparent intent to cause death or serious bodily injury.

Q    Does it have to be to immediately cause death or serious bodily injury?

A    Yes.

Q    Now, does chapter 20, the POST learning domain on use of force, have a table in it that categorizes suspect's behavior, versus what type of force you can use?

A    Yes.

Q    And what are the categories of the suspect's behavior. Can you explain that to the jury?

In other words, is there one that is resistive?

A    There is resistive, there is active resistance, and there is deadly threat.

Q    Okay.  So, if someone is resistant, let's say they are not obeying commands, is that enough, according to the training, enough to shoot them?

UNITED STATES DISTRICT COURT

A      Yes.  Again, no, you can't use deadly force based on a possible future harm or future risk.

Q      Does part of the POST training talk about fear of future harm and whether that is sufficient to use deadly force?

A      Yes.

Q      Can you explain that to the jury, please?

A      Yeah.  Again, you can't use force based because you think something might happen in the future, because, you know, if that were true, officers would be using deadly force all of the time, because somebody might use something in the future.

Q      Subjective fear.  If the officer said, I was in fear of my life or I thought he was going to raise the gun and start shooting people.

       Is that enough to use deadly force?

A      No.  Again, you have to look at reasonably objective factors to cause a reasonable police officer to believe that the person is about to use deadly force.

Q      Is there a difference in the training between a potentially lethal threat and actually an imminent threat of death or serious bodily injury?

A      Well, if it's an imminent threat, then you can use deadly force.

       If something is potential, then that's when we rely on tactics.  We seek cover --

       THE COURT:  I think the question was, what is the

possible, you give a warning you are going to use force, particularly deadly force, with the goal of getting someone to comply.

Q    Under the time sequence of this case, prior to the first shot, do you have an opinion as to whether it was feasible to give a verbal warning?

A    Yes, it was.

Q    And how about during the 11 seconds or so that the shooting sequence was taking place.

Do you think there was additional time to do so?

A    Yes.

Q    Would there have been other commands that might have been appropriate under the facts other than drop the gun?

MR. HURRELL:  Objection, that calls for speculation.

THE COURT:  Could you maybe flesh that out a bit more in the question?

BY MR. GALIPO:

Q    Sure.  Your understanding from reviewing the facts, essentially, the only command given was to drop the weapon or drop the gun?

A    Yes.

Q    Given that it was slung over his shoulder, what is your thoughts regarding that command?

A    Well, when you have a gun slung over your shoulder, you are telling them to drop the gun, you are essentially telling

them to grab the gun, to pull it off and put your hands on the gun.

Q      How could that create a potential problem?

A      Now they're grabbing ahold of the gun, and there would maybe be some movement that would cause some officer to think they are raising it, and may cause a shooting.

Q      Would there -- other than the command to drop the gun, in your opinion, were there other commands that may have been appropriate?

            MR. HURRELL:  Objection.  That calls for speculation.

            THE COURT:  You can answer that.  Go ahead.

            THE WITNESS:  Yes.  Things like get on the ground or I will shoot, stop or I will shoot.

BY MR. GALIPO:

Q      Is it your understanding there were multiple deputies on scene at the time of the shooting?

A      Yes.

Q      And that just the two deputies fired?

A      Yes.

Q      Assuming hypothetically, that Mr. Chin never grabbed the rifle and raised it in the direction of the officers or the person in the Tesla, given all of the same facts we have in this case, do you have an opinion as to whether the use of deadly force by Deputy Barajas was appropriate?

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )


            I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date: 2nd day of April, 2026.


                        /s/ TERRI A. HOURIGAN

                        _____
                        TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                               Federal Court Reporter


**UNITED STATES DISTRICT COURT**