# Exhibit 4



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE MARK SCARSI, U.S. DISTRICT JUDGE

JENNIE QUAN,

                Plaintiffs,

      vs.                     Case No. 24-cv-4805

COUNTY OF LOS ANGELES, et al,

                Defendants.
_____/

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY 3
Thursday, February 12, 2026
8:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

A    Sure.

Q    And assuming that that is occurring, can you apply your expertise in terms of the human factors aspect of this case, to what would be going on in terms of a deputy response to that?

A    Sure.

MR. GALIPO:  I apologize.  I'm going to object as it's vague and ambiguous as phrased, and assumes facts not in evidence, in this case, and it's an incomplete hypothetical.

THE COURT:  I think -- in order to get away from testifying as to what these deputies were thinking, I wonder if you can couch the question as to, in his experience in human factors, what is the likely reaction to that?

Does that make sense?

MR. HURRELL:  Yes.

BY MR. HURRELL:

Q    So, assuming that the Deputy Barajas and Detective Vasquez saw Mr. Chin raising his gun up, what would be the likely reaction of those individuals to the situation from a human factors perspective?

MR. GALIPO:  Again, Your Honor, I'm going to object, because it assumes facts not in evidence, based on his own testimony, and we're using the deputies' names.

THE COURT:  I will overrule the objection.  You can answer that.

THE WITNESS:  Okay.  So, from a human factors

UNITED STATES DISTRICT COURT

perspective, if the decedent was raising his rifle and beginning to point at someone from where it was in a down position, so the officers need to perceive that is happening, and that's maybe not as clear as a brake light going on in a car.

So, a brake light goes in a car, it's a very salient stimulus you can spot that straight away.

So the officers have to be able to determine at what point is it really coming up.

They may not be focusing on that at that time.  They may be focusing on some other aspect of the situation or of the person.

So, it may take them time to cue on to that, that that is happening.

And then they have to coordinate their response, they have to make a decision, is this a threat, does this represent a threat, do I need to respond to it?

So, that takes time.

While that is happening, I'm going to assume that the rifle is still coming up, still moving up and posing maybe more of a threat, or being aimed at someone.

Then the officers would have to aim their own weapons, so acquire their sites, so they can do their best to hit what they are aiming at.

Then they have to pull the trigger.

So, while they are doing all of those things, I assume, in the situation that you have posed, that the muzzle is coming up all of the time, and so from research that has been done related to that kind of situation where an officer has a weapon in their hand, and there is a suspect who has a weapon and the suspect is told to make a move, and the officer is told to respond to that, as I recall, from that study, approximately --

MR. GALIPO:  I apologize, I think the study would call for hearsay.

THE COURT:  Your response?

MR. HURRELL:  He relied on the studies to formulate his opinions, Your Honor.

THE COURT:  So, he can discuss the study, but the study is not in evidence, so, what the study said can't take to be true, but you can use his description of the study to allow you to have an understanding as for how he forms his opinions in the case.

Go ahead.

THE WITNESS:  In that study, approximately 60 percent of the time, officers were not the first to shoot. So approximately 60 percent of time, the suspect was able to fire before the officers fired.

That is in the best case scenario of the officer waiting and expecting the person to do something.

BY MR. HURRELL:

experience as it applies to law enforcement, the perception/reaction time concept, how does that apply to an officer that is shooting a gun?

A     Okay.

Q     In other words, the first step they have to actually perceive there is a need to shoot the gun?

A     Yes.  So, they need to be monitoring whatever the threat -- the environment for threats, and at some stage, if they decide to shoot, then it has to be something that leads them to kind of cross a decision barrier to decide that they need to shoot.

Once that decision is made, then they need to carry out the actions necessary to actually shoot, so that would involve bringing their weapon up and orienting it toward the target if it's not already there.

And aiming, so acquiring the sites, and making sure that they have got a correct site picture and site alignment, and then pulling the trigger.

Those things take time.  Maybe very short time, it may be fractions of a second, but those things still take time, and while that is happening, it's possible that the threat may change to some extent during that time.

Q     Is that because the threat or if the threat is an individual, could potentially be moving?

A     Yes, that is correct.  Yes, they could be moving.

you had moved.

You were residing in Canada when I took your deposition.

A    Yes, that's right.

Q    Okay.  So, just as a followup to a few of the questions asked by counsel.  You did write a report in this case?

A    I did.

Q    And you have watched the videos?

A    Yes, I have.

Q    And you -- in your report, you would agree, you indicated that from your analysis of the case, including the videos, that Mr. Chin never pointed, or raised, or attempted to raise the rifle; is that fair?

A    Yes.

Q    And you also analyzed the shooting sequence in a chart, I think, in your report?

A    Yes.

Q    And your understanding, I think, there was a total of five shots?

A    Yes.

Q    Three shots fired by Deputy Barajas?

A    Yes.

Q    And then two shots fired by Deputy Vazquez?

A    Yes.  But I would just like to clarify that this wasn't -- they weren't in that order.

So it wasn't three shots, and then two shots by Vazquez.

**UNITED STATES DISTRICT COURT**

Q    Thank you.  The jury has heard a lot about this, but just in all fairness to catch you up, the first shot would have been by Deputy Barajas?

A    Yes.

Q    In fact, do you have a copy of your report handy?

A    I don't have it here in front of me.

Q    No problem.

     There was some passage of time, five or six seconds or so before the second shot?

A    Yes.

Q    The second shot would have been by Deputy Vazquez?

A    Yes.

Q    Then there was some passing of time before the third and fourth shots, those two were by Deputy Barajas?

A    Yes.

Q    The final shot, the fifth shot was by Deputy Vazquez.

     Do I have that correct?

A    Yes, that is my understanding.

Q    Okay.  So in terms of this -- your understanding that Mr. Chin was struck by two shots?

     Do you know that, or you are not sure?

A    That, I'm not sure about.

Q    Okay.  And counsel asked you a question about Mr. Chin, a hypothetical, I guess, Mr. Chin being bent forward at the time of the last shot, or do you recall that?

**UNITED STATES DISTRICT COURT**

A    Yes.

Q    The last shot, you understand was Deputy Vazquez?

A    Yes.

Q    And did you have an understanding from reviewing the materials whether Mr. Chin had been struck by any of the first four shots before he bent over for that last shot?

A    It's my understanding that he had been struck by at least one of them.

Q    And as a human factors expert, do you think him bending over, as we see in the video, is related to him being struck by a shot, or can you say?

A    I assume from the way that he bent forward that it was in response to a shot.

Q    Okay.  And you talked about this perception/reaction time and different things take time.

Obviously, if the officer's gun was in the holster, for example, it might take time to get it out of the holster?

A    Yes.

Q    It might take time to bring it up towards the target?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    But if the gun is already pointed out of the holster and pointed at the target, that would save part of that reaction time?

**UNITED STATES DISTRICT COURT**

A       Yes.  It would reduce it, but it wouldn't cancel it out.

Q       Right.  I'm not saying it canceled it, but at least those time components would not be there because the gun was already pointed, that would take -- the time element of bringing it up on target at least would be eliminated?

A       Yes, but in my mind, there is just because a deputy has the gun oriented towards the target, doesn't mean that there is not time needed to bring it -- to aim it at wherever they are trying to hit.

So just because it's out already, there is still aspects -- there is still movement in time that needs to be taken before a shot can be made.

Q    Do you have a round estimate as to how many hours you have worked on this case?

A       Yes.  Approximately, 35 to 40.

Q    What do you charge per hour for your work on this?

A       $400 an hour.

MR. GALIPO:  Thank you very much.  That's all I have, Your Honor.

THE COURT:  I have a question.  And I guess, so one of the things I'm wondering about, I don't know whether you have the expertise to form -- to have an opinion on this or not.

So first, I want to know whether or not you feel like you got expertise to answer the question, and then I will ask

it, if you do, to answer the question.

But so if the decedent has a rifle slung over his arm, how long would it take the decedent to go from that position having the rifle on his arm to a position where it was pointed in a way that could damage someone.

Is that within the time analysis, you have done in the past?

A      I think it's within my expertise.

THE COURT:  Tell me about your expertise, so I can --

THE WITNESS:  So, with respect to the question you asked, I can't draw on any research that I have done or that I'm aware of -- and I have looked further research that would answer that kind of question -- so, I'm relying on my experience, myself, when I was in the military and I carried a rifle like that and carried it slung, and observed many people firing from different positions.

I'm quite confident in saying a person could --

MR. GALIPO:  Before he gets to that, I feel very awkward objecting to Your Honor's question.

THE COURT:  I set it up to invite the objection.

MR. GALIPO:  I think it lacks foundation, if there is no studies he looked at on the issue.

THE COURT:  Does defense counsel have a different view?

MR. HURRELL: Yes, Your Honor. The jury can weigh his qualifications in terms of this testimony, but he says he has experience.

THE COURT: I'm going to allow it as a lay opinion, so, you can go ahead and give us your opinion on that.

THE WITNESS: So, I'm confident that a person could, from that position, raise the rifle and shoot in less than a second, quite easily in less than a second.

And I think it's also important to realize that while a person could use two hands to do that, if it's slung, they don't need two hands to do that, they could hold it in the way that Mr. Chin was holding it, or had it slung on his body.

You could use your right hand by itself and the sling to raise it and move the safety to the fire position if that was needed to pull the trigger in less than a second.

THE COURT: Okay. Thank you. Anybody want to do any follow up to that?

MR. GALIPO: Yes.

CROSS-EXAMINATION

BY MR. GALIPO:

Q    I think you would agree, and you indicated in your report that traditionally a rifle is fired with two hands?

A    Yes.

Q    And in terms of him, Mr. Chin, or anyone else being able to lift up a rifle and shoot it?

UNITED STATES DISTRICT COURT

96

A     Uh-huh.

Q     Am I understanding your testimony correctly, from viewing all of the materials in this case, including the videos, that your impression is that Mr. Chin never raised or attempted to raise the rifle at any time before he was shot?

Do I have that correct?

A     Yes.

Q     During the shooting sequence that lasted about 11 seconds, correct?

A     Yes.

Q     In between the first shot and the second shot, you also would agree he never raised or attempted to raise the rifle.

Would you agree with that?

A     Yes.

Q     And between the second shot and the third shot, would you also agree he never raised or attempted to raise the rifle?

A     Yes.

Q     And between the third shot and the fourth shot, you would agree, he never raised or attempted to raise the rifle?

A     Yes.

Q     And between the fourth and fifth shot, you would agree he never raised or attempted to raise the rifle?

A     Yes.

MR. GALIPO:  Thank you.  That is all I have.

THE COURT:  Anything else, counsel?

**UNITED STATES DISTRICT COURT**

Q    You are familiar with less lethal weapons, correct?

A    I am.

Q    There was some testimony in court that a consideration should have been given to utilizing a 40mm projectile weapon.

Do you feel that was a viable option in this scenario?

A    No.

Q    Why not?

A    It's a much lesser weapon, the subject has a shoulder rifle or a shoulderable rifle against something that is going to fire only one at a time, foam rubber projectile at them.

We don't train officers to go to lesser levels of force, we train them to meet or exceed the force that the subject may have.

MR. HURRELL:  Thank you very much.  That is all I have.

THE COURT:  We're going to take our break for lunch. I'm going to ask the jury to come back at 1:15, and we will pick up with cross-examination at that point.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom at 11:58 p.m.) s.

THE COURT:  Please have a seat.  If you can stand down until 1:15.  I want to give counsel an opportunity to make motions at the end of plaintiff's case.

MR. HURRELL:  Your Honor, I will be brief, because I know we filed the motion for summary judgment previously in

UNITED STATES DISTRICT COURT

this case, and it was denied.

Based on what has come out in terms of the testimony in trial in this case, I think it's pretty clear that any reasonable police officer would not feel they were violating the decedent's constitutional rights by utilizing deadly force, given the scenario that has been laid out in this case.

Mr. Flosi describes it as an active shooter situation. This gentleman had been shooting in the neighborhood, he had a bulletproof vest on, he had stabbed his mother.

He was advancing on a civilian vehicle and civilian inside.

I think any reasonable officer would have taken the exact same action that my clients took in this case.

THE COURT:  Thank you.  Counsel, do you have an opposition to the motion?

MR. GALIPO:  Well, yes, Your Honor.  First of all, the law is -- first of all, from plaintiff's perspective, the Court ruled correctly on the motion for summary judgment.

The law is very clear in the Ninth Circuit that having a gun, even in your hand, is insufficient to use deadly force.

And at a minimum, there has to be a furtive movement. In this case, it would have to be a raising of the rifle.

Some movement, the experts, even the defense experts, have agreed and the evidence has come in, there was no movement of the rifle at all.

**UNITED STATES DISTRICT COURT**

A      That is the first sentence.

Q      Did I read it correctly?

A      You read the first sentence correctly.

Q      I am going to get to the second sentence in a moment.

I don't have my glasses, so I was straining a little bit.

So based on that standard, you have to have all three, correct?

The present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury.

A      Yes.  Those three factors need to be articulated and present.

Q      And I will try to read the next sentence now that you have it.  An imminent harm is not merely a fear of future harm, no matter how great the fear, and no matter how great the likelihood of the harm.  But is one that from appearances must be instantly confronted and addressed.

Did I read that one okay?

A      You did.

Q      So, part of the training and part of the standard in these types of cases, is that fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm is not enough.

Is that a fair statement?

A      Yes.  But future harm is taught and defined as like in the

**UNITED STATES DISTRICT COURT**

future, not immediately, if you continue that sentence, must be instantly confronted and addressed.

Q    Correct, okay.

Let me ask you a few other questions about deadly force.

You would agree that officers, I think you already said this, are trained to give a verbal warning when feasible before using deadly force?

A    If the actions and behaviors of the subject allow that, then they are taught to give some kind of warning, again, not a scripted warning, but some kind of warning.

Q    And, obviously, officers are trained to assess, if they can, before using deadly force?

A    Yes.  They are trained to assess and then reassess throughout the conclusion of the event.

Q    Right, including during the sequence of the shots?

A    Yes.  Officers are trained on how to assess the threat while firing.

Q    And, in fact, officers are trained that they are responsible to justify every shot, correct?

A    Yes.  They are trained that they are going to have to articulate facts and circumstances that would support every shot, although, it could be the same set of facts and circumstances that was for shot one, two, and three, for example.

Q    And there is a table in POST Learning Domain 20, that

**UNITED STATES DISTRICT COURT**

Do you recall that?

A     I recall she used the word "panic" several times in the brief time that she saw the subject in the roadway.

Q     She even said, I think, she panicked after the last shot, after he went to the ground.

Do you recall that?

A     Not particularly, no.

Q     And based on your review of Deputy Barajas's statement and deposition, your understanding is that she was in the open V of her car?

A     She was standing in what we refer to in training as the V of the door, meaning, you had the body of the vehicle and the door that is opened.

When the door is open and left open, it creates a V and if you are standing in that, you are referring to as standing in the V.

Q     Right.  Officers have training that that provides perhaps partial cover?

A     Partial cover, yes.  But it would still expose their upper body, their neck, their head, and their ballistic vest in most cases, probably 99 percent of the cases, would not stop a round from a 223 rifle.

Q     But your understanding from reviewing Deputy Barajas's statement and deposition, she observed this rifle on Mr. Chin pointed down the whole time.

Would you at least agree with that?

A    The muzzle was pointed in a downward direction, yes.

Q    When she was asked whether he ever grabbed it with two hands or manipulated, or raised it, you would agree she said no?

A    I would agree.

Q    You would also agree you reviewed the video, correct?

A    Absolutely, sir.

Q    And your understanding is that Deputy Barajas fired three shots?

A    That's my understanding, yes.

Q    It would be the first shot, and I guess the third and fourth, in sequence?

A    Yes.  That would be correct.

Q    And then Deputy Vazquez fired shots two and five?

A    Yes.

Q    And you reviewed information that Deputy Barajas -- you have the impression from reviewing the case, that at least one of her shots struck Mr. Chin?

A    I believe she struck him one time at minimum.

Q    And with respect to Deputy Vazquez's shots you understand he shot twice, correct?

A    He did fire the shotgun twice.

Q    Your impression from reviewing the materials is that both of his shots struck Mr. Chin.  The first one just hitting the

vest, and the vest blowing up?

A    That is what I remember Deputy Vazquez recalling.

Q    And the second one you understand, Deputy Vazquez quoting his statement in deposition, he had the impression that a second shot struck him as well?

A    That's my recollection, yes.

Q    And from reviewing the materials, is it your understanding that Mr. Vazquez was -- Mr. Vazquez -- I'm sorry, Deputy Vazquez, that Mr. Chin was bent forward to some extent at the time of the fifth shot?

A    Yes.  He started to bend forward just before the fifth shot, and by the time the trigger was pulled, he was slightly bent forward.

Q    Right.  Your understanding from reviewing all of the materials that he had been struck at least once before that?

A    That is my understanding of what the deputies had testified to and what they had stated.

Q    So, your report, do you still have that handy?

A    Yes, sir, I do.

Q    On Page 10 of your report, if you could turn to that, please?

A    Yes, sir.

Q    Is it your understanding from reviewing the materials that the barrel of the rifle that Mr. Chin had was pointed down during all of the shots?

A     It appears that it was in a downward -- mostly downward position as he was approaching the vehicle stopped on the roadway.

Q     And in your report, you also provide a summary of a statements of some of the other deputies, correct?

A     Correct.

Q     And was it your understanding that there was a vehicle to the passenger's side of Deputy Barajas's patrol vehicle in between her vehicle and the curb?

A     In between the center median, you mean?

        THE COURT:  Counsel, it seems we're asking this witness a lot of the facts of the case, and I'm wondering whether you have questions about his opinions.

        MR. GALIPO:  I will get more specific.  Thank you, Your Honor.

BY MR. GALIPO:

Q     You were asked whether or not a reasonable officer in the same position as Deputy Barajas, would shoot.

        Do you recall that question?

A     I do.

Q     Were you aware that there were two deputies at the adjacent vehicle and neither one of them fired?

A     I was unaware there were deputies from a firing position. I know the vehicle to the immediate left in the No. 1 lane to Deputy Barajas, was a civilian vehicle.

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


           I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date: 2nd day of April, 2026.



                         /s/ TERRI A. HOURIGAN
    _____
                    TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                         Federal Court Reporter


**UNITED STATES DISTRICT COURT**